UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>KAISER GROUP INTERNATIONAL, INC., *et al.*,<br><br>Debtors, | Chapter 11<br><br> Case No. 00-2263 (MFW)<br><br>(Jointly Administered) |
| KAISER GROUP<br>INTERNATIONAL, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>NOVA HUT a.s. and INTERNATIONAL<br>FINANCE CORPORATION,<br><br>Defendants. | Adv. P. No. 01-928 (MFW)<br><br>Re: Docket No. 283 |

**OPPOSITION OF DEFENDANT MITTAL STEEL OSTRAVA, A.S. (FORMERLY NOVA HUT, A.S.), TO DEBTORS' MOTION IN SUPPORT OF APPEAL OR GRANTING LEAVE TO APPEAL OF DEBTORS' MOTION FOR AN ORDER PURSUANT TO FED. R. BANKR. P. 2004, OR ALTERNATIVELY, A BILL OF EQUITABLE DISCOVERY, DIRECTING EXAMINATION OF, AND PRODUCTION OF DOCUMENTS BY THE INTERNATIONAL FINANCE CORPORATION, NOVA HUT AND RELATED PARTIES**

Defendant Mittal Steel Ostrava, a.s. (formerly Nova Hut, a.s.) (**"Nova Hut"**) hereby opposes the plaintiffs' motion for leave to appeal (**"Motion for Leave"**) this Court's decision on Plaintiffs' Motion for an order pursuant to FED. R. BANKR. P. 2004, or alternatively, a bill of equitable discovery directing examination of, and production of documents by the International Finance Corporation (**"IFC"**), Nova Hut and related parties (**"Plaintiffs' Discovery Motion"**). Plaintiffs' attempt to seek

an appeal in this case is a waste of the Debtors' resources and this Court's time and is completely unsupported by the law. The case law is clear that this Court's order denying Plaintiffs' Discovery Motion is interlocutory and accordingly, there is no right of appeal at this time. There is no evidence in the record, nor can a rational person even conclude, that an appeal on discovery issues would be unavailable after judgment in this adversary proceeding. Accordingly, there is no basis for appeal here and Plaintiffs' motion should flatly be denied.

<u>BACKGROUND & PROCEDURE</u>

1.    Plaintiffs spend nearly half of their Motion for Leave reciting purported "facts" without citation related to this case. Nova Hut notes that Plaintiffs' recitation of the facts is ripe with mischaracterizations and omissions, some of which are discussed *infra*. However, Nova Hut does not believe it is necessary to re-hash and review facts that have already been determined by an arbitral tribunal and, accordingly, refer this Court to the 333 page Final Award issued by the tribunal. A copy of the Final Award is attached hereto as <u>Exhibit A</u>. Instead, the following is a summary of the relevant procedural issues and posture of the case which demonstrate why appeal of the order denying the Plaintiff's Discovery Motion is not supported by law and should be denied.

2.    Plaintiffs    in    this    case    are    Kaiser    Group

3

International, Inc. ("**Kaiser International**"), and Kaiser Engineers, Inc. ("**Kaiser Engineers**") (collectively "**Debtors**" or "**Plaintiffs**").    This adversary proceeding arises out of an agreement (the **"Agreement"**) under which Kaiser Netherlands agreed to design and construct "Phase 1" of a steel mill at Nova Hut's facility in Ostrava, Czech Republic.    Under the Agreement, Kaiser Netherlands, a non-debtor subsidiary of Kaiser International, was obligated to prove the steel mill performed to contract-mandated quality and quantity standards within a certain time period.    To secure its contractual obligations, Kaiser Netherlands posted a "Performance Letter of Credit" requiring annual renewal. As Kaiser Netherlands' parent, Kaiser International guaranteed performance under the Agreement. Kaiser Netherlands failed to provide a steel mill that met contractual standards, and failed to renew the Performance Letter of Credit.    Those two issues, that lie at the heart of Plaintiffs' claims, have now been resolved in arbitration. Because Kaiser Netherlands failed to deliver the steel mill within the terms of the Agreement or to renew the Performance Letter of Credit, Nova Hut drew under the letter of credit. Nova Hut's draw prompted the present adversary proceeding to recover the proceeds of the Performance Letter of Credit.    After a number of complaint amendments, Kaiser International and Kaiser Engineers also asserted additional claims against Nova

Hut relating to (1) Kaiser Engineers' alleged provision of engineering and financial services under a purported Letter of Intent, and (2) an alleged contingency fee under an alleged Memorandum of Understanding.

### The Debtors' Complaints Against Nova Hut

3.    On June 9, 2000, the Debtors filed their petition for relief under Chapter 11 of the Bankruptcy Code.

4.    To preserve its rights under the Plaintiffs' performance guaranty, on August 14, 2000, Nova Hut filed a proof of claim (the **"Proof of Claim"**) in the Debtors' chapter 11 case.

5.    On September 27, 2000 and March 19, 2001, the Debtors objected to Nova Hut's Proof of Claim, but adjourned hearings on its objections.

6.    Because Kaiser Netherlands failed to deliver a steel mill that conformed to its Agreement with Nova Hut, or to renew the Performance Letter of Credit, on February 16, 2001, Nova Hut drew the Performance Letter of Credit and retained the $11.1 million proceeds.

7.    On April 9, 2001, Kaiser International commenced this adversary proceeding asserting "Breach of Contract" limited to Nova Hut's draw under the Performance Letter of Credit.

8.    On May 16, 2001, Nova Hut moved to dismiss the initial adversary complaint, or to stay proceedings pending resolution of an arbitration between Nova Hut and Kaiser Netherlands.

9.    Before the motion to dismiss could be decided, Kaiser International filed an Amended Adversary Complaint on May 29, 2001 (the **"Amended Adversary Complaint"**).    Kaiser International recharacterized its claim against Nova Hut to include "Breach of Warranty" and asserted claims against the International Finance Corporation (**"IFC"**), one of Nova Hut's lenders at the time, for tortious interference with contract and with prospective business relations.

10.    On July 6, 2001, Nova Hut moved to dismiss the Amended Adversary Complaint.

11.    Before the motion to dismiss the Amended Adversary Complaint could be decided, on December 17, 2001, Kaiser International filed a Second Amended Adversary Complaint (the **"Second Amended Adversary Complaint"**) in which it repeated its contract, warranty, and tortious interference claims, and added claims for *quantum meruit* and unjust enrichment.

12.    On January 9, 2002, the Bankruptcy Court authorized Nova Hut to withdraw its Proof of Claim.    In re Kaiser Group Int'l, Inc., 272 B.R. 852 (Bankr. D. Del. 2002).

13.    On May 15, 2002, Kaiser International filed a motion for temporary restraining order and preliminary injunction (the **"TRO Motion"**) seeking a world-wide, prejudgment freeze of Nova Hut's accounts and to enjoin Nova Hut, including its controlling shareholder at the time, the Czech Government, from entering

into any agreement to privatize the steel mill. Nova Hut cross-moved to dismiss the Second Amended Complaint and to compel arbitration (the **"Cross-Motion"**).

14. On May 31, 2002, the Bankruptcy Court denied the Kaiser Netherlands' TRO Motion under the Supreme Court's controlling decision in Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308 (1999), which Kaiser Netherlands did not reference in its TRO Motion. Thereafter, on October 7, 2002, the Bankruptcy Court conducted a hearing on Nova Hut's Cross-Motion to dismiss and to compel arbitration. At Kaiser International's request, the Bankruptcy Court permitted submission of a Third Amended Complaint.

15. On October 21, 2002, Kaiser International filed a Third Amended Complaint (the **"Third Amended Complaint"**) adding Kaiser Engineers as a party plaintiff. The Third Amended Complaint asserts three claims against Nova Hut: (1) for a return of the $11,100,000 draw of the Performance Letter of Credit under theories of breach of warranty, breach of contract, unjust enrichment, and *quantum meruit* (First, Second, Fifth, and Eighth Claims); (2) a $510,000 claim by Kaiser Engineers relating to alleged engineering and financial services under a purported "Letter of Intent" (Third, Sixth, and Ninth Claims), and (3) a $5.25 million claim for an alleged contingency fee under a purported "Memorandum of Understanding" (Fourth,

Seventh, and Tenth Claims).[1]

***Kaiser International And Kaiser Engineers Are Ordered To Arbitrate***

16.   On October 28, 2002, Nova Hut moved to stay this Adversary Proceeding and to compel arbitration, or alternatively, to dismiss the Third Amended Complaint.   However, on January 6, 2003, the Bankruptcy Court denied Nova Hut's motion to compel arbitration, as well as its alternative motion to dismiss.

17.   Nova Hut thereafter filed a timely appeal to the United States District Court for the District of Delaware (the **"District Court"**), as permitted under the provisions of the Federal Arbitration Act.

18.   On March 18, 2004, the Honorable Joseph J. Farnan, Jr., of the District Court reversed the Bankruptcy Court's denial of Nova Hut's motion to compel arbitration, ordered proceedings in this action stayed, and compelled Kaiser International and Kaiser Engineers to arbitrate their claims against Nova Hut.   In re Kaiser Group Int'l (Kaiser Group Int'l v. Nova Hut a.s.), 307 B.R. 449 (D. Del. 2004).   The District Court expressly found that Plaintiffs admitted that the payments they seek in this action are the "[p]ayments due Kaiser

---

[1] The Plaintiffs also asserted claims defendant IFC for Tortious Interference with Business Relations and Prospective Economic Advantage.

International through its subsidiary Kaiser Netherlands from Nova Hut . . . ." and that "[t]he profits from the Agreement" — amounts sought in the Arbitration — "will be paid to Kaiser International." <u>Kaiser</u>, 307 B.R. at 457. As a result, the Court found that the Plaintiffs "embraced" the Agreement between Kaiser Netherlands and Nova Hut, and ordered Plaintiffs to arbitrate under the arbitration provisions of the Agreement. <u>Id.</u> at 457.[2]

### *Kaiser Netherlands Commences Arbitration Seeking The Identical Relief Sought In The Third Amended Complaint*

19. Before Judge Farnan could rule, on January 2, 2004, Kaiser Netherlands submitted a "Request for Arbitration & Statement of Claim" against Nova Hut (the "**Arbitration**") as required under the arbitration provisions in the Phase 1 Agreement. In the Arbitration, Kaiser Netherlands asserted the very claims Kaiser International and Kaiser Engineers asserted in the Third Amended Complaint.

20. During the course of the Arbitration, Kaiser Netherlands was afforded the opportunity to conduct discovery and did in fact obtain discovery from Nova Hut.[3] On February 3, 2005, Kaiser Netherlands filed a rather extensive request for production of documents with the Arbitral Tribunal. On March

---

[2] This is contrary to Plaintiffs' claim that they never agreed to arbitrate.
[3] Plaintiffs' allegations that somehow Nova Hut has managed to avoid discovery is simply untrue. As demonstrated *infra*, Nova Hut was not "hiding anything" but rather complied with all discovery requests in the Arbitration.

14, 2005, the Arbitral Tribunal handed down a Procedural Order #2 and ordered that Nova Hut communicate to Kaiser Netherlands all the documents Kaiser Netherlands referred to in 6 out of its 7 categories of requests. Nova Hut complied with the order and produced several binders of documents. In addition, on March 22-23, 2005, representatives of Kaiser Netherlands were allowed to inspect Nova Hut's plant in Ostrava, Czech Republic. Kaiser Netherlands never voiced any objection to the discovery it received and never submitted a complaint pursuant to Article 16 of the Terms of Reference objecting to such discovery. See Objection of Nova Hut to Discovery Motion, Adv. Proc. Docket No. 303.

21. On April 26, 2006, the Arbitration panel entered the Final Award, consisting of a 333 page decision in favor of Nova Hut which was a final order. See Final Award, attached hereto as Exhibit A.

22. According to Kaiser International's public filings, the Final Award is final and unappealable. A copy of the 8-K of Kaiser Group Holdings, Inc. is attached hereto as Exhibit B.

***Nova Hut's Motion for Summary Judgment & Plaintiffs' Discovery Motion***

23. Because the Final Award resolved the Plaintiffs' claims and renders further prosecution of the adversary proceeding unnecessary under the doctrines of *res judicata* and

collateral estoppel, on December 13, 2006, Nova Hut moved to lift the stay in this case and filed its motion for summary judgment based on the Final Award that was issued by the ICC arbitral tribunal in its favor on the same claims as in the Third Amended Adversary Complaint.

24. In response, on or about January 25, 2007, Plaintiffs cross-moved for summary judgment and also filed Plaintiffs' Discovery Motion. In Plaintiffs' Discovery Motion, despite the fact that this adversary proceeding was stayed, Plaintiffs sought discovery pursuant to FED. R. BANKR. P. 2004, FED. R. CIV. P. 56(f), and under the antiquated doctrine of equitable bill of discovery. In Plaintiffs' Discovery Motion, they argued that they were entitled to discovery pursuant to FED. R. BANKR. P. 2004 to aid in the prosecution of some future arbitration against Nova Hut before an ICC arbitral tribunal and in defense of the Final Award because they claimed that no discovery was available in the Austrian arbitration proceedings. Plaintiffs also claimed that they were entitled to discovery pursuant to FED. R. CIV. P. 56(f) before the summary judgment motions could be considered because they claim they need discovery as to whether they had a full and fair opportunity to litigate the dispute before the ICC arbitral tribunal. Plaintiffs set forth the following "facts" to support this need for discovery: (a) Plaintiffs asserted that a website article (the **"Website**

11

Article") dated April 26, 2006 summarizing the Final Award was posted on the website of Cleary Gottlieb Steen & Hamilton LLP, counsel to Nova Hut in the Arbitration, three weeks before Kaiser Netherlands received notice of the arbitration award[4]; (b) Plaintiffs also alleged that there was an "inexplicable" delay before the Tribunal rendered its decision, which "suggests that the IFC may have intervened in this interim period to influence the decision;"[5] (c) Plaintiffs also alleged that the fact that the Arbitral Tribunal dismissed Nova Hut's alleged prior admissions that Kaiser Netherlands passed certain performance tests required under the Agreement infers collusion of some sort; and (d) Plaintiffs also alleged that IFC "had a significant motive to secure a favorable award [in the Arbitration because] a substantial number of shares of Nova Hut stock are pledged to the IFC as collateral for its lending

---

[4]   To counter this allegation, Nova Hut submitted affidavits from Cleary Gottlieb witnesses demonstrating the Cleary Gottlieb did not learn of the Final Award until May 16, 2007 when it was released, the Website Article was posted to the Cleary Gottlieb web site on June 30, 2006, and the Website Article was merely dated with the date that appeared on the Final Award (as noted on the front page of the Final Award). See Declaration of Jean-Yves Garaud dated March 23, 2007 and Declaration of Edward Weppler dated March 23, 2007, attached hereto as Exhibit C. Indeed, not only did Cleary Gottlieb inform counsel for Plaintiffs regarding the inaccuracies of its allegations regarding the Press Release before it files its various pleadings, these allegations are currently the subject of a Motion pursuant to Fed. R. Bankr. P. 11.

[5]   The Arbitral Tribunal itself explained to the parties by letter that because of the large number of claims and the complexity of the case, the drafting of the 333 page Final Award took longer than expected. The timing of the filing of the Final Award with the ICC was in line with the time frames presented to the parties.

program" and an adverse decision in the Arbitration could have pushed Nova Hut into bankruptcy.[6]  The Plaintiffs incredulously contended the Bankruptcy Court should have reasonably inferred from these facts that Nova Hut, Cleary Gottlieb, IFC and the arbitral tribunal were all in collusion regarding the Final Award and therefore, Plaintiffs were entitled to discovery. Finally, in their Discovery Motion, Plaintiffs argued that they were also entitled to discovery pursuant to doctrine of equitable bill of discovery.

25.  After oral argument on April 25, 2007, and after considering these arguments and those put forth by Nova Hut, the Bankruptcy Court denied Plaintiffs' Discovery Motion. See Transcript of Bankruptcy Court hearing on Discovery Motion, dated April 25, 2007, a copy of which is attached hereto as Exhibit D.  On May 31, 2007, this Court issued the order denying Plaintiffs' Discovery Motion (the "**Discovery Order**").  See Exhibit A to Motion for Leave.

26.  Plaintiffs now are attempting to appeal the Discovery Order.  Because the Discovery Order is interlocutory in nature, because it does not fit within the collateral order exception and because there is no reason for this Court to exercise

---

[6]    The truth is that Mittal Steel Ostrava, which purchased Nova Hut in January 2003, satisfied all loans from the IFC as of December 15, 2004, a fact which was presented to this Court and Plaintiffs in Nova Hut's opposition to Plaintiffs' Discovery Motion.

discretion under 28 U.S.C. §1292(b), this Court should deny Plaintiffs' Motion for Leave.

<u>**ARGUMENT**</u>

I.  <u>**PLAINTIFFS' REQUEST TO APPEAL THE ORDER DENYING PLAINTIFFS' DISCOVERY MOTION MUST BE DENIED.**</u>

   A.   **THE ORDER IS INTERLOCUTORY AND ACCORDINGLY IS NOT APPEALABLE AT THIS TIME AS A MATTER OF RIGHT.**

It is beyond dispute that the Discovery Order is interlocutory and not the subject of appeal as of right. An interlocutory order is one "which does not finally determine a cause of action but only decides some intervening matter pertaining to the cause, and which requires further steps to be taken in order to enable the court to adjudicate the cause on the merits." <u>Matter of Tahkenitch Tree Farm P'Ship</u>, No. 94-460, 1994 WL 374215, at *1 (E.D. La. July 12, 1994); <u>see also</u> <u>In re Bank of New England Corp.</u>, 218 B.R. 643, 646 (B.A.P. 1st Cir. 1998) (holding that an interlocutory order "only decides some intervening matter pertaining to the cause, and which requires further steps to be taken in order to enable the court to adjudicate the cause on the merits."). In contrast, a final order is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment. <u>In re Delaware and Hudson Ry. Co.</u>, 96 B.R. 469, 471 (D. Del. 1989). District Courts only have jurisdiction to hear appeals from final orders or, if an order such as the Discovery Order is

interlocutory, where leave is granted.  28 U.S.C. § 158(a).  A long-standing Congressional policy of avoiding piecemeal litigation underlies the rule permitting appeals as of right only for final orders.  In re Edison Bros. Stores, Inc., 1996 WL 363806, at *4 (D. Del. July June 27, 1996), aff'd, 884 F.2d 1383 (3d Cir. 1989); In re Prudential Lines, Inc., 59 F.3d 327, 332 (2d Cir. 1995) (holding that the requirement of a final determination of actual controversies between parties to an adversary proceeding is "consistent with [the] long standing policy of limiting piecemeal appeals."); In re Continental Inv. Corp., 637 F.2d 1, 2 (1st Cir. 1980) (recognizing that the final judgment rule serves "a strong congressional policy against piecemeal review, and against obstructing or impeding an ongoing judicial proceeding by interlocutory appeals.") (citation omitted).

Accordingly, because the Discovery Order has not ended the instant litigation, it is not a final order.  There is no reason why the question regarding the propriety of discovery can not be considered after judgment is rendered in this adversary proceeding, whether on the cross motions for summary judgment or otherwise.  Indeed, if Nova Hut prevails at summary judgment[7] and

---

[7]    Nova Hut has filed a motion for summary judgment seeking to apply the Final Award against the Plaintiffs under the doctrines of collateral estoppel and res judicata.  See Adv. Proc. Docket No. 274.  This motion is currently pending.  Accordingly, Nova Hut contends that no further arbitration proceedings are required.

a separate and final judgment enters in its favor on all counts, Plaintiffs can seek to appeal the decision, including the decision to deny discovery.[8]  If Nova Hut's motion for summary judgment is instead denied either (a) the stay will remain in place while any arbitrations are completed and judgment in the adversary proceeding will be entered after such arbitration has concluded, or (b) the stay will be lifted and Plaintiffs' will be free to exercise their rights under FED. R. CIV. P. 26-37.

It is well settled, even in the bankruptcy context, that orders denying leave to take discovery in adversary proceedings are considered interlocutory.  See, e.g., Caldwell-Baker Co. v. Parsons, 392 F.3d 886, 888 (7th Cir. 2004); In re Towers Financial Corp., 164 B.R. 719, 720 (S.D.N.Y. 1994).  Although the Third Circuit has "consistently recognized that finality must be viewed pragmatically in bankruptcy appeals," In re Market Square Inn, Inc., 978 F.2d 116, 120 (3d Cir. 1992), merely stating, as the Debtors attempt in their Motion for Leave, that the concept of finality is treated more broadly in bankruptcy cases does not establish that the Discovery Order is final.  See First Am. Bank of New York v. Century Glove, Inc., 64 B.R. 958, 959 (D. Del. 1986).  Courts which recognize the need for a more expansive view of finality in bankruptcy cases

---

[8]     However, Nova Hut reserves the right to challenge the scope of any appeal available based on the grounds of the underlying judgment.

have made clear that this need stems from the fact that a bankruptcy proceeding is "umbrella litigation often covering numerous actions that are related only by the debtor's status as a litigant." In re Sonnax Indus., Inc., 907 F.2d 1280, 1283 (2d Cir. 1990); see also F/S Airlease II, Inc. v. Simon, 844 F.2d 99, 103 (3d Cir. 1988), cert. denied, 48 U.S. 852 (1988) (noting that "[t]he unique characteristics of bankruptcy cases have led [the Third Circuit] to 'consistently consider [] finality in a more pragmatic and less technical way.'"). Rather, the flexibility afforded the finality doctrine depends on the specific circumstances involved. See In re Belli, 268 B.R. 851, 854 (B.A.P. 9th Cir. 2001). Inefficient use of judicial resources is as objectionable in bankruptcy appeals as in other fields. In re White Beauty View, Inc., 841 F.2d 524, 526 (3d Cir. 1988).[9]

It is still the law in the Third Circuit that in individual adversary proceedings in a bankruptcy case, a "general antipathy toward piecemeal appeals still prevails [as in general civil

---

[9] As a result, the Debtors' reliance on cases such as Kaiser Aluminum Corp., 327 B.R. 554 (D. Del. 2005) and United Jersey Bank v. Collated Prods. Corp., 121 B.R. 195 (D. Del. 1990) is misplaced. In Kaiser Aluminum, the Delaware District Court merely recognized that bankruptcy appeals necessitate a pragmatic approach to finality. 327 B.R. at 558. In Collated Prods. Corp., the District Court noted that the primary basis for the more expansive interpretation of finality in bankruptcy cases results from the fact that "b]ankruptcy cases frequently involve protracted proceedings with many parties ... [and such flexibility is necessary to] avoid the waste of time and resources that might result from reviewing discrete portions of the action only after a plan of reorganization is approved." 121 B.R. at 200.

litigation]." _White Beauty_, 841 F.2d at 526.  The Third Circuit has instructed that in adversary proceedings, the Court "must apply the same concepts of appealability as those used in general civil litigation." _Id._; _see also_ _Belli_, 268 B.R. at 855 (ruling that finality for purposes of appeals in adversary proceedings "does not differ from finality in ordinary federal civil actions.").

In civil litigation, discovery orders are, with rare exception, non-appealable.  _In re Jeannette Corp._, 832 F.2d 43, 46 (3d Cir. 1987); _In re Ford Motor Co._, 110 F.3d 954, 958 (3d Cir. 1997) ("As a general rule, discovery orders are not final orders … for purposes of obtaining appellate jurisdiction."); _Union Carbide Corp. v. U.S. Cutting Serv., Inc._, 782 F.2d 710, 712 (7th Cir. 1986) (finding that the "general and very salutary rule is that discovery orders are not appealable until the end of the case."); _Mitsubishi Int'l Corp. v. Prepetition Senior Lenders_, No. IP-00-1468-C HIG, 2000 WL 1902188, at *1 (S.D. Ind. Dec. 19, 2000) (holding that "[d]iscovery orders are not final decisions and can, if erroneous, be corrected on appeal after a final decision.") (citing _Reise v. Bd. of Regents of Univ. of Wisconsin Sys._, 957 F.2d 293, 295 (7th Cir. 1992)); _In re Towers_, 164 B.R. at 720 (holding that bankruptcy court orders granting or denying discovery "do not finally dispose of an entire claim on which relief may be granted, and therefore are

18

generally treated as interlocutory and not appealable as of right."). Further, courts have held that, by definition, an order on a nondispositive motion within an adversary proceeding is interlocutory. In re Texas Bumper Exch., Inc., 333 B.R. 135, 138 (Bankr. W.D. Tex. 2005). Where an adversary proceeding continues after entry of an order, such as an order denying additional discovery, that order is not a final decision, but rather, interlocutory. In re Caldwell-Baker, 392 F.3d at 888.

Indeed, orders denying discovery under the rules of procedure and theories used by the Plaintiffs in this case have long been considered, as a matter of law, interlocutory. Plaintiffs' Discovery Motion sought relief pursuant to FED. R. BANKR. P. 2004, FED. R. CIV. P. 56(f) and the antiquated theory of equitable bill of discovery. Orders denying motions made under these rules and theories, are, as a matter of law, interlocutory. See Matter of Vance, 165 F.3d 34 (7th Cir. 1998) (Table) ("A majority of Courts that have considered the issue have held that orders granting or denying Rule 2004 examinations are, like discovery orders, interlocutory. This court does not have jurisdiction to consider appeals from interlocutory orders in bankruptcy proceedings." (citations omitted)); In re Towers, 164 B.R. at 720 (order denying Rule 2004 examination in adversary proceeding was not a final appealable order); see, e.g., Pacitti v. Macy's, 193 F.3d 766 (3d Cir. 1999) (discovery

orders, including decisions on motions pursuant to FED. R. CIV. P. 56(f) are interlocutory); <u>Gregory Lumber Co., Inc. v. U.S.</u>, 11 Cl. Ct. 489, 496 (Cl. Ct. 1986), <u>aff'd</u>, 837 F.2d 305 (Fed. Cir. 1987) (discretionary appeal of order made on FED. R. CIV. P. 56(f) motion denied).[10]  Under this prevailing law, the Discovery Order can be seen as nothing other than interlocutory.

Accordingly, there is absolutely no way to consider the Discovery Order final and no reason why appeal is unavailable after a final resolution of this action.[11]  The Discovery Order is interlocutory, and not appealable as of right pursuant to 28 U.S.C. § 158(a).  Therefore, unless the Discovery Order fits into a recognized exception to the finality rule (which it does not) or this Court otherwise determines it should exercise its discretion to grant appellate review pursuant to 28 U.S.C. §§ 158(a)(3) and 1292(b) (for which Plaintiffs' have not offered a compelling reason to do so), Plaintiffs' request for appellate review should be denied.

---

[10]    The order denying Plaintiffs' request for equitable bill for discovery is as well interlocutory and not subject to appeal as of right.  In the Motion for Leave, Plaintiffs state without citation to any authority that the order denying the requested equitable bill of discovery is essentially a final order because their request constitutes a separate proceeding.  This is not the case.  Plaintiffs' used the so-called equitable bill of discovery to impermissibly circumvent discovery rules.  This Court saw through these attempts and denied Plaintiffs' Discovery Motion.  Just as the bill cannot be used to circumvent rules of discovery, it also cannot be used to thwart the general rule that orders on motions for leave to take discovery are interlocutory.  <u>In re Jeannette Corp.</u>, 832 F.2d at 46; <u>In re Ford Motor Co.</u>, 110 F.3d  at 958; <u>Union Carbide</u>, 782 F.2d at 712; <u>Mitsubishi Int'l</u>, No. IP-00-1468-C HIG, 2000 WL 1902188, at * 1; <u>In re Towers</u>, 164 B.R. at 720.  <u>See also</u>, <u>Etiene v. Oyake</u>, 347 F.Supp.2d 215, 220-21 (D. V.I. 2004).

[11]    <u>See</u> Note 8, <em>supra</em>.

**B.    THE  ORDER  IS  NOT  A  COLLATERAL  ORDER  ENTITLED  TO APPELLATE REVIEW.**

**1.    The  Discovery  Order  Does  Not  Meet  the Requirements  to  be  Immediately  Appealable  Under the Collateral Order Doctrine.**

Plaintiffs' attempts to provide the Discovery Order a path to appellate review with the collateral order doctrine must fail.  The collateral order doctrine was first espoused by the United States Supreme Court in <u>Cohen v. Beneficial Indus. Loan Corp.</u>, 337 U.S. 541 (1949), and provides under certain circumstances a very narrow exception to the rule permitting appeals of only final orders.  According to the collateral order doctrine, an interlocutory order may be immediately appealable if the following three criteria are met:

    (1)  the order from which the appellant appeals conclusively determines the disputed question;

    (2)  the order resolves an important issue that is completely separate from the merits of the dispute; and

    (3)  the order is effectively unreviewable on appeal from a final judgment.

<u>In re Ford</u>, 110 F.3d at 958.  All three prongs must be met in order for the collateral order doctrine to apply and for the court to have appellate jurisdiction.  <u>Cipollone v. Liggett Group, Inc.</u>, 785 F.2d 1108, 1117 (3d Cir. 1986), <u>cert denied</u>, 484 U.S. 976 (1987).

The Supreme Court has repeatedly referred to the collateral order doctrine as "narrow," described its application as "stringent" and urged that it should "never be allowed to swallow the general rule." See, e.g., Digital Equip. Corp. v. Desktop Direct Inc., 511 U.S. 863, 868 (1994); Midland Asphalt Corp. v. United States, 489 U.S. 794, 799 (1989).  The Third Circuit has "followed this admonition and consistently construed the collateral order doctrine narrowly lest the exception swallow up the salutary general rule that only final orders be appealed." We, Inc. v. City of Philadelphia, 174 F.3d 322, 324 (3d Cir. 1999) (internal citations omitted); see also ADAPT of Philadelphia v. Philadelphia Housing Authority, 417 F.3d 390 (3d Cir. 2005).  The District Court for the District of Delaware has also acknowledged that the collateral order doctrine is a narrow exception to the final judgment rule.  See First American, 64 B.R. at 960.

None of the cases in the Third Circuit considering the collateral order doctrine would support for its application to the simple Discovery Order in this case.  See, e.g., ADAPT of Philadelphia, 417 F.3d at 395 (holding that routine discovery order was not reviewable under collateral order doctrine because it was not seeking to prevent disclosure of information on the basis of trade secrets or privilege); Ford, 110 F.3d at 964 (holding that order compelling production of documents arguably

subject to attorney-client privilege was final under collateral order doctrine); Smith v. BIC Corporation, 869 F.2d 194 (3d Cir. 1989) (holding that decision denying protective order for trade secrets was final under collateral order doctrine); Merkle v. Upper Dublin School Dist., 166 F. Supp.2d 210 (E.D. Pa 2001) (holding that discovery order requiring disclosure of attorney-client privileged and work product doctrine documents was appealable under collateral order doctrine).  In fact, the Third Circuit, in Bacher v. Allstate Ins. Co., 211 F.3d 52, 53-55 (3d Cir. 2000), declined to extend the collateral order doctrine for discovery orders beyond those that involve information which the party claims to be privileged or that constitute a trade secret. The Court dismissed as non-final an appeal of a discovery order which denied a party protection for highly sensitive information which didn't rise to the level of trade secrets.  Id. at 55. The Court stated that it "must be careful not to open the door to a flood of collateral order appeals from discovery orders requiring disclosure of unprivileged information which might be characterized as 'sensitive'."  Id.  Additionally, the Third Circuit in ADAPT of Philadelphia declined to extend the collateral order doctrine to allow the appeal of a routine discovery order, reiterating that "[i]t is well-established that unless a party is seeking to prevent the disclosure of information on the basis of trade secrets or some traditionally-

recognized privilege such as attorney-client or work product, the collateral order doctrine does not permit appeal from discovery orders." 417 F.3d at 395. Accordingly, this Court should flatly deny Plaintiffs' attempts to use the narrowly tailored collateral order doctrine on a routine denial of discovery order.

The Discovery Order in this case is nothing more than an order denying leave to take discovery. It does not involve issues of privilege or other unique circumstances appropriate for collateral doctrine review. This Court simply denied Plaintiffs' requests to take discovery pursuant to FED. R. BANKR. P. 2004, FED. R. CIV. P. 56(f) and equitable bill of discovery because the parties already had the same dispute decided in an arbitration governed by ICC rules. There is no reason to treat the Discovery Order as warranting special treatment under the collateral order doctrine and accordingly, Plaintiffs' request for appellate review should be denied.

To the extent this Court performs the analysis regarding the applicability of the collateral order doctrine, Plaintiffs' attempts to manufacture finality for the Discovery Order should be rejected. Under the first prong of the collateral order doctrine, Plaintiffs claim the Discovery Order conclusively determines the disputed question because "the Discovery Order may well be the final word from the Bankruptcy Court on this

issue." Motion for Leave, p. 16. The actual dispute that should be considered here is the dispute involved in the adversary proceeding and not the narrow issue involved in Plaintiffs' Discovery Motion. Regardless, the Discovery Order cannot be considered the final decision on whether discovery is appropriate. As explained above, if summary judgment is granted in Nova Hut's favor, the Discovery Order can be appealed as a separate and final judgment. If Nova Hut's request for summary judgment is denied, Plaintiffs can take discovery if the stay is lifted or proceed with discovery in any arbitration that may take place.[12] Therefore, the discovery issue has not been finally determined.

Under the second prong of the collateral order doctrine, Plaintiffs claim that the Discovery Order is completely separate from the merits of the substantive dispute and that the question of whether Plaintiffs are entitled to discovery is too important an issue to deny immediately appellate review. Plaintiffs

---

[12] Also, Kaiser has taken the position in pleadings both in the pending bankruptcy adversary proceeding and before the Dutch Court (where Nova Hut has filed an Execution Petition to enforce the Arbitration Award against Kaiser Netherlands), that it still has a pending discovery request for the very same discovery that was the subject of the Discovery Order. Although Nova Hut contests that this so-called separate discovery request remains pending after the Discovery Order, based on Kaiser's own contentions, the Discovery Order would not have conclusively determined the discovery Kaiser was requesting. See *Memorandum of Law in Opposition to Motion of Mittal Steel Ostrava, a.s. (Formerly Nova Hut, a.s.) Pursuant to Bankruptcy Rule 9011 for Sanctions Against Saul Ewing LLP*, at p. 4 n.5. [Docket No. 323] and *Reply in Support of Motion of Mittal Steel Ostrava, a.s. (Formerly Nova Hut, a.s.) Pursuant to Bankruptcy Rule 9011 for Sanctions Against Saul Ewing LLP*, at p. 8 n.5 [Docket No. 329].

attempt to bolster their argument that their entitlement to
discovery meets the "importance" criterion by rehashing their
past attempts throughout this case to procure discovery (mostly
recounting efforts to obtain discovery from Nova Hut's co-
defendant, IFC). All of Plaintiffs' past attempts to obtain
discovery from IFC or Nova Hut were denied by the Bankruptcy
Court due to the facts and procedural posture of the case when
such discovery was sought, as well as the inappropriate bases
for which Plaintiffs attempted to seek such discovery. Notably,
Plaintiffs did not attempt to seek leave to appeal any prior
denials of attempts to obtain discovery in this adversary
proceeding. Just as Plaintiffs will have the right once
judgment is entered in the adversary proceeding to seek to
appeal any prior orders denying discovery, they will also have
ample opportunity to seek to appeal this current Discovery Order
once a judgment is entered in the adversary proceeding. There
is no justification for treating the current denial of discovery
different than any past denials of discovery. Also, as the
Bankruptcy Court noted at the hearing on the Discovery Motion,
the parties to the adversary proceeding should be governed by
any procedural rules governing any ICC arbitrations they may
engage in, including any ICC arbitration rules governing
discovery procedures. Moreover, Plaintiffs' claim that the
entitlement to discovery in and of itself meets the "importance"

prong is contradicted by the prevailing general rule that
discovery orders are not final orders. Under Plaintiffs'
reasoning, every discovery order would be a final order, thus
eviscerating the purpose and policy behind the finality rule in
the first place.

Under the third and final prong of the collateral order
doctrine, Plaintiffs claim that the Discovery Order is
effectively unreviewable on appeal from a final judgment if it
is not reviewed at this time. To meet this requirement,
Plaintiffs must show that review postponed will effectively be
review denied. See e.g., Martin v. Brown, 63 F.3d 1252, 1261
(3d Cir. 1995); United States v. Bertoli, 994 F.2d 1002, 1012
(3d Cir. 1993). The only real harm Plaintiffs articulate is the
requirement to wait for the Bankruptcy Court to rule on a motion
to enforce the arbitration ruling. Requiring Plaintiffs to wait
until a judgment is entered by the Bankruptcy Court does not
make the Discovery Order unreviewable such that postponing the
review equates to denial of an opportunity for review, as is
required to meet this prong. Plaintiffs cite no law to support
their position and accordingly, they fail to meet the
requirements of the final criterion.

2. **The Discovery Order is Not Final Under the Exception for Orders Issued in a Different Jurisdiction Than the Jurisdiction of the Main Proceeding.**

Plaintiffs also make a misguided attempt to fit the denial of the Discovery Order into the extremely narrow exception to the final order rule which is applicable only where the court denying discovery is in a different circuit than the court where the main litigation proceeding is pending. See, e.g., Republic Gear v. Borg-Warner Corp., 381 F.2d 551 (2d Cir. 1967). This exception has only been applied in the very limited circumstance where discovery is sought against a non-party to a litigation in the District Court that would have jurisdiction over that non-party, but which is not the jurisdiction in which the litigation is pending.[13] Id. Circuit Courts considering whether an appeal of such a discovery order should be immediately appealable have held that such orders are final orders based on the theory that the Circuit Court in which the main litigation is pending would have no jurisdiction over the nonparty and therefore there would be no right to appeal that decision once a judgment on the main case was reached. See Heat & Control, Inc. v. Hester Indus., Inc., 785 F.2d 1017, 1021 (Fed. Cir. 1986) (holding that because California court had no jurisdiction over nonparty, party would have no other means of obtaining review than by appealing West

---

[13]     Certain courts have even further limited this exception by holding that the jurisdiction where the discovery order is entered may not even be in the same Circuit as the jurisdiction where the main litigation is pending for this exception to the finality rule to apply. See Barrick Group, Inc. v. Mosse, 849 F.2d 70, 74 (2d Cir. 1988); In re Subpoena Served on California Pub. Util. Comm'n, 813 F.2d 1473, 1479 (9th Cir. 1987).

Virginia court's discovery order to the Circuit Court for West Virginia cases); <u>Ariel v. Jones</u>, 693 F.2d 1058, 1059 (11th Cir. 1982) ("[i]f a court in one district quashes a subpoena or otherwise denies discovery from a person not a party to the action and that action is pending in a different district, the order is a final disposition of the only proceeding in that district concerning the controversy and the party seeking discovery may appeal.")(<u>quoting</u> <u>8 C. Wright and A. Miller, Federal Practice and Procedure</u> § 2006 (1970); <u>Republic</u>, 381 F.2d at 554 ("Our decision applies only when a witness is beyond the jurisdictional reach of the court in which the main proceeding is pending . . .").

Most notably, this exception cannot apply in the instant case because the Discovery Order was entered by the very same Bankruptcy Court before which the adversary proceeding (the "main proceeding" between the parties) is pending and where ultimately a judgment will be entered. This Court should not be confused by Plaintiffs' argument that the Discovery Order was issued by a different tribunal (i.e. the Delaware Bankruptcy Court) than the tribunal before which the main proceeding will be held (i.e. arbitrations under the auspices of the ICC) should be dismissed. The main proceeding in this case is still the adversary proceeding in the Delaware Bankruptcy Court, which has been stayed in favor of arbitration. Any judgment to be entered

against Nova Hut or IFC arising out of an award in the Arbitration or any other ICC-conducted arbitration between the parties to the adversary proceeding will necessarily have to be entered by the Bankruptcy Court in the adversary proceeding. At the time that such a judgment is entered by the Bankruptcy Court, Plaintiffs would then have their opportunity to appeal both the judgment and the interlocutory order denying their Discovery Motion. This would foster the goal of the finality rule - to avoid piecemeal appellate reviews. See, e.g., We, Inc., 174 F.3d at 324-325; Heat & Control, 785 F.2d at 1020.

Moreover, in all of the cases cited by Plaintiffs and any additional cases discovered by Nova Hut that apply this exception, the exception only applies to non-parties to the litigation and has no application to this case. Plaintiffs' Motion for Leave to Appeal likewise notes in a footnote that "[t]his exception may be limited to discovery proceedings brought against non-parties on the theory that the court hearing the main action does not have jurisdiction over the non-party to the case." Motion for Leave, p.12, fn. 2. The Discovery Order in this case only relates to Plaintiffs, Nova Hut and IFC, all of which are parties to this adversary proceeding and all of which are subject to the jurisdiction of the Delaware Bankruptcy Court. This exception is completely inapplicable and cannot

transform a run-of-the mill interlocutory order denying a discovery motion into a final, appealable order.

Under these circumstances, it is clear that the collateral order doctrine does not apply and cannot save the Discovery Order from its interlocutory status. Plaintiffs' request for appeal should therefore be denied.

C.    **DISCRETIONARY INTERLOCUTORY RELIEF IS NOT WARRANTED AT THIS TIME.**

The final step in conclusively determining the nonappealability of the Discovery Order is a review of discretionary interlocutory appellate review under 28 U.S.C. §§ 158(a)(3) and 1292(b). The case law from this and other circuits is clear that Plaintiffs have no grounds for discretionary appeal of the Discovery Order. As a general rule, a nonfinal interlocutory order may not be appealed. <u>Tilden Fin. Corp v. Palo Tire Serv., Inc</u>., 596 F.2d 604, 606 (3d Cir. 1979). Exceptions to the general rule are limited and must be strictly construed. <u>Matterhorn, Inc. v. NCR Corp</u>., 727 F.2d 629, 633 (7th Cir. 1984). Furthermore, the burden is on the movant to demonstrate that certification for immediate appeal is warranted. <u>Orson, Inc. v. Miramax Film Corp</u>., 867 F.Supp. 319, 320 (E.D.Pa. 1994). The purpose of section 1292(b) is the allowance of appeals from orders other than final judgments when they have final and irreparable effect on the rights of parties.

Albert v. School Dist. of Pittsburgh, 181 F.2d 690, 691-92 (3d
Cir. 1950).    In exercising its sound discretion, this Court
should be mindful of the strong policy against piecemeal
appeals.  Orson, at 321.

    For the Bankruptcy Court's Discovery Order to be
appealable, it must either be final or must fall into one of a
series of specific classes of interlocutory orders enumerated in
the statute.  Siebert v. Great N. Dev. Co., 494 F.2d 510, 511
(5th Cir. 1974).    The relevant provision, 28 U.S.C. § 1292(b),
provides that such an order must, in the opinion of the District
Judge, (1) involve a controlling issue of law; (2) as to which
there is a substantial ground for a difference of opinion; and
(3) immediate appeal may materially advance the ultimate
termination of the litigation.  A "controlling question of law"
to certify an order for immediate appeal is one that would
result in reversal of judgment after final hearing.  Orson, 867
F.Supp. at 321 (citing Katz v. Carte Blanche Corp., 496 F.2d
747, 755 (3d Cir. 1974)).    In making its evaluation of whether
the issue is controlling and if immediate appeal is necessary to
avoid irreparable harm, the Court must remember that the motion
should not be granted merely because a party disagrees with the
ruling of the Court that issued the order in question.  Cardona
v. Gen. Motors Corp., 939 F.Supp. 351, 353 (D.N.J. 1996).

Substantial ground for difference of opinion must arise out of a genuine doubt as to the correct legal standard. Id.

There is abundant case law to support a rejection of Plaintiffs' attempt to appeal the Discovery Order through the statutory procedure. Attempts to take interlocutory appeal from discovery orders are generally dismissed as premature because they are not a final orders disposing of all issues. Murdaugh Volkswagen, Inc. v. First Nat. Bank of South Carolina, 741 F.2d 41, 44 (4th Cir. 1984). Some courts have determined that an order denying a discovery motion is interlocutory and therefore, the appeals court has no jurisdiction to determine whether denial was error. Kropp v. Ziebarth, 557 F.2d 142, 143 n. 1 (8th Cir. 1977). In any event, courts conducting the statutory analysis have found that discovery orders usually do not involve controlling questions of law requiring immediate appeal. Sterling Supply Corp. v. Mullinax, 154 B.R. 660, 662-63 (E.D.Pa. 1993); McCann v. Communications Design Corp., 775 F.Supp. 1506, 1534 (D.Conn. 1991); Ostow & Jacobs, Inc., v. Morgan-Jones, Inc., 181 F.Supp. 208, 218 (S.D.N.Y. 1960).

For instance, in a case that is on all fours with the present adversary proceeding, the District Court held that a party could not appeal the Bankruptcy Court's denial of a request to take a Rule 2004 examination of the Chapter 11 Trustee. In re Towers, 164 B.R. at 720. Like this case, Towers

33

involved an adversary proceeding arising out of a Chapter 11
bankruptcy.  After denial of the motion to take a Rule 2004
examination, the applicants appealed to the District Court. Upon
review of the unequivocal legal precedent, the District Court
dismissed the appeal stating that "Bankruptcy court orders
granting or denying discovery do not finally dispose of an
entire claim on which relief may be granted, and therefore are
generally treated as interlocutory and not appealable as of
right."  Id. (citations omitted).  The Court also noted the
applicants' inability to locate a single case in which an order
denying a Rule 2004 examination was considered a final order.
Id.  Where there is indication that further action by the
Bankruptcy Court will be forthcoming, such an order cannot be
considered final.  Id.  Finally, the District Court recited the
standard for appeals under 28 U.S.C. § 1292(b), finding that the
applicants had not presented a controlling question of law.  Id.

Other cases construing the appealability of orders denying
2004 examinations are in accord.  In re Chateaugay Corp., 120
B.R. 707, 710 (S.D.N.Y. 1990); see also Gache v. Balaber-
Strauss, 198 B.R. 662, 664 (S.D.N.Y. 1996) (ordinarily it is
difficult to believe that a discovery order will present a
controlling question of law or that an immediate appeal will
materially advance the termination of the litigation), quoting,

34

8 Charles Alan Wright and Richard L. Marcus, <u>Federal Practice and Procedure</u>, § 2006 at 31 (1970 ed.).

This case is no different. First, the Discovery Order does not involve a controlling questions of law. Whether or not to allow discovery in this adversary proceeding before the Court considers summary judgment is not a question which will necessitate a reversal of judgment after final hearing. <u>Orson</u>, 867 F.Supp. at 321 (<u>citing</u>, <u>Katz v. Carte Blanche Corp</u>., 496 F.2d 747, 755 (3d Cir. 1974)). Indeed, it is well settled that ordinary discovery motions which rule on whether a party is entitled to discovery do not, as a matter of law, involve controlling questions of law. See <u>e.g.</u>, <u>Cipollone v. Liggett Group, Inc.</u>, 785 F.2d 1109, 1118 n.14 (3d Cir. 1986) ("Ordinarily it is difficult to believe that a discovery order will present a controlling question of law" (citing C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2006 at 31 (1970 & Supp. 1985)); <u>Burns v. Lavender Hill Herb Farm, Inc.</u>, 2005 WL 545288 *2 (E.D. Pa. 2005) (Order denying party leave to take discovery did not raise controlling question of law); <u>Motor Carriers Labor Advisory Council v. Trucking Mgmt., Inc.</u>, 1988 WL 120689 *5 (E. D. Pa. 1988) (order restricting discovery did not involve controlling question of law); The mere fact that Plaintiffs' disagree with the Discovery Order is not sufficient to create a controlling question of law. <u>Cardona</u>, 939 F.Supp.

at 353. Second, there can be no argument that there are substantial grounds for dispute regarding the Discovery Order. Indeed, Plaintiffs' counsel admitted at oral argument on Plaintiffs' Discovery Motion that he knew of no case law supporting the allowance of a Fed. R. Bankr. P. 2004 exam where a case had been stayed pending arbitration. Exhibit D, p. 38. The Court too based its decision on this absence of supporting law. Exhibit D at pp. 38-39. Accordingly, there is no dispute. Finally, there is no possible way that allowing discovery would advance the termination of the case between Nova Hut and Plaintiffs. As the disputed issues have already been resolved in an arbitration between Kaiser Netherlands and Nova Hut, a proceeding through which Plaintiffs and Kaiser Netherlands obtained all the discovery they requested, and where there are cross motions for summary judgment pending before this Court, there can be no contention that allowing discovery of Nova Hut would advance resolution of this case. Under these circumstances, Plaintiffs have entirely failed to satisfy the requirements of 28 U.S.C. §§ 158(a)(3) and 1292(b) and, accordingly, their Motion for Leave must be denied.

## CONCLUSION

It is undisputed that the Discovery Order is an interlocutory order and cannot be appealed as of right. Furthermore, based on the foregoing, Plaintiffs have failed to

demonstrate the applicability of the collateral order doctrine or why discretionary review pursuant to 28 U.S.C. §§ 158(a)(3) and 1292(b) is appropriate.  Therefore, Plaintiffs' Motion for Leave must be summarily denied.


Dated:  June 18, 2007                GREENBERG TRAURIG, LLP


                                     /s/ Dennis A. Meloro
                                     Victoria Watson Counihan (No.
                                     3488)
                                     Dennis A. Meloro (No. 4435)
                                     The Nemours Building
                                     1007 North Orange Street, Suite
                                     1200
                                     Wilmington, Delaware 19801
                                     (302) 661-7000

                                          — and —

                                     Annapoorni R. Sankaran
                                     One International Place, 20th
                                     floor
                                     Boston, MA 02110
                                     (617) 310-6000

                                          — and —

                                     Adam D. Cole
                                     200 Park Avenue
                                     New York, NY 10166
                                     212-801-3183


                                     *Attorneys for Defendant Mittal
                                     Steel Ostrava, a.s. (formerly
                                     Nova Hut, a.s.)*

37

# EXHIBIT A



**International Chamber of Commerce**

*The world business organization*

**International Court of Arbitration** • **Cour internationale d'arbitrage**



# AWARD

# INTERNATIONAL COURT OF ARBITRATION

## FINAL AWARD

## CASE 13101/EC

## KAISER NETHERLANDS B.V.
### (Netherlands)

vs/

## MITTAL STEEL OSTRAVA, A.S.
## (FORMERLY ISPAT NOVA HUT, A.S.)
### (Czech Republic)

*****

This document is an original of the Final Award rendered in conformity with the Rules of the ICC International Court of Arbitration.

**International Court of Arbitration**

**International Chamber of Commerce**

**ICC Arbitration No. 13101/EC**

---

**Kaiser Netherlands B.V.,** c/o Citco Nederland B.V., Telestone 8, Teleport, Naritaweg 165, 1043 BW Amsterdam, The Netherlands

**Claimant**

**Counterrespondent**

Represented by **George E. RAHN, Jr, Esq.**, Saul Ewing LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania 19102-2186, USA and **Armin DALLMANN, Esq.**, Dallmann & Juranek, Gusshausstrasse 2, 1040 Vienna, Austria

**v.**

**Mittal Steel Ostrava, a.s. (formerly Ispat Nova Hut, a.s.)**, Vratimovska 689, 707 02 Ostrava-Kincice, Czech Republic

**Respondent**

**Counterclaimant**

Represented by **Jean-Yves GARAUD, Esq.**, Cleary, Gottlieb, Steen & Hamilton, 12, rue de Tilsitt, 75008 Paris, France

---

# AWARD

---

**26 April 2006**

*j*

## Table of contents

| | | |
|---|---|---|
| I. | **INTRODUCTION** | **9** |
| A. | **The Parties** | **9** |
| 1. | The Claimant and Counterrespondent | 9 |
| 2. | The Respondent and Counterclaimant | 9 |
| B. | **The Arbitral Tribunal** | **10** |
| 1. | Co-Arbitrator nominated by the Claimant | 10 |
| 2 | Co-Arbitrator nominated by the Respondent | 10 |
| 3. | President | 11 |
| 4. | Secretary | 11 |
| C. | **The nature of the dispute** | **12** |
| D. | **The Arbitration Clause** | **12** |
| E. | **The law governing the merits** | **14** |
| F. | **The structure of this award** | **15** |
| II. | **FACTUAL BACKGROUND** | **16** |
| A. | **Preliminary comment** | **16** |
| B. | **Nova Hut's modernization and expansion program and associated Project Development Costs** | **16** |
| C. | **The Phase 0 Contract** | **17** |
| D. | **The negotiation of the Phase 1 Contract** | **18** |
| E. | **The Phase 1 Contract** | **19** |
| 1. | The subject matter of the Phase 1 Contract | 19 |
| 2. | Provisions of the Contract relevant for the resolution of the parties' claims | 19 |
| 3. | The Appendices to the Contract | 26 |
| F. | **The implementation of the Phase "1" Contract** | **26** |
| 1. | The construction phase | 26 |

2

2.   Preliminary Acceptance ........................................................................... 34

3.   The commissioning phase ....................................................................... 34

4.   The 4WIPPT ............................................................................................. 35

5.   Nova Hut's draw on the performance letter of credit ................................ 39

G.   **The termination of the Phase "1" Contract** ............................................ 41

H.   **The Tippins Arbitration** ............................................................................ 42

III.  **CHRONOLOGY OF THE PROCEEDINGS** ................................................ 43

A.   **The constitution of the Arbitral Tribunal and the initial procedural hearing** ........ 43

B.   **The phase of the written pleadings** ......................................................... 44

C.   **The evidentiary hearing** ........................................................................... 47

D.   **The post-hearing briefs and the closing of the proceedings** ................. 49

IV.  **THE PARTIES' LAST RELIEF SOUGHT** ................................................... 49

A.   **Claimant's last relief sought** ................................................................... 49

B.   **Respondent's last relief sought** .............................................................. 51

V.   **KAISER DID NOT ACHIEVE FINAL ACCEPTANCE** ................................. 52

A.   **Introduction** ............................................................................................. 52

B.   **The passing of the 4WIPPT was a precondition to the achievement of Final Acceptance** ............................................................................................ 52

C.   **Kaiser did not pass the first 4WIPPT** ...................................................... 53

1.   The Performance Tests and the 4WIPPT .................................................. 53

2.   Actual versus contractual production ........................................................ 57

     2.1   Contractual production ...................................................................... 57

     2.2   Actual production ............................................................................... 58

3.   The reasons for the controversy ............................................................... 59

4.   The formula to calculate the hourly production rate to give credit to Kaiser for production delays that are not attributable to it .................................... 60

| | 4.1 | Kaiser's position ................................................................ | 60 |
| | 4.2 | Nova Hut's position ........................................................... | 63 |
| | 4.3 | Discussion and decision..................................................... | 64 |
| 5. | | The allocation of certain delays between the parties..................................... | 79 |
| | 5.1 | Kaiser's position ................................................................ | 79 |
| | 5.2 | Nova Hut's position ........................................................... | 82 |
| | 5.3 | Discussion and decision..................................................... | 83 |
| 6. | | The formula to calculate the constraint adjusted weight............................ | 96 |
| | 6.1 | Kaiser's position ................................................................ | 96 |
| | 6.2 | Nova Hut's position ........................................................... | 97 |
| | 6.3 | Discussion and decision..................................................... | 98 |
| 7. | | The actual weight of acceptable steel coils ................................................. | 103 |
| | 7.1 | Kaiser's position ................................................................ | 103 |
| | 7 2 | Nova Hut's position ........................................................... | 105 |
| | 7 3 | Discussion and decision..................................................... | 106 |
| 8. | | Did Nova Hut acknowledge that Kaiser passed the 4WIPPT? ................... | 113 |
| | 8.1 | Preliminary comment.......................................................... | 113 |
| | 8.2 | Did Nova Hut agree to the figures it now challenges and acknowledge that Kaiser passed the 4WIPPT? ................................................. | 113 |
| | 8.3 | What is the impact of the signing of some of the test documents?................ | 117 |
| D. | | Conclusion......................................................................................... | 121 |
| VI. | | THE PARTIES' CLAIMS ....................................................................... | 123 |
| A. | | Claimant's claims .............................................................................. | 123 |
| 1 | | Claimant's claim for payments due upon achievement of Final Acceptance (USD 33,754,720.62)........................................................................ | 123 |
| | 1 1 | Claimant's position ............................................................ | 123 |
| | 1.2 | Respondent's position........................................................ | 124 |

1.3    *Discussion and decision* ............................................................................ 125

2.    **Claimant's claim for Nova Hut's wrongful draw down on the Performance Letter of Credit (USD 11,133,341.96)** ............................................................ 130

2.1    *Preliminary comment*............ ............................................................ 130

2.2    *Claimant's position* ............... ............ ......................................... 130

2.3    *Respondent's position* ......................................................................... 131

2.4    *Discussion and decision*..................................................................... .. 132

3.    **Claimant's claim for deferred project development costs (USD 510,000.00)** ............. 137

3.1    *Claimant's position* ........................................................................... .. 137

3.2    *Respondent's position* ........................................................................ .. 139

3.3    *Discussion and decision*..................................................................... 140

4.    **Claimant's   claim   for   the   warranty   reserve   and   contingency   fee (USD 5,250,000.00)**........... 147

4.1    *Claimant's position* ........................................................................... 147

4.2    *Respondent's position* ....................................................................... 148

4.3    *Discussion and decision*..................................................................... 149

5.    **Claimant's claim for Nova Hut's delay in obtaining financing (USD 2,295,950.00)** .... 154

5.1    *Claimant's position* ........................................................................... 154

5.2    *Respondent's position* ....................................................................... 159

5.3    *Discussion and decision*..................................................................... 160

6.    **Claimant's claim for a bonus payment for early achievement of Preliminary Acceptance (USD 2,800,000.00)** .................................................................. 177

6.1    *Claimant's position* ........................................................................... 177

6 2    *Respondent's position* ....................................................................... .. 178

6 3    *Discussion and decision*.....  ................................................. ......  .. 179

7    **Claimant's claims for extra work (USD 2,793,815.00)**........................................... .. 192

7.1    *Preliminary comment*.................  ..................................................... 192

7.2    *Unpaid PCNs (USD 393,320.00)*......................................................... 192

7.3     Claimant's claim for extra work performed under agreed change orders: USD 166,033.00.................................................................................................... 234

7.4     Claimant's claim for extra costs in relation with the Demonstration Day ceremony (USD 2,537,574.00)...................................................................... 251

8.     Claimant's claim for Nova Hut's failure to provide liquid steel, spare parts and utilities during commissioning and performance testing (USD 715,431.00)............... 263

8.1     Claimant's position ..................................................................................... 263

8.2     Respondent's position ...................................... .................................... ... 264

8.3     Discussion and decision.............................................................................. 264

9.     Claimant's claim for breach of contract relating to the cycloconverters (USD 78,037.00)........................................................................................... ... 268

9.1     Claimant's position ..................................................................................... 268

9.2     Respondent's position ................................................................................ 269

9.3     Discussion and decision.............................................................................. 270

10.    Claimant's claim for extended office operation costs (USD 428,737.00).................. 274

10.1    Claimant's position ..................................................................................... 274

10.2    Respondent's position ................................................................................ 274

10.3    Discussion and decision.............................................................................. 275

11.    Claimant's claim for additional legal and consulting fees and costs USD 1,879,610.00 ..................................................................................... 276

11.1    Claimant's position ..................................................................................... 276

11.2    Respondent's position ................................................................................ 277

11.3    Discussion and decision.............................................................................. 277

12.    Claimant's claim for unjust enrichment ................................................................ 278

12.1    Claimant's position ..................................................................................... 278

12 2    Respondent's position... .. .  .  . .................................................................. 279

12.3    Discussion and decision........... ................................................................. 280

B.     Respondent's counterclaims................................................................................ 283

1.     Respondent's counterclaims in connection with Kaiser's failure to achieve Final Acceptance and the termination of the Phase 1 Contract ....................................... 283

1.1    *Respondent's counterclaim for a USD 46 million production penalty* ............. 283

1.2    *Respondent's counterclaim for a USD 3.7 million penalty* ............................ 284

1.3    *Nova Hut already holds USD 35,621,378.66 and must give credit to Kaiser up to that amount.* ........................................................................... 286

1.4    *Nova Hut's interest claim* ..................................................................... 287

2.    Respondent's counterclaim for unpaid PCNs (USD 779,010.50) ......................... 289

2.1    *Preliminary comment* ............................................................................ 289

2.2    *PCN No. 043: foundations columns (USD 83,628.00)* ............................... 291

2.3    *PCN No. 202: ONAF cooling (USD 6,090.00)* ......................................... 292

2.4    *PCN No. 205: 22 & 6 kV switchgear configuration discrepancy (USD 35,617.00)* ................................................................................... 294

2.5    *PCN No. 207: VVVF drives for descale pumps (USD 359,259.00)* ............... 297

2.6    *PCN No. 209: Ansaldo motors (USD 20,321.00)* ..................................... 301

2.7    *PCN No. 216: Internal piping water traps (USD 1,982.00)* ......................... 304

2.8    *PCN No. 220: Carbon dioxide fire extinguishing system (USD 52,799.00)* .... 305

2.9    *PCN No. 221: Compressor station HVAC (USD 41,281.00)* ......................... 308

2.10   *PCN No. 224: Insulated bus-bars in 22 and 6 kV switchgear (USD 13,233)* ...................................................................................... 311

2.11   *PCN No. 229: Mill main building (USD 164,800.00)* .................................. 315

2.12   *Summary* ............................................................................................ 317

2.13   *Interest* .............................................................................................. 318

VII.   **RECAPITULATION OF AMOUNTS CLAIMED AND AWARDED** ............................ 319

A.    **Amounts claimed by and awarded to Claimant** ............................................. 319

B.    **Amounts claimed by and awarded to Respondent** ........................................ 321

C.    **Set-Off** .................................................................................................. 321

VIII.  **OUTSTANDING PROCEDURAL ISSUES** .......................................................... 323

IX.    **COSTS** .................................................................................................... 326

A.   The parties' reasonable legal and other costs ....................................................... 326

1.   Kaiser's costs .......................................................................................... 326

2.   Nova Hut's costs....................................................................................... 326

B.   The ICC costs of arbitration....................................................................... 326

C.   The Parties' Relief Sought ......................................................................... 326

1.   Kaiser's relief sought ................. ............................................................. 326

2.   Nova Hut's relief sought................................. .......................................... 327

D.   Apportionment between the parties.............................................................. 327

E.   Decision .................................................................................................. 328

X.   RELIEF ..................................................................................................... 331

8

## I.    INTRODUCTION

### A.    THE PARTIES

### 1.    The Claimant and Counterrespondent

(1)    The Claimant and Counterrespondent, Kaiser Netherlands B.V. (formerly ICF Kaiser Netherlands B.V. and referred to hereinafter as "Kaiser" or "Claimant") is a corporation organized under the laws of the Netherlands, with its registered office at:

> c/o Citco Nederland B.V.
> Telestone 8
> Teleport
> Naritaweg 165
> 1043 BW Amsterdam
> The Netherlands

(2)    Kaiser is an engineering and construction company.

(3)    The Claimant is represented in this arbitration by George E. RAHN, Jr, Esq. and Armin DALLMANN, Esq.

### 2.    The Respondent and Counterclaimant

(4)    The Respondent and Counterclaimant, Mittal Steel Ostrava, a.s.,[1] is a corporation organized under the laws of the Czech Republic, with its registered office at:

> Vratimovska 689
> 707 02 Ostrava-Kincice
> Czech Republic

(5)    Mittal Steel is a producer of steel and associated products.

---

[1] At the close of the 12 to 15 September 2005 witness hearing in Vienna, the Arbitral Tribunal invited Respondent to address the issue of its identity, which appeared to have changed from Ispat Nova Hut, a.s., to Mittal Steel Ostrava, a.s. In its Post-Hearing Brief of 28 October 2005, Respondent indicated that Ispat Nova Hut, a.s. had changed its name to Mittal Steel Ostrava a.s. with effect from 28 February 2005 but otherwise remained the same entity (¶111, p. 43).

(6)    The Respondent is represented in this arbitration by Jean-Yves GARAUD, Esq.

(7)    Given that nearly all documents submitted in this arbitration refer to Mittal Steel, a.s. as "Ispat Nova Hut, a.s.", Respondent shall be referred to hereinafter as "Nova Hut". To avoid any ambiguity, this Award is directed at Mittal Steel, a.s., to which the operative part shall expressly refer.

**B.    THE ARBITRAL TRIBUNAL**

**1.    Co-Arbitrator nominated by the Claimant**

(8)    By letter of 12 May 2004, Kaiser nominated as arbitrator:

> Dr. Johannes HOCK Jun.
> Stallburggasse 4
> 1010 Vienna
> Austria

(9)    On 24 May 2004, the Secretary General of the ICC International Court of Arbitration (the "ICC Court") confirmed Dr. Johannes HOCK pursuant to Article 9(2) of the ICC Rules of Arbitration in force as of 1 January 1998 (the "ICC Rules").

**2.    Co-Arbitrator nominated by the Respondent**

(10)    By letter of 5 February 2004, Respondent nominated as arbitrator:

> Dr. Anton BAIER
> Baier Lambert Rechtsanwälte
> Kärntner Ring 12
> 1010 Vienna
> Austria

(11)    On 24 May 2004, the Secretary General of the ICC Court confirmed Dr. Anton Baier pursuant to Article 9(2) of the ICC Rules.

*10*

**3.    President**

(12)    On 9 June 2004, the Co-Arbitrators jointly nominated as President of the Arbitral Tribunal:

> Prof. Gabrielle KAUFMANN-KOHLER
> Schellenberg Wittmer
> 15bis, rue des Alpes
> P.O. Box 2088
> 1211 Geneva 1
> Switzerland

(13)    On 16 June 2004, the Secretary General of the ICC Court confirmed Prof. Gabrielle Kaufmann-Kohler pursuant to Article 9(2) of the ICC Rules.

**4.    Secretary**

(14)    On 25 August 2004, the Arbitral Tribunal appointed with the consent of the parties as Administrative Secretary:

> Blaise STUCKI, Esq.
> Schellenberg Wittmer
> 15bis, rue des Alpes
> P.O. Box 2088
> 1211 Geneva 1
> Switzerland

C.    THE NATURE OF THE DISPUTE

(15)    The parties' dispute arises out of a "*Contract between Nova Hut, a.s. (Owner) and ICF Kaiser Netherlands B.V. (Supplier) for the Design and Construction of Phase 1 of the Flat Roll Products Minimill*" dated 27 June 1997 (hereinafter the "Phase 1 Contract" or the "Contract") (C18).

(16)    Pursuant to the Phase 1 Contract, Kaiser agreed "*in exchange for a fixed price, to deliver to the Owner, on a turnkey basis, on time, and at [Kaiser]'s risk, a fully constructed, operational Phase 1 of the mini-mill for flat rolled products […] the output, capabilities and characteristics of which will comply with the requirements of* [the Contract], *all in accordance with the Scope of Supply attached to* [the Contract] *including the Basic Design Documentation incorporated therein and in compliance with the commercial, technical, quality, throughput, and other terms, conditions and requirements with respect thereto that are more fully set forth in this Contract and its attachments (the "Project")*" (C18).

(17)    In the event, controversies arose leading to the ultimate termination of the Phase 1 Contract by Nova Hut and claims by each side against the other.

D.    THE ARBITRATION CLAUSE

(18)    The jurisdiction of the Arbitral Tribunal is derived from the arbitration clause contained in Article 11 of the Phase 1 Contract, which reads as follows (C18):

> Article 11 Arbitration
>
> 11.1    AMICABLE RESOLUTION
>
> 11.1.1    Claims, disputes and other matters in question between the parties to this Contract arising out of or relating to this Contract shall be amicably resolved by the Owner's representative and the Supplier's Project Manager. In the event the matter cannot be so resolved, it shall be referred to the Chief Executive Officers of Owner and Supplier for resolution within ten (10) working days of the submittal to said Chief Executive Officers.

## 11.2    ARBITRATION

If the matter is not resolved within the provisions of Section 11.1. any claims, disputes and other matters in question shall be solely decided by arbitration in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce. If any claims, disputes or other matters are referred to arbitration under this Contract and claims, disputes or other matters are referred to arbitration under the Phase 0 contract involve common matters, facts, or issues in dispute, then the proceedings under this Contract shall be consolidated with the proceedings under the Phase 0 contract to be dealt with as a single proceeding.

11.2.1    There shall be three Arbitrators who shall be appointed as follows: each party shall be entitled to choose one arbitrator at its discretion. The third arbitrator shall be chosen by agreement of the first two arbitrators. If the first two arbitrators fail to agree on a third arbitrator within twenty (20) Days of their own appointment, the third arbitrator shall be appointed by the President of the Chamber of Commerce in Vienna, Austria.

11.2.2    No arbitration arising out of or relating to this Contract shall include, by consolidation or joinder or in any other manner, an additional person not a party to the Contract except by written consent containing specific reference to the Contract and signed by the Owner, Supplier and any other person sought to be joined, provided Owner and Supplier hereby consent to the joinder of the IFC and any lender or lenders to the Owner associated with or participating in a financing or financial syndication lead or arranged by the IFC or an agent acting for such lender or lenders to whom the Owner assigns any rights under the Agreement pursuant to any security interest granted by the Owner to such lender or lenders. Consent to arbitration involving an additional person or persons shall not constitute consent to arbitration of a dispute not described or with a person not named therein.

11.2.3    This provision shall be specifically enforceable in any court of competent jurisdiction. The place in which the Arbitration shall be held shall be Vienna, Austria. The language and form of the Contract to be utilized in arbitration shall be at all times the English Language, and the applicable law shall be the law of The Republic of Austria. The language version of correspondence, technical and other documents to be utilized in arbitration shall be as specified in Section 12.2 6.

## 11.3    ARBITRATION DEMAND

11.3.1    Notice of demand for arbitration shall be filed in writing with the other party to this Contract and with the International Chamber of Commerce. The demand shall be made within fifteen (15) Days of the failure of such Chief Executive Officers to resolve the issue in question

## 11.4    ENFORCEMENT OF ARBITRATION AWARD

11.4.1  The award rendered by arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction.

11.5    WORK TO CONTINUE DURING ARBITRATION

Unless otherwise agreed in writing, the Supplier shall carry on the Work and maintain its progress during any arbitration proceedings, and the Owner shall continue to make payments for all work except the disputed and demonstrably defective Work in accordance with the Contract Documents."

(19)    For the purpose of these proceedings, as expressly confirmed in the Terms of Reference of 25 August 2004, both Kaiser and Nova Hut accepted without any objection the jurisdiction of this Tribunal to decide their respective claims and counterclaims pursuant to this arbitration agreement, save that Nova Hut disputed the Tribunal's jurisdiction to entertain a claim for USD 510,000.00 asserted by Kaiser on 23 April 2004 and to which Kaiser cited to as "Claim XV".

(20)    In its Post-Hearing Brief of 28 October 2005, Nova Hut, while reiterating its objection that Kaiser had no standing to make the above claim, withdrew the jurisdictional defense raised against it (see Respondent's Post-Hearing Brief of 28 October 2005, ¶¶112-113, pp. 43-44).

E.    THE LAW GOVERNING THE MERITS

(21)    Kaiser and Nova Hut agreed in Section 12.1 of the Phase 1 Contract that the substantive laws of the Republic of Austria would govern the Contract.

/-/

F.    THE STRUCTURE OF THIS AWARD

(22)    This Award is structured as follows:

-    Section II sets out a chronology of key events;

-    Section III contains a summary of the procedural steps that led from the commencement of the arbitration to the rendering of this Award;

-    Section IV sets out the parties' last relief sought;

-    Section V addresses and resolves an issue that is central to several of the parties' claims, namely whether Kaiser achieved Final Acceptance;

-    Section VI addresses each of the parties' claims in turn;

-    Section VII recapitulates the amounts awarded to the parties;

-    Section VIII addresses outstanding procedural issues that arose in the course of the proceedings and were reserved for determination in this Award;

-    Section IX deals with the assessment and allocation of the costs of these proceedings; and

-    Section X comprises the operative Award.

II.    **FACTUAL BACKGROUND**

A.    PRELIMINARY COMMENT

(23)    In this section, the Arbitral Tribunal summarizes the main facts only. It will refer to additional facts in the course of the legal discussion.

B.    NOVA HUT'S MODERNIZATION AND EXPANSION PROGRAM AND ASSOCIATED PROJECT DEVELOPMENT COSTS

(24)    In the early 1990s, Nova Hut embarked in a program of modernization and expansion of its steel production plant in Ostrava, Czech Republic, which it operates since 1952.

(25)    On 18 July 1994, Nova Hut, on the one hand, and Kaiser *Engineers*, Tippins, Inc. and Samsung Heavy Industries, on the other, executed a Letter of Intent, pursuant to which Kaiser *Engineers* undertook to provide certain advisory services in exchange for a consideration of USD 1.5 million payable in ten equal monthly instalments (C2).

(26)    In this context, in a letter of 28 March 1995, Kaiser indicated that it accepted that a USD 200,000.00 amount be deducted from the amounts owed to it under the Letter of Intent, which amount would be used by Nova Hut to pay the International Financial Corporation's (hereinafter the "IFC") appraisal fee (C5). Kaiser specified that it expected to be reimbursed at financial closing.

(27)    On 7 April 1995, Kaiser wrote to Nova Hut, stating that it would agree to an additional USD 10,000.00 deduction from the amounts owed to it pursuant to the Letter of Intent in connection with a financial review to be performed by PriceWaterhouse (C6).

(28)    On 8 August 1995, Kaiser agreed to a further USD 300,000.00 deduction (C7)

[...]

16

In accordance with our continued obligation as your developer for the Mini-Mill Project, we confirm that we will uphold our obligations as specified in the Letter of Intent signed by our respective companies. Therefore, we propose the following:

1. ICF Kaiser will agree to the deduction of $300,000 from the amount owed to them (or their affiliates, ICF Kaiser – Netherlands B.V.) to compensate Nova Hut for the appraisal fee charged by the IFC in accordance with the "Second Letter Agreement" dated July 7, 1995 negotiated between Nova Hut and the IFC.

2. [...].

3. Should the project's financing close with the IFC for the Mini-Mill project, we will expect to recover the above costs at financial closing.

(29)   On 14 August 1995, Nova Hut issued a Purchase Order, pursuant to which Kaiser *Engineers* agreed to provide Nova Hut with additional services in exchange for USD 4 million (C8/C9).

## C.   THE PHASE 0 CONTRACT

(30)   On 15 March 1996, Kaiser and Nova Hut entered into a contract for the first phase of the work, namely the design, procurement and construction of a Ladle Metallurgical Furnace, a Continuous Caster and necessary infrastructure and support facilities (hereinafter, the "Phase 0 Contract").

(31)   This work was the first part of a larger project for the supply of a single flat roll products minimill comprising a Ladle Metallurgical Furnace, a Continuous Caster, an Equalizing Furnace and a Reversing Hot Strip Mill. The parties had agreed to separate the project into two phases, namely Phase 0 and Phase 1.

(32)   It is common ground between the parties that the Phase 0 Contract was fully implemented and reached Final Acceptance on 16 July 1998.

### D.    THE NEGOTIATION OF THE PHASE 1 CONTRACT

(33)    On 8 November 1996, the parties, together with IFC, entered into a Memorandum of Understanding, setting the total price for the Phase 1 of the work at USD 168.5 million (C16):

> Memorandum of Understanding
>
> Between ICF Kaiser International, Inc. and ICF Kaiser Netherland B.V. and NOVA HUT, a.s. done 8 November 1996
>
> The parties have agreed as follows:
>
> 1.    The total price of contract between NH, a.s. and ICF Kaiser Netherland [sic] for Phase 1 of Minimill shall be 168.500.000,– USD. The contract terms for Phase 1 will be similar to the contract terms for Phase 0.
>
> 2.    [...]
>
> 3.    [...]
>
> 4.    [...]
>
> 5.    The amount of 160.000.000,-- USD shall be the fixed price. To this amount has been added 8.500.000,– USD for contingency and escalation.
>
> In the investment program of NH, a s. until 2000, the minimill shall be included at the following costs:
>
>         95.000.000,– USD for Phase 0
>
>         160.000.000,– USD for Phase 1
>
> total 255.000.000,– USD
>
> and
>
> the amounts for contingency shall be:
>
>         6.000.000,-- USD for Phase 0
>
>         8.500.000,-- USD for Phase 1
>
> total 14.500.000,-- USD

(34)    Kaiser alleges that, in April 1997, the parties eventually agreed to reduce the price for the Phase 1 to USD 167mio, namely USD 160mio for the engineering, procurement and construction of the minimill and USD 7mio to be paid



separately, USD 3.5mio being paid as a contingency fund upon Preliminary Acceptance and USD 3.5mio in the form of a warranty reserve to guarantee performance by Kaiser of its warranty obligations. Still according to Kaiser, the price for the Phase 1 Contract was established at USD 167 million to accommodate Nova Hut's requirements for funding from the IFC. This is disputed by Nova Hut, who claims that the Phase 1 Contract superseded the Memorandum of Understanding.

## E.     THE PHASE 1 CONTRACT

### 1.     The subject matter of the Phase 1 Contract

(35)     On 27 June 1997, Kaiser and Nova Hut entered into the Phase 1 Contract.

(36)     Pursuant to the terms of the Contract, Kaiser agreed to convert the one casting strand of the Continuous Caster from its Phase 0 casting capabilities to its Phase 1 capabilities and to design, procure and construct, on a turnkey basis, an Equalizing/Reheat Furnace, a Two-stand Reversing Hot Strip Mill (hereinafter, the "minimill"),[2] together with certain infrastructure and support facilities.

### 2.     Provisions of the Contract relevant for the resolution of the parties' claims

(37)     Provisions of the Phase 1 Contract relevant in the present context are the following (C18):

(38)     At the time of contracting, Nova Hut had not yet obtained the necessary financing from the IFC. Hence, in accordance with Section 2.4 of the Contract, effectiveness was conditioned upon Nova Hut obtaining financing:

> 2.4     EFFECTIVENESS
>
> 2.4.1     The Owner will be borrowing funds necessary to pay for Phase 1 from a consortium of lenders lead [sic] by and represented by the IFC, pursuant to certain loan and credit agreements (the "IFC

---

[2]     A "minimill" rolls the steel slabs into strip coils of differing thicknesses (gauges) and widths.

19

Credit Agreements") to be executed between the IFC and the Owner. The Owner anticipates that the IFC Credit Agreements will become effective during 1997, and that funding for Phase 1 under the IFC Credit Agreements will become available to the Owner immediately such agreements become effective [sic]. The Owner records that it cannot proceed with Phase 1 unless the IFC Credit Agreements become effective and funding becomes available to the Owner under the IFC Credit Agreements.

2.4.2    [...]

2.4.3    The Owner will notify the Supplier when the IFC Credit Agreements become effective and funding becomes available to the Owner thereunder, which notification shall constitute the Owner's notice to the Supplier to proceed under the Contract, and the date on which such notice is given shall constitute the Date of Effectiveness. If the date of Effectiveness occurs after June 30, 1997 the Fixed Price, Schedule and other affected terms shall be adjusted by mutual agreement.

2.4 4    [. .]

2.4.5    [...]

(39)    Section 2.1 of the Phase 1 Contract ("Basic Definitions") defined the "Date of Effectiveness" as "*the date when the notice to proceed under the Contract is given by the Owner to the Supplier under Section 2.4*".

(40)    Section 3.1 of the Contract set out the principle that equipment, materials and services were to be supplied by Kaiser directly or by qualified subcontractors approved by Nova Hut. Section 3.1.1.2(iv) further provided that the Main Drive and Cycle Converters for the Reversing Hot Strip Mill were to be supplied by Ansaldo.

(41)    Nova Hut contends that the Phase 1 Contract involved technology (two stand reversing hot strip mill) that, at the time of contracting, had not been implemented previously. Accordingly, it was of the greatest importance to Nova Hut that Tippins, Inc., Kaiser's principal subcontractor, had been engaged to work on a similar project in Thailand. In relevant parts, Section 3.2.35 of the Phase 1 Contract provided as follows:

3 2.35    The Supplier shall provide to the Owner, both on a regular basis and whenever requested by the Owner, full information concerning the progress and status of the Tippins two stand reversing hot strip

mill similar to the Reversing Hot Strip Mill to be provided to the Owner under this Contract which is being provided by Tippins to a steel mill in Thailand (the "Thai Project").

.1    [...]

.2    [...]

.3    [...]

.4    If the Thai Project for the two stand reversing hot strip mill and its associated components is delayed due to technical problems or subject to any material technical problems, then the Supplier shall promptly provide the Owner with a full explanation of the difficulty or problem, of what is being done to remedy the difficulty or problem, and of the implication to Phase 1 of the difficulty or problem.

.5    If, after receiving such explanation, the Owner reasonably believes that such difficulty or problem will or may reasonably be expected to result in a material inability on the part of the Supplier to fully and punctually perform its obligations under this Contract (...), then the Owner will advise the Supplier thereof.

(i)    [...]

(ii)    [...]

(iii)    If, after a reasonable time and having regard to the information exchanged between Supplier, Tippins and Owner, it becomes apparent that notwithstanding the attempts of Tippins to fix the technical problems associated with the Thai project two stand reversing hot strip mill, that such problems can reasonably be expected to result in a material inability on the part of the Supplier to fully and punctually perform its obligations under this Contract, then the Owner may (A) order first a pause in the Project, (...), and then (B) if the difficulty or problems associated with the Thai project are not resolved within a reasonable period of time, the Owner may terminate the Project under Section 13.1 for the default of the Supplier. (...).

(iv)    [...]

.6    [...]

(42)    Section 5 of the Contract provided for the timeframe in which Kaiser was to perform the work.

(43)    Pursuant to Section 5.2.1, Nova Hut was entitled to terminate the Contract in case Kaiser failed to achieve Preliminary Acceptance within 130 days from the

date by which it was to achieve it (i.e., pursuant to Section 16.1, within 30 days from 30 June 1999, subject to adjustments and delays not caused by Kaiser).

(44)    Section 5.3.1 set forth certain milestone dates that the parties deemed "important" to achieve Preliminary Acceptance by 30 June 1999. In particular, Section 5.3.1 provided for milestones:

-    No. 8 on 15 April 1999 for Mechanical Completion;

-    No. 9 on 15 June 1999 for the first preliminary hot tests; and

-    No. 10 on 30 June 1999 for Preliminary Acceptance.

(45)    The contract price and/or the project schedule were to be adjusted in case Kaiser's performance was delayed for reasons not attributable to it and specified in Section 5.4 of the Contract entitled "Certain Delays".

(46)    Section 5.6.1 stipulated Nova Hut's commitment to pay Kaiser a Success Fee of USD 40,000.00 for each day Preliminary Acceptance was achieved earlier than 31 May 1999, up to a ceiling of USD 4 million. The following reservation was set out in the second paragraph of Section 5.6.1:

> Such success fee shall not be payable to Supplier unless and until, and the right of the Supplier to receive such success fee shall be conditional upon, the Phase 1 Plant completely meeting all of the Performance Tests set out in Appendix G with respect to Final Acceptance without the imposition of any penalties.

(47)    Section 6.1.1 set the contract price at a fixed amount of USD 160mio. The main issue that arises in connection with this section is whether the Contract superseded the Memorandum of Understanding of 8 November 1996, which established the contract price at USD 168 million (C16).

(48)    Pursuant to Section 6.3.1 of the Contract, Kaiser was entitled to interest at the rate of LIBOR for one-year US dollars deposits plus eight percent on any amount overdue by more than 30 days.

(49)     Section 6.5.3.5.a) required that Nova Hut make a USD 10 million down payment within 30 days of the Date of Effectiveness, provided that Kaiser had met the requirements of Section 8.3.2 of the Contract.

(50)     Section 6.5.4 of the Contract stipulated how and when Nova Hut was to effect Final Payment. Section 6.5.6 of the Phase 1 Contract provided that ownership of the part of the work, the plant and the project having not passed to Nova Hut at that time would pass upon final payment.

(51)     Section 8.3.2 of the Phase 1 Contract stipulated that Kaiser was to provide Nova Hut with a USD 5 million performance letter of credit and a USD 5 million bill of exchange as security for performance of the work within 10 days from the Date of Effectiveness. In accordance with Section 8.3.2.3, Nova Hut was to have the right to draw down on the letter of credit if it was to expire before Final Acceptance without having been extended beyond that date.

(52)     Section 9, entitled "Changes in the Work", governed changes in the design, scope or performance of the work and their consequences on the contract price.

(53)     Change Orders were defined in Section 9.2.1, which read as follows:

> A change order (herein a "Change Order") is a written order signed by the Owner and Supplier, and issued after execution of the Contract, authorizing an addition, deletion, change, or other revision (herein a "Change") in the Work or adjustment in the Fixed Price (including, in the case of a reduction in the Scope of Supply, an appropriate reduction in the Fixed Price) or in the date by which Preliminary Acceptance is required to be reached under Section 16.1 but a 'Change' does not include any change referred to in Section 9.2.5.

(54)     The following procedure applied to the issuance of Change Orders (Section 9.2.2):

> 9.2.2    The Owner, without invalidating the Contract, may order Changes in the Work within the general scope of the Contract, which shall be in writing issued to Supplier by Owner.
>
> .1    Upon receipt of such request for a Change, Supplier shall prepare a Proposed Change Order to Owner for such

Change outlining the applicable Scope of Supply for the Change, the schedule for the Change, and any changes required to the Schedule and the Fixed Price.

.2    [...]

.3    [...]

.4    If Owner agrees to the Supplier's Proposed Change Order, the Owner will countersign the proposal which will then constitute the Change Order, and the Contract Scope of Supply, the Schedule and the Fixed Price shall be adjusted appropriately. If the Owner rejects the Supplier's Proposed Change Order, then the Proposed Change Order shall become a rejected Proposed Change Order.

(55)    However, Section 9.2.5 specified that the above procedure did not apply "*to correction of Supplier's Work which is defective or which fails to comply with the requirements of this Contract or correction of parts of the constructed Works affected by Supplier's Work which is defective or which fails to comply with the requirements of this Contract. Such corrections shall be corrected by the Supplier at its own cost as provided in Article 10 and without adjustment to the Schedule*".

(56)    Pursuant to Section 12.1.1 of the Phase 1 Contract, Austrian law was the governing law.

(57)    Section 12.8 of the Contract provided for the following "entire agreement" clause:

12.8.1    The Contract, the Appendices to this Contract, and, subject to Section 3.2.25, the Basic Design Documentation, and any written programs or documents expressly referred to in this Contract, represent the entire agreement between [Nova Hut] and [Kaiser] and supersedes any prior negotiations, representations or agreements with respect to the Project (but, as set out in Section 1.4 does not supersede the Phase 0 contract). The Contract may be amended only by written instrument signed by both Owner and Supplier.

12.8.2    The Contract and its Appendices and its written programs and documents do not supersede any Work done (including any Documents or Drawings prepared) before execution of the Contract, provided that such Work shall be required to comply with the terms of this Contract and its Appendices and written programs and documents.

(58)    Termination of the Contract was governed by Section 13.

(59)     Kaiser's default (Section 13.1.2) or failure to pass certain performance tests provided for at Section 14 within 18 months from Preliminary Acceptance (Section 13.1.3) were among the specific grounds for termination. As to Section 13.1.1, it conferred upon Nova Hut the right to terminate the Phase 1 Contract for any other reasons not covered by Sections 13.1.2 and 13.1.3 upon 30-day written notice to Kaiser and subject to Nova Hut fully compensating Kaiser for the work performed, cost and expenses.

(60)     Section 13.3 of the Contract stipulated the consequences of the termination of the Contract:

> 13.3.1    In any termination of the Contract under Article 13, the Supplier shall transfer and assign to the Owner:
>
> > .1    ownership to all Work (including without limitation all Documents and Drawings) effected in connection with the Project which would pass to Owner were the Project to have been completed and to all parts of the Phase 1 Plant which have been completed (and for which in the case of a termination under Section 13.1.1. Supplier is entitled to be paid), including:
> >
> > > (i)    all technical and operating documentation necessary for maintenance and running of the Plant and completion of the Project and Plant and
> > >
> > > (ii)    all work effected by Subcontractors for which the Subcontractors have been paid or have a right to payment from Owner (including, in the case of a termination under Section 13.1.1. for which Supplier has a right to claim payment from Owner to enable Supplier to make payment to the Subcontractor); and
>
> [...]

(61)     Pursuant to Section 14.6 of the Contract and Appendix G, Kaiser was to perform and successfully complete certain performance tests to achieve Final Acceptance of the work. The goal of the performance tests was "*to test the Plant with both Phase 0 and Phase 1 operating as an integrated operating unit over a sustained period of time to determine that the Phase 1 Plant, when operated as an integrated plant with Phase 0, [was] able to meet the performance criteria set out in this Section 14.6 and in Appendix G*".

(62)     To achieve Final Acceptance, Kaiser was in particular required to pass a Four Week Integrated Production Performance Tests (hereinafter, the "4WIPPT"), being specified that, pursuant to Section 14.6.6.6 of the Phase 1 Contract, Kaiser's failure to perform a first or second successful 4WIPPT within 18 months from Preliminary Acceptance and to conduct a third test gave Nova Hut the right to terminate the Contract.

(63)     Section 14.7 of the Phase 1 Contract governed Final Acceptance.

3.     **The Appendices to the Contract**

(64)     The Phase 1 Contract was supplemented by Appendices A to R. The following Appendices are pertinent for the resolution of the present dispute:

- Appendix B, Scope of Supply (R1) ;
- Appendix C, "Schedule of Penalty Conditions, Calculations and Parameters" (C18); and
- Appendix G, "Performance Guarantees and Performance Tests for Nova Hut Strip Mini-Mill (Phase 1)" (C18).

(65)     Relevant provisions of the above Appendices shall be set out below, in the course of the legal discussion.

F.     THE IMPLEMENTATION OF THE PHASE "1" CONTRACT

1.     **The construction phase**

(66)     On 27 June 1997, i.e. on the day the parties executed the Phase 1 Contract, Nova Hut entered into a loan agreement with IFC.

(67)     Still on 27 June 1997, Nova Hut issued a "*Notice for ICF Kaiser Netherlands B.V. to proceed with its Work under the Contract*", spelling out that, pursuant to Section 8.3.2 of the Contract, such notice would become effective upon the

submission by Kaiser of a USD 5 million performance letter of credit and a USD 5 million bill of exchange (C19):

> Pursuant to the Contract between NOVA HUT, a.s. and ICF Kaiser Netherlands B.V. for the Design and Construction of the Phase 1 of the Flat Roll Products Mini Mill at NOVA HUT's facilities in Ostrava, Czech Republic (the Contract), I am pleased to issue this Notice for ICF Kaiser Netherlands B.V. to proceed with its Work under the Contract.
>
> This Notice shall be effective four (4) days after the delivery to NOVA HUT, a.s. of a Performance Guarantee Letter of Credit in the amount of USD 5.000.000,- and Bill of Exchange in the amount of USD 5.000.000,- in the form set forth in Appendices A and F to the Contract as required by Section 8.3.2 of the Contract.

(68)   Nova Hut does not dispute that, at the time it gave to Kaiser notice to proceed, it had not yet obtained the necessary financing from the IFC but contends that this is irrelevant as it could give notice as early as it wished.

(69)   By telex of 8 July 1997, Kaiser's bank, First Union National Bank (then known as Corestates Bank), confirmed the issuance, upon Kaiser's application, of an irrevocable standby letter of credit no. 400920P in favour of Nova Hut in the amount of USD 5 million (C183).

(70)   Pursuant to the terms and conditions of the letter of credit, Nova Hut had the right to draw down on the letter of credit if it did not receive a notice of extension from the bank 30 days prior to its expiration date.

(71)   On 12 July 1997, four days after the receipt of the performance letter of credit and the bill of exchange, Nova Hut's Notice to Proceed became effective. According to Nova Hut, this was also the date on which the Contract became effective. By contrast, Kaiser takes the position that the Date of Effectiveness of the Contract occurred five months later, on 9 December 1997, when Nova Hut obtained the necessary financing through the IFC.

(72)   On 15 July 1997, pursuant to Section 6.5.3 of the Phase 1 Contract, Kaiser billed Nova Hut for the USD 10 million down payment (R2).

(73)     On 31 July 1997, Nova Hut sent to Kaiser a letter authorizing it to proceed with the Phase 1 work (C22).

(74)     On 21 August 1997, Kaiser advised Nova Hut that it would suspend its performance of the Phase 1 Contract as long as Nova Hut had not secured full financing and effected the Down Payment (C23). Kaiser further stated that Nova Hut's failure timely to secure financing and meet its payment obligations was having significant impact on both the project cost and the construction schedule.

(75)     By letter dated 4 September 1997, Nova Hut replied that the negotiations with the IFC were in their closing stages and that financing would be available by mid October. Moreover, Nova Hut confirmed that it would pay USD 10 million to Kaiser by mid September (C24).

(76)     On 15 September 1997, Nova Hut effected the USD 10 million down payment.

(77)     On 24 September 1997, Kaiser wrote to Nova Hut, stating that the project was two months behind schedule, primarily as a result of the lack of financing (C25).

(78)     On 14 October 1997, Kaiser requested a 7-week time extension to complete the Phase 1 work (C26):

> This letter is to advise Nova Hut a.s. that our current analysis of the Phase 1 project schedule is that the Phase 1 project is behind schedule and that the potential continues to exist for further project schedule delays due to circumstances which will be discussed below.
>
> In accordance with our letter to Nova Hut a.s. dated 21 August 1997, we advised that the project was being delayed due to lack of funds to continue the project. Nova Hut eventually paid ICF Kaiser Netherlands B.V. the down payment required by the contract on 15 September 1997. This down payment should have been received 30 days from the Date of Effectiveness, i.e. 28 July 1997. Until payment was made, the project was except for engineering activities effectively delayed.
>
> [...]
>
> Due to the uncertainty of the availability of funding as advised by us and as confirmed in Nova Hut's letter dated 4 September 1997, both ICF Kaiser and Tippins were unable to incur additional financial exposure until Nova Hut

could assure us that the cash flow for the Phase 1 project was in place. In fact, it was not until last week that the final agreements were reached for the cash flow for 1997.

By this letter ICF Kaiser officially requests a seven (7) week extension to the project completion date and intermediate milestone dates.

[...]

(79)    On 27 November 1997, Kaiser issued Proposed Change Notice (hereinafter, "PCN") No. 18, pursuant to which it requested a 7-week time extension of the project schedule. Kaiser called upon the following reasons in support of its PCN:

LACK OF FUNDS AND LATE DOWN PAYMENT TO THE SUPPLIER (5 WEEKS). DELAY IN APPROVING THE FRA FOR THE STRUCTURAL STEEL AWARD (2 WEEKS)

(80)    On 9 December 1997, i.e. five months after the date contemplated in the Phase 1 Contract (30 June 1997; see Section 2.4 of the Contract), Nova Hut notified Kaiser that the credit agreements between Nova Hut and the IFC had become effective and, hence, that funding had become available to Nova Hut.

(81)    By letter of 11 February 1998, Kaiser informed Nova Hut that the project in Thailand on which its subcontractor Tippins, Inc. was working had been put on hold and would not be achieved prior to the completion of the Phase 1 project.

(82)    By letter of 16 March 1998, Mr. Pretsch (Nova Hut) advised Kaiser that Nova Hut's Board of Directors had directed that Kaiser supply Cycloconverters manufactured by ABB rather than by Ansaldo and expected that this would not cause additional financial requirements (C39/R67).

(83)    On 16 July 1998, the parties executed the Certificate of Final Acceptance of the Phase 0 work (C56).

(84)    By letter of 25 November 1998, Nova Hut denied Kaiser's statement that the belated transfer of the USD 10 million down payment had pushed back the Effective Date of the Contract until December 1997 (C60). Moreover, Nova Hut

noted that the down payment had been delayed by 14 days, not by six weeks, and, accordingly, that there was no reason to amend the project schedule.

(85)     At a Project Senior Management Meeting held on 20 January 1999, Nova Hut presented its plan for running a plant demonstration for various Czech officials on 22 June 1999 (hereinafter, the "Demonstration Day") (C91).

(86)     At a meeting held on 17 February 1999, Nova Hut advised Kaiser that the Demonstration Day would take place on 22 June 1999 (R14).

(87)     By letter of 23 February 1999, Kaiser confirmed that it and its subcontractors would *"make all efforts to support the* [Demonstration Day]*"* (C72). Kaiser however stated that *"*[i]*n view of the shared concerns regarding the project schedule, it* [was] *important that both parties have a clear understanding of the exact requirements for this occasion"* and requested that Nova Hut submit a proposal in this respect as early as possible given the proximity of the Demonstration Day, scheduled to take place on 22 June 1999.

(88)     In a letter of 15 March 1999, Kaiser confirmed that *"the current slippage to the schedule place*[d] *great pressure on* [it] *to perform a meaningful plant demonstration on the 22nd of June 1999"* (C197). Kaiser nevertheless articulated a proposal for the demonstration, specifying that such proposal was *"based on current schedule constraints"* and was what it believed to be *"reasonably achievable by the required date"*.

(89)     By letter of 28 April 1999, Nova Hut informed Kaiser that it would impose penalties on Kaiser for the latter's failure to achieve Mechanical Completion (Milestone Date No. 8) by 15 April 1999 (C86).

(90)     On the same day, Kaiser requested Nova Hut's confirmation that the Milestone Dates Nos 8 (Mechanical Completion), 9 (First Preliminary Hot Test) and 10 (Preliminary Acceptance) were rescheduled for 20 September, 20 November and 5 December 1999, respectively, as a result of the five months and five days delay

incurred by Nova Hut in obtaining financing and, accordingly, in achieving the Date of Effectiveness (C85).

(91)     Nova Hut replied on 3 May 1999, stating that it would not impose penalties on Kaiser if the hot tests and Preliminary Acceptance were achieved by 30 June 1999 (C87). Moreover, Nova Hut commented on Kaiser' statement that the Date of Effectiveness had been delayed by five months and five days:

> Allow me to express our statement:
>
> The contract between NH and ICF was formally signed on 27th June, 1997 under the very festive circumstances and very important persons being participated. At the same time it was clear to all parties that there is the necessary time to achieve the loan of IFC. Therefore there is the article 2.4.1 in the contract saying the presumption of the date of effectiveness within the year 1997. All parties expressed the frank interest to continue in already started erection of minimill, including company Tippins which was in very difficult situation because of Thai project failure.
>
> NH used the possibility of bridge over credits to assure the current financing of the project. This starting position was given by the letter of Mr. Petros to Mr. Vines dated 27th June, 1997 and this letter was responded and agreed by Kaiser's letter from 31st July 1997 (see enclosures). Therefore we do not understand why you are seeking the arguments which bring doubts on the Date of Effectiveness of the contract when the documents attached confirm the Date of Effectiveness of the contract.
>
> The true is, the loan from IFC was achieved on December 1997 but already in September of that year Kaiser was given by the first prepayment of 10 mil USD to start and continue the work on the project. We are thinking your arguments are faulty and they should not be applied in the final phase of the project when on the one hand the participants on the project have been mobilised to achieve stated aims and on the other hand by your letter those which are responsible for the erection have been demobilised.
>
> Based on these reasons we have to refuse your letter with regret. On the contrary we think that we have to find all the ways how to fulfil the date 22nd June 1997 and that there is no time to deal with formal obstacles. It seems to us that this way is the way how to seek an alibi for the case that our common effort to finish the project on the time would be not successful. The copy of our letter we send to Mr. Vines.

(92)     By letter of 3 May 1999, Kaiser rejected Nova Hut's assertion that testing had been delayed by Kaiser and stated that at least 21 days of delay had been incurred as a result of Nova Hut's failure to provide utilities and qualified operators (C181).

(93)     On 3 June 1999, Kaiser sent to Nova Hut a memorandum setting out outstanding contractual issues, insisting that these were to be addressed and solved without delay (C91). The memorandum was made of an executive summary presenting five unresolved issued – namely, i) the Development Costs, ii) the Contingency Amount, iii) Financing Delays and their implications on the price, schedule and contract terms, iv) Proposed Change Notices and v) the Demonstration Day – and of five exhibits (A to E) giving detailed particulars of those issues (R24). Regarding Nova Hut's alleged delay in obtaining financing, Kaiser claimed a 164-day time extension and overhead costs in an amount of USD 2,292,999.00 (Exhibit C). According to Exhibit E, which related to the preparation for the Demonstration Day, Kaiser had incurred USD 800,000.00 in additional costs to prepare for the Demonstration Day and such preparation had delayed the overall performance of the work by 37 days.

(94)     On 18 June 1999, representatives of the parties met in Nova Hut's premises to discuss various open contractual issues, including the project development costs incurred by Kaiser and the contract price (C92). However, the parties could not resolve these two issues, which were left open for further discussions at a higher level.

(95)     On 22 June 1999, a demonstration took place at the plant.

(96)     On 23 June 1999, the parties held another meeting to try and settle the open contractual issues (R28). Regarding Kaiser's claim for a time extension and compensation of overhead costs for Nova Hut's delay in obtaining financing, the parties resolved as follows:

> Exhibit "C" Extension of Time Claim
>
> [ ..]
>
> Conclusion to Exhibit C:
>
> 1.     NH will cancel their invoice No. 569 556 dated 4 May, 1999 for USD 100,000 of LD's [liquidated damages].
>
> 2.     ICF KAISER will draw a new $5 mil bill of exchange valid until the date of Final Acceptance, which is expected to be January 31, 2000 which

should be submitted to NH no later than June 30, 1999. In case that Final Acceptance date is postponed ICF KAISER will automatically issue a new Bill of Exchange for the same amount valid until the new date of Final Acceptance.

3.   The grace period for Preliminary Acceptance according to article 5.6.2 of the contract will be extended in comparison to initial date of July 30, 1999 until September 16, 1999 when the Ph. 0 warranty L/C expires. It was further agreed that Ph. 1 Performance L/C will be increased by $8 mil September 17, 1999 at the latest, which means that total L/C's will amount to $19.1 mil. Total warranty (L/C + Bill of exchange) will be equal to the initial amount of $24.1 mil according to contract clause 8.3.2.2.

4.   This does not affect the validity of Preliminary Acceptance date of June 30, 1999 according to section 5.3.1.10 of the Contract.

By this arrangement ICF KAISER will retract its claim presented in Exhibit C and agree not to further pursue the matter.

[...]

Exhibit "E" Dedication Date Preparation Costs

ICF KAISER incurred extra costs for achieving Dedication Date. That claim is not complete in money terms and some additional costs are likely to occur. During previous joint meeting ICF KAISER submitted to NH a summary sheet as a support for the $800,000 claim where a break down of all extra costs known to that date was presented, including 37 days of schedule extension. ICF KAISER pointed out that they advised NH several times in the past that meeting June'99 date would be very difficult.

NH expressed their concerns that their request to organize the Dedication Ceremony on June 22, 1999 based on the assumption that Contract Milestone – June 15, 1999 "Start of Hot Tests" prior to Preliminary Acceptance will be kept, which means that no additional costs could arise

In NH's opinion, the costs were incurred mainly because of delays of Tippins/Stein Heurtey equipment deliveries, and later as a result of Stein Heurtey delayed commissioning, which is ICF KAISER responsibility. They said the whole issue had been reconciled and NH were willing to give $50,000 to cover all those extra costs. NH reminded ICF KAISER that they did not want to open at all the question of late mill operation which would result in production losses.

ICF KAISER stated that with this NH approach they would have to reopen Exhibit "C" issues, which have been just closed. $50,000 compared to $800,000 estimates is a very small amount. Rather than choosing just a number both parties should meet and review support documentation presented by ICF KAISER and subcontractors and reach an agreement as to what part should be reimbursed. In order to satisfy NH requirements for 22 June ICF KAISER took short cuts and special measures like extra bonuses for subcontractors, overtime work, etc. so $50,000 is not an adequate amount. NH and ICF KAISER agreed that a different and more objective approach should be taken.

It was decided that project directors of both parties (Mr. Winstanley and Mr. Halabrin) will form working groups and will meet at a later date to agree on real cost associated with Dedication Ceremony and conclude the matter.

[...]

## 2.    Preliminary Acceptance

(97)    On 29 October 1999, Kaiser achieved Preliminary Acceptance of the work (C107). According to Kaiser, taking into account the time extensions to which it is entitled, Kaiser was to achieve Preliminary Acceptance on 7 January 2000. It thus achieved Preliminary Acceptance 70 days prior to the date on which it was required to do so and is entitled to a USD 2.8mio bonus payment for early achievement of Preliminary Acceptance.

## 3.    The commissioning phase

(98)    On 29 February 2000, Kaiser wrote to Nova Hut to record the status of unresolved issues. Exhibit C to Kaiser's letter, which gave detailed particulars of Kaiser's claim for a time extension and extended overheads as a result of Nova Hut's delay in obtaining financing, reads as follows (R78):

> **Claim Description:**    ICF Kaiser is due an extension in the time for Contract performance and added cost for extended overhead due to Nova Hut's delay in finalizing project financing (Date of Effectiveness).
>
> **Claim Amount:**    Time for Performance   164 Days
>
>         Cost of Extended Overhead     US$ 2,292,999
>
> Schedule and Status of Negotiations:
>
> -    ICF Kaiser presented its formal claim for time extension and extended overhead costs on 3 June 1999.
>
> -    In subsequent discussions and negotiations on this claim item, Nova Hut agreed to an extension of the period for assessment of liquidated damages following Preliminary Acceptance from 30 July 1999 to 16 September 1999.
>
> -    In consideration of this change in date of assessment of liquidated damages associated with the achievement of Preliminary Acceptance,

*34*

ICF Kaiser agreed to drop the claim for extended overhead costs in the amount of US$ 2,292,999.

- Subsequently both parties accepted 29 October 1999 as the date of Preliminary Acceptance with no assessment of liquidated damages.

- Unresolved is the commencement of the period required to reach Final Acceptance (18 months).

Nova Hut holds the position that the 18-month period for Performance Testing should begin from the original Contract date of 30 June 1999.

ICF Kaiser holds the position that the 18-month period for Performance Testing should begin from the revised date of Preliminary Acceptance of 29 October 1999 in accordance with Contract provisions.

Current Status of Claim:

- Claim is valid and has been fully documented to Nova Hut

- Amount due of US$ 2,292,999 dropped by ICF Kaiser in exchange for the Nova Hut Agreement to a revised date of Preliminary Acceptance with no assessment of liquidated damages.

- Unresolved is the revised date for Final Acceptance.

## 4.     The 4WIPPT

(99)    On 10 October 2000, Kaiser sent to Nova Hut revision No. 1 of PCN No. 096 entitled "*Changes in Ph. 1 Performance Guarantees and Performance tests Parameters Subject to Exhibit 'G'*" (R49). According to Nova Hut, this was an attempt by Kaiser to lower the quality standard imposed by the 4WIPPT.

(100)   On 12 October 2000, Nova Hut replied that it could not approve Kaiser's PCN No. 96, which would have to be discussed "*later upon evaluating partial tests results based on actually obtained results*" (R50).

(101)   On 13 October 2000, the parties executed a document entitled "Four weeks performance test procedure" setting forth the methodology and measurement parameters agreed by the parties (hereinafter, the "4WIPPT Protocol") (C134/C173). Pursuant to Section 3.1 of such document, the average rate to calculate the constraint adjusted weight was of 134.7 tons per hour. Section 3.2 of the Test Protocol reads as follows:

3.2     Calculation of the daily coil production:

Extract from the Mill L2 the rolled cold slabs weight

Calculate the Coil weight by multiplying the slab weight by 0.97

Calculate the constraint adjusted coils weight as per Table E and R4 of App. G

The values of caster production of the Table R-4 will be multiplied by 1.009 in order to adjust the density to actual value.

(102)   On 16 October 2000, the 4WIPPT began (C132). During each day of the test, numerous documents were produced that recorded the daily production, the delays in the production of the mill and of the continuous caster, etc. The majority of these documents have been filed by Kaiser and marked as exhibit C132.

(103)   On 18 October 2000, the parties executed Addendum 1 to the Test Procedure, which provided as follows (C131):

Addendum #1

to the Nova Hut Minimill Phase 1, Four weeks Performance Test Procedure signed the 13 October by the Owner and the Supplier.

The following sentence will be added to the section 3.2 Calculation of the daily coil production:

The coil production will be defined as acceptable if the coils are adhering too CSN, DIN, EU and ASTM Standards.

(104)   From 3 to 8 November 2000, during the 4WIPPT, the parties carried out the Hot Rolled Coils Quality Tests (hereinafter, the "HRCQTs").

(105)   The 4WIPPT ended on 13 November 2000.

(106)   On 15 November 2000, Mr. Pretsch (Nova Hut) wrote the following letter to Kaiser (R57):

I was told by my engineers that Kaiser Netherlands B.V. seems to pretend that the signing of the protocols of the production rolled during the first days of the [4WIPPT] were to indicate that NOVA HUT accepts this production as being of acceptable quality as defined in the Phase 1 Contract.

I may repeat in writing what I have already said many times orally and what follows clearly from the Contract itself. NOVA HUT has never accepted those coils as being of acceptable quality when signing the protocols as NOVA HUT was not in a position to do so with virtually all quality tests still missing. Consequently, the signatures of my experts only acknowledge that the coils were rolled. This is, however, only a pure reproduction of facts, not a binding declaration of law.

(107)    On 24 November 2000, Nova Hut wrote as follows to the IFC (C233):

The Minimill Performance Test has been finished at 6 a.m. on November 13, 2000, and the final evaluation has been done on November 22, 2000. There followed from the evaluation that the Test has been fulfilled and overreached at the production volume up to 108.5%, whereby a theoretical claim for Kaiser NBV has risen for bonus amounting to USD 5.3 million, but NH has a claim of USD 4.8 million penalty for nonfulfilment [sic] of the quality tests. For the time being, NH doesn't acknowledge the test, and we shall attempt at the overall agreement, acceptable for NH, IFC, as well as KNBV. The main problem is that the rolling mill has not proved the ability of reliable rolling of gauges under 2.5 mm, and it need another 6 months for completion and modification of some functions. There is a real assumption that it shall succeed, but NH shall make the realization at the KNBV's cost, and at presence of selected specialist of Tippins. [...].

(108)    On 28 November 2000, pursuant to Section 14.7.1 of the Contract, Kaiser sent to Nova Hut, for Nova Hut's approval, a signed copy of the "Protocol of Completion of the Performance Guarantees and Performance Tests" (C143). Nova Hut refused to sign it.

(109)    On the same day, SSAB Tunnplat, a consultant commissioned by Nova Hut to observe and supervise the 4WIPPT, produced its report (R58). The executive summary of SSAB's report provides as follows:

At Nova Hut in Ostrava (Czech Republic) are they in a final stage of a investment project of a hot strip mill and the contract requires a performance test which will prove the suppliers guarantee for production, quality and yield of the entire mini-mill facility. During this test the mill showed so insufficient capability of rolling and reliability so the performance shouldn't have been done in this stage. The reason of why the performance was done we don't know anything about and we just concentrate on the performance test. The mill managed to do 7 of scheduled 12 quality tests, 3 of these tests which were not done because the mill were not able to roll these gauges and 2 of them were not done because of no steel available.

What has to be notified is that during the last part of the performance test there were so big improvements done on the rolling that we think this mill will reach the target related to quality and production rate. Today the mill is able to roll 2.5-3.0 mm (without reliability) and if the people work as god [sic] as in

3·/

the second half of performance test we believe the mill will roll 2.0mm in 3-6 month.

(110) By letter of 30 November 2000, Kaiser notified Nova Hut of the "Proposed Final Inspection Date", which it had scheduled to take place on 7 December 2000 (C145).

(111) On 1 December 2000, Nova Hut wrote the following letter to Kaiser (R60):

> We refer to your letter of November 28, 2000 (L-NH/KN/2169) and the annexed documentation on the [4WIPPT] of October 16, 2000 – November 13, 2000. We will review your documentation, but can already announce today that we cannot accept this report as being a Contract Completion Report as defined in Section 14.7.1 of the Phase 1 Contract.
>
> Without prejudice to our legal position and arguments as well as the ongoing testing of the coils produced during the [4WIPPT] (approximately 10,000.00 tons of coils still rest untested in the coil yards – however, according to Section 9.5 read in connection with Section 6.3, in particular its paras 1, 3 and 4 of Appendix G, the quality tests of the [4WIPPT] need to be carried out on every coil), NOVA HUT can officially announce its first assessment of the referenced [4WIPPT]:
>
> 1.  Almost none of the coils produced during the Four Week Integrated Performance Production Tests are of prime quality. As this is a necessary precondition for applying an [sic] production bonus according to Section 5 1 of Appendix C, there is no valid claim for the application of any performance bonus;
>
> 2.  Only a few thousand tons of coils produced during the [4WIPPT] seem to reach acceptable quality as defined in Section 9.5 read in connection with Section 6.3 of Appendix G. In particular (but not limited to) the product widths of the coils are not within the maximum tolerance parameters as required by the Phase 1 Contract. Consequently, such coils need to be disregarded when counting actual and adjusted production during the [4WIPPT] (Section 9.5 of Appendix G).
>
> Please be informed that NOVA HUT is preparing a document identifying every single coil that does not fulfil contractual obligations.
>
> 3.  The Hot Rolled Coil Quality Tests have brought very disturbing results. Not a single test was successfully completed without the need to apply a penalty.
>
> Summing up, the [4WIPPT] have not fulfilled the contractual requirements under the Phase 1 Contract. NOVA HUT reserves all its contractual and extra-contractual rights to enforce its legal position.
>
> NOVA HUT understands that the failure of the referenced [4WIPPT] puts Kaiser Netherlands B.V. in a difficult position, as there is no time left for a repetition of those [4WIPPT] before the Phase 1 Contract will expire and

therefore, full penalties under the Phase 1 Contract, in particular its Appendix C, are due to NOVA HUT.

However, NOVA HUT has seen the potential of the Minimill during the [4WIPPT] and wishes to continue its working relationship with Kaiser Netherlands B.V. and Tippins in order to improve the rolling of the Minimill up to the contractual parameters. Therefore, we attach a proposal for a settlement agreement to be concluded between NOVA HUT, Kaiser Netherlands B.V., Kaiser Group International, Inc. and IFC to this letter for your review and information.

[...].

(112)  In a letter of the same day enclosing the Protocol of Completion for the HRCQTs, Kaiser acknowledged its failure fully to meet the quality parameters and conceded that, pursuant to Appendix C to the Contract, it was subject to a penalty (R59). Kaiser further requested that a meeting be convened to discuss the amount of such penalty, with respect to which the parties' views were differing.

(113)  In a letter dated 11 December to the IFC, Nova Hut stated that a repetition of the 4WIPPT would not be suitable from an economic and commercial point of view (C235).

## 5.   Nova Hut's draw on the performance letter of credit

(114)  By letter of 18 January 2001, Nova Hut requested *inter alia* that Kaiser extend the validity period of the performance letter of credit until 31 July 2001. Nova Hut specified that Kaiser's failure to do so would force it to draw down on the letter of credit (R62). At this time, the letter of credit was due to expire on 7 March 2001.

(115)  On 6 February 2001, Kaiser confirmed that it was extending the validity of the performance letter of credit until 31 July 2001, which extension would be effective no later than on 7 February 2001 (C156).

(116)  On 7 February 2001, Nova Hut drew down on the USD 11.1 million performance letter of credit (C158). In a statement of the same day to First Union National Bank, Nova Hut set out the reasons for its draw down (C158):

STATEMENT

THE AMOUNT OF THIS DRAWING, USD 11,100,000 UNDER CORESTATES BANK, N.A.'S (NOW FIRST UNION NATIONAL BANK'S) IRREVOCABLE STANDBY LETTER OF CREDIT NO. 400920p DATED 8-JUL-1997 FOR THE ACCOUNT OF ICF KAISER NETHERLANDS, B.V. REPRESENTS FUNDS DUE US AS THE DATE HEREOF IS LESS THAN THIRTY (30) DAYS PRIOR TO THE EXPIRATION DATE OF THE IRREVOCABLE STANDBY LETTER OF CREDIT NO. 400920P, WE HAVE NOT RECEIVED A NOTICE OF EXTENSION FROM CORESTATES BANK, N.A. (NOW FIRST UNION NATIONAL BANK), PHILADELPHIA, PENNSYLVANIA CONFIRMING ITS DECISION TO EXTEND THE IRREVOCABLE STANBY LETTER OF CREDIT NO. 400920P FOR AN ADDITIONAL PERIOD OF ONE (1) YEAR AND ICF KAISER NETHERLANDS, B.V. HAS NOT PROVIDED A SUBSTITUTE PERFORMANCE STANDBY LETTER OF CREDIT PURSUANT TO THAT CERTAIN CONTRACT BETWEEN NOVA HUT, A.S. AND ICF KAISER NETHERLANDS, B.V., DATED JUNE 27, 1997.

(117)    On 15 February 2001, Kaiser wrote to Nova Hut, advising that it had arranged for the extension until 31 July 2001 of the validity period of the letter of and requesting that Nova Hut's bank confirm to First Union National Bank that Nova Hut's draw would be processed "*unless Kaiser has in fact extended the subject letter of credit under its current terms and conditions*" (C157).

(118)    On 16 February 2001, First Union National Bank sent to Nova Hut a notice of extension of the validity period of the letter of credit (C158).

(119)    Still on 16 February 2001, Nova Hut's counsel in the US (Greenberg Traurig) demanded payment of the letter of credit to First Union National Bank on behalf of its client (C237):

We are counsel to Nova Hut, a.s., the beneficiary under the above-referenced Letter of Credit ("Nova Hut"). Documents supporting Nova Hut's draw request with respect to the Letter of Credit were received by First Union on or about February 12, 2001. As you are aware, the Letter of Credit by its terms requires payment on the next business day following presentment. We now understand that notwithstanding the valid presentment on February 12, 2001, First Union wrongfully dishonoured Nova Hut's draw request. Apparently, rather than honouring the draw after a valid presentment, First Union wrongfully accepted instructions from its customer Kaiser Group International, the account party ("Kaiser") to delay payment. At no time did Nova Hut authorize this delay. Further, on February 15, 2001, Rick Frimmer of our Philadelphia office had a number of conversations with you where he reiterated that Nova Hut expected the draw to be honoured immediately and that no extension would be accepted. You confirmed orally with Mr. Frimmer that First Union would honour the draw this morning.

> Notwithstanding the foregoing, First Union again accepted instructions from Kaiser to wrongfully delay the payment further. Nova Hut has at no time authorized any delay, expects the draw to be honoured immediately, and will accept no extension of the Letter of Credit. Additionally, Nova Hut demands that First Union include in its immediate wire the full amount of the Letter of Credit plus interest thereon at First Union's Federal Funds Rate from the date that the draw should have been honoured, February 13, 2001, as a result of the wrongful dishonour.

> Finally, Nova Hut reserves all of its rights against First Union and the account party.

(120)   On the same day, First Union National Bank informed Kaiser that it had debited its account of an amount of USD 11,133,341.96, including USD 33,341.96 in banking fees (C158). This amount was credited to Nova Hut's account on 20 February 2001.

(121)   On 28 February 2001, Nova Hut deposited the amount paid under the letter of credit on an escrow account (C160).

(122)   On 8 April 2001, Kaiser International filed with the Delaware bankruptcy court a complaint against Nova Hut and the IFC, asserting claims similar to those advanced in this arbitration. As noted below, the US District Court for the District of Delaware ruled that Kaiser International claims were subject to arbitration on 16 March 2004. Kaiser International's filing for bankruptcy did not have a direct impact on the dispute referred to the Tribunal. However, as will be seen below (see ¶(1516)), Nova Hut relied on it in support of its request that the Tribunal offset amounts awarded to both parties.

## G.    THE TERMINATION OF THE PHASE "1" CONTRACT

(123)   By letter of 2 May 2001, Nova Hut terminated the Phase "1" Contract pursuant to its Section 13.1.3, i.e. on account of Kaiser's alleged failure to pass the performance tests:

> 13.1.3    If Supplier conducts the first and second Performance Tests under Section 14.6 and they are not successfully passed and conducts the third Performance Test under Section 14.6 and the output of the Plant during such third Performance Test is less than ninety percent (90%) of maximum rated capacity or fails to conduct the

third Performance Test, then, on notice by either the Owner or the Supplier to the other, this Contract shall be terminated on account of the Supplier's default [...]

## H.    THE TIPPINS ARBITRATION

(124)    On 26 September 2001, Tippins Inc. and Tippins Field Services Inc. (hereinafter "Tippins"), two of Kaiser's subcontractors, filed an ICC arbitration against Kaiser (ICC Case No. 11785/ACS/EC), seeking approximately USD 6 million in damages for increased costs for the Demonstration Day and USD 4.5 million as a result of the change from Ansaldo to ABB cycloconverters (hereinafter, the "Tippins Arbitration").

(125)    In its Final Award of 5 December 2003 (hereinafter, the "Tippins Award"), the Tippins tribunal ruled that Tippins was due USD 1,489,994.00, plus interest, for its additional work for the Demonstration Day, and USD 78,037.00 for the change from Ansaldo to ABB cycloconverters (R86).

III.    **CHRONOLOGY OF THE PROCEEDINGS**

A.    THE CONSTITUTION OF THE ARBITRAL TRIBUNAL AND THE INITIAL PROCEDURAL HEARING

(126)    On 2 January 2004, Claimant filed its Request for Arbitration with the ICC Court, together with exhibits "A" and "B" The Request for Arbitration was received by the ICC Court on 5 January 2004.

(127)    On 6 January 2004, the Secretariat wrote to the parties, noting that, failing an objection by either party, it would consider that the Co-Arbitrators were granted 20 days as of their *confirmation* to select the Chairman of the Arbitral Tribunal. As a matter of fact, in relevant part, the arbitration clause set out in Article 11 of the Phase 1 Contract provided for the nomination of the Chairman of the Tribunal within twenty days of their *appointment.* Neither party objected to the Secretariat's proposed course of action.

(128)    On 22 March 2004, Respondent submitted its Answer to the Request for Arbitration and Counterclaim.

(129)    On 23 April 2004, Claimant filed its Reply to the Counterclaim with the ICC Court.

(130)    At its session of 28 April 2004, the ICC Court fixed the advance on costs at USD 680,000.00, subject to later readjustments.

(131)    On 24 May 2004, the Secretary General of the ICC Court confirmed Dr. Johannes Hock as Arbitrator upon Claimant's nomination and Dr. Anton Baier as Arbitrator upon Respondents' nomination.

(132)    On 16 June 2004, the Secretary General of the ICC Court confirmed Prof. Gabrielle Kaufmann-Kohler as President and forwarded the file to the Arbitral Tribunal.

(133)   By letter of 15 July 2004, the Secretariat of the ICC Court confirmed that the advance on costs fixed by the ICC Court had been entirely paid by the parties in equal shares.

(134)   The Parties and the Arbitral Tribunal held an initial procedural hearing in Geneva on 25 August 2004. On this occasion, the Terms of Reference drafted by the Arbitral Tribunal were executed and the Arbitral Tribunal issued the procedural rules governing the arbitration proceedings. The Provisional Timetable was also discussed and agreed upon.

(135)   On 27 August 2004, the Arbitral Tribunal handed down its Procedural Order #1, recording the Provisional Timetable, and the Minutes of the 27 August 2004 hearing.

### B.   THE PHASE OF THE WRITTEN PLEADINGS

(136)   On 3 November 2004, Claimant applied for a 5-day time extension to file its Statement of Claim.

(137)   By letter of 4 November 2004, Respondent confirmed that it agreed with the 5-day time extension requested by Claimant to file its Statement of Claim, provided that it would benefit from the same amount of time to prepare its Statement of Defence and Counterclaim.

(138)   On 4 November 2004, the Arbitral Tribunal granted the requested time extensions and issued a revised Provisional Timetable.

(139)   On 10 November 2004, Claimant filed its "Statement of Claim", together with exhibits C1 to C183 and six witness statements marked CWS1 to 6.

(140)   On 24 January 2005, Respondent filed its "Statement of Defence and Counterclaim", accompanied by exhibits R1 to R63 and three witness statements numbered RWS1 to 3.

(141)    On 3 February 2005, pursuant to the Provisional Timetable confirmed in Procedural Order #1 of 27 August 2004 (as amended on 4 November 2004), both parties filed requests for production of documents with the Arbitral Tribunal. Claimant's application also set forth a request for site access.

(142)    On 17 February 2005, each party replied to the other party's request for production of documents. Moreover, Respondent replied to Claimant's request for site access.

(143)    On 21 February 2005, the Arbitral Tribunal held a telephone conference in connection with Claimant's request for site access.

(144)    On 14 March 2005, the Arbitral Tribunal handed down its Procedural Order #2, ruling upon the parties' respective requests for production of documents of 3 February 2004.

(145)    On 18 March 2005, the Arbitral Tribunal handed down Procedural Order #3 dealing with Claimant's request for site access.

(146)    On 22 and 23 March 2005, representatives of Kaiser inspected Nova Hut's plant in Ostrava, Czech Republic.

(147)    On 7 April 2005, Claimant filed its "Reply on the Claim and Statement of Defense on the Counterclaim", together with exhibits C184 to C240. Together with this brief, Claimant also filed six witness statements numbered CWS7 to CWS12.

(148)    On 10 June 2005, Respondent filed its "Rejoinder on the Claim and Reply on the Counterclaim", accompanied by exhibits R64 to R99 and four witness statements numbered RWS4 to 7.

(149)    By letter of 17 June 2005, Claimant requested an extension until 1 July 2005 of the 24 June 2005 deadline to submit its Rejoinder on the Counterclaim.

(150)    On 21 June 2005, Respondent stated that it would not object to an extension of such deadline until 29 June 2005.

(151)    On 23 June 2005, the Arbitral Tribunal granted Claimant a time extension until 29 June 2005 to file its Rejoinder on the Counterclaim.

(152)    On 29 June 2005, Claimant filed its "Rejoinder on the Counterclaim", together with exhibits C241 to C246 and four witness statements (CWS13 to CWS16).

(153)    On 6 July 2005, the Arbitral Tribunal held a telephone conference for the purpose of discussing the details of the evidentiary hearing scheduled for 12 to 19 September 2005. Agreement was reached on all issues.

(154)    On 18 July 2005, the Arbitral Tribunal handed down Procedural Order #4 summarizing the items discussed during the 6 July 2005 telephone conference.

(155)    On 2 September 2005, Kaiser requested that certain revised Exhibits be substituted to existing ones and applied for leave to introduce new Exhibits.

(156)    By letter of 5 September 2005, Respondent stated that it did not object to the production of revised versions of Exhibits C184 and C221 to C229 but requested that Claimant's application to submit revised versions of Exhibit E to N to the witness statement of Mr. Dale Fackler (CWS3) and to introduce a new Exhibit (marked as C247) be dismissed.

(157)    In a ruling of 7 September 2005, the Arbitral Tribunal consented to the introduction into the record of Exhibits C184, C221 to C229 and E to T to CWS3 but refused to accept the production of the new Exhibit marked as C247. The Arbitral Tribunal however reserved its final decision on the admissibility of Exhibit C247 for after the evidentiary hearing.

C.    THE EVIDENTIARY HEARING

(158)    A hearing for the taking of evidence from factual witnesses presented by each party took place in Vienna, Austria, over four days from 12 to 15 September 2005.

(159)    In accordance with Procedural Order No. 1 of 27 August 2004, for each witness, there was a brief direct examination, followed by cross-examination, redirect and re-cross examination, and questions from the arbitrators. A verbatim transcript of the hearing was maintained.

(160)    On Claimant's side, the hearing was attended by Georges E. Rahn, Jr., Esq. and Risa Greene, Esq., of the law firm Saul Ewing, Armin Dallmann, Esq. and Roland Marko, Esq., of the law firm Dallmann & Juranek, counsel to Claimant. The hearing was also attended by Messrs. Nicholas Burakow and Douglas McMinn, representative of Claimant.

(161)    On Respondent's side, the hearing was attended by Jean-Pierre Garaud, Esq., Jacob Grierson, Esq., Roland Ziadé, Esq. and Olivier Loizon, Esq., of the law firm Cleary Gottlieb Steen & Hamilton LLP, counsel to Respondent. The hearing was also attended by Mr. Jiri Michalek and Ms. Irena Guzikova, representatives of Respondent.

(162)    Over the four days of the hearing, the Arbitral Tribunal heard the testimonies of:

- on 12 September 2005:

  • Mr. Joseph Pietryka.

- on 13 September 2005:

  • Mr. Nicholas Rickard;

  • Mr. Dale Fackler; and

- • Mr. Franck Bury.

- on 14 September 2005:

  - • Mr. Jan Hascin;

  - • Mr. Premysl Kuncicky, and

  - • Mr. Jan Halabrin.

- on 15 September 2005:

  - • Mr. Ivo Chmelik; and

  - • Mr. Jiri Obsil.

(163)   Interpreters retained by the Arbitral Tribunal provided simultaneous interpretation of the examination of Respondent's witnesses.

(164)   Briault Reporting recorded the proceedings. A copy of the transcript was sent to the parties on 23 September 2005.

(165)   At the close of the hearing, the parties expressly confirmed that they had no objection to the manner in which arbitration and the hearing had been conducted.

(166)   Also at the end of the hearing, the Arbitral Tribunal and the Parties addressed the procedural follow up to the hearing, in particular that there would be two rounds of simultaneous post-hearing briefs; that the parties would submit their respective statements of reasonable and other costs in accordance with Article 31(1) of the ICC Rules together with their reply post-hearing briefs; and that each party would have leave to comment on the other party's cost submission within one week from receipt of such statement.

(167)   On such basis, the Arbitral Tribunal issued Procedural Order #5 on 23 September 2005, which confirmed these arrangements and, among other things, set the time schedule for the further proceedings.

**D.     THE POST-HEARING BRIEFS AND THE CLOSING OF THE PROCEEDINGS**

(168)     Both parties subsequently filed simultaneous post-hearing submissions on 28 October 2005.

(169)     On 14 November 2005, the parties simultaneously filed reply Post-Hearing Briefs with the Arbitral Tribunal, together with their cost submissions.

(170)     On 21 November 2005, Claimant filed its comments to Respondent's statement of costs with the Arbitral Tribunal. On the same day, Respondent confirmed that it had no comments to make with respect to Claimant's statement of costs.

(171)     On 23 December 2005, the Arbitral Tribunal declared the proceedings closed in accordance with Article 22 (1) of the ICC Rules.

(172)     The ICC Court periodically extended the time limit for rendering the Final Award and, on 14 February 2006, the Secretariat of the ICC Court informed the Arbitral Tribunal that the ICC Court, at its session of 10 February 2006, had extended until 31 May 2006 the time limit to render the Final Award.

(173)     The ICC Court scrutinized and approved the award at its session of 31 March 2006.

**IV.     THE PARTIES' LAST RELIEF SOUGHT**

**A.     CLAIMANT'S LAST RELIEF SOUGHT**

(174)     In its Post-Hearing Brief of 28 October 2005, Kaiser made the following requests for relief:

<div align="center">

III. CONCLUSION.

For the foregoing reasons, Kaiser requests the following:

**<u>FINAL AWARD.</u>**

</div>

404. Nova Hut shall pay to Kaiser within thirty days of the issuance of the Tribunal's Final Award:

405. For items related to Kaiser's passage of the four-week test and achieving Final Acceptance – the principal amount of $22,654,720.62 together with simple contractual interest calculated from March 2, 2001[14] and compound interest calculated from January 2, 2004.

406. For Nova Hut's wrongful draw on the letter of credit – the principal amount of $11,133,341.96 together with commercial interest to be determined by the Tribunal from February 16, 2001.

407. For deferred project development costs – the principal amount of $510,000 together with contractual interest calculated from February 8, 1998 and compound interest calculated from January 2, 2004.

408. For the warranty reserve and contingency fee – the principal amount of $5,250,000 together with interest from December 30, 1999 (on the contingency) and from February 6, 2002 (on the warranty reserve). Compound interest is due on both amounts from January 2, 2004.

409. For Nova Hut's delay in obtaining financing – the principal amount of $2,295,950 together with contractual interest from February 9, 1998 and compound interest calculated from January 2, 2004.

410. For the bonus on achieving early Preliminary Acceptance – the principal amount of $2,800,000 together with contractual interest from December 29, 1999 and compound calculated from January 2, 2004.

411. For unpaid change orders – the principal amount of $393,320 together with contractual interest from December 26, 1999 and compound interest calculated from January 2, 2004.

412. For late payment penalty interest on progress Billings 91, 92 and the other progress billings — the principal amount of $166,033 together with interest from January 9, 2001 (on Billing 91 and 92), from December 17, 2000 (on other progress billings), and from December 9, 2000 (on the $60,000 balance of Billing 92). Compound interest also is due from January 2, 2004.

413. For the arbitration award related to Demonstration Day — the principal amount of $1,489,994 together with interest awarded by the Arbitral Tribunal from November 12, 1999 to November 11, 2001. This interest continues to accrue according to the arbitration award

414. For other costs related to the plant demonstration — the principal amount of $744,468 together with interest from June 22, 1999 and compound interest calculated from January 2, 2004.

415. For Nova Hut's failure to provide materials — the amount of $715,431 including interest from October 3, 2000 and compound interest calculated from January 2, 2004.

416. For the arbitration award related to cycloconverters — the principal amount of $78,037 together with interest awarded by the Arbitral Tribunal

from April 20, 1998 to November 11, 1999. This interest continues to accrue according to the arbitration award.

417. For Ostrava office operating costs — the amount of $428,737, which is updated to July 2005 and continues to accrue. (CWS 3, Exhs. E-I).

418. For legal and consulting fees due to Nova Hut's failure to pay — the amount of $1,879,610, which is updated to July 2005 and continues to accrue. (CWS 3, Exhs. J-L).

419. Also, an amount to be determined after Kaiser's receipt of documentation from Nova Hut plus Value Added Tax, together with the costs of this arbitration and attorneys' fees.

420. It is declared with effect between the parties, that Kaiser was entitled to a time extension under the contract of not less than 163 days and 58 days resulting from the delays caused by Demonstration Day.

**B.    RESPONDENT'S LAST RELIEF SOUGHT**

(175)    In its Reply Post-Hearing Brief of 14 November 2005, Nova Hut made the following requests for relief:

CONCLUSION

Based on the foregoing and on its previous written submissions, Nova Hut denies that Kaiser is entitled to any of the relief claimed and requests that it be granted an award:

(1)    of $46 million as liquidated damages for Kaiser's failure to pass the Four Week Integrated Performance Test;

(2)    of 3.7$ million as liquidated damages for Kaiser's failure to pass the Hot Rolled Coil Quality Tests;

(3)    of $704,808 resulting from Proposed Change Notices issued by Nova Hut and wrongfully rejected by Kaiser;

(4)    of compound interest on the aforesaid sums;

(5)    assessing against Kaiser all the costs of this arbitration proceeding, as provided in Article 20 of the ICC Rules, including legal fees and costs incurred by Nova Hut.

## V.    KAISER DID NOT ACHIEVE FINAL ACCEPTANCE

### A.    INTRODUCTION

(176)    The issue whether Kaiser achieved Final Acceptance is determinative of several of the parties' respective claims in this arbitration.

(177)    Therefore, the Arbitral Tribunal shall address and resolve this issue first and foremost, as a preliminary question.

### B.    THE PASSING OF THE 4WIPPT WAS A PRECONDITION TO THE ACHIEVEMENT OF FINAL ACCEPTANCE

(178)    Final Acceptance is governed by Section 14.7 of the Contract, which, in relevant parts, provides as follows (emphasis added):

> 14.7.1    **Promptly after the Supplier has successfully passed a first, second or third Performance Test in which the Plant achieves the required percentage of maximum rated capacity** pursuant to Section 14.6 the Supplier may submit a report containing the information specified in the Contract Documents (the "Contract Completion report"), final as-built drawings (if and to the extent that there are any changes from the final as-built drawings submitted under Section 14.4), and the Final Acceptance Written Schedule of Deficiencies to Owner accompanied by notice of a proposed preliminary inspection date (the "Final Inspection Date"), which date shall be no earlier than five (5) working days following the receipt of such notice by Owner.
>
> [...]
>
> 14.7.3    Upon correction of those matters noted in the Contract Completion Report and the Final Acceptance Written Programs of Deficiencies and of those matters which the Owner has so listed as defects, discrepancies and omissions in the Phase 1 Plant or its testing, **Owner shall issue the Certificate of Final Acceptance as of the date of such final completion, whereupon the Phase 1 Plant shall, subject to the provisions of this Contract, have been finally accepted by Owner ("Final Acceptance")**. Upon final payment in terms of Section 6.5 following Final Acceptance, ownership in the Work shall pass to the Owner as provided for in Section 6.5.6.
>
> [...]

52

(179)   It follows from the above that, to achieve Final Acceptance, Kaiser was to pass the 4WIPPT.

C.    **KAISER DID NOT PASS THE FIRST 4WIPPT**

1.    **The Performance Tests and the 4WIPPT**

(180)   As a precondition to Final Acceptance (see Section 14.7 of the Contract), Kaiser was to perform and pass certain performance tests (emphasis added):

> 14.6    PERFORMANCE TESTS
>
> 14.6.1    Prior to Final Acceptance, [Kaiser] shall perform, and **shall be obligated to successfully complete**, Performance Tests pursuant to the Contract Documents and as set forth in Appendix G.

(181)   The objective of the performance tests was "*to test the Plant with both Phase 0 and Phase 1 operating as an integrated operating unit over a sustained period of time to determine that the Phase 1 Plant, when operated as an integrated plant with Phase 0, is able to meet the performance criteria set out in this Section 14.6 and in Appendix G*" (Section 14.6.2 of the Contract).

(182)   The 4WIPPT was one of these performance tests. In accordance with Section 1.2.2 of Appendix G to the Phase 1 Contract, it was to be the last of the Phase 1 tests (emphasis added):

> 1.2.2    Sequence of Phase 1 Tests
>
> The tests shall be conducted after successful Preliminary Acceptance in the following sequence.
>
> 1.    The tests to be conducted and completed prior to the start of the Four Week Integrated Production Test:
>
> 1.1    The Phase 1 Continuous Caster Test referred to in Section 4; and
>
> 1.2    The Cold Slab Test of Equalizing Furnace Tests referred to in Section 5.

2. The tests to be conducted prior to or in conjunction with the Four Week Integrated Production Test:

 2.1 The Reversing Hot Strip Mill Technology Guarantee Test referred to in Section 7; and

 2.2 The Hot Rolled Coil Tests referred to in Section 6.

3. **The Four Week Integrated Production Test referred** to 9 [sic] including:

 3.1 the Yield Performance Test referred to in Section 8; and

 3.2 the Equalizing Furnace tests referred to in Section 5.

[ ..].

(183) The objective of the 4WIPPT was to prove the effective integration of the Phase 0 and Phase 1 facilities – i.e. that the plant with both Phase 0 (ladle metallurgy furnace and slab caster) and Phase 1 (reheat furnace and minimill) could be operated as an integrated unit – and, by extrapolation of the production figures achieved during the 4WIPPT, the ability of the plant to achieve the contractually agreed annual production goal of one million tons of rolled steel (Section 1.1 of Appendix G):

> Production of the entire NOVA HUT Mini-Mill (Phase 0 and Phase 1) will be proven in a four-week production campaign (the Four Week Integrated Production Performance Test) using the applicable product mix (defined following) and on the defined facilities, during which the Mini-Mill will be required to meet the production, yield and quality parameters and to prove the technology.

(184) To demonstrate that the plant would achieve the contractually agreed production goal once operated on a commercial basis, steel was to be rolled over 28 consecutive days and the production thus achieved was to be compared to the plant's "Rated Maximum Capacity" (Section 14.6.6.2 of the Contract):

> 2. The Rated Maximum Capacity of the Plant is set out in Appendix G and in the Scope of Supply, and Appendix G sets out the criteria for determining what percentage of Rated Maximum Capacity has been achieved. The Rated Maximum Capacity is measured against the slabs cast and rolled in the Phase 0 Plant and the Phase 1 Plant in integrated operation.

54

(185)   The 4WIPPT was to be considered successful, if the required percentage of the Rated Maximum Capacity had been achieved (Section 14.6.6.3 of Appendix G):

> 3.     The Performance Tests be considered successful and to have been passed if the required percentage of Rated Maximum Capacity is achieved.

(186)   Kaiser was not required to reach 100% of the "Rated Maximum Capacity". As a matter of fact, acknowledging the fact that there would be a learning curve and, hence, that the plant would not reach its maximal capacity until after 18 months from Preliminary Acceptance, the parties had convened that only a fraction of the maximal capacity would have to be reached, such fraction being commensurate with the number of months having lapsed since Preliminary Acceptance (Section 14.6.6 of the Contract):

> 14.6.6   The following criteria shall be used to determine whether or not a Performance Test has been successfully passed or has failed.
>
> > 1.     The Performance Test shall be required to demonstrate that the Plant can attain the production goals of slabs cast and rolled. The Owner and the Supplier recognize that there is a learning curve and that the Plant will not attain 100% of Rated Maximum Capacity until after eighteen months after Preliminary Acceptance, and that the Plant production capacity that the Plant will be required to achieve in the Performance Tests will be the following percentage of Rated Maximum Capacity. If the Performance Test occurs the number of months after Preliminary Acceptance set out in the column "Months", then the Plant shall be required to attain the percentage of Rated Maximum Capacity set out in the Column "%":

| Month | % | | Month | % |
|---|---|---|---|---|
| 3 | 90,0% | | 11 | 92,0% |
| 4 | 90,0% | | 12 | 92,5% |
| 5 | 90,0% | | 13 | 95% |
| 6 | 90,0% | | 14 | 95,5% |
| 7 | 90,0% | | 15 | 96,0% |
| 8 | 90,0% | | 16 | 96,5% |
| 9 | 91,5% | | 17 | 97,0% |

| 10 | 91,5% | | 18 | 97,5% |
|---|---|---|---|---|

(187)   Pursuant to the same provision, the relevant figure to determine the percentage of the Rated Maximum Capacity achieved by the minimill was not to be the actual production but a constraint adjusted tonnage (emphasis added):

> In determining what percentage of Rated Maximum Capacity the Plant has achieved, the "constraint adjusted capacity" of the Plant shall be used as the 100% target, and the output which shall be measured against this target will be **the constraint adjusted output**, being the actual output adjusted by the formula set out in footnote 4 to Table E to Appendix G.

(188)   The reason why the parties decided that the relevant figure to score the 4WIPPT would be the adjusted tonnage, as opposed to the actual weight of steel coils produced, can be found in Table E appended to Appendix G to the Contract (emphasis added):

> In the [4WIPPT], the Plant will be required to produce 72,000 tons (determined by adjusted weight, not by actual weight) of rolled steel in 576 operating hours. The constraint adjusted weight will be taken from the Constraint Adjusted Weight in column 7. below. The constraint adjusted weight is used in preference to the actual weight **to compensate for the fact that different steels can be produced at different weights per hour**. Thus, if the actual product mix used in the [4WIPPT] differs from that set out below, the Plant will still be required to produce 72,000 tons (constraint adjusted weight) in 576 hours, although the actual production may [recte: be] more or less than 72,000 tons, and will only equal 72,000 tons if the actual production is a fully representative sample of the products set out in Table R-4 (that is, fully representative of the average production rate of all products, weighted for anticipated volume.

(189)   In accordance with the terms originally agreed upon by the parties, only coils of prime quality were to be counted to determine the production during the 4WIPPT (Section 9.3 of Appendix G to the Contract) (emphasis added):

> The Supplier will be judged to have successfully completed the [4WIPPT] if, during the test, the Plant achieves during the [4WIPPT] the referenced percentage of the production goal of hot rolled coils as listed in Section 14.6.6 of the Contract, [ ..], and for which purposes **only prime (acceptable quality judged in accordance with Section 9.5 below) coils will be included in the production which the Plant is considered to have achieved**. [...].

)

2.    **Actual versus contractual production**

2.1    **Contractual production**

(190)    Pursuant to the first paragraph of Section 9.1 of Appendix G to the Phase 1 Contract, the schedule of production for the 4WIPPT was to consist of *"four weekly periods, each of twenty (20) consecutive eight-hour operating periods and one (1) eight-hour scheduled down period for maintenance"*, i.e. a total 672 hours (4 x 21 x 8), of which 640 hours of operation (4 x 20 x 8) and 32 hours of maintenance (4 x 8).

(191)    The production to be achieved during the test was 80,000 constraint adjusted tons of hot rolled coils (Section 9.3 of Appendix G, emphasis added):

| Annual | ton/year |
|---|---|
| Total liquid steel delivered to the HCR Mini-mill | 1,030,930 |
| Cast slabs produced (at 97% caster yield) | 1,000,000 |
| Stainless steel slabs received from other sources (Vitkovice) | 30,930 |
| Total slabs charged to rolling mill | 1,030,930 |
| **Total hot rolled coils produced (at 97% rolling mill yield)** | **1,000,000** |
| Four Week Integrated Production Performance Test | ton/4 Weeks |
| Total liquid steel delivered to the HCR Mini-mill | 82,475 |
| Cast slabs produced (at 97% caster yield) | 80,000 |
| Stainless steel slabs received from other sources (Vitkovice) | 2,475 |
| Total slabs charged to rolling mill | 82,475 |
| **Total hot rolled coils produced (at 97% rolling mill yield)** | **80,000** |

(192)    However, the test procedure adopted by the parties for the 4WIPPT (the 4WIPPT Protocol) shows that the parties eventually lowered the production goal to 77,600 constraint adjusted tons in 576 operating hours (C173, p. 2, emphasis added):

3.    Basic parameters for calculation of the Four Week Integrated Production test

57

3.1    Hot rolled coils produced

Defined as 100%, in chapter 9.3 of App. G:

- Stainless steel slab: not used

- Cast slabs produced (at 97% caster yield):        80,000T

- **Total Hot Coils Produced (at 97% rolling Mill yield):    77,600T**

- **Average production adjusted to 576 hours production: 134.7T/H**

(193)    Joseph Pietryka provided the following explanation for this change (CWS10¶¶15-16, p. 5):

> 15. Nova Hut made a change to Table R-4 when Nova Hut decided not to provide stainless steel for the [4WIPPT]. Table R-4 lists rolled steel of various gauges and widths. If this table were duplicated precisely, it would yield 80,000 tons of hot-rolled coils during the [4WIPPT]. In order to roll this amount, however, because of the limitation of the caster, Nova Hut had to provide steel from an outside source. [...]. Before the [4WIPPT], Nova Hut told Kaiser that it would not provide the stainless steel because of the additional cost. Accordingly, the stainless steel would be eliminated from Table R-4.
>
> 16. In light of this change to Table R-4, there was less steel available for Kaiser to roll to prove the mill could produce one million tons per year. This required a change in the formula for the [4WIPPT]. Nova Hut and Kaiser representatives met and reconstructed the [4WIPPT] tonnage requirements in light of this shortage and agreed upon a new total, which is reflected in Exhibit C-173 at pages 2 and 9. This new total of 77,600 tons of coils, divided by test operation period of 576 hours, gave a value of 134.7 tons per hour, a calculation that was approved and signed by both Nova Hut and Kaiser representatives.

(194)    Kaiser's allegation that the production goal for the 4WIPPT was 77,600 constraint adjusted tons of steel coils has not been disputed by Nova Hut (see for instance Respondent's Statement of Defence of 24 January 2005, ¶30, p. 14, where Nova Hut states that the target to be achieved was 77,600 tons "*according to Kaiser*", without disputing this figure or otherwise relying on a different figure).

## 2.2    Actual production

(195)    The 4WIPPT took place from 16 October to 13 November 2000.

(196)    The parties have diverging views as to whether Kaiser passed the test.

(197)     Kaiser alleges that it produced 42,209 tons of steel coils during the 4WIPPT (see Kaiser summary document, C132, p. 3). Based on this figure for actual production, 168 hours of owner delays and a "default" hourly production rate of 178.02 tons per hour, Kaiser claims that its constraint adjusted production was of 84,027 tons. Accordingly, Kaiser claims to have *achieved a score of 108.3% against a standard of 100%, which was a higher score than* [it] *was required to achieve at the time of the test*" (Claimant's Statement of Claim of 10 November 2004, ¶2.24, p. 12).

(198)     Nova Hut states that, "*application of the correct formula for calculating the average hourly production rate* [...] *leads to a final result of 70,085 T*" that is "*still below the target that Kaiser itself asserts that it needed to achieve in order to pass the 4WIPPT, namely 77,600 T*" (see Respondent's Rejoinder of 10 June 2005, ¶9, p. 9). It asserts that "[t]*he test, which started on October 16, 2000 and ended on November 13, 2000, was completely unsuccessful*" and that "*Kaiser fell far short of the test result that it needed in order to pass the 4WIPPT*" (Respondent's Statement of Defence of 24 January 2005, ¶¶19-20, pp. 9-10).

### 3.     The reasons for the controversy

(199)     The parties have diverging views as to how the volume of the production actually achieved by Kaiser during the testing had to be measured and, on this basis, how the constraint adjusted weight had to be calculated. Specifically, the parties are in disagreement as to:

- how certain delays were to be assigned between the parties;

- the correct formula to calculate the hourly production rate to give credit to Kaiser for production delays that are not attributable to it;

- the relevant weighted average tons per hour figure to be plugged in the formula to calculate constraint adjusted weight, namely 125 tons per hour or 134.7 tons per hour; and

–   the relevant figure for actual weight, i.e. what coils should be deemed of a quality sufficient to be included in the actual production achieved during the 4WIPPT.

(200)   The Arbitral Tribunal will address and resolve these issues in turn.

(201)   However, Nova Hut has alleged that even if the Tribunal were to find in favour of Kaiser regarding each of the above disputed items, application of the correct formula for calculating the average hourly production rate would lead to a final result of 70,085 constraint adjusted tons, i.e. below the target needed to pass the 4WIPPT (see Respondent's Rejoinder of 10 June 2005, ¶9, p. 9) (emphasis added):

> In any case, even if the Tribunal were to reject each and every one of these criticisms – even if the Tribunal were to compensate Kaiser for all the scheduled and unscheduled delays for which Kaiser claims compensation, even if the Tribunal were to calculate constraint adjusted weight on the basis of the figure of 134.7 T/hr rather than 125 T/hr and even if the Tribunal were to accept Kaiser's figure for actual weight – **application of the correct formula for calculating the average hourly production rate instead of Kaiser's circular formula would lead to a final result of 70,085 T**. This is still below the target that Kaiser itself asserts that it needed to achieve in order to pass the 4WIPPT, namely 77,600 T.

(202)   Therefore, the Arbitral Tribunal shall first determine what is the correct formula to calculate the average rate of steel production to be applied to the delay periods attributable to Nova Hut.

## 4.   The formula to calculate the hourly production rate to give credit to Kaiser for production delays that are not attributable to it

### 4.1   Kaiser's position

(203)   At the end of the test, Nova Hut's representative Jan Hascin met with Joseph Pietryka to calculate the total tons produced by Kaiser during the test. Such calculation required the calculation of the average tons per hour. Both Hascin and Pietryka made their own calculation and arrived at the average ton per hour figure of 178.02. Although Jan Hascin now claims that he did not agree to that figure, he does not say that he communicated this to Joseph Pietryka and does

not state what figure should be the correct average hourly production rate. Also, Nova Hut signed documents for each day of the test stating that the average hourly production rate was "to be adjusted at the end of the test".

(204)  Assuming that Nova Hut had not agreed to the method of calculation of the hourly production rate, the calculation relied upon by Kaiser is in accordance with the Phase 1 Contract.

(205)  Section 9.1 of Appendix G provides that "*the period of delay shall be credited to the monthly production totals by multiplying the delay hours times the average hourly production rate (the rate achieved after subtracting Owner caused delays) over the four-week period*".

(206)  In short, the hourly production rate is the total tons divided by the total hours of the tests minus the owner delay hours:

$$\frac{\text{total constraint weight}}{\text{test hr. } - \text{ max. delay hr}}$$

(207)  In order to determine the total constraint weight, the parties had to know the production rate during the delay hours. Thus, the formula for total credited tons was constraint weight produced plus delay hours multiplied by the hourly production rate:

$$\text{constraint adjusted production} + (\text{delay hr x HPR})$$

(208)  The hourly production rate was the total production divided by the total hours minus maximum Nova Hut delays:

$$\text{HPR} = \frac{\text{constraint weight} + (\text{delay hr x HPR})}{\text{total hr } - \text{ max. delay hr}}$$

(209)  This situation presented the parties with a mathematical problem. As a matter of fact, as is illustrated by the above formula, the parties had to know the average hourly production rate in order to determine the average hourly production rate.

(210)    The parties solved this dilemma by using a well-recognized mathematical method known as an iterative process. To determine daily production while the test was in process, the parties started by using 134.7 tons per hour as the hourly production rate. They started with this figure because it was the production rate required if the mill was to reach the goal of 77,600 tons in 576 operating hours. The parties knew this would not be the final number. With each repeated calculation, the new production rate value was inserted, converging on a number closer and closer to the result. This process resulted in 178.02 tons per hour as the hourly production rate.

(211)    In its Rejoinder, Nova Hut targets the formula that the parties used to calculate the average hourly production rate and that results in an average hourly production rate of 178.02 t/h. However, Table A presented by Nova Hut with its Rejoinder and the underlying formula Nova Hut now uses are not based on the Contract. In fact, Nova Hut commits two errors in this Table, which results in crediting Kaiser with fewer delay tons than it is entitled to under the Contract.

(212)    First, Nova Hut improperly uses the actual delay hours (190) rather than the 168-hour maximum that the Contract expressly states must be used. The number of delay hours is to be subtracted from the total hours of the test in calculating the average production rate. Nova Hut complains that there is simply no reason why 168 hours should be subtracted from its incorrect formula. The reason why the parties subtracted 168 hours from the true formula is that Section 9.1(i) of Appendix G required it. This provision does not, as Nova Hut contends, say that "it was the actual delay hours that were to be subtracted from the total test hours".

(213)    The second error in Table A is Nova Hut's use of the constraint adjusted weight production total (51,033.64 tons) rather than the monthly production total (84,027 tons) to determine the average hourly production rate. Section 9.1 of Appendix G does not state how the average hourly production rate is to be calculated other than that owner delays are not to be considered. Nova Hut would have the Tribunal consider only constraint adjusted weight in calculating the production rate. The parties chose otherwise. There is no reason, based on the language of

the contract, why the monthly production total – that is production during the test plus delay tons – should not be used in this calculation. The parties addressed this issue during the test and agreed to use the monthly production total number.

## 4.2　Nova Hut's position

(214)　In accordance with Section 9.1 of Appendix G to the Phase 1 Contract, the correct formula to calculate constraint adjusted weight after compensation for delays is:

$$\text{constraint weight} + (\text{delay hr} \times \text{HPR})$$

(215)　The same provision defines the "average hourly production rate" as *"the rate achieved after subtracting Owner caused delays"*. Therefore, the correct formula for calculating the average hourly production rate is:

$$\frac{\text{constraint weight}}{\text{total hr} - \text{delay hr}}$$

(216)　The average hourly production rate is not 178.02 t/h as alleged by Kaiser. This figure has been reached by applying an absurd circular formula.

(217)　What Kaiser appears to have done is to substitute constraint adjusted weight *after compensation for delays* - which it alleges to be 84,027 tons - for constraint adjusted weight. Indeed, 84,027 / (640 – 168) = 178.02 t/h. Yet, the figure for constraint adjusted weight after compensation for delays (84,027 t) has itself been calculated using the figure 178.02 t/h (see Table B to Respondent's Statement of Defense of 24 January 2005).

(218)　In other words, Kaiser simply used the following formula:

$$\frac{[\text{total production}]}{[672 \text{ hours}] - [\text{maintenance shifts}] - [168 \text{ hours}] - [\text{owner delays}] - [\text{scheduled delay}]}$$

(219)　This formula is identical to the correct formula, except that there is no reason why the 168 hours figure should be subtracted in excess of the delays caused by

Nova Hut. The only reason why Kaiser subtracted it was to inflate the figures on which it relied to assert that it passed the 4WIPPT.

(220)    If the correct formula is applied to Kaiser's own figures – i.e. assuming that Kaiser was entitled to be compensated for the unscheduled caster delays that it has attributed to Nova Hut, that Kaiser produced 42,209 tons of steel coils of acceptable quality and that the correct figure to calculate constraint adjusted weight is 134.7 tons per hour instead of 125 tons per hour – Kaiser achieved 70,085 constraint adjusted tons, which is below the target Kaiser itself asserts that it needed to achieve to pass the 4WIPPT, namely 77,600 tons.

## 4.3    Discussion and decision

### 4.3.1    The contractual formula to determine the hourly production rate

(221)    Section 9.1 of Appendix G to the Phase 1 Contract lays down the principle that Kaiser is entitled to receive credit towards the total quantity of steel coils produced during the 4WIPPT as though steel has been produced during the periods of delay caused by Nova Hut (emphasis added):

If any delay is attributable to Owner responsibility, then:

(i)    if the delay is minor (less then [sic] 24 consecutive hours of production interruption), the period of the delay shall be credited to the **monthly production totals** by multiplying the delay hours times **the average hourly production rate (the rate achieved after subtracting Owner caused delays)** over the four week period provided that the maximum aggregate number of hours of interrupted production which may be dealt with under this (i) shall be one hundred and sixty eight (168) hours, and any hours in excess thereof shall be dealt with under (ii) below; or

(ii)    if the delay is between 24 consecutive hours and 7 consecutive days of production interruption, the test will be extended by the time of the delay; or

(iii)    if the delay is a major delay (more than 7 consecutive days of production interruption), the Owner may request an extension of the [4WIPPT] affected by the delay by the number of days corresponding to the delay period. Two such extensions may be requested on Supplier's costs. If third major Owner's delay occurs, the test shall be considered completed successfully. The test extensions due to Owner's delay shall not be counted against the Supplier's rights for two repeat tests in case of failure.

64

> If any delay is attributable to Supplier responsibility, the delay period shall stand as a non-production period and, therefore, no production credit shall accrue.

(222) The above provision defines the hourly production rate ("HPR") as *"the rate achieved after subtracting Owner caused delays"*. The parties agree that this wording results in the following formula (see, for instance, ¶47 of Claimant's Reply of 7 April 2005, p. 20, in which Kaiser writes that *"[i]n short, the hourly production rate is the total tons divided by the total hours of the test minus the owner delay hours"*):

$$HPR = \frac{\text{total tons}}{\text{total hr} - \text{owner delay}}$$

(223) The parties disagree as to the relevant term above the bar in the fraction (numerator).

(224) Kaiser asserts that the wording "monthly production totals" in Section 9.1(i) of the Contract means the actual tonnage produced during the 4WIPPT *plus* the production that Kaiser could have achieved during the delay hours (see Claimant's Post-Hearing Brief of 28 October 2005, ¶90, p. 33). Thus, according to Kaiser, the correct formula to determine the hourly production rate is the following (see Claimant's Reply of 7 April 2005, ¶48, p. 20 and Claimant's Post-Hearing Brief of 28 October 2005, ¶90, p. 33):

$$HPR = \frac{\text{total tons} + (\text{delay hr x HPR})}{\text{total hr} - \text{max. delay hr}}$$

(225) Nova Hut argues that the words "monthly production totals" refers to the *actual* constraint production achieved during the 4WIPPT. In order to determine this amount, it is sufficient to know how much steel coils Kaiser actually produced during the hours when it was able to roll. The resulting rate is then multiplied by the delay hours to achieve the delay tons. Nova Hut thus relies on the following formula (see Respondent's Statement of Defense, ¶35, p. 18):

$$HPR = \frac{\text{total tons}}{}$$

total hr – delay hr

(226)    As the parties' views diverge in respect of the meaning to be ascribed to Section 9.1(i) of the Contract, the Arbitral Tribunal shall now interpret this provision.

(227)    In its Post-Hearing Brief of 28 October 2005, Kaiser argues for the first time that, under Austrian law, the interpretation of a contract shall not be based upon the literal meaning of the expressions used but rather upon the true intention of the parties and the contract shall be constructed in accordance with the customs of honest dealings (¶98, pp. 35–36). Kaiser further states that Nova Hut, as opposed to Kaiser, has not presented a single witness to testify about the parties' intentions.

(228)    Kaiser's restatement of the principles of interpretation under Austrian law are correct. However, Kaiser has not established what was the parties' intention when they agreed to Section 9.1 of Appendix G to the Contract. According to Kaiser itself, Appendix G was drafted by the IFC on behalf of Nova Hut. Moreover, it is not alleged that Joseph Pietryka participated in the negotiations of the Contract. Therefore, if his explanations as to how he achieved an hourly production rate figure of 178.02 tons per hour can enlighten the Arbitral Tribunal on his personal understanding of Section 9.1, they bring nothing regarding the parties' intention.

(229)    Kaiser's reliance on the *contra proferentem* principle is similarly inapposite (see Claimant's Post-Hearing Brief of 28 October 2005, ¶99, p. 36). As Kaiser acknowledges it, the principle only applies in presence of an ambiguous declaration. As noted above, Section 9.1 of Appendix G to the Contract can easily be interpreted by using a common sense understanding.

(230)    The Arbitral Tribunal cannot establish the real mutual intent of the parties – which, under Austrian law, must be sought first. It shall therefore seek the hypothetical intent of the parties, having regard to circumstances which a honest and reasonable person would take into account.

66

(231)    The purpose of the formula described in Section 9.1(i) of the Contract is to determine the total production achieved by Kaiser during the 4WIPPT, which includes both the actual production and the (hypothetical) production that Kaiser would have achieved if it had not been prevented from rolling due to Nova Hut (owner's delays).

(232)    Section 9.1(i) of the Contract provides that, to achieve that goal, the period of the delay shall be *credited* to the "monthly production totals". "To credit" means "to add" to, although the following words ("... by multiplying ...") would rather suggest a multiplication. However, it is clear from the aim of this provision that an addition ("credit") shall be made, the actually produced tons being one number and the other number the product of the multiplication set forth in the provision of the Contract. In other words, the (hypothetical) delay tons – which are calculated by multiplying the delay hours time the hourly production rate - must be *added* to the monthly production total. The formula described in Section 9.1 may thus be expressed as follows:

$$\text{total production} = \text{actual production} + \text{delay hours} \times \text{HPR}$$

(233)    Or:

$$\text{total production} = \text{actual production} + \text{delay hours} \times \frac{\text{actual production}}{\text{actual hours}}$$

(234)    Or:

$$\text{total production} = \text{actual production} + \text{delay hours} \times \frac{\text{actual production}}{\text{total hours} - \text{delay hours}}$$

(235)    The Tribunal notes that this corresponds exactly to the formula described by Nova Hut and set out in its Statement of Defense of 24 January 2005, ¶¶34-35, pp. 17-18):

> 34. Accordingly, the correct formula to calculate constraint adjusted weight after compensation for delays is:

*Total production + owner delays x average hourly production rate*

35. As to the average hourly production rate, s. 9.1 of Appendix G defines this as "the rate achieved after subtracting Owner caused delays". In other words, the contractual formula for calculating the average hourly production rate is:

$$\frac{Total\ production}{Total\ number\ of\ hours\ in\ 28\ days\ (672\ hours) - delays\ caused\ by\ Nova\ Hut}$$

(236)    By contrast, there can be no (additional) *credit* to the monthly production total if, as results from Kaiser's formula, such total already includes the actual production *and* the delay tons.

(237)    Therefore, the "monthly production total" within the meaning of Section 9.1(i) of the Contract may only be the actual production achieved during the 4WIPPT. Kaiser's assertion that "[t]*here is no reason, based on the language of the contract, why the monthly production total – that is production during the test plus delay tons – should not be used in this calculation*" (see Claimant's Rejoinder of 28 June 2005, ¶22, p. 9) does not enable to depart from this finding. Kaiser did not explain or give any plausible reason for assumption that the "monthly production total" should be any other number than the actually achieved number of tons produced.

(238)    Two further observations may be made in respect of the formula relied upon by Kaiser to determine the hourly production rate that show unambiguously that such formula may not be the one warranted by the Contract:

$$HPR = \frac{total\ tons + (delay\ hr\ x\ HPR)}{total\ hr - max.\ delay\ hr}$$

(239)    First, if the delay tons are added to the actual production in the *numerator* of the formula to determine the hourly production rate, then the term below the line (the denominator) *must* be the total time and not the total time less the delays. In other words, it is conceptually wrong to include tons achieved during delays in the numerator and, at the same time, to deduce these very same delays in the

denominator. As is shown by the developing of the formula proposed by Kaiser, this formula results in an artificially increased production rate:

$$HPR = \frac{\text{total tons} + (\text{delay hr} \times HPR)}{\text{total hr} - \max \text{ delay hr}}$$

$$HPR \times (\text{total hr} - \text{max. delay hr}) = \frac{\text{total tons} + (\text{delay hr} \times HPR)}{\cancel{\text{total hr} - \text{max. delay hr}}} \times \cancel{\text{total hr} - \text{max. delay hr}}$$

$$HPR \times \text{total hr} - HPR \times \text{max. delay hr} = \text{total tons} + (\text{delay hr} \times HPR)$$

$$HPR \times \text{total hr} - HPR \times \text{max. delay hr} - HPR \times \text{delay hr} = \text{total tons}$$

$$HPR \times (\text{total hr} - \text{max. delay hr} - \text{delay hr}) = \text{total tons}$$

$$\frac{HPR \times \cancel{(\text{total hr} - \text{max. delay hr} - \text{delay hr})}}{\cancel{(\text{total hr} - \text{max. delay hr} - \text{delay hr})}} = \frac{\text{total tons}}{(\text{total hr} - \text{max. delay hr} - \text{delay hr})}$$

$$HPR = \frac{\text{total tons}}{(\text{total hr} - \text{max. delay hr} - \text{delay hr})}$$

(240)    It thus appears that, notwithstanding Kaiser's affirmation that "[t]*he parties did not double count delays by subtracting both the maximum delay hours and the actual delay hours, as show in the calculation presented in paragraph 15, supra*" (see Claimant's Rejoinder of 28 June 2005, ¶23, p. 9), Kaiser's formula actually results in subtracting from the actual weight not only the actual hours of delay attributed to Nova Hut, but also the maximum delay hours allowed under the contract, i.e. 168 hours. By deducing twice the delays, the denominator is reduced and the resulting production rate "artificially" increased.

(241)    It is worth noting in this respect that, although it apparently assumed wrongly that the 168 hours limit of Section 9.1(i) of the Contract was relevant to calculate the hourly production rate (whereas it is only relevant to calculate the credit to be granted to Kaiser), Kaiser *knew* perfectly that, to determine the hourly production rate, it was wrong to subtract from the total test hours both the 168 hours *and* the actual delay hours. Indeed, in a summary document prepared by Joseph Pietryka and relied upon by Kaiser in this arbitration in support of its allegation that it passed the 4WIPPT, the formula to calculate the hourly production rate is expressed as follows (C132, p. 3) (emphasis added):

| Total | 77600 | 42,209 | 84,027 | 108.3% |
|---|---|---|---|---|

Based on 178.02 T/H average production rate, adjusted at the end of the test

**Average production rate = Constraint adjusted production/[test time (640h) − max. allowed owner delay (168h)]**

**Actual        178.02 T/H**

(242)    The second observation that the Arbitral Tribunal wishes to make concerns Kaiser's statement that "*in order to determine the average hourly production rate, the parties had to use the average hourly production rate*" (see Claimant's Reply of 7 April 2005, ¶49, p. 20) and that, to solve this problem, they "*solved this dilemma by using a well-recognized mathematical method known as an iterative process*".

(243)    As seen above, once developed, Kaiser's formula to determine the hourly production rate may be expressed as follows:

$$HPR = \frac{\text{total tons}}{(\text{total hr} - \text{max. delay hr} - \text{delay hr})}$$

(244)    Thus, the hourly production rate term (HPR) may be isolated on one side of the equation and there is no need to resort to an iterative process.

(245)   Based on the above, the Arbitral Tribunal finds that the formula to determine the hourly production rate in accordance with Section 9.1 of Appendix G to the Phase 1 Contract is:

$$HPR = \frac{total\ tons}{total\ hr - actual\ delay\ hr}$$

(246)   Therefore, the formula to calculate the total production achieved by Kaiser during the 4WIPPT, including the delay tons is the following:

$$total\ production = actual\ production + delay\ hours \times \frac{actual\ production}{total\ hours - delay\ hours}$$

(247)   The Arbitral Tribunal has yet to determine if, as Kaiser contends, Nova Hut agreed to an average hourly production rate of 178.02 tons per hour to calculate the constraint adjusted weight achieved during the 4WIPPT.

### 4.3.2   Did Nova Hut agree to the formula used by Kaiser?

(248)   Kaiser alleges that, in any event, Nova Hut agreed immediately after the test to the very figures it now challenges, including the average hourly production rate of 178.02 tons per hour.

(249)   In support of the above allegation, Kaiser alleges that Jan Hascin agreed to a summary document compiled by Joseph Pietryka at the end of the 4WIPPT that refers to the hourly production rate figure of 178.02 tons per hour. To back this allegation, Kaiser points to the fact that a representative of Nova Hut used another figure that also appears on the summary document and that may only have been reached using the hourly production rate of 178.02 tons per hour.

(250)   Kaiser also relies on summary documents that were issued daily during the 4WIPPT and that a representative of Nova Hut countersigned for the first nine days of the test. These documents *inter alia* specify that the average hourly production rate will be "*adjusted at the end of the test*".

(251)    Kaiser has not proven that Nova Hut agreed to the formula to calculate the hourly production rate relied upon by Kaiser or to the figure for hourly production rate of 178.02 tons per hour.

(252)    The summary document produced by Joseph Pietryka is a one-page table (C132, p. 3). It was apparently produced on 22 October 2000. It specifies, in four columns, for each day of the test, the theoretical 100% performance, the actual production, the constraint adjusted production and the performance efficiency ratio.

(253)    The following comment appears at the bottom of the table (emphasis added):

| Total | 77600 | 42,209 | 84,027 | 108.3% |
|-------|-------|--------|--------|--------|

Based on 178.02 T/H average production rate, adjusted at the end of the test

**Average production rate = Constraint adjusted production/[test time (640h) − max. allowed owner delay (168h)]**

**Actual        178.02 T/H**

(254)    With respect to the above document, Joseph Pietryka testified as follows in his second witness statement (CWS10¶¶13-14, pp. 4-5):

> 13. After the completion of the test, I met with Nova Hut's on-site representative, Jan Hascin, to finalize the test result calculations. Hascin independently made the calculations underlying these results and shared them with me. I had separately performed the same calculations and achieved the same results.
>
> 14. I then compiled a summary document memorializing each of the figures Hascin and I agreed upon. I reviewed this summary document with Hascin, who agreed to everything in it. This document is Exhibit C.132, page 3.

(255)    And further (CWS10¶21):

> 21. Mr. Hascin and I also both made our independent calculations of the total tons produced by Kaiser during the test. We reached the same result in this calculation too − 84,027 tons, or 108.3% of he required tons. To reach this result, Mr. Hascin used 178.02 tons per hour.

72

(256)    However, both Jan Hascin and Premysl Kuncicky have bluntly rejected Joseph Pietryka's testimony as being untrue. In his first witness statement, Jan Hascin explained that (RWS6¶14, p. 4):

> 14. Following the [4WIPPT], Mr. Pietryka came to me with a diskette containing his calculations of the results of the test. [...]. Contrary to what Kaiser states at ¶¶24 and 44 of its Statement of Reply, I did not agree to that figure, let alone perform my own calculations resulting in the same figure. To the contrary, I and my colleagues from Nova Hut disagreed with the figure of 178 T/hr, because Mr. Pietryka never explained how he calculated it.

(257)    He confirmed the above testimony at the hearing (Tr. 462:23-25 to 463:1-5):

> Let me go back to your first question. After the termination of the performance test Mr Pietryka approached me with four folders, one for each week, and the figures there were 178.02 tons per hour. He gave these folders to the secretary of our director, Mr Buryan, and he gave me a disk which showed this figure, 178.02. That is how we arrived at 178. That is how we got the figure.

(258)    And further (Tr. 464:18-21):

> [...]. At the end of the test we were just reported the figure but there was no discussion over the figure. There was no explanation of the figure either.

(259)    Premysl Kuncicky stated that "*Mr. Pietryka presented* [him] *with documents that contained his calculations of the results of the* [4WIPPT]" *and that "*[he] *did not understand these calculations, and did not agree to them*" (see RWS2¶37, p. 11).

(260)    Admittedly, the 108.3% figure appears in both Joseph Pietryka's summary document and – although it is slightly different - in a letter sent by Nova Hut's Gerhard Pretsch to Douglas Craig of the IFC on 24 November 2000, in which the former states that "*the Test has been fulfilled and overreached at the production volume up to 108.5%*" (C233).

(261)    This does not suffice to establish that Nova Hut performed its own calculations, let alone agreed with Kaiser's calculations. What the letter to the IFC simply shows is that Nova Hut used a figure similar to the one relied upon by Kaiser. These lines seem to simply quote Kaiser's evaluation, they do not expressly say that Nova Hut had accepted or acknowledged Kaiser's results or evaluations

(however, the Arbitral Tribunal notes Nova Hut has not explained these lines nor applied to hear the author of this letter, Mr. Pretsch, as witness. This letter has, however, never been addressed to Kaiser and it does not express an acceptance, so that a speculation where the figure came from need not be made.) Jan Hascin testified that he did not perform his own calculations and did not reach the same results. Whether Nova Hut's letter to the IFC may be interpreted as Nova Hut's acknowledgement that Kaiser passed the 4WIPPT will be discussed in greater detail in Section V.C.8.2 below.

(262)    Kaiser also avails itself of what it calls the "Daily Calculation Documents". The "Daily Calculation Documents" are spreadsheets entitled "Four weeks performance test". They were produced by Joseph Pietryka and record *inter alia* Kaiser's calculation of the constraint adjusted production for each day of the test, before and after compensation of delays. The following notation appears at the end of each daily summary (see for instance C132, pp. 15 to 19 for Day 1):

| Remarks: Average hourly production rate (134.7T/h to be adjusted at the end of the test) | | 178.02 T/H |
|---|---|---|
| Owner delay hours | 384 | 6.4 H |

(263)    These documents do not help Kaiser's case.

(264)    First, the 178.02 T/H figure only appears on "Daily Calculation Documents" printed on 22 November 2000, i.e., after the end of the 4WIPPT, and that were signed by Joseph Pietryka only. Thus, the "Daily Calculation Documents" signed by Premysl Kuncicky for the first nine days of the test are identical, with the exception that a 134.70 T/H figure appears instead of 178.02 T/H (C221 to C229):

| Remarks: Average hourly production rate (134 7T/h to be adjusted at the end of the test) | | 134.70 T/H |
|---|---|---|
| Owner delay hours | 384 | 6 4 H |

(265)    Premysl Kuncicky confirmed that the versions he signed did not refer to 178.02 tons per hour (RWS 4¶6, p. 2):

Kaiser has correctly stated that, for the first nine days of the Four Week Integrated Production Performance Test, I signed a version of Kaiser's daily calculation documents. The versions that I signed are, with the exception of one relating to October 16, 2000, different from the versions contained in Exh. C-132. In particular, unlike those versions, none of the versions that I signed contains the figure 178 T/hr that Kaiser relies on to assert that it passed the test.

(266)    Moreover, the fact that the average hourly production rate is "to be adjusted at the end of the test" would rather accredit Nova Hut's contention that the relevant figure to calculate the hourly production rate was the *actual* constraint production. As a matter of fact, such actual production could only be ascertained at the end of the test. The 134.7 figure – which is the hypothetical hourly production rate if 77,600 tons are rolled in 576 hours, i.e., without any delay (77,600/576 = 134.7) - was most likely used by Kaiser to estimate, pending the 4WIPPT, the quantity of tons that would be credited to it at the end of the test and, accordingly, whether it was ahead or behind schedule.

(267)    In any event, the Daily Calculation Documents were not signed beyond the tenth day of the test. As will be seen below, Nova Hut's employees were instructed to stop signing the Daily Calculation Documents (see Section 8.3 below).

(268)    Based on the above considerations, the Arbitral Tribunal finds that Nova Hut did not agree to the figures for hourly production rate relied upon by Kaiser.

### 4.3.3    Applying the contractual formula, did Kaiser pass the 4WIPPT?

(269)    Kaiser having failed to demonstrate that the parties agreed to use 178.02 tons per hour as the relevant hourly production rate, the Arbitral Tribunal shall now determine whether Kaiser passed the 4WIPPT applying the relevant contractual formula.

(270)    According to Nova Hut, using all the figures relied upon by Kaiser but for the hourly production rate, Kaiser produced a total **70,085** constraint adjusted tons during the 4WIPPT, i.e., below the production it was required to achieve to pass

the 4WIPPT (77,600 tons) (see Table A to Respondent's Rejoinder of 10 June 2005).

(271)   Kaiser however alleges that Nova Hut's calculation presents the following two errors, which resulted in crediting Kaiser with fewer delays tons than it is entitled to under the Contract (see Claimant's Rejoinder of 28 June 2005, ¶14, p. 7).

(272)   First, Nova Hut would have calculated the hourly production rate using the actual delay hours rather than the 168-hour limit of Section 9.1 of Appendix G to the Contract.

(273)   Second, Kaiser keeps claiming that "*Nova Hut uses constraint adjusted weight rather than the monthly production total to calculate the average hourly production rate*" (see Claimant's Rejoinder of 28 June 2005, ¶14, p. 7). In other words, Kaiser reasserts that the correct numerator in the formula to calculate the hourly production rate is not the actual constraint weight, but such weight added by the "delay tons", i.e. (see Claimant's Rejoinder of 28 June 2005, ¶15, p. 7):

$$HPR = \frac{\text{constraint weight} + (\text{delay hr} \times \text{HPR})}{\text{total hr} - \text{max. delay hr}}$$

(274)   Other than that, Kaiser has not disputed the figures used by Nova Hut in Table A to its Rejoinder (which, in any event, are the very figures relied upon by Kaiser).

(275)   The Arbitral Tribunal has already dealt with Claimant's second argument in details at Section V.C.4.3.1 and has reached the conclusion that Kaiser's formula finds no basis in the Contract.

(276)   Section 9.1(i) of Appendix G provides that "delay tons" must be credited to Kaiser but that "*the maximum aggregate number of hours of **interrupted** production which may be dealt with under this (i) shall be one hundred and sixty eight (168) hours, and any hours in excess thereof shall be dealt with under (ii) below*". In other words, up to 168 hours of delay at the relevant hourly production rate may

be credited to Kaiser, the hours of delay in excess of that amount being dealt with under Section 9.1(ii), i.e. being added to the overall test time:

> (ii)    if the delay is between 24 consecutive hours and 7 consecutive days of production interruption, the test will be extended by the time of delay; or

(277)    It thus appears that the 168 hours limit has no bearing whatsoever with the method of calculating the hourly production rate, which must still be determined by dividing the actual constraint production achieved by the actual operation period.

(278)    Applying the very figures for constraint adjusted weight and delays relied upon by Kaiser, the hourly production rate achieved by Kaiser was of **112.23 tons per hour**:

$$112.23 = \frac{51,033.64}{640 - 185.3}$$

(279)    If this hourly production rate is multiplied by the maximum delay hours that may be dealt with under Section 9.1(i) of Appendix G, i.e. 168 hours, the weight of steel coils to be credited to Kaiser (the "delay tons") amount to 18,854.64 tons.

(280)    The hours of delay in excess of 168 – i.e, 17.3 (185.3 – 168) must be dealt with under Section 9.1(ii) of Appendix G and the test duration should have been "*extended by the time of the delay*". In fact, the duration was not extended by 17.3 hours. However, using the hourly production rate achieved by Kaiser during the 4WIPPT, one may assume that the weight of coil produced during these additional hours would have been of 1941.58.

(281)    Adding the above "delay tons" to Kaiser's actual production, i.e., 51,033.64 tons, the constraint adjusted weight of steel coils produced by Kaiser during the 4WIPPT totals **71,829.86 tons**.

(282)   Kaiser's criticism that "*Nova Hut presents for the first time what it calls Table A, which is its latest attempt to re-calculate the results of the four-week test*" changes nothing. The Arbitral Tribunal has found above that Nova Hut did not agree to the formula relied upon by Kaiser. Hence, it is necessary to go back to the Contract and whether Nova Hut states its position in this respect now or at the time does not alter this finding.

(283)   Therefore, the Arbitral Tribunal finds that Kaiser did not pass the 4WIPPT.

(284)   In light of the above finding – which, again, is based on the figures that Kaiser claims to be correct - there is in principle no need to determine if, as alleged by Nova Hut, Kaiser's figures themselves are wrong because, for instance, Kaiser was over-compensated for delays or because Kaiser's figure for actual weight include coils that were not of acceptable quality and, accordingly, should not have been counted.

(285)   Nevertheless, for the sake of completeness, the Arbitral Tribunal shall determine in the following sections whether:

-   the delays were correctly assigned between the parties;

-   the relevant weighted average tons per hour figure to be plugged in the formula to calculate constraint adjusted weight is 125 tons per hour or 134.7 tons per hour; and whether

-   the figure for actual weight relied upon by Kaiser includes coils that were not of acceptable quality.

(286)   If the Arbitral Tribunal finds that Kaiser's delay figure (185.3 hours) include delays that were unduly attributed to Nova Hut; or that the figure of 134.7 was unduly substituted for 125 in the formula for calculating constraint adjusted weight; or yet that unacceptable coils were included in Kaiser's figure for actual weight (56,033.64), the total production of Kaiser during the 4WIPPT will be in fact lower

than the **71,829.86** tons figure reached above using Kaiser's figures, which will reinforce the conclusion that Kaiser did not pass the 4WIPPT.

**5.    The allocation of certain delays between the parties**

**5.1    Kaiser's position**

(287)    Appendix G to the Phase 1 Contract places all delays in one of two categories, namely "owner delays" and "supplier delays". The Contract states that owner delays are to be credited to Kaiser for purposes of counting total production.

(288)    Appendix G does not dictate which delays fall within which category. The parties recognized this and agreed how delays were to be assigned. These agreements were used as the basis for the calculation of the results of the test. Nova Hut agreed with this allocation of delays by agreeing to the daily calculations (C221 to C229) and signing the Daily Caster Delay report for each day of the 4WIPPT

(289)    Nova Hut now takes issue with two types of delay period, namely roll changes and caster restranding.

(290)    A roll refers to the piece of equipment used by the rolling mill to flatten the slabs produced on the caster to the desired width and thickness. These rolls must be changed periodically due to wear or damage. The parties recognized that the frequency of roll changes and the length of time required for a roll change depends upon the operators of the plant. To avoid constant negotiation over this issue, Nova Hut agreed that roll changes would be considered owner delays and production would be credited to Kaiser for these periods. Accordingly, the parties included the periods for roll changes in calculating Kaiser's production during the 4WIPPT.

(291)    The rolling mill could produce rolled steel faster than the caster could produce slabs. Therefore, the caster was the limitation on the production process. If the caster stopped production, the rolling mill could never recover that time even if it was running at the time the caster was stalled. Eventually, the rolling mill would

require additional steel slabs and the caster delay would slow production of coils. A delay in the caster, therefore, resulted in a delay in finished coil production.

(292)   The caster was designed to run continuously. In this respect, and contrary to Jan Hascin's statement, stopping and restarting the caster for a tundish change is not necessary when the slab width is changed by more than 2 cm. However, Nova Hut chose not to run it in this continuous mode, which resulted in periods when the caster was not producing steel for no reason other than Nova Hut's operational preference. These delays resulted in lost production in the rolling mill.

(293)   Before the performance tests, representatives from Nova Hut and Kaiser discussed the issue of caster delays. The parties agreed that production delays caused by Nova Hut's decision not to run the caster continuously would be charged to Nova Hut, which was in full compliance with the provisions of Appendix G.

(294)   Assuming that the parties did not agree how to assign delays, the methods they used were correct and in accordance with the Phase 1 Contract. As a matter of fact, Appendix G to the Phase 1 Contract places all delays into two categories, namely "owner delays" and "supplier delays", which is true whether an owner delay is scheduled or unscheduled.

(295)   Nova Hut's contention that nothing in the Phase 1 Contract provided for compensation of scheduled delays – i.e delays defined by Nova Hut as delays that are an inevitable part of the production process – must be rejected.

(296)   First, Nova Hut alleges that these scheduled delays were principally roll changes and restranding in the caster. However, Nova Hut cites to no evidence that these are the scheduled delays or that they were an inevitable part or the production process.

(297)    Second, in any event, the roll changes depend on the skill of the operator, which was Nova Hut. As for the caster, it was to run continuously, without restranding, or stopping and restarting, but Nova Hut chose not to run it in that fashion.

(298)    Nova Hut's contention that Kaiser has been over-compensated in respect of unscheduled caster delays must be rejected as well. Nova Hut agreed otherwise during the test. It specifically initialed its agreement that these delays would be owner delays and credited to Kaiser. In any event, Nova Hut elected to operate the caster in its own manner and scheduled unnecessary "re-starts" during the 4WIPPT. These unscheduled delays included time in excess of the amount Nova Hut scheduled for its re-starts, and delays caused by Nova Hut's operation of the caster, all of which Nova Hut agreed come within its responsibility.

(299)    Nova Hut's claim that x minutes' delay in the caster does not necessarily result in x minutes' delay in production, in particular because the parties were able to and did use cold slabs, should be disregarded as well. The caster was and is recognized as the production unit limiting the minimill to one million tons per year production. In other words, since the mill could roll steel faster than the caster could supply it, the caster was the limiting bottleneck in the process. Nova Hut's reference to using cold slabs stored in the yard is particularly disingenuous. Section 9.3 of Appendix G provides that stored slabs could only be used in the same amount that the caster produced steel in the 4WIPPT that was then temporarily stored in the yard. In other words, with the exception of the 2,475 tons that Nova Hut was to purchase from outside sources to provide sufficient material to test the Phase 1 plant, the caster was required to produce during the test period the number of tons used by the mill. Kaiser could not simply go to the yard and grab steel for rolling. The only exception to this restriction on using cold slabs was that Kaiser could use cold slabs (produced prior to the 4WIPPT) equal to the weight of stainless steel slabs required to be purchased for the test if Nova Hut did not supply the stainless steel slabs. Nova Hut did not supply these slabs and, accordingly, the production goal had to be revised. As the records cited by Nova Hut demonstrate, some of the cold slabs produced during the 4WIPPT were returned from the slab yard to the rolling mill and processed.

**5.2    Nova Hut's position**

(300)    The scheduled delays, which were principally 40-minute tundish changes in the caster and roll changes in the rolling mill, were delays that were an inevitable part of the production process.

(301)    Contrary to Claimant's allegations, tundish changes in the caster were necessary whenever the width of the slab was changed by more than 2 cm. Yet, under normal operating conditions, the caster would necessarily cast slabs whose width would frequently change by more than 2 cm.

(302)    As for the roll changes, the parties agreed that Kaiser would be compensated for any time taken in excess of 10 minutes. As a matter of fact, the Phase 1 Contract provided that the time to change work rolls would not exceed 10 minutes. Yet, it appears that Kaiser is actually claiming compensation in each case for the 10 minutes to which Nova Hut was entitled.

(303)    Kaiser should not be compensated for the above delays. The contract does not provide for the compensation of such delays and the 4WIPPT's very purpose was to reproduce reality.

(304)    Moreover, Kaiser's calculations unjustifiably compensate it in respect of the delays encountered in the <u>caster production</u>.

(305)    First, pursuant to Section 1.3.5 of Appendix G, Kaiser assumes responsibility for the supervision of the caster and its ability to perform to the specifications required by the Phase 1 Contract.

(306)    Second, x minutes' delay in the caster does not necessarily translate in x minutes' delay in production, in particular because the parties were able and did use cold slabs that had been cast earlier and stored in the slab yard. In this respect, it appears that Kaiser did in fact use steel from the yard, which is evidenced by the temperature of the slabs at the time of charging. Another

reason why x minutes' delay at the caster did not necessarily result in x minutes' delay at the mill is that the periods during which the rolling mill was waiting for steel often coincided with periods of mechanical delay within the rolling mill for which Kaiser also claims compensation (e.g. roll changes). If Kaiser is compensated for the delays in the caster as well as those in the rolling mill then there is bound to be double-counting.

## 5.3    Discussion and decision

### 5.3.1    Preliminary comment

(307)    As mentioned above (see ¶(221)), Section 9.1(i) of Appendix G lays down the principle that Kaiser is entitled to receive credit towards the total quantity of steel coils produced during the 4WIPPT as though steel has been produced during the periods of delay caused by Nova Hut (emphasis added):

> (i)    if the delay is minor (less than 24 consecutive hours of production interruption), the period of the delay shall be credited to the monthly production totals by multiplying the delay hours times the average hourly production rate **(the rate achieved after subtracting Owner caused delays** over the four week period, [...]; or

(308)    The implementation of the above principle requires that delays caused by Nova Hut during the 4WIPPT be subtracted from the total test time, which implies that all delays incurred during the 4WIPPT be classified and attributed to either Kaiser or Nova Hut.

(309)    All delays incurred during the 4WIPPT, whether at the minimill or at the continuous caster, were recorded mainly in two sets of documents, namely the Daily Mill Delay report (marked as Exhibit C132, p. 13, for the first day of the test, p. 77, for the second day, etc.) and the Daily Caster Delay report (marked as Exhibit C132, p. 20, for the first day of the test, p. 83, for the second day, etc.).

(310)    The Daily Mill Delay is a table that was prepared by Kaiser. It places all delays incurred daily at the minimill in three categories, namely "SUPPLIER Resp.", "OWNER Sched." and "OWNER Delay". A fourth column classifies all the delays

incurred in different categories entitled "MECH1", "COM1", etc. and a fifth one indicates what was the event at the origin of each delay (for instance, roll change, cobble removal, etc.).

(311)    The Daily Caster Delay report (actually entitled "Monitoring of caster delays") records all the delays incurred at the caster during the 4WIPPT. The delays are placed into four main categories, namely "Owner sch. delays", Owner unsch. delays", "Owner delays" and "Supplier resp.".

(312)    Both the Daily Mill Delay report and the Daily Caster Delay report were signed by a representative of Nova Hut for each day of the test. In fact, Nova Hut concurs that these reports are agreed records of the delays incurred during the 4WIPPT (see Respondent's Statement of Defence of 24 January 2005, ¶32(2), p. 15 and ¶32(4) for a similar statement regarding the Daily Caster Delay report):

> [The Daily Mill Delay] is a record of the delays that occurred during the rolling process, again agreed between the parties at a meeting on the morning following the day in question. It attributes certain delays to Kaiser (in the column headed "SUPPLIER Resp.") and others to Nova Hut (in the column headed "Owner Delay"). A third category are listed under the heading "OWNER Sched."

(313)    A summary of all the delays incurred, prepared on the basis of the Daily Mill Delay and Daily Caster Delay reports, was included in the Daily and To Date Production Calculation (see C132, p. 23/C221 for 16 October 2000). According to this document – which, again, was signed by Nova Hut for the first nine days of the test - 384 minutes of delay were caused by Nova Hut on 16 October 2000, namely 72 and 75 minutes from the Daily Mill Delay report (C132, pp. 13-14) and 167 minutes (80 + 87) from the Daily Caster Delay report (C132, pp. 20-22).

(314)    This is where the dispute arises. If Nova Hut agrees with the way the delays were recorded during the test, it disputes the way they were assigned between the parties for the purpose of crediting to Kaiser the production it could have achieved during interruptions attributable to Nova Hut.

34

(315)    Specifically, Nova Hut first contends that there is no reason why Kaiser should be compensated for scheduled delays. According to Nova Hut, these delays -which were principally restranding at the caster and roll changes at the mill – were an inevitable part of the production process and nothing in the Contract provides for their compensation. There is no reason why it should do so as the 4WIPPT was intended to test the integration of the different facilities and the production rate was to be measured under realistic conditions.

(316)    Second Nova Hut contends that Kaiser has been over-compensated in respect of the unscheduled caster delays. According to Nova Hut, the Contract provides that Kaiser is to be responsible for these delays. Second, x minutes' delay in the caster does not necessarily result in x minutes' delay in the production, in particular because the parties were able and indeed used slabs that had been cast earlier.

(317)    According to Kaiser, the parties, having recognized that Appendix G, whilst dictating that delays be classified as either attributable to the owner or to the supplier, did not specify which delays fall within which category, agreed how to assign delays incurred during the 4WIPPT and these agreements were used as the basis for the calculation of the test results. The parties also agreed that Nova Hut would be charged with production delays caused by Nova Hut's decision not to run the caster continuously. Kaiser further argues that Kaiser agreed to be responsible for unscheduled delays; that the operation of the caster was within Nova Hut's responsibility; and that, contrary to Nova Hut's allegations, a delay in caster production could not be made up from another source and inevitably resulted in a corresponding delay in production.

(318)    The Arbitral Tribunal shall now determine whether Nova Hut agreed to Kaiser's allocation of the delays, as Kaiser argues, and, in the negative, whether the delays incurred during the 4WIPPT were assigned between Kaiser and Nova Hut in accordance with the Contract.

**5.3.2    Did Nova Hut agree to the allocation of delays?**

a)    **The allocation of the scheduled mill delays**

(319)   In support of the allegation that the handling of the minimill delays resulted from the parties' agreement, Kaiser relies mainly on the testimony of Joseph Pietryka and Nicholas Rickard and on the fact that representatives of Nova Hut signed, for each day of the test, the Daily Mill Delay Report, and, for the first nine days of the test, the Daily and to Date Production Calculation.

(320)   In his second witness statement, Jospeh Pietryka confirms that the parties had an agreement regarding the allocation of scheduled minimill delay, such as roll changes (CWS10¶¶18-19, p. 6) (emphasis added):

> 18. before the performance tests, I met with Nova Hut to discuss the issue of delays caused by roll changes. The frequency of roll changes and the length of time required for a roll change depends upon the operators of the plant. To avoid constant negotiation over this issue, **Nova Hut agreed that roll changes would be considered owner delays and production would be credited to Kaiser for the periods**. Accordingly, the parties included the period for roll changes in calculating Kaiser's production during the four-week test.
>
> 19. Appendix G only describes owner delays or supplier delays. The contract does not make any reference to whether the delays are "scheduled" or not. A scheduled delay can be an owner delay under the contract. During the course of the project, **Nova Hut agreed that owner-scheduled delays in the documents were Nova Hut's responsibility**. Nova Hut initialed documents showing that these scheduled delays were owner delays.

(321)   However, as unequivocally stated by Premysl Kuncicky, it appears that the parties' agreement was in fact that Kaiser would be compensated only for any delay in excess of 10 minutes (RWS4¶¶3-4, pp. 1-2) (emphasis added):

> 3. Under the Phase 1 Contract, Kaiser guaranteed that "the time to change work rolls [would] not exceed 10 minutes." See Phase 1 Contract, App. G, section 7.1 (Exhibit C-18, p. 216). Since Kaiser had already proven that this was possible before the Four Week Integrated Production Performance Test began, and since it was Nova Hut employees that were performing the roll changes, **I agreed with Mr. Pietryka that Kaiser would be compensated for any delay in excess of 10 minutes**. In other words, if a roll change took 25 minutes then Kaiser would be compensated for 15 minutes.
>
> 4. **I never agreed that Kaiser would be compensated for roll changes that took less than 10 minutes to perform**. Nor, so far I am aware, did any of my colleagues at Nova Hut.

(322)    Premysl Kuncicky confirmed his above testimony at the hearing (Tr. 516:1-16):

> MR KUNCICKY: I am not sure whether there is a record available but the time for change of the rolls is one of the criteria relating to the test. This was something that was met. It was proved it was possible to change the rolls in less than 10 minutes. That is the technology time required. Anything beyond ten minutes, or anything in excess of ten minutes, is either [sic] an issue of lack of experience of the service people. This could either be our responsibility of Kaiser's responsibility or our fault or Kaiser's fault. Whenever it is our fault, then of course we do compensate Kaiser for this. This was the arrangement between us. Whenever it is Kaiser's fault, there is no compensation due to Kaiser.

(323)    Ivo Chmelik appears to share the same understanding (RWS7¶¶22-23, pp. 5-6):

> 22. I am very surprised to find that Kaiser is now claiming compensation for delays caused by roll changes. These were recorded in the daily logs of delays as "Owner Sched." Delays, which I understood to mean that they were delays that would not be attributed to either Kaiser or Nova Hut. This made sense, because the roll changes were changes that were part of the normal operating process; they were not something for which Kaiser or Nova Hut was to blame.
>
> 23. Indeed, I was told that it had been agreed that Kaiser would only be compensated for roll changes insofar as these took longer than 10 minutes to perform. This made sense, because Kaiser had already proven (in the Reversing Hot Strip Mill Technology Guarantee Test) that roll changes could be performed in 10 minutes.

(324)    Premysl Kuncicky's and Ivo Chmelik's testimonies, as opposed to Joseph Pietryka's, is backed up by Phase 1 Contract.

(325)    First, as pointed out by Premysl Kuncicky, Kaiser guaranteed in Section 7.1 of Appendix G to the Contract that "*the time to change work rolls will not exceed 10 minutes. [...]*".

(326)    Second, even more strikingly, Section 9.1 provides as follows in relevant parts (emphasis added):

> [...]
>
> Any delays to production due to equipment or operating failure **other than normal process delays** shall be attributed to Owner or Supplier as follows:
>
> [...]

(327)   Kaiser agrees that roll changes are such a normal process (Claimant's Reply of 7 April 2005, ¶38, p. 17):

> A roll refers to the piece of equipment used by the rolling mill to "flatten" the slabs produced on the caster to the desired width and thickness. Periodically, these rolls must be changed due to wear or damage.

(328)   The fact that the 4WIPPT Protocol places the "Scheduled Roll change" within Nova Hut's responsibility is not in contradiction with the finding that roll change delays were not to be credited to Kaiser unless they exceeded 10 minutes (C173, p. 34). The reference to "Scheduled time out of operation" and "Scheduled Roll change" also disproves Kaiser's statements at ¶54 of its Reply of 7 April 2005 that *"Nova Hut would have this Tribunal assign a meaning to the word "scheduled" that is not found in the Phase 1 Contract and was not used by the parties"* and at ¶56, p. 22, that *"Nova Hut cites to no evidence that these are the scheduled delays, or that these were "an inevitable part of the production process"*.

(329)   Admittedly, the Daily Mill Delay Report was signed by a representative of Nova Hut for each day of the test. However, while it assigns all the delays incurred in various categories, including a category entitled "OWNER sched.", the Daily Mill Delay Report does not contain any finding as to whether such scheduled owner delays will eventually be credited to Kaiser. Thus, all the delays are simply summarized as follows at the bottom of each daily report (C132, p. 13, for 16 October 2000):

| | | | |
|---|---|---|---|
| Supplier delays | 199 | 3.3 | Hrs |
| Owner        delays scheduled | 72 | 1.2 | Hrs |
| Owner delays | 145 | 2.4 | Hrs |
| Rolling | 1,024 | 17.1 | Hrs |
| Total minutes | 1,440 | 24 | Hrs |

(330)   Therefore, Nova Hut could not acknowledge the allocation of the delays recorded in the Daily Mill Delay report by signing such report.

(331)    By contrast, the scheduled delays are expressly attributed to Nova Hut in the Daily and to Date Production Calculation (C132, p. 23/C221 for 16 October 2000):

| Total | | |
|---|---|---|
| Owner | Scheduled time out of operation | 72 |
| delays | Mill operational and maintenance delays | 145 |
| | Caster delays | 167 |
| **Total** | **2,503.07** | **384** |

(332)    Representatives of Nova Hut signed the Daily and To Date Production Calculation for the first nine days of the test, but refused to sign thereafter as they did not agree to their content (C221 to C229). Moreover, Premysl Kuncicky has testified that he did not intend to amend the Contract by his signature (RWS4¶7, p. 2):

> I understand that Kaiser is trying to argue that, because I signed Kaiser's daily calculation documents relating to the first nine days of the test, I thereby accepted various modifications to the Phase 1 Contract. That was certainly not my intention. Nor did I have authority to make such modifications.

(333)    Based on the above, the Arbitral Tribunal finds that Kaiser and Nova Hut agreed that scheduled owner delays would in principle <u>not</u> be credited to Kaiser. In this respect, it is worth quoting again Section 9.1 of Appendix G, which, in other parts, specifies what types of delays may be credited to Kaiser:

> Owner caused delays shall include (but not limited to):
>
> • Failure of utilities provided to the new facility boundaries;
>
> • Failure to deliver liquid steel or imported slabs on-time and on-specifications to the new facilities
>
> • Failure of Owner's operating and maintenance personnel to follow procedures directed by the Supplier and/or contained in the Supplier's operating and maintenance manuals.
>
> Supplier caused delays shall include (but not limited to):

- Failure of technology components for any reason other than a failure of Owner's operating and maintenance personnel which is attributable to Owner as set out above.

- Time spent correcting defects in technology, workmanship, setup, or design of any part of the plant supplied by the Supplier.

(334)    Although the list is only intended as an illustration, it is immediately apparent that minor delays that result from the normal operation of the mill are not to be taken into account when determining the delay tons to be credited to Kaiser.

(335)    Specifically, the Tribunal finds that Kaiser and Nova Hut agreed that the former would be compensated for roll changes only to the extent that these exceeded 10 minutes.

(336)    In the instant case, it appears that Kaiser's calculations for the 4WIPPT give credit to Kaiser for all the scheduled delays incurred to change rolls, including the first 10 minutes (see for instance C132, pp. 13 in connection with p. 23, for 16 October 2000; pp. 77 in connection with 82, for 17 October 2000; etc.).

(337)    It thus appears that, as raised by Nova Hut, Kaiser's own delay calculation, which the Arbitral Tribunal used to calculate the delay tons to be credited to Kaiser, is not accurate and includes delay hours that should not have been accounted for. In other words, the production to be credited to Kaiser for the hours in which in was not able to roll due to Nova Hut must be reduced, which reinforces the conclusion that Kaiser did not pass the 4WIPPT.

**b)    The allocation of the caster delays**

*i)    Scheduled caster delays*

(338)    The scheduled caster delays were mainly 40-minute interruptions during which the caster was stopped to perform tundish changes (see for instance C132, p. 20 for 16 October 2000).

(339)    In support of the allegation that the parties agreed to the allocation of the scheduled caster delays, Kaiser mainly relies on the testimony of Nicholas

Rickard and, once again, on the Daily Caster Delay report signed by representatives of Nova Hut for each day of the 4WIPPT and, for the first nine days of the test, on the Daily and to Date Production Calculation.

(340)    As is the case for the Daily Mill Delay report, the signing of the Daily Caster Delay report by a representative of Nova Hut for each day of the test is not conclusive. As a matter of fact, the Daily Caster Delay report merely enables to determine what delays falls within what category but does not contain any indication as to the types of delays that will then be credited to Kaiser.

(341)    In his second witness statement, Nicholas Rickard testifies as follows with respect to the allocation of caster delays (CWS11¶2, pp. 1-2) (emphasis added):

> 2. Before the performance tests, representatives from Nova Hut and Kaiser discussed the issue of caster delays. **The parties agreed that production delays caused by Nova Hut's operation of the caster would be charged to Nova Hut.** [...].

(342)    And further (CWS11¶6-7, p. 3) (emphasis added):

> 6. The continuous casting machine was designed to be operated in a "continuous-continuous" manner, that is, to continuously process liquid steel to semi-finished slabs. [...]. In continuous operation, the caster would not have needed to stop and restrand [sic]. In fact, if the caster had run as intended, there would be no caster delays except an occasional operator error or equipment problem.
>
> 7. Nova Hut, however, chose not to run the caster in this continuous mode. Nova Hut chose not to cast more than six ladles at a time, thus requiring a re-starting of the casting process approximately every 10 to 12 hours. These "restarts" were not required by the equipment as designed and supplied. Kaiser requested that Nova Hut run the caster continuously, without these restarts. Nova Hut refused. Kaiser's production was dependent upon this continuous caster production, and these caster delays were entirely the result of Nova Hut's decision. For this reason, **the parties agreed that production delays caused by stopping the caster would be charged to Nova Hut.** The fact that some caster delays may have been scheduled by Nova Hut does not change their status as owner delays.

(343)    There is no reason to depart from Nicholas Rickard's testimony.

(344)    First, by contrast with the scheduled mill delays, none of Nova Hut's witnesses has expressly disputed the existence of an agreement to charge the caster scheduled delays to Nova Hut.

(345)    Jan Hascin – who, according to Ivo Chmelik, was the person responsible for counting caster delays (RWS7¶21, p. 5) - states that he does not "*believe that Kaiser is entitled to compensation for 40-minutes tundish changes*" (RWS6¶9). He then explains that he does not understand what Kaiser is referring to when it alleges to have instructed Nova Hut to operate the caster continuously. Indeed, according to Jan Hascin, a 40-minute tundish change is necessary whenever the slab width is changed by more than 2 cm and the slab width is changed frequently by more than 2 cm in the normal operation of the caster.

(346)    Regarding the allocation of caster delays, Ivo Chmelik merely says that he is "*surprised by the extent to which Kaiser is claiming compensation for caster delays*" (RWS7¶24, p. 6).

(347)    True enough, the crediting to Kaiser of scheduled caster delays is a departure from the allocation principle agreed for the scheduled mill delay, for which the parties agreed that only delays in excess of 10 minutes for roll changes would be credited to Kaiser. With respect to the caster, the application of this principle should have led to a solution where only delays in excess of 40 minutes for tundish changes would have been credited to Kaiser.

(348)    However, by contrast with the roll changes, the Contract shows that the caster machine was designed to be operated in a continuous manner, in particular with width changes during casting and "flying tundish changes" (Section 4 of Appendix G):

> 4.    Phase 1 Continuous Caster Performance Demonstration
>
> The first test after Preliminary Acceptance of Phase 1 facilities shall be the Continuous Caster Performance Demonstration. This shall be done in the test sequence specified in Section 1.2 2. The Supplier shall demonstrate to the Owner that the Continuous Caster, when producing the Phase 1 product

mix (see Table R-3), shall be capable of achieving the following performance characteristics.

1.: Caster preparation time from closing the tundish nozzle to caster ready for the next cast. 40 Min. Maximum (including the time for mold width change)

2.. Width change during casting under casting conditions: 0-50 mm in one slab length.

3.: The capability of the caster to perform a "flying tundish change" will be demonstrated.

[...]

(349) The record shows that the caster's ability to perform on fly width changes of up to 50mm and flying tundish changes was tested and that the tests were passed (C173, pp. 27 and 28).

(350) Therefore, the Arbitral Tribunal finds that the parties agreed that scheduled caster delays would be credited to Kaiser.

ii)    *The unscheduled caster delays*

(351) Nova Hut complains that Kaiser was overcompensated with respect to unscheduled delays. The argument rests on the allegations that, pursuant to Appendix G to the Contract, Nova Hut was to assume responsibility for the caster's ability to perform to the contractual specifications and that x minutes' delay at the caster did not result in x minutes' delay in the mill production.

(352) The Arbitral Tribunal concurs that neither the Contract nor logic justify the crediting of all unscheduled caster delays to Kaiser.

(353) First, as correctly pointed out by Nova Hut, Section 1.3.5 of Appendix G, explicitly stipulates that Kaiser is responsible for the caster's ability to perform up to the contractual specifications (emphasis added):

1.3.5 Effect of Time, Operation and Maintenance on Phase 0 and its Condition

Owner and Supplier will jointly review the information (Section 1.3.2) to determine the level of performance of the Phase 0 CCM [Continuous Casting Machine] and its ability to operate (after Phase 1 modifications) at the level of performance required for the Phase 1 Performance Tests. If the Supplier agrees that there are no apparent insufficiencies, restrictions, or other observable reasons why the Phase 0 CCM (as modified by the Phase 1 modifications) should not operate at the levels of performance required for the Phase 1 Performance Tests, the Owner and the Supplier shall initiate and sign a protocol attesting to the readiness of the CCM for the Phase 1 Performance Tests

[...]

Upon issuance of this protocol by Owner and acceptance by Supplier:

(i)    **Supplier will assume responsibility for** equipment that comprises the CCM and for supervision of the CCM and **the ability of the CCM to perform to the specifications required by the Phase 1 Performance Tests**, and for affecting the Phase 1 retrofit of the CCM;

[...]

(354)    Second, the contractual description of the delays that must be deemed "owner-caused" excludes the failure of technology components for any reason other than a failure of Nova Hut's operating and maintenance personnel (Section 9.1 of Appendix G) (emphasis added):

Owner caused delays shall include (but not limited to):

- Failure of utilities provided to the new facility boundaries.

- Failure to deliver liquid steel or imported slabs on-time and on specification to the new facilities.

- Failure of Owner's operating and maintenance personnel to follow procedures directed by the Supplier and/or contained in the Supplier's operating and maintenance manuals.

Supplier caused delays shall include (but not limited to):

- **Failure of technology components for any reason other than a failure of Owner's operating and maintenance personnel which is attributable to Owner as set out above**.

- Time spent correcting defects in technology, workmanship, setup, or design of any part of the plant supplied by the Supplier.

(355)    Therefore, with exception of delays caused by a failure to provide liquid steel to the caster or imported slabs, Kaiser appears to be responsible for delays resulting from technical failures of the caster.

(356)    Third, it seems not only over-simplistic but also unjust to credit all of the unscheduled caster delays to Kaiser. As a matter of fact, one may not exclude that the mill was operated at times when the caster was stopped for any reason. Therefore, to credit all the caster unscheduled delays to Kaiser may in fact result in double-counting.

(357)    This being said, Nicholas Rickard unequivocally testified, without being contradicted, that Nova Hut agreed that Kaiser be given credit for the unscheduled caster delays (CWS11¶8, pp. 3-4) (emphasis added):

> I also have reviewed Nova Hut's assertion that "Kaiser has ... been overcompensated in respect of the unscheduled caster delays". Nova Hut contends that "Kaiser rather than Nova Hut was to be responsible for such delays". I am not ware of any decision to attribute these delays to Kaiser. I also am not aware of any facts that might support the amount of the alleged "over-compensation". **During the test, Nova Hut agreed to accept responsibility for these caster delays and have them credited to Kaiser.**

(358)    In addition, Nova Hut only criticizes the over-compensation of the unscheduled caster delays. In other words, it does not dispute that, to a certain extent, Kaiser was to be given credit for such delays. Yet, Nova Hut does not specify the extent of the credit that would be unjustified and constitute over-compensation. As a result, even if it where to find in favour of Respondent, the Arbitral Tribunal would not be able to determine how many hours should be removed from Kaiser's calculation of the delay hours.

(359)    Therefore, the Arbitral Tribunal finds that the parties agreed that the unscheduled caster delays would be credited to Kaiser.

### 5.3.3    Conclusion

(360)   The Arbitral Tribunal has found that the parties agreed that Kaiser would be entitled to receive credit towards the total quantity of steel coils produced during the 4WIPPT for the caster scheduled and unscheduled delays.

(361)   Hence, there is therefore no need to revise Kaiser's calculation of delay hours with respect to the caster scheduled and unscheduled delays, which is deemed to be correct.

(362)   By contrast, the Tribunal has found that the parties had only agreed to credit to Kaiser the scheduled mill delay for roll changes that were in excess of 10 minutes. In other words, Kaiser's calculation of delay hours, which includes the roll changes delay from the first minute of interruption, is incorrect and should be revised downwards.

(363)   Therefore, the above finding that Kaiser did not pass the 4WIPPT is reinforced. As a matter of fact, beside the fact that the hourly production rate relied upon by Kaiser was found to be inflated, Kaiser's delay tons calculation is also based on too high a number of delay hours.

## 6.   The formula to calculate the constraint adjusted weight

### 6.1   Kaiser's position

(364)   Nova Hut expressly agreed to substitute 134.7 tons for 125 tons per hour in the formula to calculate constraint adjusted weight.

(365)   First, the 4WIPPT Protocol, which is signed by Nova Hut, shows that the parties will use 134.7 for the calculation. Second, the 134.7 figure is confirmed in a calculation sheet signed and/or initialed by two of Nova Hut's representatives.

(366)   The reason for the change is that Table R-4, which listed rolled steel of various gauges and widths to be rolled during the 4WIPPT, was changed prior to the test. Thus, if Table R-4 were to be duplicated precisely, it would yield 80,000 tons of hot rolled coils during the 4WIPPT. However, in order to roll this amount,

because of the limitation of the caster, Nova Hut had to provide steel from an outside source.

(367)    Before the 4WIPPT, Nova Hut told Kaiser that it would not purchase stainless steel slabs. Accordingly, the stainless steel was eliminated from Table R-4, which required a change in the constraint weight formula. Nova Hut and Kaiser representatives met and reconstructed the 4WIPPT requirements in light of this shortage and agreed upon a new total, which is reflected in Exhibit C173, pp. 2 and 9. This new total of 77,600 tons of coils, divided by the test operation period of 576 hours gave a value of 134.7 tons per hour. The calculation was approved and signed by Nova Hut.

(368)    Jan Hascin claims that he unwittingly agreed to the change. Nova Hut should not be permitted to rewrite agreements that Kaiser relied upon.

(369)    Nova Hut also criticizes the use of 576 test hours when the parties adjusted the calculation of constraint adjusted weight and says that the total hours of the test – 640 – should be used. This is contrary to Table E of the Contract, which specifies that the constraint hours will be 576 "*although the actual production may* [be] *more or less than 72,000 tons*". Therefore, when the parties adjusted the total number of tons, the hours used in this constraint calculation were not similarly revised.

(370)    Last, Nova Hut claims that the lack of stainless steel slabs did not translate into less steel to be rolled as the parties could have rolled other products in Table R-4. The parties decided at the time to follow section 9.3 of Appendix G and revised the production goal.

**6.2    Nova Hut's position**

(371)    The formula for calculating constraint adjusted weight is specified in Table E of Appendix G to the Phase 1 Contract.

(372)   This formula in particular provides that the weighted average tons per hour of all items listed in Table R-4 is 125 tons per hour.

(373)   However, Kaiser has unduly replaced this figure with 134.7 tons per hour. There was no reason to do so. Kaiser's explanation that 134.7 tons per hour was substituted for 125 tons per hour to account for the fact that there was less steel available for Kaiser to roll and that a new total of 77,600 tons was agreed upon makes no sense.

(374)   First, the fact that stainless steel products were not rolled during the 4WIPPT did not mean that there was less steel available for Kaiser to roll. As a matter of fact, Kaiser simply rolled other products.

(375)   Second, the test operation period was 640 hours (i.e., 28 days x 24 hours -- 32 hours of maintenance), not 576.

(376)   Third, the fact that certain products were not rolled does not mean that the weighted average production rate of the products in Table R-4 should change. Indeed, there were over 100 other products that were not rolled in addition to the stainless steel products. There was never any suggestion that the weighted average production rate should be changed because these products were not rolled.

(377)   If Kaiser had applied the correct formula for calculating the constraint adjusted weight, i.e. using 125 tons per hour instead of 134.7 tons per hour, to its own (incorrect) figures for actual weight, it would have reached a constraint adjusted production of 59,724 tons.

## 6.3   Discussion and decision

(378)   The parties agreed that, to pass the 4WIPPT, Kaiser was to produce 77,600 tons of steel coils in 576 operating hours.

(379)    However, the minimill operates at different production rates, which vary depending on the gauge of the product or its width. Table E to Appendix G, which is a sample production schedule, illustrates well the issue (C18, p. 227). It shows that, for instance, the production rate of a product of 2mm gauge and 1,500mm width is of 143 tons per hour. By contrast, the production rate of a product of the same gauge but of a 1,200mm width is only 124 tons per hour.

(380)    The parties were aware of this problem and agreed that the actual weight produced would be "constraint adjusted", i.e. that the actual weight of each product would be weighted by a certain factor to determine its "constraint adjusted weight" (Section 14.6.6.2 of the Phase 1 Contract):

> [...]
>
> In determining what percentage of Rated Maximum Capacity the Plant has achieved, the "constraint adjusted capacity" of the Plant shall be used as the 100% target, and the output which shall be measured against this target will be the constraint adjusted output, being the actual output adjusted by the formula set out in footnote 4 to Table E to Appendix G.
>
> [.. ]

(381)    In relevant parts, Table E to Appendix G provides as follows (emphasis added):

> In the [4WIPPT], the Plant will be required to produce 72,000 tons (determined by adjusted weight, not by actual weight) of rolled steel in 576 operating hours. The constraint adjusted weight will be taken from the Constraint Adjusted Weight in column 7. below. **The constraint adjusted weight is used in preference to the actual weight to compensate for the fact that different steel can be produced at different weights per hour.** [...].

(382)    The consequence of this non-continuous production rate on the 4WIPPT is obvious. If Kaiser decided to roll a large quantity of products with a high production rate, it would pass the test more easily than if it rolled products with a low production rate. For instance, if Kaiser had produced only 2mm gauge and 1,500mm width products during the 576 hours of the 4WIPPT, it would have produced 82,368 tons (actual). If it had only produced 3.5mm gauge and 850mm width products, i.e., products that the plant is able to produce at a rate of 85 tons per hour, the total production would hardly exceed 48,000 tons (576 x 85 = 48,960).

(383)   The formula to determine the weighting factor of each product is set in Note 4 of Table E (C18, p. 228):

> 4-   The constraint adjusted weight quantity is obtained by (i) taking the actual weight of steel produced and (ii) multiplying the actual weight of steel produced by (X ÷ Y); where X is 125 (the weighted average tons per hour of all the items listed in Table R-4) and Y is the Constraint Capacity (as set out in footnote (3) above, obtained by taking from Table R-4, for the relevant item, whichever is the lower of the figure for "Mill Prod. [tons/Hr]" and "Caster Prod. [tons/hr]" and multiplying such figure by 74%).

(384)   The parties have diverging views as to the X value.

(385)   According to Kaiser, since the parties decided that Kaiser was to roll 77,600 tons in 576 hours instead of 72,000 tons as provided in Table E, 134.7 tons per hour (77,600 ÷ 576) must be substituted for 125 tons per hour (72,000 ÷ 576). Kaiser used this 134.7 tons per hour figure to score the 4WIPPT results and reach the figures it relied upon.

(386)   According to Nova Hut, there is no reason to change the average production rate, which must remain 125 tons per hour irrespective of the quantity that Kaiser is to roll during the 4WIPPT.

(387)   As correctly pointed by Claimant, the relevant weighting factor (WF) to determine the constraint adjusted weight of the different products rolled by Kaiser during the 4WIPPT is:

$$\text{weighting factor} = \frac{134.7}{\text{relevant constraint capacity}}$$

(388)   The weighting factor's purpose is to weight the actual production so that such production, irrespective of the applicable production rate, be equal to the production to be achieved during the test. Being specified that the actual production is equal to the production rate times the total hours of the test, this may be expressed as follows:

production rate x total test hours x weighting factor = production goal

(389)   Or:

$$\text{weighting factor} = \frac{\text{production goal}}{\text{production rate x total test hours}}$$

(390)   The above equation may also be expressed as follows:

$$\text{weighting factor} = \frac{1}{\text{production rate}} \times \frac{\text{production goal}}{\text{total test hours}}$$

(391)   Or:

$$\text{weighting factor} = \frac{\dfrac{\text{production goal}}{\text{total hours}}}{\text{production rate}}$$

(392)   The correctness of this equation is demonstrated by replacing the different terms by the concrete values in Table E, for instance for a 2mm gauge and 1,500 width product, in which case the weighting factor obtained is **0.87**:

$$0.87 = \frac{\dfrac{72{,}000}{576}}{143}$$

(393)   Assuming that Kaiser only produced 2mm gauge and 1,500mm width products - i.e., with a production rate of 143 tons per hour - during the 576 hours of the test, the actual weight of the production achieved would be 82,368 tons. To determine the constraint adjusted weight, this figure would have to be multiplied by the relevant weighting factor, which has been determined to be 0.87. As a result, the constraint adjusted weight would be 72,000[3] (0.87 x 82,368).

---

[3]     71,660.16 rounded up at 72,000.

/ © /

(394)   What is unequivocally shown by the above formula is that the numerator in the weighting factor (the "X" in Table E's formula) is equal to the production total divided by the total hours:

$$\text{weighting factor} = \dfrac{\dfrac{\text{production goal}}{\text{total hours}}}{\text{production rate}}$$

(395)   Thus:

$$\text{weighting factor} = \dfrac{\dfrac{72{,}000}{576}}{\text{production rate}}$$

(396)   Or:

$$\text{weighting factor} = \dfrac{125}{\text{production rate}}$$

(397)   Therefore, contrary to Nova Hut's opinion, any modification of the production goal leads to a modification of the weighting factor. If the production goal is increased to 77,600 tons, the weighting factor will be equal to:

$$\text{weighting factor} = \dfrac{\dfrac{77{,}600}{576}}{\text{production rate}}$$

(398)   Or:

$$\text{weighting factor} = \dfrac{134.7}{\text{production rate}}$$

(399)   It follows from the above that, contrary to Nova Hut's stance, Kaiser was correct in substituting the 134.7 tons per hour for the 125 tons per hour figure in the formula to calculate the constraint adjusted weight of the products rolled during

the 4WIPPT. Moreover, the Protocol submitted as C173 which was signed by both parties, confirm Kaiser's position that Nova Hut had agreed to this number for the 4WIPPT.

(400)    Therefore, Kaiser has applied the correct formula to calculate the constraint adjusted weight of its actual production during the 4WIPPT.

## 7.    The actual weight of acceptable steel coils

### 7.1    Kaiser's position

(401)    During the 4WIPPT, Kaiser was only permitted to count those coils that were of "prime and acceptable quality".

(402)    Addendum 1 to the test protocol provided that the coils were considered acceptable for the 4WIPPT and therefore would be counted if they adhered to "CSN, DIN, EU and ASTM Standards", i.e. the standards used commercially by steel purchasers in the Czech Republic and throughout the world.

(403)    The parties' observers met for each day of the test and agreed on the product that was of acceptable quality and, on that basis, the total tons of acceptable rolled coils produced during the day using the constraint adjusted weight methodology calculated in accordance with the Contract.

(404)    The representatives of the parties never left the daily meetings until they had reached agreement on the tons of acceptable quality.

(405)    The parties prepared various evaluations of each coil for conformity with the appropriate standards. These valuations included information on gauge, crown, width, flatness, camber, coil surface by direct observation, telescope by direct visual inspection, and mechanical properties.

(406)   The total weight of all the coils agreed by the parties to be acceptable is reflected in the Daily TSP report.

(407)   Any suggestion by Nova Hut that it did not agree to the coils that were of acceptable quality is without merit. As a matter of fact, Nova Hut provided to Kaiser a list of coils that were of acceptable quality and in accordance with the contract and test protocol for each day of the test. This document was used for calculation of constraint adjusted weight.

(408)   Nova Hut alleges that the list did not address whether the coils were acceptable based on standards other than width, gauge variations and crown should be rejected. Nova Hut does not explain how Kaiser or any party would know that Nova Hut's list of acceptable coil did not address all standards Nova Hut considered relevant. In any event, Nova Hut's allegations are not accurate. The list of acceptable coils included only those coils that Nova Hut concluded met all standards for acceptability, including whether the coils had wavy edges, improper descaling, improper coiling, etc.

(409)   Nova Hut's own internal records show that Kaiser only counted coils of acceptable quality. Thus, Jan Hascin prepared a table that records a total weight of 42,209 tons, i.e. the same figure as in the summary sheet prepared by Joseph Pietryka (C132, p. 3).

(410)   Nova Hut correctly states that in order to pass the 4WIPPT, the minimill had to roll a sufficient quantity of coils of an acceptable quality. However, Nova Hut falsely implies that the measure of "acceptable quality" is the HRCQTs. The parties agreed that the measure of "acceptable quality" would be the standards set forth in Addendum 1, which are the standards used commercially by steel producers in the Czech Republic and worldwide. The standards of Addendum 1 are not the same as the standards for the HRCQTs, which Nova Hut admits when it states that it "*agreed to lower the quality standard imposed by the 4WIPPT*".

### 7.2 Nova Hut's position

(411)    Kaiser attempted to pass the 4WIPPT in October 2000, which was the sixteenth month after Preliminary Acceptance.

(412)    The Phase 1 plant was evidently not ready and, to improve its chances, Kaiser attempted to modify the requirements of the 4WIPPT.

(413)    On 10 October 2000, Kaiser sent a proposed change order to Nova Hut that sought to reduce the quality standard imposed by the 4WIPPT [R49 and R50]. Nova Hut refused.

(414)    The simple fact is that the coils produced during the 4WIPPT were not of contractual quality or quantity. In this respect, it is worth noting that, by its own admission, Kaiser has failed the HRCQTs that were carried out from 3 to 8 November 2000, i.e. during the 4WIPPT. In its letter of 1 December 2000, Kaiser stated that it had not met fully all of the quality parameters, and was therefore subject to a penalty. In order to pass the 4WIPPT, the mill had to roll a sufficient quantity of coils of an acceptable quality. Accordingly, if the mill was unable to roll coils of a sufficient quality – which the HRCQTs showed it was not – then it could not pass the 4WIPPT.

(415)    Kaiser's figure for actual weight, which it claims total 42,209 tons, unduly includes coils that were not of acceptable quality for the purpose of the 4WIPPT. In particular, Kaiser has counted coils that were insufficiently descaled, that had not been properly coiled or that had unacceptably wavy edges (C132, pp. 859, 122 and 942).

(416)    Kaiser asserts that, in determining which coils were acceptable, the parties relied on a document that Nova Hut itself produced (the Acceptable Coils List). What Kaiser does not explain is that the document in question only addresses the question whether the coils were acceptable from the point of view of width and gauge variations and crown. It does not contain any information about, for

example, whether the coils were sufficiently descaled, whether they were properly coiled and whether the waviness of their edges was acceptable.

(417)    Last, in support of its assertion that its figures for actual weight are accurate, Kaiser has sought to rely on an internal document produced by Jan Hascin on 9 January 2001 (C236). This document contains a table comparing the production achieved during the 4WIPPT with the contractual specifications set forth in Table R1 and Table E of Appendix G to the Phase 1 Contract. It is true that the figure adopted by Mr. Hascin for total weight in accordance with Czech standards (42,209 tons) is the same as the figure for total actual production on Joseph Pietryka's summary sheet (C132, p. 3). However, Jan Hascin had available to him data relating to actual weight from only two sources, namely the data collected by Kaiser according to the Czech standard and the data collected by Nova Hut according to the contractual specifications. When he produced the tables, which he did for internal purposes, Mr. Hascin did not for a moment think that he was certifying as correct the figures that he was analyzing.

## 7.3    Discussion and decision

(418)    To pass the 4WIPPT, Kaiser had to produce 77,600 constraint adjusted tons, i.e. the actual weight of coils produced multiplied by the relevant weighting factor.

(419)    To determine the weight of Kaiser's actual production during the 4WIPPT, only coils of acceptable quality were to be counted. To wit (Section 9.3 of Appendix G, emphasis added):

> The Supplier will be judged to have successfully completed the [4WIPPT] if, during the test, the Plant achieves during the [4WIPPT] the referenced percentage of the production goal of hot rolled coils as listed in Section 14.6.6.6 of the Contract (adjusted for actual product mix as referenced in Section 9.4 below), rolled only from slabs produced from the Phase 1 Continuous Caster and (but only to the extent set out herein) stainless steel slabs obtained from Vitkovice or other sources, **and for which purposes only prime (acceptable quality judged in accordance with Section 9.5 below) coils will be included in the production which the Plant is considered to have achieved**. [...].

(420)    Kaiser alleges that its production of acceptable coils totaled 42,209 tons (C132, p. 3). Nova Hut claims that this figure includes coils that were not of acceptable quality for the purpose of the 4WIPPT.

(421)    The issue to be determined by the Arbitral Tribunal is whether Kaiser's above figure for weight of steel coils adhering to the relevant standards is correct.

(422)    Kaiser's figure of 42,209 tons of actual production of acceptable quality is derived from a document entitled Daily TSP report (see for instance C132, pp. 7-12 for Day 1).

(423)    The Daily TSP report, which was produced by Kaiser, is a Table recording all the coils produced for each day of the 4WIPPT. Each coil is numbered and the report records the time at which it was produced and its gauge. Moreover, the last column contains, vis-à-vis each coil, a notation concerning its coiling (see C132, p. 7 for Day 1):

| # | Time | Coil # | Gauge | |
|---|------|--------|-------|---|
| | | | | |
| 4 | 6:40 | 20300 | 3.65 | Coiled, H ok, F ok, B ok, c=-0.99%, Coiling: ok |
| 5 | 6:46 | 20301 | 3.65 | Coiled, H ok, F ok, B ok, c=-0.89%, Coiling: ok |
| | | | | |

(424)    A summary of the results of each test day appears on the last page of each Daily TSP report (C132, p. 11 for Day 1):

| Performance | | Slabs rolled | Slabs coiled | Cobble scrap | Coils diverted | Weight of coils |
|-------------|---|--------------|--------------|--------------|----------------|-----------------|
| | shift #1 | 797.3 | 791.7 | 5.6 | 91 8 | 714.4 |
| Tons | shift #2 | 1010 2 | 987 3 | 23 0 | 0.0 | 949.4 |
| | shift #3 | 906.0 | 906.0 | 0.0 | 21.7 | 868.8 |
| No. of piece | | 122 | 120 | 2 | 5 | |
| Total | | 2713.5 | 2684.9 | 28.6 | 113.6 | 2532.6 |

**c)    Discussion and decision**

(958)    In his first witness statement, Jiri Obsil stated that "[t]*he required 400 Volt power for the Roll Shop was not provided in addition to the originally supposed 690V power distribution but instead of the same*" (RWS3¶38, p. 9). In other words, Nova Hut argues that the supply and installation of a 400V transformer was no extra work for Kaiser.

(959)    Hence, the first issue to be determined is whether, as it alleges, Kaiser supplied the 400V transformer in addition to the 690V system that it has already provided.

(960)    The Arbitral Tribunal finds that the 400V transformer was indeed supplied on top of the 690V distribution system. In his second witness statement of 10 June 2005, Jiri Obsil did not press further the argument that the 400V transformer was supplied instead of the 690V system (RWS5¶27, pp. 7-8). Nor did he dispute the affirmation in Franck Bury's preceding witness statement of 7 April 2005 that "[t]*he scope of supply provided for 690V transformers, which Kaiser installed*" (CWS8¶17, p. 8).

(961)    Second, Nova Hut argues that, if Kaiser had installed an air forced air cooling system as Section 3.6.7 of the Scope of Supply required it to do, there would have been no need to install a 400V transformer. This argument is based on the premise that air forced cooling provides an increase of 40% of the transforming capacity of a transformer.

(962)    It may well be that air forced cooling increases the capacity of a transformer. Kaiser seemingly agrees to that proposition. It thus writes in its Post-Hearing Brief of 28 October 2005 that "[a]*dditional cooling to a voltage supply will increase its power, and, in this case, would allow a 400-volt power to supply a 690-volt grinder*" (¶311, p. 105).

(963)    However, Nova Hut requested Kaiser to modify the voltage by providing a 400V transformer, not additional cooling. Thus, at a meeting held on 20 March 1998, Nova Hut directed that "*equipment power supply be 400V as per scope of supply*"

(C41). Also, Nova Hut could not ignore that Kaiser was minded to install a 400V transformer as the supplier of this transformer was a Nova Hut subsidiary "Nova Hut Zabreh, a.s." (C74, C80 and C99). Moreover, it appears that Nova Hut only had additional cooling installed after Kaiser had delivered the 400V transformer (R27, offer of 17 June 1999 from Nova Hut's air cooling supplier). Last, as will be seen below (see Section VI.B.2.3 below), Kaiser was in fact not obliged to supply additional cooling.

(964)    It remains to be determined whether Kaiser is entitled to recoup the entire extra cost incurred in connection with the installation of a 400V transformer.

(965)    Kaiser's claim is based on the premise that the installation of a 400V transformer was necessary to remedy a problem caused by Nova Hut, namely the supply by Nova Hut of a grinder not in accordance with the Scope of Supply that needed 400V power.

(966)    However, the record shows that Kaiser had also supplied a piece of equipment that needed 400V instead of 690V power. In his second witness statement, Jiri Obsil affirms that "*Kaiser failed to procure HVAC units with 690V nominal voltage and delivered 400 V units*" (RWS5¶27, p. 7) and that "*the necessity to install additional 400 V transformers and load centers was due to Nova Hut **and** Kaiser's failing to respect the original project*" (Ibid., ¶28, p. 8).

(967)    Kaiser has not explicitly disputed this affirmation. Nor did Franck Bury rebut it in his third witness statement. To the contrary, Franck Bury states that "[t]*he engineer recommended that Kaiser purchase a 400-volt transformer to supply the Nova Hut grinder, **and the parties agreed to split the price**" without providing any further explanations as to why the parties decided to share the price (CWS13¶1, p. 1, emphasis added). The witness also testified that "*PCN 68 was Kaiser's claim for half of the cost of the 400-volt transformer*" (ibid., ¶1, p. 2).

(968)    In light of the above, the Arbitral Tribunal finds that Kaiser may only claim payment of half of the extra costs incurred to install a 400V transformer.

(969)     Under PCN No. 068, Kaiser claims payment of an amount of damages of USD 35,378.00. In his third witness statement, Franck Bury stated that "PCN No. 068 was "Kaiser's claim for half of the cost of the 400-volt transformer" (CWS13¶11, p. 2).

(970)     Yet, if Kaiser were indeed claiming payment of half of the extra costs it incurred, the record would show that Kaiser's supplier invoiced to Kaiser an amount representing the double of USD 35,378.00, i.e., at the exchange rate then prevailing, approximately CZK 2,400,000.00.

(971)     Yet, the purchase orders produced by Kaiser evidence a cost increase of about CZK 1,684,664.00, i.e. close to USD 47,000.00 (C74, C80 and C99). It thus appears that, contrary to what it states, Kaiser is not claiming half of the cost of the 400V transformer, but the full price of it.

(972)     Therefore, the Arbitral Tribunal shall grant Kaiser's claim in connection with PCN No. 068 up to an amount of USD 23,500.00 corresponding to half of USD 47,000.00.

### 7.2.12   PCN No. 069: Work associated with additional paving (USD 6,585.00)

### a)     Claimant's position

(973)     The scope of supply required Kaiser to pave 4,000 square meters of sidewalk and roads surrounding the minimill.

(974)     At a meeting in June 1999, Nova Hut told Kaiser to complete the paving. Kaiser informed Nova Hut that the surface area of the roads and sidewalks surrounding the minimill buildings and entryways totalled 5,306 square meters, which was more than contracted for in the scope of supply. Nova Hut stated that it approved the cost for the out-of-scope work, which, at the time, amounted to USD 5,179.00.

(975)  Nova Hut claims that the minutes of the June meeting are irrelevant because "*it contains no indication of date and purpose of the meeting*". However, Nova Hut does not allege that Kaiser has fabricated this document and does not provide evidence to refute the conclusion stated in the minutes.

(976)  Therefore, Kaiser is due USD 6,585.00.

**b)    Respondent's position**

(977)  Kaiser has not shown that it performed paving work beyond its scope of supply.

(978)  In any event, Nova Hut never approved any change order, let alone to pay USD 5,179.00.

(979)  Kaiser has not produced any evidence that Nova Hut signed any change order in this respect, which Nova Hut would have done if it had agreed to pay USD 5,179.00 for this item of work pursuant to Section 9.2.2.4 of the Phase 1 Contract.

(980)  The minutes cited to by Kaiser do not evidence that Nova Hut agreed to pay the above amount. First, there is no indication that Nova Hut attended this meeting. Second, Nova Hut did not agree to the minutes.

(981)  Nova Hut rejected this Proposed Change Notice on 5 November 1999, which Kaiser acknowledged on 28 August 2000.

**c)    Discussion and decision**

(982)  Nova Hut claims that Kaiser did not perform any paving work beyond what it was required to do.

(983)  On 5 May 1999, Kaiser wrote as follows to Nova Hut (C88):

After verification by Metalconsult, Nova Hut personnel and ICF KN regarding roads, the following quantities have been established:

a)   Phase 1 roads, calculated surface of $4230m^2$ (scope of supply=$4000m^2$)

b)   Coil yard area, additional surface requested by Nova Hut for truck transportation of coils; calculated surface of $781m^2$

c)   Additional road required to give access to furnace area north wall door requested by Nova Hut; calculated surface of $295m^2$

This represents a total change to the Scope of Supply of 1306m2 (+33%).

Please advise us of your acceptance of this change, by signing and returning the attached Change Notice No. 069.

(984)   There is no evidence that Nova Hut objected to Kaiser's above statements. Therefore, the Arbitral Tribunal finds that Kaiser did indeed perform paving work beyond what the Scope of Supply required it to do.

(985)   Kaiser claims payment of USD 6,585.00, which is not far from the USD 6,600.00 amount it claimed on 28 January 2000 (C118):

ICFKN previously submitted for NH approval above PCN. ICFKN requested $5,700 to cover additional costs incurred by ICFKN for roads and paved areas in SO 03.03 Coil Storage Yard, SO 03.01 Roll-up Gate area, and areas west and east from the plant in excess of Scope of Supply. The subject is still open.

This is to advise that above number has been revised. During miscellaneous repairs on roads NH instructed ICFKN to do work on mini mill administration building ramp as per attached documentation on behalf of NH. Extra repair did by ICFKN is worth another $900

Total incurred by ICFKN extra cost on roads and paved areas at the moment equals to $6,600.

(986)   This amount, which approximately corresponds to CZK 238,570.00 at the rate prevailing on 28 January 2000, is difficult to reconcile with the amounts of CZK 501,801.00 (USD 14,398.00) and CZK 104,640.00 (USD 3,002.00) referred to in the purchase order issued by Kaiser's subcontractor Alpine IPS Ostrava a.s. on 2 November 1999 for "additional works on roads" and "remedial works on roads and areas", respectively (C111) and with the amount of CZK 4,304.000.00 claimed by Kaiser in PCN No. 069 (C89).

(987)    However, Kaiser produced minutes of a PCN revision meeting held on 30 June 1999, which shows that Nova Hut agreed to pay Kaiser USD 5,179.00 in connection with PCN No. 069 (C95).

(988)    Nova Hut claims that these minutes do not evidence Nova Hut's agreement failing an indication that Nova Hut attended this meeting or agreed to the minutes.

(989)    Nova Hut's stance is untenable. The attendance list of the 30 June 1999 meeting was signed by 7 employees of Nova Hut. Nova Hut does not allege that Kaiser has fabricated this list and does not provide evidence to refute the conclusion stated in the minutes.

(990)    Therefore, the Arbitral Tribunal shall order that Nova Hut pay Kaiser USD 5,179.00.

### 7.2.13    PCN No. 082: Additional engineering work for a new nitrogen take-over point (USD 2,127.00)[6]

#### a)    Claimant's position

(991)    The original design provided for nitrogen tanks.

(992)    In March 1999, Nova Hut announced that it would use a permanent source of nitrogen and requested that Kaiser install a new location for nitrogen piping. The extra work involved adding longer nitrogen piping and increased engineering and construction costs. In a letter of 19 March 1999, Nova Hut conceded that the modification was outside the scope of supply.

(993)    Nova Hut's contention that the furnace supplier required a permanent source of nitrogen is incorrect. The furnace supplier required only that the nitrogen have a higher pressure than the gas supplied by Nova Hut to the furnace. This

224

requirement could be satisfied either with mobile nitrogen containers – at no extra costs – or a permanent source of nitrogen with a new take-over point at a different location. The furnace supplier confirmed to Kaiser that it would accept a lower pressure that was available at the existing nitrogen take-over point.

(994)    Therefore, the choice of a permanent source of nitrogen was merely a preference by Nova Hut, which resulted in extra work by Kaiser. Accordingly, Kaiser is owed USD 2,127.00.

**b)    Respondent's position**

(995)    The change to the nitrogen take-over point and piping design was requested by Tippins' sub-supplier Stein Heurtey, not by Nova Hut. Accordingly, Nova Hut is not responsible for PCN No. 82.

**c)    Discussion and decision**

(996)    Nova Hut does not dispute that the initial design, which provided for nitrogen tanks, was changed in favour of a permanent source of nitrogen.

(997)    However, Nova Hut alleges that this change was requested by Stein Heurtey and, hence, that it is not responsible for PCN No. 082.

(998)    Nova Hut's position is untenable.

(999)    By letter of 19 March 1999, Nova Hut requested that Kaiser build a new nitrogen pipeline (C79):

> Due to the permanent availability of nitrogen for purging NOVA HUT, a.s. have decided to build a new nitrogen pipeline instead of the original solution of utilising bottled nitrogen together with an evaporation station. The new line is supposed to be finished by April 30, 1999. [...].

---

[6]    In its Statement of Claim of 10 November 2004, ¶8.1.4(o), pp. 33-34 and Reply of 7 April 2005, ¶152(n), p. 62, Kaiser claimed an amount of USD 2,217. Kaiser reduced its claim to USD 2,127.00 with its Post-Hearing Brief of 28 October 2005 (see ¶317, p. 107 and Exhibit E).

(1000)    It thus appears that it is Nova Hut that requested a change to the nitrogen supply design.

(1001)    In any event, whether Nova Hut or Stein Heurtey requested such change is irrelevant. There is a change in the work as soon as the actual design departs from "*the Basic Design Documentation as adapted pursuant to Section 3.2.25, Scope of Supply, proper functioning of the entire Phase 1 Plant and all applicable laws, regulations, codes and standards valid in the Czech Republic at the Date of Validity*" (Section 9.1.2 of the Contract). Nova Hut does not assert that the change was necessary to remedy Kaiser's defective work.

(1002)    Furthermore, Nova Hut does not dispute the amount claimed by Kaiser.

(1003)    Therefore, the Arbitral Tribunal grants Kaiser's claim and shall order Nova Hut to pay Kaiser USD 2,127.00.

### 7.2.14   PCN No. 097: Maintenance work of the torch-cutting machine after expiry of the warranty period (USD 3,157.00)

### a)      Claimant's position

(1004)    In September 2000, after the warranty period on the equipment expired, Nova Hut requested Kaiser to perform maintenance work on the Phase 0 continuous caster torch-cutting machine.

(1005)    Kaiser advised Nova Hut that the problem was not a warranty issue and that, in any event, the Phase 0 warranty had expired.

(1006)    Nova Hut incorrectly claims that Kaiser is responsible for the repairs because the cause of the problem was a hidden fault in the equipment. This assertion is contradicted by the subcontractor who repaired the equipment and according to which there was a need to realign the table rolls that supported the slabs. Realignment of this sort is routine maintenance.

(1007)   Accordingly, Kaiser is due USD 3,157.00 for the work it was not obligated to perform.

**b)    Respondent's position**

(1008)   Nova Hut requested that Kaiser remedy the defects affecting the torch-cutting machine delivered by Kaiser during Phase 0 works.

(1009)   The extra work may not be considered as routine maintenance.

(1010)   Kaiser issued a purchase order to a supplier and advised Nova Hut that it reserved the right to backcharge Nova Hut for all costs associated with additional services related to torch-cutting machine if it was determined that problems were caused by Nova Hut. There is no evidence that the problems affecting the torch-cutting machine were caused by Nova Hut.

(1011)   Therefore, Nova Hut is not under the obligation to pay for the items of work for which Kaiser claims payment.

**c)    Discussion and decision**

(1012)   Kaiser claims payment of USD 3,157.00. This amount corresponds to an invoice issued by Kaiser's subcontractor Framag GmbH for work performed in October 2000 on the torch-cutting machine.

(1013)   The issue to be determined is whether the above work was routine maintenance work or corrective work necessary to remedy a defect affecting the torch-cutting machine.

(1014)   The Arbitral Tribunal finds that Nova Hut has not demonstrated that the torch-cutting machine was defective.

(1015)   Admittedly, Jiri Obsil has testified that the torch-cutting machine was defective (see RWS3¶45, p. 11). However, his testimony is contradicted by the evidence

given by Franck Bury that the work performed by Framag was routine maintenance (CWS8¶20, p. 10). Also, in a letter of 19 October 2000, Kaiser wrote to Nova Hut that it "*preserve*[d] *its right to backcharge NH for all costs associated with additional services related to torch cutting machine if supplier VAI-Framag determines that current problems are caused by NH*" (C137), which shows that the fact that the torch-cutting machine was defective was not as obvious as Nova Hut would have the Arbitral Tribunal find.

(1016)    As pointed out by Nova Hut, there is no clear evidence either that the problems were caused by Nova Hut. In particular, contrary to what Kaiser asserts, Exhibit C234 does not constitute such evidence. Exhibit C234 is a letter sent by Kaiser to Nova Hut on 27 November 2000 to accompany "*the Framag report dated 30.10.2000 with their recommendations to improve slab end quality*". However, Kaiser has omitted the Framag report and the only attachment to the letter is the bill issued by Framag on 6 November 2000.

(1017)    Be it as it may, the Arbitral Tribunal finds that Nova Hut has failed to demonstrate that the torch-cutting machine was defective. In any event, Nova Hut does not dispute that the torch-cutting machine was delivered as part of the Phase 0 work. Therefore, assuming *arguendo* that the torch-cutting machine was defective, Kaiser would only have been responsible for such work provided it was covered by the warranty period of the Phase 0 Contract. Yet, Nova Hut does not dispute Kaiser's allegation that the Phase 0 warranty period expired in mid-1999.

(1018)    As an additional argument in support of its position, Kaiser has linked PCN No. 097 with PCNs No. 098 and 099, which Nova Hut allegedly approved along with PCN No. 097, all three PCNs being made part of Change Order No. 6. As PCNs No. 098 and 099 give credit to Nova Hut, the Arbitral Tribunal understands the gist of Kaiser's argument as being that if Nova Hut accepts the credit conferred by PCNs No. 098 and 099, it should by the same token acknowledge that it owes Kaiser USD 3,157.00 under PCN No. 097, which it approved simultaneously.

(1019)    There is however no need to address this argument in further detail as the Arbitral Tribunal has found that Nova Hut did not prove that the torch-cutting machine was defective and, accordingly, that Kaiser was responsible for the cost of the necessary remedial work.

(1020)    In light of the above considerations, the Arbitral Tribunal shall grant Kaiser's claim.

(1021)    Kaiser argues that it is owed USD 3,157.00. This amount is incompatible with the EUR 3,495.41 invoice issued by Framag on 6 November 2000. At the exchange rate prevailing on that date, EUR 3,495.41 corresponded to USD 3,037.16. Kaiser gives no explanations for the difference. As a result, the Tribunal will award Kaiser USD 3,037.16.

**7.2.15    PCN No. 098: The UNIMO building (USD 7,388.00)**

**a)        Claimant's position**

(1022)    The Phase 1 Contract required Kaiser to demolish a temporary office structure for use by field operations personnel at the site, the Unimo building.

(1023)    In December 2000, Nova Hut requested that Kaiser Netherlands not demolish the Unimo building.

(1024)    Kaiser issued PCN No. 098 to reflect the deduction in cost. Nova Hut is due a credit of USD 7,388.00.

**b)        Respondent's position**

(1025)    Nova Hut is due a credit of USD 7,388.00, as acknowledged by Kaiser in its Statement of Reply.

**c)        Discussion and decision**

(1026)    Kaiser does not dispute that it owes Nova Hut a credit of USD 7,388.00 in connection with PCN No. 098.

(1027)    Therefore, the Arbitral Tribunal will deduct such amount from the amounts awarded to Kaiser in relation to its PCNs claim.

### 7.2.16    PCN No. 099, The laptop computer (USD 2,038.00)

#### a)    Claimant's position

(1028)    Under the Phase 1 Contract, Kaiser Netherlands supplied Nova Hut with a Gateway laptop computer for use in the minimill production operations.

(1029)    The laptop malfunctioned and Kaiser agreed to a deduction to allow Nova Hut to purchase its own replacement computer.

(1030)    Nova Hut approved this deduction and is due a credit of USD 2,038.00.

#### b)    Respondent's position

(1031)    Nova Hut is due a credit of USD 2,038.00, as acknowledged by Kaiser in its Statement of Reply.

#### c)    Discussion and decision

(1032)    Kaiser does not dispute that it owes Nova Hut a credit of USD 2,038.00 in connection with PCN No. 099.

(1033)    Therefore, the Arbitral Tribunal will deduct such amount from the amounts awarded to Kaiser in relation to its PCNs claim.

### 7.2.17    Summary

(1034)    The Arbitral Tribunal will award Kaiser the principal amount of USD 128,982.16, breaking down as follows:

| PCN No. | Amount claimed (USD) | Amount awarded (USD) |
|---------|----------------------|----------------------|
| 020 | 12,359.00 | 12,359.00 |
| 027 | 12,147.00 | 12,147.00 |
| 036 | 67,758.00 | 67,758.00 |
| 040 | 10,028.00 | 10,028.00 |
| 047 | 164,284.00 | 0 |
| 054 | 33,208.00 | 0 |
| 055 | 2,273.00 | 2,273.00 |
| 060 | 41,552.00 | 0 |
| 062 | 2,663.00 | 0 |
| 066 | 9,227.00 | 0 |
| 068 | 35,378.00 | 23,500.00 |
| 069 | 6,585.00 | 5,179.00 |
| 082 | 2,127.00 | 2,127.00 |
| 097 | 3,157.00 | 3,037.16 |
| 098 | (7,388.00) | (7,388.00) |
| 099 | (2,038.00) | (2,038.00) |
| **Total** | **393,320.00** | **128,982.16** |

**7.2.18   Interest**

**a)        Claimant's position**

(1035)   Kaiser requests contractual interest from 26 December 1999 on the principal amount of USD 393,320.00 and compound interest from 2 January 2004 (see Kaiser's Post-Hearing Brief of 28 October 2005, ¶¶401 ff., pp. 134-136 and 411, p. 138).

**b)     Respondent's position**

(1036)   Kaiser is not entitled to interest.

(1037)   First, the work items for which Kaiser claims payment are all items in respect of which Nova Hut rejected the proposed change orders submitted by Kaiser.

(1038)   Second, Kaiser has not explained why the interest it claims should run from 26 December 1999.

**c)     Discussion and decision**

(1039)   Kaiser claims payment of interest at the contractual interest rate of LIBOR for one-year deposits plus eight percent (Section 6.3.1 of the Contract; see Kaiser's Post-Hearing Brief of 28 October 2005, ¶325, p. 109 and ¶402, p. 135) from 26 December 1999.

(1040)   Nova Hut's objection that it rejected the PCNs is inapposite. Admittedly, pursuant to Section 6.3.1 of the Contract, interest is only due on "*any approved payment between the Owner and the Supplier [...] delayed of more than thirty (30) Days after the due date*". Notwithstanding the text of this provision, interest is also due on payments that, though they were not formally approved, should have been approved by either party. This is the case of amounts that the Arbitral Tribunal found were owed to Kaiser under PCNs and that Nova Hut improperly rejected at the time.

(1041)   Therefore, there is no objection in principle to grant interest on amounts claimed by Kaiser under PCNs.

(1042)   Interest generally accrues from the due date. This approach is consistent with Section 6.3.1 of the Contract providing in pertinent part that interest will be paid if Kaiser "*is delayed of more than thirty (30) Days after the due date*".

(1043)   If the above provision were applied strictly, the Arbitral Tribunal should grant interest on each and every PCN from a date being 30 days after the time when payment under such PCN became due. However, Kaiser did not specify the due date for every PCN under which it claims payment. Nor did Kaiser adduce the evidence that would allow the Tribunal to determine such date. It is telling in this respect that Kaiser claims interest from a single date for all its PCNs.

(1044)   Where interest at a constant rate accrues on several amounts payable on different dates, it is not unusual to determine the average due date and to grant interest on the principal from such date. However, this method assumes that the due dates are known – at least the earliest and the latest ones. The condition is not met.

(1045)   This being said, the Arbitral Tribunal notes that discussions between the parties about PCNs took place almost until the end of the project. On 5 November 1999, Nova Hut sent to Kaiser an overview of all the PCNs issued by the parties until that date "*for a proposed meeting*" (R35). On 28 August 2000, Kaiser acknowledged "*Nova Hut official rejection of PCN's 003, 020, 027, 040, 047, 054, 055,060,062,066, 069, and 082*" (R43). Other PCNs relevant for this claim (PCNs No. 036, 068) were still open when the parties met for a "PCN meeting" on 11 September 2000 (R44). Ultimately, following a letter from Nova Hut of 25 September 1999 (R45), Kaiser wrote as follows to Nova Hut on 29 September 2000 (R46):

> KN is in receipt of your above transmittal which makes a review of the PCN's which remain still unresolved after our last 11 September 2000 meeting.
>
> Both parties have had plenty of opportunities to discuss and resolve all identified Changes to Contract so far. As Contract does not have provisions for "open" changes, therefore with regards to all subject discussions and correspondence to date, all mutually agreed PCN's have become a part of Change Orders Nos. 3, 4 and 5, and the balance are contractually rejected PCN's.

[...]

> This resolves PCN issue on Project level. If any of the parties decides to pursue PCN resolution further, provisions subject to Article 11 of the Ph. 1 Contract should apply.

(1046)    Taking into account that, pursuant to Section 6.5.3.5(c) of the Contract, an invoice is due within 30 days from its receipt and that, pursuant to Section 6.3.1 of the Contract, interest accrue 30 days after the due date, the Arbitral Tribunal concludes that it is appropriate that interest on Kaiser's PCNs run from 28 November 2000, i.e. 60 days from Kaiser's acknowledgement of the formal rejection by Nova Hut of its PCNs. In the Arbitral Tribunal's opinion, long-lasting discussions about the characterization of certain work as extra work and, in the affirmative, about the principle and amount of compensation is part of the normal process in construction contracts. The fact that Kaiser at no point mentioned its right to claim late payment interest on its PCNs shows that it did not expect – and it could not legitimately do so – that interest would accrue on its PCNs from a date earlier than 28 November 2000.

(1047)    Therefore, the Arbitral Tribunal shall award to Kaiser the amount of USD 128,982.16, plus simple contractual interest at the rate of 8% above LIBOR for one-year US dollars deposits, from 28 November 2000 until payment, plus compound interest on such interest, at the rate of 4% per annum, from 5 January 2004 until payment.

## 7.3    Claimant's claim for extra work performed under agreed change orders: USD 166,033.00

### 7.3.1    Preliminary comment

(1048)    Kaiser advances the following four sub-claims in relation to work performed under agreed change orders:

-    USD 16,285.00 in late payment interest resulting from the late payment of Billings 78, 79, 80, 81, 82, 83, 84, 85 and 86, plus interest on such unpaid interest;

234

- accrued interest, plus interest on such unpaid interest, as a result of the late payment of Billing 91;

- accrued interest, plus interest on such unpaid interest, as a result of the late payment of Billing 92; and

- USD 60,000.00 corresponding to the unpaid balance of Billing 92.

### 7.3.2 Interest for the late payment of Billings 78, 79, 80, 81, 82, 83, 84, 85 and 86 (USD 16,285.00)

**a)    Claimant's position**

(1049)  Section 6.5.3.5(c) of the Phase 1 Contract required Nova Hut to pay approved billing invoices within 30 days of receipt.

(1050)  The Contract permitted an additional 30-day grace period, giving Nova Hut 60 days before interest began to accrue on late payments.

(1051)  Nova Hut was late in paying Billings 78, 79, 80, 81, 82, 83, 84, 85 and 86, which resulted in late payment interest charge of USD 16,753.00 (and not USD 20,573.00 as Kaiser originally claimed).

(1052)  To settle this claim, Kaiser is willing to concede the difference between its calculation (USD 16,753.00) and Nova Hut's calculation (USD 16,285.00).

(1053)  Interest continues to accrue on this amount.

**b)    Respondent's position**

(1054)  The late payment interest charge resulting from late payment of Billings 78 to 86 is of USD 16,285.00, and not USD 20,573.00 or USD 16,753.00 as argued by Kaiser.

225

(1055)    The discrepancy results from Kaiser's incorrect calculation of the late payment interest arising out of Billing 83. First, Kaiser's calculation is premised on the assertion that the grace period for invoice expired on 3 August 1999, whereas it expired on 6 August 1999. Second, it starts from the wrong premise that Nova Hut effected a USD 302,738.00 partial payment for invoice 83 on 9 August 1999, while this amount was paid on 6 August 1999.

(1056)    Original invoice 83 was issued on 3 June 1999. Kaiser issued a revised invoice on 7 June 1999, which Nova Hut received on 8 June 1999. This invoice was payable within 30 days from its receipt, i.e. on 8 July 1999, and the grace period expired on 6 August 1999.

(1057)    Nova Hut paid invoice 83 in instalments of USD 1,200,000.00 on 6 August 1999, USD 302,738.00 on 6 August 1999, USD 1,100,000.00 on 9 August 1999, and USD 290,536.00 on 11 August 1999.

(1058)    The USD 1,100,000 and USD 290,536.00 were thus paid three days and five days after expiration of the grace period. Contrary to Kaiser's affirmation, the USD 302,738.00 instalment, which was paid on 6 August 1999, is not subject to late payment interest.

(1059)    By letter of 27 October 2000, Nova Hut advised Kaiser that its calculation was incorrect and enclosed a table showing that, after correction, the late payment interest for Billings 78 to 86 amounted to USD 16,285.00.

(1060)    As long as Kaiser wrongfully refused to correct its claim, Nova Hut was entitled to reject it and interest did not accrue. Therefore, Kaiser is not entitled to payment of interest in relation to this claim.

**c)    Discussion and decision**

(1061)    Nova Hut concedes that it was late in paying Billings 78 to 86 and, as a result, acknowledges that it owes Kaiser USD 16,285.00 in late payment interest. Kaiser, which initially claimed payment of USD 20,573.00 has accepted to settle

the claim for USD 16,285.00. Accordingly, there is no need to determine which of Kaiser's or Nova Hut's calculation is correct and the Arbitral Tribunal shall order that Nova Hut pay Kaiser USD 16,285.00.

(1062)  Kaiser also claims interest on this amount, which raises two separate issues.

(1063)  The first issue is whether Kaiser, who mistakenly claimed an amount of USD 20,573.00 until its Reply of 7 April 2005, is at all entitled to interest. In its Statement of Defence of 24 January 2005, Nova Hut indeed points out that it was entitled to reject Kaiser's claim as long as Kaiser insisted on the payment of an amount of USD 20,573.00 (¶142, p. 52).

(1064)  On 17 October 2000, Kaiser incorrectly invoiced Nova Hut an amount of USD 20,573.00 (R51). By letter 27 October 2000, Nova Hut objected to Kaiser's invoice, on the ground that Kaiser's calculation of the interest owed to it was flawed (R52).

(1065)  In the Arbitral Tribunal's opinion, Nova Hut should have settled Kaiser's invoice up to the amount it considered due, specifying for what reason it withheld the balance. By simply refusing to settle Kaiser's invoice in its entirety, Nova Hut was in default in respect of the portion of such invoice that was effectively due and took the risk that late payment interest would accrue on such part.

(1066)  The second issue is whether, as a matter of principle, Kaiser is entitled to payment of interest on the amount claimed. In fact, the amount of USD 16,235.00 claimed by Kaiser already corresponds to late payment interest accrued until 17 October 2000 (R51).

(1067)  At the close of the evidentiary hearing, the Arbitral Tribunal requested that the parties address, in their post-hearing submissions, the issue of the parties' entitlement to interest, specifically to compound interest, if any, on amounts to be awarded by the Arbitral Tribunal (see Procedural Order #5 of 23 September 2005, ¶7, p. 3).

(1068)   In its Post-Brief, Kaiser stated that it was due compound interest dating from the statement of claim for all claims on which interest is claimed. Thus, according to Kaiser, pursuant to Section 1000 of the Austrian Civil Code, compound interest *"may be claimed if explicitly agreed upon or if due interest is claimed"* (see Kaiser's Post-Hearing Brief of 28 October 2005, ¶401, p. 134). In other words, *"Kaiser is entitled to compound interest for all claims in which Kaiser has separately asserted its claim for simple contractual interest"* (ibid., ¶401, p. 134). Kaiser then confirms that it has claimed simple contractual interest on its claims for unpaid progress billings and states that it is entitled to interest at the statutory rate from the date when the statement of claim was served to Nova Hut, i.e. from 2 January 2004 (ibid., ¶¶402-403, pp. 135-136).

(1069)   Nova Hut does not dispute the parties' entitlement to compound interest. Admittedly, in its Post-Hearing Brief of 28 October 2005, Nova Hut stated that *"[n]either party has claimed compound interest in these proceedings"* and that *"[a]ccordingly, the parties are entitled only to simple interest on any amount to be awarded by the Arbitral Tribunal"* (¶114, p. 44). However, Nova Hut reserved the right to claim compound interest *"in the event that Kaiser requests compound interest in its post-hearing brief"* (¶115, p. 44). Eventually, in its Reply Post-Hearing Brief of 14 November 2005, Nova Hut claimed compound interest on all its counterclaims (see "Conclusion", p. 46).

(1070)   Based on the above developments, the Arbitral Tribunal finds that interest may indeed accrue on interest since the filing of the Statement of Claim.

(1071)   However, in Exhibit E to its Post-Hearing Brief of 28 October 2005, Kaiser states that late payment interest due by Nova Hut amount to USD 11,450.00 as of 14 November 2005. As it results from the chart below (reproducing Exhibit R52, with the addition of a column "interest as of 14 November 2005" on the right), Kaiser has computed late payment interest *at the contractual rate* on contractual late payment interest ascertained at the date of its invoice (17 October 2000):

| Billing No. | Penalty Date | Amount Subject to | Date paid | Penalty Rate | Interest Due | Interest as of 14 |
|---|---|---|---|---|---|---|

|  |  | Penalty |  |  |  | November 2005 |
|---|---|---|---|---|---|---|
| 78-Retention | 5.7.1999 | 173 458,00 | 13.7.1999 | 13,75 | 530,00 | 370,00 |
| 79-Retention | 5.7.1999 | 40 765,00 | 13.7.1999 | 13,75 | 124,00 | 86,55 |
| 80-Retention | 5.7.1999 | 95 190,00 | 13.7.1999 | 13,75 | 291,00 | 203,00 |
| 81-Progree | 1.8.1999 | 1 089 136,00 | 4 8.1999 | 13,9375 | 1 265,00 | 895,00 |
| 81-Retention | 1.8.1999 | 170 730,00 | 9 8.1999 | 13,9375 | 529,00 | 374,30 |
| 82-Progress | 1 8.1999 | 893 166,00 | 4.8.1999 | 13,9375 | 1 037,00 | 733,70 |
| 82-Retention | 1.8 1999 | 72 419,00 | 9.8.1999 | 13,9375 | 224,00 | 158,50 |
| 83-Progress | 6.8 1999 | 1 200 000,00 | 6.8 1999 | 13,92 | - |  |
| 83-Progress | 6.8.1999 | 1 100 000,00 | 9 8 1999 | 13,92 | 1 276,00 | 901,70 |
| 83-Progress | 6 8.1999 | 302 738,00 | 6.8.1999 | 13,92 | - |  |
| 83-Retention | 6.8.1999 | 290 536,00 | 11.8.1999 | 13,92 | 562,00 | 397,15 |
| 84-progr+ret. | 5.9.1999 | 1 236 090,00 | 17.9.1999 | 14,03875 | 5 784,00 | 4 122,30 |
| 85-progr+ret. | 5.9 1999 | 874 651,00 | 17.9.1999 | 14,03875 | 4 093,00 | 2 917,10 |
| 86-progr+ret | 10.9 1999 | 208 555,00 | 17.9.1999 | 14,03875 | 570,00 | 406 20 |
| TOTAL |  |  |  |  | 16 285,00 | 11 565,50 |

(1072)    Section 6.3.1 of the Contract reads as follows:

> 6.3.1  In the event that any approved payment between the Owner and the Supplier is delayed of more than thirty (30) Days after the due date, then interest on the delayed payment will be paid at an annual rate of interest of LIBOR (for one year deposits) plus eight percent (8%) until the invoice is paid.

(1073)    It clearly follows from the above provision that the parties' intention was that late payment interest would only accrue on principal amounts, not on interest.

(1074)    Accordingly, Kaiser will only be awarded interest at the (statutory) rate of 4% per annum from 5 January 2004 until full and final payment.

**7.3.3    Accrued interest, plus interest on such unpaid interest, as a result of the late payment of Billing 91 (USD 87,642.00)**

**a)    Claimant's position**

(1075)    Payment of Billing 91 was due in October 1999.

(1076)    Nova Hut paid Billing 91 on 9 January 2001, without any adjustment.

(1077)    There was no basis in the Contract for withholding payment on a progress billing to force the settlement of other claims. Under the Contract, the owner's first remedy in settling outstanding issues was to make a claim against the retention reserve (Sections 8.3.4 and 8.3.1 of the Contract).

(1078)    Nova Hut also claims that late payment interest on Billing 91 should be offset by unpaid billings owed to Nova Hut. Nova Hut does not make a counterclaim for this alleged debt and does not supply any documentary support. Kaiser does not acknowledge this debt. Nova Hut misrepresents a letter in which Kaiser makes a settlement offer to offset billing 91 against another debt. Nova Hut never accepted the offer by paying based on the settlement offer.

(1079)    It follows from the above that Nova Hut's payment of Billing 91 was late. The late payment interest on this invoice, calculated to 9 January 2001, totalled USD 87,642.00.

(1080)    Kaiser is entitled to payment of this amount plus late payment interest on the unpaid interest.

**b)    Respondent's position**

(1081)    Nova Hut paid Billing 91 on 9 January 2001.

(1082)    Kaiser's claim is based on the wrong premise that Billing 91 was to be paid in October 1999.

(1083)    When Kaiser issued invoice 91, there were several unfinished items of work that Kaiser had to complete in order to meet the contractual requirements for Preliminary Acceptance.

(1084)    It was agreed by the parties that payment of invoice 91 would be withheld in the form of retention by Nova Hut and would be paid upon completion of such unfinished work, which occurred in August 2000.

(1085)    Then, Nova Hut and Kaiser agreed that invoice 91 would be paid by way of set-off with Nova Hut's then outstanding invoices. After discussions, Kaiser advised Nova Hut that the latter's billings which were subject to a set-off would amount to CZK 7,699,714.72.

(1086)    It was only on 3 January 2001 that Kaiser advised Nova Hut that it would not accept any set-off and pay Nova Hut's outstanding billings in the amount of CZK 7,799,616.58 upon payment by Nova Hut of Billings 91 and 92.

(1087)    Nova Hut paid Billing 91 on 9 January 2001 and, accordingly, was not late in doing so.

(1088)    Therefore, Kaiser's claim should be rejected.

**c)      Discussion and decision**

(1089)    The issue is whether Nova Hut's payment was late and, accordingly, whether Nova Hut owed Kaiser interest in addition to the amount invoiced.

(1090)    According to Kaiser (which has not produced Billing 91), Billing 91 was due in October 1999. According to Nova Hut, Billing 91 only became payable on 9 January 2001.

(1091)    The record confirms that, as alleged by Nova Hut, the parties had initially agreed that Billing 91 would only become payable upon certain remedial work being

*241*

performed by Kaiser. On 8 August 2000, Nova Hut wrote as follows to Kaiser (R40, emphasis added):

> We inform you that with regard to removal of six critical punch list items from the previous acceptance which NH, a.s. based on agreement of both companies management of October 22, 1999 estimated /evaluated retention, we are ready now to settle the payment of the invoice no. 91.
>
> [...]

(1092)    There is no evidence on record that Kaiser contemporaneously disputed the contents of the above letter, specifically the existence of an agreement. Nor did Kaiser object to a letter sent a few days later on 15 August 2000 and which referred to the agreement (R41).

(1093)    Kaiser's objection that Nova Hut was not entitled to withhold payment of Billing 91 as there were other contractual mechanisms to force Kaiser to perform remedial work is irrelevant. What is decisive is that the parties agreed that Nova Hut was entitled to defer payment of Billing 91.

(1094)    It thus appears that Billing 91 did not become due until August 2000.

(1095)    On 15 August 2000, Nova Hut advised that payment of Billing 91 was conditional upon the conclusion of an agreement *"on mutual credit of receivables and obligations"*, which Nova Hut suggested the parties should discuss (R41):

> Regarding the letter [R40] sent to you on August 14, 2000 and based on agreement concluded at a senior meeting concerning conduct of credits between our companies, we submit you our policy as follows:
>
> [...]
>
> We expect the invoice no. 91 to be issued on the amount of USD 382.337,-. The prerequisite for its payment is concluding of the Contract on credit of mutual receivables/claims when on one side there will be your invoice no. 91 and on the other side there will be ICFKN obligations currently filed/registered at NH, a.s.
>
> Attached you will find the Agreement on mutual credit of receivables and obligations and the summary of all claims. We are aware that part of obligations is retention.

242

We believe that you are going to agree with the proposed steps/policy. We would like to meet with you to finalize your claims regarding the amount of retention money. Be so kind and propose the term of the meeting.

(1096)    On the same 15 August 2000, Kaiser replied as follows (R42):

[...] ICFKN registers NH intention to settle payment of the long past due progress Billing No. 91.

Attached is a list of all NH due invoices which at the current time ICFKN is withholding payment as an off set against billing 91. Total of all invoices, including VAT is 6,564,431.92 Kc. Converted to US dollars using today's Czech National Bank exchange rate of Kc 39.052 to the US$ represents $ 168,095.00.

Balance due from Nova Hut on Billing No. 91 after offset is US $350,204.00 Your early payment of this outstanding amount will be appreciated.

(1097)    The above exchange of correspondence shows that, as of 15 August 2000, Kaiser had agreed that amounts it owed to Nova Hut should come in deduction of Billing 91 and, more importantly, only asserted the principal amount of its claim, not interest.

(1098)    Kaiser has argued that Nova Hut did not make a counterclaim for the amounts allegedly due by Kaiser and did not supply any documentary support. This argument must be rejected. It is thus sufficient that, at the time, Kaiser expressly acknowledged that it owed certain amounts to Nova Hut ("Attached is a list of all NH due invoices") and agreed that these amounts should be deducted from the principal amount that appeared on its own invoice.

(1099)    In fact, on 27 October 2000, Kaiser itself sent to Nova Hut "*the latest KN update of NH billings which has been issued regularly*" to become "*the basis of an offset agreement, which can be immediately signed by both parties*" (R53). Again, Kaiser did not include in its calculation late payment interest accrued on its billing 91. The parties were still discussing the basis of an offset agreement on 15 November 2000 (R56).

(1100)    The record shows that, between August 2000 and January 2001, the parties discussed how they should treat outstanding invoices on both sides and agreed

243

on the principle that overdue amounts should be offset. In this process, Kaiser itself produced estimations of its resulting claim based on offsets of principal amounts. None of these estimations did take into account late payment interest.

(1101)   It is only on 3 January 2001 that Kaiser, for the first time, requested immediate payment of billing 91 and specified that it would claim late payment interest (R61):

> [...]. As the Contract does not allow offset payments, immediately upon receipt from Nova Hut of the Net Due amounts shown above, ICF Kaiser will pay these outstanding billing amounts to Nova Hut.
> Please note that the amounts shown above for Billing Nos. 91 and 92 do not include consideration of accumulated late payment interest penalties as provided by Contract. These late payment penalties will be calculated and billed once the actual date of payment by Nova Hut is known.

(1102)   It follows from the above that Billing 91 only became due on 3 January 2001. As a result, interest would have started to accrue 60 days later, on 4 March 2001.

(1103)   However, Nova Hut settled Billing 91 on 9 January 2001 (C152), i.e. within the 30-day grace period of Section 6.5.3.5.(c) of the Contract, which must be applied by analogy.

(1104)   Therefore, Nova Hut was not late in paying Billing 91 and Kaiser's claim will be rejected.

### 7.3.4   Accrued interest, plus interest on such unpaid interest, as a result of the late payment of Billing 92 (USD 2,106.00)

### a)   Claimant's position

(1105)   Kaiser issued an invoice covering Billing 92 on 10 October 2000.

(1106)   Nova Hut did countersign the change order constituting Billing 92 and therefore, all the steps had occurred to entitle Kaiser to payment.

(1107)    In any event, the fact that other change orders for which Nova Hut sought settlement were not approved until November 2000 is irrelevant. Nova Hut cannot extend its payment deadlines by seeking to offset payment of other change orders.

(1108)    Therefore, Nova Hut was late in paying Billing 92. The late payment interest on this invoice, calculated to 9 January 2001 when Nova Hut eventually paid the invoice, totalled USD 2,106.00.

(1109)    Kaiser is entitled to payment of this amount plus late payment interest on the unpaid interest.

**b)       Respondent's position**

(1110)    Kaiser's claim is premised on the notion that payment of Billing 92 was due in October 2000, which is wrong.

(1111)    Billing 92 incorporated several PCNs that were approved by the parties as a package under Change Order No. 4 and Change Order No. 5. On 10 October 2000, Kaiser issued Billing 92 attaching Change Order No. 4 and Change Order No. 5. Nova Hut agreed to these proposed change orders on 10 November 2000 pursuant to Section 9.2.2.4 of the Contract.

(1112)    Accordingly, payment of Billing 92 was due since 10 November 2000 and interest did not accrue until 11 January 2000.

(1113)    Therefore, Nova Hut was not late in paying Billing 92 on 9 January 2001 and Kaiser's claim should be rejected.

**c)       Discussion and decision**

(1114)    Again, the issue raised by this claim is whether Nova Hut was late in settling Billing 92, and, accordingly, owes Kaiser late payment interest.

245

(1115)    In accordance with Section 6.3.1 of the Contract, late payment interest starts to accrue "[i]n the event that an approved payment [...] is delayed of more than thirty (30) days after the due date".

(1116)    Pursuant to Section 6.5.3.5(c) of the Contract, "[a]pproved invoice or its part will be due within 30 Days of receipt thereof by Owner".

(1117)    In the instant case, Billing 92 - which was issued on 10 October 2000 - became due on 9 November 2000 (R48).

(1118)    Therefore, late payment interest started accruing on 9 December 2000. As Nova Hut paid invoice 92 on 9 January 2001, it owes in principle late payment interest for the period between 9 December 2000 and 9 January 2001.

(1119)    Nova Hut however alleges that Billing 92 was not approved until 10 November 2000. As a matter of fact, it is alleged, Billing 92 covered proposed change orders no. 4 and 5 that Nova Hut only approved 10 November 2000.

(1120)    It appears that Nova Hut signed proposed change orders no. 4 and 5 on 10 November 2000 (R54 and R55). There is no doubt that these change orders, in the respective amounts of USD 114,567.00 and USD 149,905.00 formed the basis of Billing 92.

(1121)    Yet, pursuant to Section 9.2.2.4 of the Contract, a proposed change order will only be a change order once countersigned by Nova Hut.

(1122)    It follows from the above that Billing 92 could not be approved until the approval by Nova Hut of the underlying change orders, which approval occurred on 10 November 2000. As a result, Billing 92 actually become due on 10 December 2000 and late payment interest accrued on 9 January 2001.

(1123)    Nova Hut was not late in paying Billing 92 and Kaiser's claim must be dismissed.

### 7.3.5    The unpaid balance of Billing 92 (USD 60,000.00)

**a)**      **Claimant's position**

(1124)    Nova Hut alleged that there were deficiencies in the mold level control mechanism, which had no connection to billing 92. The mold level control was part of the Phase 0 Contract. The parties agreed at the end of Phase 0 to transfer corrections, if necessary, for this item to the Phase 1 Contract, and agreed that the corrections, if not made, had a value of USD 60,000.00.

(1125)    The mold level was tested and approved during the Phase 1 plant performance testing. Kaiser performed all obligations in connection with the mold level control.

(1126)    For some unexplained reason, Nova Hut decided to deduct the USD 60,000.00 from Billing 92, which was not justified. As a matter of fact, the equipment was determined to not need repairs.

(1127)    Therefore, Nova Hut should not have deducted USD 60,000.00 from Billing 92 and Kaiser is entitled to full payment of this billing, plus interest which continues to accrue.

**b)**      **Respondent's position**

(1128)    At the time of final acceptance of the Phase 0 work, there were deficiencies in the mold steel level control mechanism, which Kaiser undertook to correct before 30 September 1998 under a penalty of USD 60,000.00.

(1129)    The term of correction of this defect was afterwards extended to 3 November 1998. However, Kaiser was not able to correct these defects within that date either.

(1130)    In August 1999, the parties transferred this item of work to Phase 1 and Kaiser undertook to remedy the defects in the mold steel level mechanism as part of the Phase 1 Scope of Supply before 31 January 2000. Kaiser and Nova Hut

expressly agreed that the USD 60,000.00 for non-correction of the defect on 30 September 1998 would not be affected by the agreement of August 1999.

(1131)   Accordingly, Nova Hut issued on 1 March 2000 a penalty invoice in the amount of USD 60,000.00. Kaiser never paid this invoice, which was due on 31 March 2000. The item of work to be performed by Kaiser in relation to the mold steel level control mechanism was referred to as PCN No. 88, which became part of Change Order No. 4, which was ultimately included in Billing 92.

(1132)   Therefore, Nova Hut was entitled to withhold USD 60,000.00 from Billing 92.

c)      **Discussion and decision**

(1133)   Kaiser claims payment of the USD 60,000.00 balance of billing 92, which Nova Hut partially settled on 9 January 2001.

(1134)   It is common ground between the parties that, at the time of final acceptance of the Phase 0 work, Nova Hut alleged that there were deficiencies in the mold level control mechanism and that, in August 1999, the parties agreed to transfer any necessary corrections to the Phase 1 of the work.

(1135)   The disagreement between the parties relates to the contents of the agreement of August 1999, in particular whether a certain amount of USD 60,000.00 was a penalty or a retention.

(1136)   According to Nova Hut, Kaiser had undertaken to correct any deficiencies before 30 September 1998 under a *penalty* of USD 60,000.00. In August 1999, Kaiser and Nova Hut agreed that the transfer of the corrections to the Phase 1 of the work would not affect the penalty, which Kaiser owed Nova Hut.

(1137)   According to Kaiser, the parties estimated that corrections to the mold level control mechanism, *if any*, had a value of USD 60,000.00. This amount was retained by Nova Hut. Testing of the mold level during the Phase 1 plant

performance testing demonstrated that no corrections were required and the USD 60,000.00 became payable to Kaiser.

(1138)    On 16 August 1999, Nova Hut sent to Kaiser a draft agreement for Kaiser's approval and signature. In relevant part, the draft provides as follows (C103, emphasis added):

<div align="center">

**Agreement**

</div>

concluded between NH a.s. and ICF KN B.V. to enable ICF KN to fulfil their obligation to correct and complete warranty defects including uncorrected defects from the Phase 0 Acceptance Proceedings as per Contract between NOVA HUT a.s. and ICF Kaiser Netherlands B.V. for the design and construction of the Hot Strip Mini Mill Phase 0.

Since the Contractor – ICF KN failed to correct all defects ensuing from the Preliminary and Final Acceptance within the scope of due terms stipulated by the contract or terms later extended including duly claimed defects until the end of the Phase 0 Period of Warranty i.e. on 16 JULY 1999, the facts quoted hereinafter have been agreed and confirmed:

**A/ Defect – Punch-List Item: Mold Hot Level Monitoring**

-    claimed during the Preliminary Acceptance and subsequently reclaimed and confirmed by ICF KN at the Final Acceptance in Table A2 stating **the term of correction to be 30 SEPTEMBER 1998 under a penalty of USD 60,000.- if the term is not fulfilled**.

-    The term for correction of this defect was extended again by the agreement between the management of NH a.s. and ICF KN dated 3 NOVEMBER 1998 until the expiry of the Phase 0 Warranty Period.

-    This uncorrected defect from the Acceptance Proceedings was duly claimed as **a major warranty defect CAS-26 on 15 'JULY 1999**.

**B/ Phase 0 Warranty defects Duly Claimed by NH a.s. and Not Corrected by ICF KN in Warranty Period:**

[...]

CAS-26 Mold steel level control

[...]

**It has been agreed that these defects will be corrected as part of the Phase 1 Scope of Supply** within the scope of the Phase 1 Contract surety by ICF KN until 31 January 2000 or before the Phase 1 Final Acceptance depending on which of the aforementioned comes first. If ICF KN does not correct the mentioned warranty defects before the above quoted term, ICF KN will pay NH a.s. **a penalty of USD 10,000.- per each uncorrected**

**warranty defect and USD 50,000.- per each uncorrected major warranty defect (CAS 26, CAS27, CAS28). [...].**

**The penalty for non-correction of the defect under item A on 30 SEPTEMBER 1998 at the amount of USD 60,000.- for the benefit of NH a.s. is not affected by this agreement.**

[...]

(1139)   On 18 August 1999, Kaiser sent a signed revised proposal to Nova Hut (C104). The statement that [t]*he penalty for non-correction of the defect under item A on 30 September 1998 at the amount of USD 60,000.- for the benefit of NH a.s. is not affected by this agreement*" subsisted unchanged.

(1140)   Whereas this counter-offer was accepted by Nova Hut and eventually performed by the parties is irrelevant. Kaiser's signed proposal sufficiently reflects that the parties' common intention was that the USD 60,000.00 amount was a penalty, which became due to Nova Hut on 30 September 1998 as a result of Kaiser's failure to remedy defects affecting the mold steel level control mechanism before 30 September 1998.

(1141)   Kaiser has alleged that the mold steel level control mechanism was determined to not need repairs.

(1142)   The exhibit referred to by Kaiser in support of this allegation is a test protocol, which shows that, on 26 May 2000, Kaiser's guarantee of the average casting speed was tested successfully (C123). Nowhere in this exhibit is there a reference to the mold steel level control mechanism. Without any further explanations, the Arbitral Tribunal is not able to link this successful test to the proper functioning of the mold steel level control mechanism. Accordingly, the exhibit cited by Kaiser is not apt to prove the fact it is supposed to evidence.

(1143)   The Arbitral Tribunal observes that, even a proper functioning of the mold steel level control mechanism was a prerequisite, technically speaking, to the successful completion of the test of the casting speed on 26 May 2000, this would not lead to Kaiser's claim being granted. The fact that on 18 August 1999, Kaiser returned a signed agreement in which it undertook that "*these defects will*

*be corrected as part of the Phase 1 Scope of Supply*" is a strong evidence that the equipment at issue was indeed defective.

(1144)    Therefore, the Arbitral Tribunal will dismiss Kaiser's claim.

## 7.4    Claimant's claim for extra costs in relation with the Demonstration Day ceremony (USD 2,537,574.00)

### 7.4.1    Claimant's position

(1145)    In January 1999, Nova Hut demanded that Kaiser put on a plant demonstration (the "Dedication Day ceremony"). The demonstration, intended for various IFC and Czech Republic national officials, was unilaterally scheduled by Nova Hut to take place on 22 June 1999. In this respect, Nova Hut's argument that the work performed by Kaiser was required under the Phase 1 Contract ignores the fact that, by June 1999, the contract schedule was delayed by several months due to Nova Hut's conduct, in particular Nova Hut's failure to obtain financing and to supply electrical power.

(1146)    The work schedule was disrupted by the preparations for the Dedication Day Nova Hut constructed ceremonial stages in the area used for the construction of the rolling mill, which restricted access to the work site and resulted in lost time and additional costs. During preparations, Nova Hut failed to provide permanent electrical power during 21 days until 29 April 1999.

(1147)    Moreover, because of Nova Hut's late payments, Kaiser's subcontractors refused to perform additional work for the Demonstration Day ceremony. To convince them to perform such work, Kaiser was required to create a bonus incentive program. Kaiser paid USD 139,500.00 in bonuses to subcontractors.

(1148)    In 2002, an ICC Arbitral Tribunal awarded Kaiser's subcontractors Tippins Inc. and Tippins Field Services USD 1,489,994.00, plus interest of USD 303,112.00 calculated from 12 November 1999 to 1 November 2001, for increased costs for the Demonstration Day Ceremony. The Demonstration Day work was required by

Nova Hut and Nova Hut should bear all additional costs for this work. Therefore, Kaiser is entitled to USD 1,793,106.00, plus interest at a rate to be determined by the Tribunal (Kaiser's Post-Hearing Brief of 28 October 2005, ¶¶401 ff., pp. 134-136 and 413, p. 138 and Exhibit E).

(1149)   In addition, Kaiser incurred USD 744,468.00 in additional costs for preparing the facilities for the plant demonstration, accelerating the schedule to meet the demonstration deadline and lost time while the facilities were used for cleanup, standby and restart. Kaiser claims payment of this amount, plus contractual interest from 22 June 1999 and compound interest from 2 January 2004 (Kaiser's Post-Hearing Brief of 28 October 2005, ¶¶401 ff., pp. 134-136 and 414, p. 138)

### 7.4.2    Respondent's position

(1150)   The work performed by Kaiser in relation with the Demonstration Day ceremony was within Kaiser Phase 1 scope of work. As explained by Ian Halabrin, the work that Kaiser had to perform in view of the plant demonstration was no more than a Preliminary Hot Test as scheduled in the Phase 1 Contract. As the First Preliminary Hot Test was scheduled for 15 June 1999 and the ceremony on 22 June 1999, there would have been no extra work if Kaiser had complied with the contractual schedule.

(1151)   Kaiser's allegation that Nova Hut failed to provide permanent power is not correct. Nor is Kaiser's allegation that it was delayed by the delay in obtaining financing. First, it has been established that Kaiser was not materially prejudiced. Second, Kaiser's argument is already the subject of another claim. Third, Kaiser initially agreed to the date proposed by Nova Hut for the demonstration without stating that this would involve any additional costs or delay.

(1152)   It also appeared that at that time Kaiser's subcontractors were experiencing some difficulties causing significant delays in the preparation of the contractual milestones.

(1153)    Moreover, Nova Hut never accepted any Proposed Change Order with respect to the plant demonstration. Absent a Proposed Change Order signed by Nova Hut, Kaiser is not entitled to any additional compensation.

(1154)    Last, Kaiser has not evidenced the fact that it incurred any extra costs in relation to the plant demonstration.

(1155)    Kaiser took it upon itself to grant bonuses to its sub-contractors without Nova Hut's approval and is responsible for those bonuses. In all events, Kaiser has not adduced any evidence that it paid its subcontractors Mostostal and Sigma the amounts for which it claims payment, i.e. USD 80,000.00 and USD 59,500.00. In any event, the documents adduced by Kaiser do not show that theses amounts were paid in connection with the plant demonstration. Also, Kaiser took it upon itself to grant these bonuses without Nova Hut's approval.

(1156)    As regards the amount paid to Tippins, it results from the Tippins award that Tippins asserted a claim on the grounds that Kaiser directed Tippins to perform the work that Kaiser itself was required to perform pursuant to the Phase 1 Contract. Therefore, Kaiser is not entitled to forward this claim to Nova Hut.

(1157)    The allegations made in the witness statement of Dale Fackler in relation to the USD 604,968.00 extra costs Kaiser allegedly incurred in relation with the Dedication Day ceremony are not supported by any piece of evidence and should be disregarded.

### 7.4.3    Discussion and decision

### a)    Introduction

(1158)    Under this head of claim, termed "Extra Work Required for Nova Hut's Plant Demonstration", Kaiser seeks compensation for additional costs it claims to have incurred as a result of:

- restricted access to the work site due to Nova Hut's preparations for the ceremony;

- Nova Hut's failure to supply electrical power during 21 days;

- Nova Hut's failure to pay subcontractors on time; and

- Tippins' claim for increased costs.

(1159)  Kaiser claims a total amount of USD 2,537,574.00, which breaks down as follows:

- USD 604,968.00 in extended overhead costs;

- USD 139,500.00 in bonuses for subcontractors; and

- USD 1,489,994.00, plus USD 303,112.00 in interest, paid to Tippins in compliance with an ICC award.

(1160)  Nova Hut disputes Kaiser's claim for additional costs. It asserts that:

- that the work performed by Kaiser in connection with the Demonstration Day ceremony was within Kaiser's scope of work;

- that the program of the plant demonstration was not more than a Preliminary Hot Test, which, according to the contract schedule, was to take place earlier than the ceremony;

- that Kaiser agreed to the date proposed by Nova Hut without stating that it would involve any additional costs;

-    that difficulties experienced by Kaiser's subcontractors caused significant delays;

-    that Nova Hut never accepted any Proposed Change Order and that, absent a change order signed by Nova Hut, Kaiser is not entitled to compensation; and

-    that Kaiser has not demonstrated that it incurred extra costs in relation to the plant demonstration.

(1161)   The Arbitral Tribunal has already dealt with Nova Hut's arguments that the preparation day was within Kaiser's scope of work; that Kaiser agreed to the date of the ceremony; and that Kaiser's subcontractors caused significant delays the in connection with Kaiser's claim for a success fee for early achievement of Preliminary Acceptance (see Section VI.A.6.3.3). It shall now determine whether Kaiser actually incurred extra costs in connection with the Demonstration Day ceremony and whether its failure to submit a Proposed Change Order bars it from claiming compensation for such costs.

**b)    Kaiser incurred USD 604,968.00 in overtime costs**

(1162)   Kaiser argues that it incurred USD 604,968.00 in overhead costs for preparing the facilities for the plant demonstration, accelerating the schedule to meet the demonstration deadline and lost time while facilities were used for cleanup, standby and restart.

(1163)   In his first witness statement, Dale Fackler has given detailed explanations as to how he calculated the above amount (CWS3¶¶38-40, pp. 10-11 and Exhibits B, C and D), which includes USD 141,960.00 in temporary work or duplication or earlier work (Exhibit B); USD 353,808.00 in overtime work (Exhibit C); and USD 109,200.00 for lost time (Exhibit D). Dale Fackler also testified that he based his calculation on the number of staff hours reported by Construction Manager Colin Rumbles, who was responsible for managing field staff at the site

(CWS3¶38, pp. 10-11). Colin Rumbles's summary of staff costs has been produced and marked as exhibit C93.

(1164) Nova Hut argues in its Rejoinder that "*Kaiser has the burden of proof to show the amount of the costs it claims*", that "*all* [it] *has produced in support of its allegations is a witness statement of Mr. Faclker*" and that "*[t]he allegations made in this witness statements are not supported by any piece of evidence and should be disregarded*" (¶150, p. 54).

(1165) In its Post-Hearing Brief of 28 October 2005, Nova Hut further claims that Dale Fackler's calculations are totally arbitrary and unreliable. Nova Hut's criticism stems from the fact that the numbers presented by Dale Fackler differ from those gathered by Colin Rumble and from the figure of USD 800,000.00 contemporaneously asserted by Kaiser.

(1166) Nova Hut is mistaken.

(1167) **First, Nova** Hut could have requested that Kaiser produce all the documents on which Dale Fackler, and, before him, Colin Rumble, relied to arrive at the USD 604,968.00 figure. It did not. In its Statement of Defence, which was filed after Nova Hut had received Dale Fackler's first witness statement, simply wrote that Kaiser had not brought any evidence that the preparation of the Dedication Day ceremony involved any extra costs (¶151, p. 57).

(1168) Second, the Arbitral Tribunal is satisfied by Dale Fackler's explanations as to why his figures differ from those achieved by Colin Rumble in exhibit C93. In particular, Dale Fackler unequivocally testified that all costs that were not directly attributable to the claim item have been excluded (Tr. 344:11-13).

(1169) Last, extended overhead costs of the types claimed by Kaiser are, by nature, difficult to assess with absolute precision. As a matter of fact, it is almost impossible to link every minute of lost time or of additional time worked to the alleged disruption. Accordingly, a lower standard of proof must be adopted.

(1170)    Therefore, the Arbitral Tribunal finds that Kaiser is entitled to the payment of USD 604,968.00 in overhead costs.

(1171)    Kaiser claimed interest on the above amount without specifying the *dies a quo*. The Contract requires late payments to accrue interest 60 days after the date of invoice (Section 6.3.1 of the Contract).

(1172)    Kaiser claimed payment of added costs in connection with the Dedication Day ceremony for the first time on 3 June 1999 (R24). However, Kaiser's letter was intended "*to serve as [Kaiser] preliminary notice of claim for additional costs and extension of time associated with the impact of the preparation for the plant dedication ceremony*". Kaiser formally claimed payment of the Demonstration Day costs at the meeting held on 21 June 1999 (R28). On this occasion, the parties agreed to meet at a later date to conclude the matter. Kaiser reasserted its claim on 29 February 2000.

(1173)    The Arbitral Tribunal shall therefore order that Nova Hut pay Kaiser USD 604,968.00, plus simple contractual interest at the rate of 8% above LIBOR for one year US dollars deposits from 29 April 2000 until payment, plus compound interest on such interest, at the rate of 4% per annum from 5 January 2004 until payment.

c)    **Kaiser's claim for USD 139,500.00 for bonuses paid to subcontractors shall be dismissed**

(1174)    Kaiser alleges that it was required to create a bonus incentive program "*to convince subcontractors to perform the extra Demonstration Day work*" and paid USD 139,500.00 in bonuses (Claimant's Statement of Claim, ¶8.3.7, p. 38), namely USD 59,500.00 to Sigma Lutin and USD 80,000.00 to Mostostal.

(1175)    Exhibit C97 shows that on 7 July 1997, Kaiser issued Project Change Notice No. 084, which aimed at passing on Nova Hut extra costs incurred by Sigma. Sigma provided utilities and skilled operators water treatment equipment tests and furnace cooling tests. The extra costs totalled CZK 1,243,590.00, i.e.

USD 35,256.00 at the then prevailing exchange rate. On the face of it, nothing enables to link Project Change Notice No. 084 to the preparation for the Demonstration Day, let alone to the payment of bonuses.

(1176)    Revision No. 1 of Project Change Notice No. 084, sent on 3 August 1999, states that the extra costs were incurred "*during the Reheat Furnace dry out period, which was accelerated in relationship to Dedication Date ceremony*". The amount claimed in Revision No. 1 is of CZK 1,606,500.00, i.e. 46,771.30 on 3 August 1999.

(1177)    Exhibit C208 is Change Order No. 15 of 6 August 1999 to Subcontract No. 70244-3026.56C between Kaiser and Sigma. It was issued on "*to cover the supply of operators for furnace dryout period to monitor furnace cooling circuit through 7 July 1999*".

(1178)    Based on the above exhibits, the Arbitral Tribunal makes the following findings:

- there is no evidence that the amount claimed by Sigma correspond to bonuses paid to convince Sigma to perform extra work;

- on the contrary, the costs claimed appear to be overtime working hours performed by Sigma's employees in connection with the Furnace Dry Out;

- contrary to Nova Hut's stance, the mere fact that the costs claimed do not specifically relate to the plant demonstration does not exclude their recovery.

(1179)    This being said, the Arbitral Tribunal is of the opinion that Kaiser has failed to allege the facts underlying its claim with sufficient precision. Moreover, the evidence adduced is difficult to reconcile with the factual allegations, if not in direct contradiction with them.

(1180)    Thus, Kaiser alleges that the USD 59,500.00 amount is a bonus paid to its subcontractor Sigma who was unwilling to perform work for Nova Hut's demonstration (see Claimant's Reply of 7 April 2005, ¶166, p. 73). Yet, the amounts claimed by Sigma correspond to overtime working hours performed by its employees. In its 3 August 1999 letter to Nova Hut, Kaiser states that "[a]*ll of the extra costs have been evolved* [sic] *during the Reheat Furnace dry out period, which was accelerated in relationship to Dedication Date ceremony*" (C206). Yet, whereas the ceremony took place on 22 June 1999, the log attached to Project Change Notice No. 084 (Revision No. 1) includes working hours incurred up until 7 July 1999 (C206). Last, the CZK 1,606,500.00 amount claimed by Sigma correspond to an amount of USD 46,771.30 on 3 August 1999 and not USD 59,500.00.

(1181)    Therefore, Kaiser's claim shall be dismissed.

(1182)    Kaiser has not proven either that it incurred USD 80,000.00 in bonuses paid to Mostostal to convince Mostostal to accelerate its work or to perform extra work and that Nova Hut should refund such amount.

(1183)    The only exhibit submitted by Kaiser in support of this claim is a letter sent to Mostostal, in which Mostostal claims to have "*completed all his contractual works*" and reaches the conclusion that it has "*fulfilled his obligations for conditional bonus*". There is however no indication whatsoever that the bonus claimed by Mostostal was linked to a request from Kaiser that Mostostal perform extra work or accelerate its work. To the contrary, Mostostal appears to claim payment of a contractual bonus for early achievement (C100, emphasis added):

> Taking all a/m facts into consideration we hereby declare that all our obligations have been fulfilled to receive conditional bonus as stated in mutual agreement. **Some of the completion dates are even shortened against requirement**.

(1184)    The invoice attached to Mostostal's letter, for an amount of USD 80,000.00, merely states that this requested amount corresponds to "*services rendered for the Installation of Rolling Mill in Nova Hut, Ostrava, Czech Republic*".

(1185)    The Arbitral Tribunal is unable to reconcile the above with Kaiser's allegation that it paid Mostostal a bonus to convince it to accelerate its work.

**d)    Kaiser is entitled to recover the amount of USD 1,489,994.00, plus interest, paid to Tippins**

(1186)    Kaiser claims that Nova Hut required the Demonstration Day work and should bear all additional costs incurred for such work, including an amount of USD 1,489,994.00 awarded to Tippins by an ICC arbitral tribunal, plus interest.

(1187)    Nova Hut argues that Kaiser has not established that the Tippins award was ultimately Nova Hut's responsibility. To the contrary, the argument follows, the Tippins award shows that Tippins asserted a claim on the grounds that Kaiser directed Tippins to perform the work that Kaiser was itself required to perform pursuant to the Phase 1 Contract.

(1188)    On 5 December 2003, an ICC arbitral tribunal issued a final award in the case No. 11785/ACS/EC between Kaiser, on the one hand, and Tippins Inc. and Tippins Field Services Inc., on the other (the Tippins Award). Together with its Statement of Claim of 10 November 2004, Kaiser submitted the first and the last page of the Tippins Award (C168). On 14 March 2005, upon Nova Hut's request, the Arbitral Tribunal ordered that Kaiser communicate the Tippins Award to Nova Hut (see Procedural Order No. 2 of 14 March 2005). Nova Hut submitted the Tippins Award with its Rejoinder of 10 June 2005 marked as Exhibit R68.

(1189)    Nova Hut mainly argues that the extra costs incurred by Tippins were for work within Kaiser's original scope of work. Therefore, it is argued, Kaiser should not be allowed to pass on such costs to Nova Hut. In support of this argument, Nova Hut cites to the following passage of the Tippins Award (R68, p. 34):

> Tippins argues that all of the additional and out-of-scope work performed by Tippins and the Nova Hut project was for work that Kaiser was required to perform pursuant to its scope of work under the Kaiser-Nova Hut Contract.

(1190)   As a matter of fact, in this part of the Tippins Award, the arbitral tribunal simply summarizes Tippins' position. In other word, the fact that the work performed by Tippins was within Kaiser's original scope of work is not a finding of the tribunal.

(1191)   Having restated the parties' arguments, the Tippins arbitral tribunal reaches the conclusion that Kaiser is liable to Tippins for any costs and expenses that Tippins incurred in performing the additional work for the Dedication Day ceremony (R68, p. 37) and evaluates the quantum of Tippins' claim to be USD 1,489,994.00 (R68, p. 39). The Arbitral Tribunal finds Tippins' description of the extra work performed, which the Tippins arbitral tribunal considered to reach the above finding, to be particularly enlightening (R68, pp. 34-35):

> 158
>
> Tippins claims that it had to redesign, construct and commission the Mini Mill to heat a slab and roll it up and down the line (without processing it) so that the mill would look operational to the Czech dignitaries during the demonstration.
>
> 159.
>
> What this meant was explained by Tippins by a number of examples.
>
> 160.
>
> First, all wiring in a given area would normally be commissioned all at one time. Because of lack of time, the parties only connected and commissioned the wiring necessary to meet the deadline for demonstration.
>
> 161.
>
> Second, Tippins had to trick the computers by giving them false prompts, new software and wiring and jumper changes: Changes to Level 1 control, Level 2 controls that had to be set to manual mode; the looper roll was taken out of commission; several jumpers and extra wire and local controls were temporarily put in place in the APC cabinets; the reheat furnace had to be redesigned and placed in manual mode.
>
> 162.
>
> Third, undo and redo the work.
>
> 163.
>
> Fourth, additional expense in support engineering and technical services from Pittsburgh for the referenced changes.
>
> 164.

Fifth, expenses for having the Tippins personnel work overtime and on non-weekdays and holidays.

(1192)    There is no reason to depart from the conclusion reached in the Tippins Award. Kaiser is entitled to recover from Nova Hut the amount it paid to Tippins.

(1193)    Kaiser claims the principal amount it was ordered to pay Tippins, i.e., USD 1,489,994.00, plus the interest awarded by the Tippins Arbitral Tribunal on such amount, namely USD 303,112.00 (LIBOR rate on US dollars deposits plus 8 percent from 12 November 1999 to 2 November 2001) (R86).

(1194)    Therefore, the Arbitral Tribunal shall order Nova Hut to pay Kaiser the amount of USD 1,793,106.00. In Exhibit E to its Post-Hearing Brief of 28 October 2005, Kaiser indicated that the decision to award late payment interest was *"left to the determination of the Tribunal"*. Kaiser did not specify when it paid this amount to Tippins, which makes it impossible for the Tribunal to determine when interest begins to accrue. Therefore, the Arbitral Tribunal will not award interest on the principal amount owed by Nova Hut in respect of the Tippins Award.

e)    **The absence of signed Change Order does not change anything (see 5.4.4(i))**

(1195)    Nova Hut alleges that it *"never accepted any Proposed Change Order with respect to the plant demonstration"* and that *"[a]bsent a Proposed Change Order signed by Nova Hut, Kaiser is not entitled to any additional compensation"* (Respondent's Statement of Defense of 24 January 2005, ¶149, p. 56).

(1196)    Admittedly, Section 5.4.4(i) of the Contract provides that *"the Fixed Price at which the Supplier shall complete the Project shall be equitably adjusted by Change Order"*.

(1197)    Contrary to Nova Hut's opinion, an adjustment to the contract price may not be deemed inadmissible simply because it was not made through a change order. In other words, the requirement is Section 5.4.4(i) is not an absolute requirement of form.

(1198)    In any event, in the instant case, Kaiser claimed adjustments to the contract schedule and price by letter of 3 June 1999 (R24). A no time did Nova Hut protest that Kaiser's claim did not meet the requirement of form of Section 5.4.4(i) of the Contract. To the contrary, Nova Hut started discussing the merits of Kaiser's claims.

(1199)    Therefore, the Arbitral Tribunal finds that the fact that Kaiser did not submit a change order does not bar it from claiming extra costs.

8.    **Claimant's claim for Nova Hut's failure to provide liquid steel, spare parts and utilities during commissioning and performance testing (USD 715,431.00)**

8.1    **Claimant's position**

(1200)    The Phase 1 Contract required that Nova Hut provide liquid steel and spare parts to meet Kaiser's requirements for commissioning the minimill.

(1201)    Nova Hut failed repeatedly to provide liquid steel in a timely manner, which forced Kaiser to delay in its commissioning activities while Nova Hut produced steel. When Nova Hut provided steel, it was only in those grades and volumes that would meet market demands, regardless of Kaiser's needs.

(1202)    Nova Hut caused 1,821.93 hours of delay because of its failure to supply liquid steel in a timely manner.

(1203)    Nova Hut also failed to provide spare parts for continued plant operation during the commissioning period or provided inadequate parts. This resulted in a shut down of the plant while Nova Hut found and purchased replacement parts.

(1204)    Nova Hut thus caused 329.1 hours of delays from December 1999 through October 2000.

(1205)    Last, Kaiser lost an additional 86.9 hours for other delays caused by Nova Hut, including unscheduled maintenance or maintenance extending beyond the agreed terms for plant maintenance.

(1206)    Kaiser's average daily costs during the commissioning phase were USD 7,673.00 per day. Based upon this rate, Nova Hut owes Kaiser USD 715,431.00, plus contractual interest from 3 October 2000 and compound interest from 2 January 2004 (Kaiser's Post-Hearing Brief of 28 October 2005, ¶¶401 ff., pp. 134-136 and 415, p. 138), for delays associated with liquid steel, spare parts and excessive maintenance.

## 8.2    Respondent's position

(1207)    Nova Hut was required to provide liquid steel and spare parts for the Performance Tests, which it did. Nova Hut was not required to provide liquid steel and spare parts during the commissioning phase. Section 1.3.4 of Appendix G to the Contract relates exclusively to the Performance Tests, as listed in Section 1.2.2 of Appendix G, not to the commissioning.

(1208)    In any event, Nova Hut denies that it failed to provide liquid steel and spare parts during the commissioning. Delay in commissioning was not caused by Nova Hut. In particular, although it was no required to do so, Nova Hut provided liquid steel or spare parts during the commissioning phase on the basis of a common practice. Thus, Kaiser never lacked steel or spare parts.

(1209)    The delay log produced by Kaiser was never reviewed or agreed to by Nova Hut.

(1210)    In a letter of 1 September 2000, Nova Hut stated that it had been providing steel in accordance with the contract.

## 8.3    Discussion and decision

### 8.3.1    Nova Hut was required to provide liquid steel and spare parts for the "commissioning phase"

(1211)    Kaiser argues that Nova Hut caused damages to it by failing to provide liquid steel and spare parts during the commissioning phase. Kaiser relies on Section 1.3 of Appendix G to the Contract, which, in relevant parts, reads as follows (emphasis added):

> 1.3    Supplier's and Owner's Responsibilities **for Performance Tests**
>
> [...]
>
> 1.3.4    Owner's and Supplier's Responsibilities
>
> In addition to the responsibility of supplying a trained operating and maintenance work force as described above, the **Owner is responsible for the delivery of liquid steel** in ladles from the Owner's facilities to the new Plant. Liquid steel shall be delivered at the time specified and at weight 205 tons ± 10 tons, temperature and chemical composition dictated by the specific requirement of the product to be produced as set out in the applicable Czech standards. [. .].
>
> [...]

(1212)    Nova Hut replies that it was only required to provide liquid steel and spare parts during the performance tests, which it did.

(1213)    Nova Hut relies on a distinction between "commissioning phase", on the one hand, and "performance tests", on the other, that does not exist in the Contract.

(1214)    The Phase 1 Contract does not use the language "commissioning phase". However, both parties use this language to designate the contract phase that was to start on Preliminary Acceptance and to end 18 months later with Final Acceptance. For instance, according to Franck Bury, "[b]eginning in October 1999, Nova Hut took control of the operation of the minimill, and Kaiser Netherlands moved into the commissioning, performance training and testing phase of the contract" (CWS2¶4, p. 2; see also, RWS2¶23, p. 6).

(1215)    Yet, it appears that the contract phase that followed immediately after Preliminary Acceptance was termed the "Phase 1 Performance Tests" (Section 1.2 of Appendix G):

> 1.2    Sequence and Objective of Tests

1.2.1  Sequence of Phase 0 & Phase 1

[...]

After completion of these tests in compliance with Section 14.3 of the Phase 1 Contract, including without limitation completion of the tests required by Section 14.3.3 of the Phase 1 Contract, Preliminary Acceptance will be proceeded with under Section 14.4 of the Phase 1 Contract.

1.2.3  Sequence of Phase 1 Tests

The tests shall be conducted after successful Preliminary Acceptance in the following sequence.

1.      [...]

[...]

These various tests culminating in the Four Week Integrated Production Performance Test will collectively be termed the Phase 1 Performance Tests. [...].

(1216)  Furthermore, Appendix J to the Phase 1 Contract sets out a diagram that shows that Preliminary Acceptance is followed immediately by a period of "Hot Start-up", itself followed by a period of Hot Tests. Section 2.1 of the Contract defines Hot Start-up as "*the commencement of operation of the Phase 1 Plant, being the commencement of casting slabs in the Phase 1 Continuous Caster, equalizing or reheating these slabs in the Equalizing Furnace and rolling them on the Reversing Hot Strip Mill, all following the Cold Tests (...) and then the Preliminary Acceptance of the Phase 1 Plant, all set out in Article 14*".

(1217)  It is thus obvious that Nova Hut was required to supply liquid steel as of achievement of Preliminary Acceptance until Final Acceptance.

(1218)  Although it now claims to have done so "*on the basis of a common practice*" (Respondent's Statement of Defence of 24 January 2005, ¶154, p. 58), Nova Hut knew that it had to supply liquid steel and did supply it.

**8.3.2    Nova Hut's failure to provide liquid steel, spare parts and utilities delayed Kaiser**

(1219)    Exhibit C126 produced by Kaiser is a contemporaneous log of delays incurred at the minimill from December 1999 (Hot start-up) until October 2000 (4WIPPT). Daily delays at the caster, the furnace or the minimill are listed together with a description of the nature of the delay and its cause.

(1220)    Exhibit C116 is based on the data contained in the daily log of delay, which it restates in a summarized and simplified form. According to Exhibit C116, Kaiser lost the equivalent of 2,237.93 hours, i.e., 93.24 days, namely 1,821.93 hours waiting for steel, 329.10 hours waiting for spare parts and 86.90 in "other owner caused delays".

(1221)    On 20 February 2000, Kaiser had already asserted to have lost 98 hours as a result of Nova Hut's failure to provide liquid steel (C119). There is no evidence that Nova Hut ever rejected Kaiser's claim.

(1222)    Nova Hut's only criticism is that it "*never reviewed nor agreed to the 'delay log' produced by Kaiser as Exhibit C126 to its memorial*" (Respondent's Statement of Defence of 24 January 2005, ¶155, p. 58).

(1223)    This is not sufficient to discard Kaiser's evidence. Nor is the fact that, on 1 September 2000, Nova Hut wrote that it "*ha[d] been providing steel for the testing operation of Phase 1 in accordance to the Contract*" (R81).

### 8.3.3    The quantum

(1224)    Kaiser argues that it would have completed its work earlier but for the delays caused by Nova Hut and claims that its costs would accordingly have been lower.

(1225)    To price its claim, Kaiser has calculated its average daily cost during the commissioning phase, which it asserts to be USD 7,673.00. It has then multiplied this average daily cost by the number of days lost.

(1226)  Nova Hut did not dispute Kaiser's figures. The Arbitral Tribunal shall award Kaiser USD 715,431.00, plus simple contractual interest at the rate of 8% above LIBOR for one-year US dollars deposits from 3 October 2000 until payment, plus compound interest on such interest, at the rate of 4% per annum, from 5 January 2004 until payment.

## 9.    Claimant's claim for breach of contract relating to the cycloconverters (USD 78,037.00)

### 9.1    Claimant's position

(1227)  Pursuant to Section 3.1.1.2 of the Phase 1 Contract, Kaiser was to supply parts called "cycloconverters" from Ansaldo Rosshill.

(1228)  On 16 March 1998, Nova Hut decided that it no longer wanted Ansaldo cycloconverters and directed that Kaiser supply cycloconverters manufactured by ABB instead.

(1229)  The reason alleged by Nova Hut is that Ansaldo had a subcontract with Elpro and that the Ansaldo cycloconverters did not conform to the applicable standards and were not new and of first rate quality.

(1230)  The Phase 1 Contract only gave Nova Hut the right to challenge subcontracts. There was no subcontract with Elpro. This would have been impossible since Ansaldo and Elpro had merged, which Nova Hut knew. As to the standards, Ansaldo had agreed to modify its cycloconverters and would have supplied cycloconverters in accordance with the Contract. As to quality, the cycloconverters had not been used before, which qualifies under the definition of "new".

(1231)  On 17 March 1998, Kaiser forwarded Nova Hut's instructions to Tippins, requesting that Tippins act accordingly.

(1232)    As Tippins planned to supply Ansaldo cycloconverters, Nova Hut's instructions constituted a change and Tippins sought additional compensation.

(1233)    Tippins asserted a claim for those costs in an ICC arbitration and was awarded USD 78,037, plus USD 12,572.83 in late payment interest from 20 April 1998 to 11 November 1999. The determination of the applicable interest rate (interest continues to accrue according to the Tippins award) is left to the Tribunal (Kaiser's Post-Hearing Brief of 28 October 2005, ¶¶401 ff., pp. 134-136 and 416, p. 138 and Exhibit E).

(1234)    Nova Hut, which directed and required the change from Ansaldo to ABB cycloconverters should be required to compensate Kaiser for the amounts awarded to Tippins in the Tippins Arbitration.

## 9.2    Respondent's position

(1235)    Nova Hut was entitled to direct Kaiser to supply ABB cycloconverters instead of Ansaldo cycloconverters. Indeed, pursuant to the Phase 1 Contract, the approval of subcontractors extends not only to Kaiser's immediate subcontractors, but also to the sub-subcontractors.

(1236)    While it had accepted to be provided with Ansaldo cycloconverters, Nova Hut discovered in October 1997, after the signing of the Phase 1 Contract that the control units of the cycloconverters would have been supplied by Elpro, a company that it had not approved. This was a departure from the Contract, which authorized Nova Hut to reject the cycloconverters.

(1237)    Nova Hut was all the more so entitled to reject Ansaldo's cycloconverters that they did not comply with the relevant standards nor were of new or first rate quality as required by the Contract.

(1238)    In any event, Kaiser has not demonstrated that the damages it sustained in the Tippins Arbitration resulted from Nova Hut's request to change from Ansaldo to

ABB cycloconverters. In this context, Kaiser asserted that the change to ABB cycloconverters was due in part to Ansaldo's inability to comply with requirements of the Phase 1 Contract.

(1239)   Also, Kaiser failed to provide references of Ansaldo-Elpro technology.

(1240)   Last, Tippins' claim was denied by the arbitral tribunal and Tippins was only awarded additional engineering costs on the grounds of pre-contractual liability.

## 9.3    Discussion and decision

(1241)   Section 3.1.1.2 of the Contract provided that Kaiser was to supply cycloconverters manufactured by Ansaldo:

> .2    Notwithstanding the other subsections of Section 3.1, the Owner agrees that the following items will be furnished by Tippins as a Subcontractor to the Supplier and by the following Subcontractors to Tippins, but this designation and approval of Subcontractors will not be construed as allowing the subcontracts with any of these Subcontractors to fail to comply with all other requirements of this Contract:
>
> [...]
>
> (iv)    Main Drive and Cycle Converters for the reversing Hot Strip Mill: Ansaldo.

(1242)   On 16 March 1998, Nova Hut directed that Kaiser supply cycloconverters manufactured by ABB (C39).

> NH Board of Directors held the meeting on Friday 13 March 1998 and decided to solve open issues as follows:
>
> [...]
>
> 2. Cycloconverters
>
> Instead of Ansaldo cycloconverters we order you to assure ABB cycloconverters.
>
> [ ..]

2 10

(1243)     Kaiser forwarded Nova Hut's instructions to Tippins who installed ABB cycloconverters. However, Tippins asserted a claim against Kaiser to cover additional engineering costs associated with the change from Ansaldo to ABB cycloconverters (R86). The Tippins arbitral tribunal granted Tippins' claim and, offsetting the amount claimed by Tippins with an amount claimed by Kaiser, ordered Kaiser to pay Nova Hut USD 78,037.00, plus interest at LIBOR on US dollars deposits, plus 8 percent, from 20 April 1998 to the date of payment (R86, ¶¶301 and 307-309, pp. 58-60).

(1244)     The issue is thus whether Kaiser may now claim this amount from Nova Hut.

(1245)     Section 9 of the Contract sets out the procedure to be followed in case Nova Hut orders a change in the scope of Kaiser's work. It follows from this provision that the procedure for changes does not apply in case Nova Hut requests that Kaiser correct work that is defective or fails to comply with the requirements of the Contract (Section 9.2.5):

> 9.2.5 The procedure for Changes (whether minor changes or changes requiring Change Orders) shall not apply to correction of Supplier's Work which is defective or which fails to comply with the requirements of this Contract. Such corrections shall be corrected by the Supplier at its own cost as provided in Article 10 and without adjustment to the Schedule.

(1246)     Nova Hut has demonstrated that the Ansaldo equipment did not meet the relevant standards (RWS3¶79, p. 20):

> 79. Furthermore it appeared that certain tests required by IEC and CSN standards were not performed, that the certificates of type tests provided by Ansaldo were incomplete, that Elpro's equipment were tested according to VDI (DIN) standards instead of IEC and CSN standards. [...].

(1247)     The reason for the non-compliance appears to be that Ansaldo had manufactured the equipment for the Thai project (R4, p. 4):

> The trip was organized on the grounds of invitation by ICF KN with the objective to enable participation of NH representative, who had status of observers, in piece tests of components of the main drive for the Steckel mill for the LPN Project, Thailand, in testing shops of company ANSALDO in Milan (thyristor converter) and in Monfalcone (synchronous motor).

The aim of the trip was to assess the possibility of utilization of the above-mentioned drive for the Hot Strip Mini-Mill project at NH a.s. under the conditions of cancellation of the project in Thailand.

(1248)   Kaiser does not dispute that the cycloconverters did not conform to the applicable specifications. However, it argues that Ansaldo agreed to modify them so they would comply with the scope of supply and all applicable standards. This argument must be rejected. First, Kaiser does not show that Ansaldo would have upgraded its equipment at no cost. Second, in the Tippins Arbitration, Kaiser argued that the selection of ABB "*was due, in part, to Ansaldo's inability to comply with the other requirements of the Kaiser – Nova Hut Main Contract, a prerequisite to their designation as subcontractor under Clause 3.1.1.2 of the Subcontracts*" (R86, p. 48).

(1249)   Moreover, part of the equipment that Tippins intended to supply had been manufactured by Elpro, a company that Nova Hut had not approved and, apparently, did not trust (RWS3¶78, p. 20):

> 78. During this trip, we found out that, in contradiction with the terms of the Phase 1 Contract, the cycloconverters' control system was to be manufactured by a company named Elpro. This former East-German company was well known by Nova Hut. Elpro's predecessor KEAB, later EAB Berlin, had supplied equipment for Nova Hut's Medium & Light Section Mill Run-out Area, which proved to be of poor reliability and service life. [...].

(1250)   Kaiser has argued that Ansaldo and Elpro had merged and, hence, that Elpro was not a subcontractor subject to Nova Hut's approval pursuant to Section 3.1.1 of the Contract. In other words, Nova Hut was not entitled to reject Elpro.

(1251)   It is true that, pursuant to Section 3.1.1 of the Contract, Nova Hut has its say only on subcontractors and sub-subcontractors. Therefore, it could not reject Elpro if the latter had merged with Ansaldo. However, this presupposes that the equipment was manufactured *after* the merger. Otherwise, the very purpose of Section 3.1.1 of the Contract - which is to ensure that Nova Hut can exercise effective control over the selection of the subcontractors – would be defeated.

(1252)   In the instant case, it appears that the Elpro equipment had been manufactured prior to Elpro's merger with Ansaldo (R4, p. 6):

> 1.1   On the ground of a contract between ANSALDO and ELPRO a programmable cycloconverter controller was jointly developed. A part of it was also a source of exciting voltage. Both these parts were manufactured and supplied by company ELPRO.
>
> 1.2   In 1997 major restructuring took place in ELPRO. As consequence of this restructuring the company virtually came to an end. [. .]
>
> [...]
>
> 1.5   ANSALDO refuses to supply another controller as replacement for the ELPRO controller with reference to the fact that the controller of their own design will be available as late as in the course of two years. Utilization of a third party controller was strictly refused.

(1253)   Last, Nova Hut has demonstrated that it only discovered that part of the equipment would be manufactured by ELPRO during the visit at Ansaldo's facilities in October 1997, i.e., after the execution of the Phase 1 Contract and the resulting acceptance of Ansaldo as the supplier for the cycloconverters (RWS5¶63, p. 17):

> 63. It was not until the trip to ANSALDO in October 1997 that all information regarding the issue was collected from ANSALDO people, as set forth in the corresponding trip report.

(1254)   It follows from the above that Kaiser was responsible for the change from Ansaldo to ABB cycloconverters. In other words, the supply of ABB cycloconverters was not a change to Kaiser's scope of supply, to be dealt with under Section 9 of the Contract, but a correction to Kaiser's defective work within the meaning of Section 10.

(1255)   Therefore, the change to ABB cycloconverters was at Kaiser's cost and Kaiser's claim shall be dismissed.

**10.    Claimant's claim for extended office operation costs (USD 428,737.00)**

**10.1    Claimant's position**

(1256)    Kaiser intended to close the office it maintained in Ostrava in March 2001, upon Final Acceptance.

(1257)    However, Nova Hut failed to make contractually required payments to Kaiser in exchange for the work performed by Kaiser. These payments are not progress payments but the contract fee and the retainage, a portion of which was due to Kaiser's subcontractors. Also, Kaiser refused to acknowledge that Kaiser reached Final Acceptance in December 2000.

(1258)    As a result, several of Kaiser's subcontractors asserted claims against Kaiser.

(1259)    To deal with such claims, Kaiser has been forced to delay closure of its office in Ostrava and incurred office operation costs. The amount of costs incurred by Kaiser totaled USD 428,737.00 in July 2005 and continues to accrue (Kaiser's Post-Hearing Brief of 28 October 2005, ¶¶401 ff., pp. 134-136 and 417, p. 139 and Exhibit E).

**10.2    Respondent's position**

(1260)    Nova Hut did not fail to make timely payments. Kaiser did not achieve Final Acceptance and, accordingly, was not entitled to payment of the USD 10mio fee or the USD 10,673,814.00 retainage.

(1261)    In any event, Article 6.3.1 of the Contract already provides a more than satisfactory mechanism to compensate Kaiser in the event of late payment by requiring Nova Hut to pay interest at LIBOR plus 8 percent. Since it already seeks payment of late payment interest on the USD 10mio fee and the USD 10,673,814.00 retainage based on Section 6.3 of the Phase 1 Contract, Kaiser is not entitled to the costs it claims, which, if they were awarded, would constitute double recovery.

(1262)     There is no evidence that Kaiser intended to close its office upon Final Acceptance.

(1263)     There is no evidence either that Kaiser incurred the extra costs for which it claims payment. All Kaiser has produced is a "damage summary" prepared by Kaiser and not supported by any evidence.

## 10.3    Discussion and decision

(1264)     Kaiser claims damages in the amount of USD 428,737.00 corresponding to office operation costs it allegedly incurred from April 2001 to August 2004. The amount of USD 428,737.00 is updated as of July 2005 and continues to accrue (Kaiser's Post-Hearing Brief of 28 October 2005, ¶¶401 ff., pp. 134-136 and 417, p. 139 and Exhibit E).

(1265)     Kaiser does not assert that, under the Phase 1 Contract, Nova Hut had a specific obligation to compensate Kaiser for its office operation costs and breached that obligation. Nor does Kaiser allege that Nova Hut represented that it would pay for such costs or otherwise induced Kaiser to believe that it should maintain an office on site.

(1266)     Therefore, the Arbitral Tribunal must determine whether Nova Hut otherwise breached the Phase 1 Contract and whether the damages sought by Kaiser were incurred as a result of such breach.

(1267)     Kaiser alleges that Nova Hut failed to pay Kaiser the USD 10mio fee due under the Contract and the USD 10,673,814.00 contract retainage. It is also alleged that Kaiser refused to acknowledge that Kaiser reached Final Acceptance.

(1268)     The Arbitral Tribunal has found above that Nova Hut was entitled to retain these amounts (see ¶(512) and ¶(516)). It has also reached the conclusion that Kaiser did not pass the 4WIPPT and, hence, that Kaiser did not achieve Final

Acceptance (see Section V). Therefore, Nova Hut was justified not to acknowledge Final Acceptance.

(1269)    Therefore, Nova Hut has not breached the Contract and Kaiser's claim shall be dismissed.

(1270)    As a side note, the Arbitral Tribunal observes that, assuming *arguendo* Nova Hut had indeed breached the Contract, Kaiser's claim would probably have to be dismissed: Kaiser did not establish the existence of a causal link between its damage (i.e., the additional costs incurred) and the alleged breach.

(1271)    Under Austrian law, only the act or event that is considered as the true cause of a specific result will be taken into account. An act or event will be deemed the cause of such result if, by human foresight, such result could be anticipated as likely to follow from this act or event. In the instant case, Kaiser does not demonstrate – and one fails to see how it could achieve such demonstration – that local office operation costs are likely to follow from the owner's failure to make payments it is required to make. Kaiser has not demonstrated that it was forced to maintain an office in Ostrava, and one could reasonably argue that, by so doing, it even breached a party's general duty to mitigate its damage.

(1272)    Therefore, the Arbitral Tribunal will dismiss Kaiser's claim and there is no need to consider Nova Hut's argument that Kaiser failed to evidence the quantum of its claim.

## 11.    Claimant's claim for additional legal and consulting fees and costs USD 1,879,610.00

### 11.1    Claimant's position

(1273)    Kaiser incurred legal and consulting fees and costs as a result of Nova Hut's breaches of its contractual obligations.

(1274)    These legal and consulting fees and costs include fees and costs incurred in connection with Kaiser's legal dispute with Nova Hut.

(1275)    These costs are damages that Kaiser may recover based on the general provisions of Austrian tort law and Article 1333(3) ABGB, which allow the creditor to recover all costs incurred for out-of-court action necessarily taken to collect outstanding debts.

(1276)    Kaiser's legal and consulting fees and costs amount to USD 1,879,610.00 as of July 2005 and continue to accrue (Kaiser's Post-Hearing Brief of 28 October 2005, ¶¶401 ff., pp. 134-136 and 418, p. 139 and Exhibit E).

**11.2    Respondent's position**

(1277)    Nova Hut did not breach the Contract by failing to make timely payment or refusing to acknowledge Final Acceptance.

(1278)    In addition, Kaiser has not provided any particulars as to what the consulting fees and costs it claims refer and has not produced any evidence to establish that it incurred the consulting fees and costs for which it claims payment, thereby making it impossible for Nova Hut to determine whether Kaiser incurred any consulting fees and costs.

**11.3    Discussion and decision**

(1279)    Kaiser's claim is based on the premise that Nova Hut failed to make payments it was required to and wrongfully refused to acknowledge that Kaiser had achieved Final Acceptance.

(1280)    As mentioned above (see VI.A.10), Nova Hut was entitled to retain the USD 10mio fee (see ¶¶(513) ff) and the USD 10,673,814.00 contract retainage (see ¶¶(503) ff). The Arbitral Tribunal also found that Kaiser did not pass the 4WIPPT and, hence, that it did not achieve Final Acceptance (see Section V). Therefore, Nova Hut was justified not to acknowledge Final Acceptance.

(1281)  Therefore, Nova Hut has not breached the Contract and Kaiser's claim shall be dismissed.

(1282)  Kaiser's claim being dismissed, there is no need to determine whether Kaiser proved the extent of the damage it alleges to have suffered. However, the Arbitral Tribunal notes in this respect that the claim would in any event have been dismissed for Kaiser's failure to allege the facts forming the basis of its claim with sufficient precision, thus making it impossible for Nova Hut and for the Arbitral Tribunal to assess its merits.

## 12.    Claimant's claim for unjust enrichment

### 12.1    Claimant's position

(1283)  Kaiser passed the 4WIPPT. Therefore, Nova Hut's termination may not be based on Kaiser's default and must be assessed as wrongful termination under Section 13.1.1 of the Contract covering all termination scenarios other than default.

(1284)  Pursuant to Section 13.1.1, Nova Hut must compensate Kaiser for work completed and for actual costs sustained, including reasonable profit. Nova Hut must also reimburse Kaiser for its demobilization costs.

(1285)  Section 13.3.1 of the Contract, which stipulates the consequences of a termination, provides that Kaiser must transfer and assign to Nova Hut ownership to all work that would pass to Nova Hut if the project were completed and for which Kaiser is entitled to be paid in the case of a termination under Section 13.1.1.

(1286)  The Contract thus provides for a synallagmatic obligation of matching payment with the passing of ownership. Section 1052 of the Austrian civil code, which provides that a person who insists upon delivery must either have performed his obligation or be ready to perform it, applies to contract for work.

(1287)    After its wrongful termination of the Contract, Nova Hut drew on the Letter of Credit, thereby unambiguously expressing it will not to compensate Kaiser for the work performed under the Contract. Accordingly, Kaiser was entitled to retain ownership and to withhold possession thereof until compensation had been effected.

(1288)    As Kaiser retains partial ownership of the minimill until it receives final payment, it has been and still is a proprietor of the minimill.

(1289)    Nevertheless, Nova Hut used the minimill for its own commercial benefit unjustifiably and without cause. In this respect, Nova Hut's assertion that it had been assigned the minimill under retention of title from Kaiser is baseless. As a matter of fact, a retention of title requires a specific agreement stipulating that the buyer shall be handed over the object of the sale whereas the seller retains title to the object until he receives payment.

(1290)    Kaiser is entitled to reclaim the advantage taken by Nova Hut, regardless of whether, apart from the depreciation of the minimill, it might not have suffered any loss or damage out of Nova Hut's unjustified use.

(1291)    The compensation fee to which Kaiser is entitled is decreased by depreciation.

## 12.2    Respondent's position

(1292)    Pursuant to the Austrian civil code, the owner has a claim for unjust enrichment only if its property was used for the benefit of another person without legal cause.

(1293)    Pursuant to the Phase 1 Contract, ownership to the work passes to Nova Hut upon termination of the Contract. As Nova Hut terminated the Contract, ownership of the plant or the project passed to it. Therefore, Nova Hut's use was not without cause and Kaiser may not have a claim for unjust enrichment.

(1294)    Kaiser has only a claim for unjust enrichment if it retained sole ownership. Indeed, if it retained partial ownership, Nova Hut's use was not without legal justification. Pursuant to the Phase 1 Contract, ownership to the work passed to Nova Hut to the extent Nova Hut did make a progress payment. Nova Hut paid more than USD 140mio and, therefore, is the owner of the plant comprising the equipment and services covered by such payment. Accordingly, Kaiser may not have remained sole proprietor as it alleges it.

(1295)    Assuming that Kaiser did retain ownership of the minimill, which it did not, it would only have a claim for unjust enrichment if Nova Hut used the minimill without cause. There is no provision in the Contract that prohibits Nova Hut from using the minimill. On the contrary, the Phase 1 Contract expresses the parties' intention to confer upon Nova Hut the right to use the minimill prior to Final Acceptance or termination without having to compensate Kaiser.

(1296)    Last, because Nova Hut terminated the Phase 1 Contract for Kaiser's default, Nova Hut has the right to use Kaiser's work products for which Nova Hut did not make a full associated payment under the Contract. Under the Phase 1 Contract, Kaiser was required to transfer to Nova Hut a minimill that meets the contractual requirements. Kaiser has failed to do so and is not entitled to benefit from its breach of contract. Also, the obligation to mitigate damages resulting from Kaiser's breach requires that Kaiser authorize Nova Hut to operate the minimill.

## 12.3    Discussion and decision

(1297)    On 2 May 2001, Nova Hut terminated the Contract based on Section 13.1.3 of the Contract (C182):

> According to Section 13.1.3 read in connection with Sections 13.3 and 14.6 of the Phase 1 Contract, the Phase 1 Contract shall expire if Supplier has failed to conduct a successful Four Week Integrated Performance Production Test by the end of the eighteen month after Preliminary Acceptance In this case, on notice by either Owner or Supplier, the Phase 1 Contract is terminated on Account of Suppliers' default.

(1298)    Section 14.6.6.6 of the Contract provides that "[i]f the Supplier has failed by the end of the eighteen (18th) month after Preliminary Acceptance to successfully

*280*

conduct a first or second Performance Test which achieves the required percentage of Rated Maximum Capacity and has failed to conduct a third Performance Test, then Supplier shall be deemed to have conducted a Performance Test which demonstrated an output of the Plant of less than ninety percent (90%) of maximum rated capacity, the Contract shall be terminated under Section 13.1.3 for the Supplier's default [...]".

(1299)   Section 13.1.3 of the Contract entitles Nova Hut to terminate the Contract if "Supplier conducts the first and second Performance Tests under Section 14.6 and they are not successfully passed and conducts the third Performance Test under Section 14.6 and the output of the Plant during such third Performance Test is less than ninety percent (90%) of maximum rated capacity or fails to conduct the third Performance Test, then, on notice by either the Owner or the Supplier to the other, this Contract shall be terminated on account of the Suppliers' default [...]".

(1300)   Kaiser failed to pass the 4WIPPT at its first attempt and did not successfully conduct a second or third 4WIPPT that achieved the required percentage of Rated Maximum Capacity. Therefore, Kaiser is deemed to have conducted a 4WIPPT which demonstrated an output of less than 90% of the maximum rated capacity of the Plant and Nova Hut validly terminated the Contract based on Section 13.1.3.

(1301)   Section 13.3.1 stipulates the consequences of a termination based on Section 13.1.3 of the Contract (emphasis added):

> 13.3.1   In any termination of the Contract under Article 13, **the Supplier shall transfer and assign to the Owner**:
>
> > .1   **ownership to all Work (including without limitation all Documents and Drawings) effected in connection with the Project which would pass to Owner were the Project to have been completed and to all parts of the Phase 1 Plant which have been completed** (and for which, in the case of a termination under Section 13.1.1. Supplier is entitled to be paid), including
>
> [...]

a281

(1302)    Upon termination of the Contract, ownership to all work passed to Nova Hut.

(1303)    Therefore, Kaiser's claim for unjust enrichment – which is based on Article 1041 of the Austrian civil code and presupposes that the owner's property was used without legal justification – must be dismissed.

(1304)    Kaiser reserved the right to specify the amount claimed in both its Statement of Claim of 10 November 2004 (¶13.11, p. 46) and its Reply of 7 April 2005 (¶208, p. 86). It did not, however, quantify its claim.

B.    RESPONDENT'S COUNTERCLAIMS

1.    **Respondent's counterclaims in connection with Kaiser's failure to achieve Final Acceptance and the termination of the Phase 1 Contract**

1.1    **Respondent's counterclaim for a USD 46 million production penalty**

1.1.1    **Respondent's position**

(1305)    Kaiser did not pass the 4WIPPT at its first attempt and did not successfully conduct a second or third 4WIPPT within eighteen months following Preliminary Acceptance. Therefore, Kaiser is deemed to have conducted a 4WIPPT that demonstrated an output of less than 90% of Maximum Rated Capacity and must pay Nova Hut the amount of liquidated damages set out in Appendix C to the Contract.

(1306)    Pursuant to Appendix C of the Contract, the penalty payable in the event that the output of the Plant is less than 90% of Maximum Rated Capacity is USD 46mio.

(1307)    Therefore, Kaiser must pay Nova Hut a penalty of USD 46mio.

1.1.2    **Claimant's position**

(1308)    Kaiser passed the 4WIPPT.

(1309)    Therefore, Nova Hut is not entitled to recover the USD 46mio penalty.

1.1.3    **Discussion and decision**

(1310)    Section 14.6.6.6 of the Contract reads as follows:

> 6.    If the Supplier has failed by the end of the eighteenth (18[th]) month after Preliminary Acceptance to successfully conduct a first or second Performance Test which achieves the required percentage of Rated Maximum Capacity and has failed to conduct a third Performance

Test, then Supplier shall be deemed to have conducted a Performance Test which demonstrated an output of the Plant of less than ninety percent (90%) of maximum rated capacity, the Contract shall be terminated under Section 13.1.3 for the Supplier's default, and Supplier will pay Owner the amount of liquidated damages set out in Appendix C to the Contract.

(1311)    Pursuant to the Table in section 5.2 of Appendix C to the Contract, the production penalty owed in case the output of the Plant is below 90% of the Maximum Rated Capacity is of USD 46mio. This is confirmed by Section 6, which provides that "[t]*he maximum penalty payable by the Supplier if the Contract is terminated for the default of the Supplier shall be forty six million dollars ($46,000,000)*".

(1312)    Therefore, the Arbitral Tribunal decides that Nova Hut is entitled to receive USD 46 mio from Kaiser.

## 1.2    Respondent's counterclaim for a USD 3.7 million penalty

### 1.2.1    Respondent's position

(1313)    Kaiser failed the HRCQTs that it undertook between 3 to 8 November 2000. The remaining three HRCQTs were not undertaken.

(1314)    Therefore, Kaiser owes Nova Hut penalties of USD 3.7 million, which Kaiser has admitted.

### 1.2.2    Claimant's position

(1315)    Kaiser owes a USD 3.7mio penalty to Nova Hut in connection with the HRCQTs.

### 1.2.3    Discussion and decision

(1316)    It is common ground between the parties that the production penalty assessed for Kaiser's failure to pass the HRCQTs amounts to USD 3.7mio.

*a7B4*

(1317)  Kaiser does not dispute that it owes Nova Hut a quality penalty of USD 3.7mio in connection with its failure to pass the HRCQTs (see Claimant's Statement of Claim of 10 November 2004, ¶2.29, p. 13):

> 2.29 As a result of passing the four-week integrated production performance test and submitting the documents noted above to Nova Hut, Kaiser has met the requirements for Final Acceptance as defined by Section 14.7 of the Phase 1 Contract, and is entitled to receive the following amounts from Nova Hut:
>
> (a) a net bonus in connection with the production performance test of $1.6 million ($5.3 million production bonus offset by $3.7 million penalties on some quality tests), together with interest which, as of June 30, 2004, amounted to $717,446.40;
>
> [...]

(1318)  Kaiser states that the production penalty is offset by the bonus it is entitled to for passing of the 4WIPPT.

(1319)  Kaiser is not entitled to a bonus and, accordingly, should be ordered to pay Kaiser the USD 3.7mio penalty in full.

(1320)  However, the Arbitral Tribunal notes that Nova Hut may not claim a penalty that exceeds USD 46 mio, a fact that both parties appear to have overlooked (Section 5.2 of Appendix C, Note (ii), emphasis added):

> Notes:
>
> (i) Any monies recovered by the Owner from Subcontractors under Sections 8.3.3 [guarantees posted by subcontractors] and 13.3 of the Contract shall be in addition to this limit, and this limit shall not be reduced on account of any such recovery by the Owner.
>
> (ii) Any penalties under 1. [Equalizing Furnace Penalty], 2. [Yield Penalty] and 4. [Phase 1 CCM Penalty] above (...) shall be payable in addition to the maximum production penalty, up to a maximum aggregate liability of forty six million dollars ($46,000,000) together with the maximum production penalty and Quality penalty. Subject to the provisions above with respect to when the Quality Penalty will be payable, **the Quality Penalty shall also be payable in addition to the maximum production penalty, up to a maximum liability aggregate liability [sic] of forty six million dollars ($46,000,000) together with the maximum production penalty and Equalizing Furnace, for Yield and for the Phase 1 CCM technology penalties.**

[...]

(1321)  Nova Hut is already entitled to USD 46mio for Kaiser's failure to pass the 4WIPPT.

(1322)  Therefore, Nova Hut's claim for a USD 3.7mio quality penalty shall be dismissed.

**1.3      Nova Hut already holds USD 35,621,378.66 and must give credit to Kaiser up to that amount.**

(1323)  Section 13.1.4 of the Contract reads as follows (emphasis added):

> 13.1.4  Supplier's maximum liability or penalties paid to Owner upon a termination under Section 13.1.2 or 13.1.3 for any and all claims, causes of action, complaints, costs, expenses, damages, penalties, etc. arising out of or in connection with the Contract or performance of the Work, whether based on contract, warranties, negligence (or other wrongful act) or strict liability shall be limited, in the case of termination under Section 13.1.2 to the maximum sum set out in Section 6 of Appendix C, **and in the case of termination under Section 13.1.3, to the payment of the amounts referred to in Section 14.6.6 read with Appendix C,** as applicable. [.. ].

(1324)  Kaiser owes Nova Hut an amount of USD 46mio.

(1325)  Nova Hut already holds an amount of USD 35,621,378.66, namely:

- the USD 10mio Contract Fee;

- the USD 11.1mio Performance Letter of Credit; and

- the USD 11,021,378.66 retention amount; and

- the USD 3.5mio warranty reserve.

(1326)  Pursuant to Section 13.1.5 of the Contract, "[i]f the security provided by Supplier to Owner and described in Section 8.3 is inadequate to meet any liquidated

*damages or liability imposed in or for which Supplier is liable under, this Section 13.1 following a termination under Section 13.1.2 or 13.1.3, then Supplier shall promptly pay the shortfall to Owner".*

(1327)    Therefore, the Arbitral Tribunal shall order that Kaiser must pay Nova Hut the amount of USD 10,378,621.34 (46,000,000 less 35,621,378.66).

### 1.4    Nova Hut's interest claim

### 1.4.1    Respondent's position

(1328)    In its Statement of Defense of 24 January 2005 and Rejoinder of 10 June 2005, Nova Hut sought payment of principal amounts and requested an award "*of interest on the aforesaid sums*".

(1329)    In its Post-Hearing Brief of 28 October 2005, Nova Hut stated that neither party had claimed compound interest and, as a result, that the parties were only entitled to simple interest. However, Nova Hut reserved the right to claim compound interest "*in the event that Kaiser requests compound interest in its post-hearing brief*" (see ¶115, p. 44).

(1330)    In its Reply Post-Hearing Brief of 14 November 2005, Nova Hut included a request for compound interest in its relief sought (see "CONCLUSION", p. 46).

(1331)    At no point throughout these proceedings has Nova Hut specified the applicable interest rate or the date from and until which interest was due.

### 1.4.2    Claimant's position

(1332)    Kaiser considers that Nova Hut should be barred from claiming compound interest because Nova Hut never sought accumulated interest or specified any method for claiming simple interest, as required under Austrian law.

(1333)  Moreover, even if Nova Hut's latest submission can be considered a request for compound interest, this too should be denied because no dates or method of calculation of accumulated interest have been provided (Kaiser's Post-Hearing Brief of 14 November 2005, ¶109, p. 42).

### 1.4.3   Discussion and decision

(1334)  Nova Hut included a valid claim for compound interest in its Reply Post-Hearing Brief.

(1335)  While it is true that Nova Hut did not specify the *dies a quo* and *dies ad quem* of its interest claim, nor the applicable interest rates, these are easily determinable.

(1336)  Section 14.6.6.6 of the Contract provides "[i]*f the Supplier has failed by the end of the eighteenth (18th) month after Preliminary Acceptance to successfully conduct a first or second Performance Test which achieves the required percentage of Rated Maximum Capacity and has failed to conduct a third Performance Test, then Supplier shall be deemed to have conducted a Performance Test which demonstrated an output of the Plant of less than ninety percent (90%) of maximum rated capacity, the Contract shall be terminated under Section 13.1.3 for the Supplier's default, and Supplier will pay Owner the amount of liquidated damages set out in Appendix C to the Contract*".

(1337)  If follows from the above that the amounts claimed by Nova Hut became due upon termination of the Phase 1 Contract, i.e. on 2 May 2001. Pursuant to Sections 6.3.1 and 6.5.3.5(c) of the Phase 1 Contract, late payment contractual interest on these amounts started to accrue 60 days thereafter, i.e., from 1 July 2001. Compound interest accrued from the date Nova Hut's Answer to the Request for Arbitration and Counterclaim was served to Kaiser, i.e. from 22 March 2004.

(1338)  Therefore, the Arbitral Tribunal shall order that Kaiser pay Nova Hut USD 10,378,621.34, plus simple contractual interest at the rate of 8% above

LIBOR for one year US dollars deposits from 1 July 2001 until payment, plus compound interest on such interest, at the rate of 4% per annum from 22 March 2004 until payment.

2.      **Respondent's counterclaim for unpaid PCNs (USD 779,010.50)**[7]

2.1     **Preliminary comment**

(1339)    In its Statement of Defence of 24 January 2005, Nova Hut alleges that it is "due a credit of $ 9,426.00, as acknowledged by Kaiser in its Statement of Claim, plus $822,825.00 resulting from PCNs issued by Nova Hut and wrongfully rejected by Kaiser" (see Nova Hut's Statement of Defence of 24 January 2005, ¶137, p. 51). It then refers to the testimony of Mr. Jiri Obsil (RWS3) who, at ¶¶46 to 73 of his witness statement, gives further particulars of these PCNs.

(1340)    However, as correctly pointed out by Kaiser in its Reply of 7 April 2005, Nova Hut does not make separate counterclaims for these alleged proposed change notices in its Statement of Defence (see Nova Hut's Statement of Defence of 24 January 2005, pp. 65-66 ("CONCLUSION")).

(1341)    Thus, it is only in its Rejoinder of 10 June 2005 that Nova Hut expressly counterclaimed payment of USD 709,943.00 for PCNs rejected by Kaiser (see Nova Hut's Rejoinder of 10 June 2005, p. 67 ("CONCLUSION")).

(1342)    The issue therefore arises whether Nova Hut should be permitted to add these counterclaims at such stage of briefing or whether, as Kaiser alleges, "*Nova Hut's assertion of these counterclaims violates the Tribunal's schedule for briefing*" and, accordingly, "*the Tribunal should reject these claims as untimely*" (Kaiser's Rejoinder of 28 June 2005, ¶78, p. 28).

---

[7]    In his first witness statement, filed with Respondent's Statement of Defence and Counterclaim, Jiri Obsil quantified Nova Hut's claim at USD 822,855.00 (see RW3, ¶48, p. 12). Nova Hut sought payment of USD 709,943.00 in connection with unpaid PCNs in its Rejoinder on the Claim and Reply on the Counterclaim and in its Post-Hearing Brief of 28 October 2005. In its last relief sought, set out in its Post-Hearing Brief of 14 November 2005, Nova Hut claimed an amount of USD 704,808.00, namely USD 695,382.00 in unpaid PCNs and USD 9,426.00 in credit due by Kaiser under PCNs No. 98 and 99

(1343)    Article 19 of the ICC Rules provides that "[a]*fter the Terms of Reference have been signed or approved by the Court, no party shall make new claims or counterclaims which fall outside the limits of the Terms of Reference unless it has been authorized to do so by the Arbitral Tribunal, which shall consider the nature of such new claims or counterclaims, the stage of the arbitration and other relevant circumstances*".

(1344)    One may wonder whether Nova Hut's counterclaim falls outside the limits of the Terms of Reference, although the answer would probably be in the negative. As a matter of fact, Nova Hut's claim for unpaid PCNs is closely connected with Kaiser's claim for unpaid PCNs.

(1345)    This question may however be left open.

(1346)    Article 19 of the ICC Rules confers upon the Arbitral Tribunal the power to authorize the introduction of new claims after the signing of the Terms of Reference in certain circumstances. The Arbitral Tribunal, which retains broad discretion in this respect, must consider "*the nature of such new claims or counterclaims, the stage of the arbitration and other relevant circumstances*".

(1347)    Nova Hut already stated that it was due USD 822,825.00 resulting from PCNs wrongfully rejected by Kaiser in its Statement of Defense of 24 January 2005, i.e., in its very first main written submission. Full particulars regarding these PCNs and the amount claimed were given in the witness statement of Mr. Jiri Obsil filed with this submission, to which it was expressly referring to.

(1348)    In its Reply of 7 April 2005, which was Kaiser's first main submission on the counterclaims, Kaiser addressed Nova Hut's "counterclaim" for rejected PCNs over 6 pages (see Kaiser's Reply of 7 April 2005, ¶154 to pp. 63 to 69). Mr. Franck Bury addressed these PCNs in his second witness statement (CWS8). Kaiser also addressed Nova Hut's claims for PCNs in its Rejoinder of 28 June 2005 (see Kaiser's Rejoinder of 28 June 2005, ¶¶78-80, pp. 28-29).

(1349)    The Arbitral Tribunal is satisfied that Kaiser has had ample opportunity to state its case in respect of Nova Hut's counterclaim for unpaid PCNs and did not suffer any prejudice from the fact that this counterclaim was not mentioned in the Terms of Reference and only formulated as a counterclaim in Nova Hut's Rejoinder of 10 June 2005.

(1350)    What the Arbitral Tribunal finds more questionable is for a party to incorporate the statements of a witness by reference in its written submissions instead of alleging the facts and legal arguments forming the basis of its claims in its briefs. This being so, Kaiser did not oppose these claims on this ground and the Arbitral Tribunal finds that there is no valid reason not to consider Nova Hut's counterclaim. Accordingly, it will now assess the merits of each PCN.

## 2.2     PCN No. 043: foundations columns (USD 83,628.00)

### 2.2.1     Respondent's position

(1351)    In his first witness statement (RWS3¶49), Jiri Obsil submitted that Nova Hut was owed USD 83,628.00 for unfinished work on foundation columns.

(1352)    In his second witness statement (RWS5¶37), Jiri Obsil withdrew the claim regarding PCN No. 43, stating that "[b]ased on the fact that Billing No. 92 with [sic] included credit for PCN No. 43 was actually accepted and reimbursed by Nova Hut, I agree that this issue has been resolved".

### 2.2.2     Claimant's position

(1353)    Nova Hut concedes that this claim should be dismissed.

(1354)    Accordingly, by agreement of the parties, the Arbitral Tribunal should dismiss this claim.

### 2.2.3     Discussion and decision

(1355)    Nova Hut acknowledges that Kaiser does not owe it any amount under PCN No. 043.

(1356)    Therefore, the Arbitral Tribunal shall dismiss this claim.

## 2.3    PCN No. 202: ONAF cooling (USD 6,090.00)

### 2.3.1    Respondent's position

(1357)    Pursuant to Sections 3.6.6 and 3.6.7 of the Scope of Supply, Kaiser agreed to supply an air forced cooling system for the 6/0, 42kV, 1 MVA transformers. The forced cooling for the transformers was to be provided only if required.

(1358)    The installation of an air forced cooling system on 400V transformers became necessary when Nova Hut provided a HVAC unit with nominal voltage of 400V instead of 690V as designed.

(1359)    However, Kaiser wrongfully rejected PCN No. 202 during the PCN meeting held on 11 September 2000, claiming that air forced cooling requirement was conditional.

(1360)    Nova Hut is due compensation for three air forced cooling packages for 6/0, 42kV, 1 MVA transformers, i.e., USD 6,090.00.

### 2.3.2    Claimant's position

(1361)    Pursuant to Sections 3.6.6 and 3.6.7 of the Scope of Supply, the forced cooling for the transformers in the roll shop was to be provided only if required.

(1362)    Nova Hut provides no engineering data or evidence that forced ventilation was necessary. In fact, ventilation was not necessary as the transformers provided by Kaiser did not require cooling. The engineer recommended that Kaiser purchase a 400V transformer for the Nova Hut grinder rather than provide forced cooling.

In fact, Nova Hut did not seek reimbursement for the cooling unit until after Kaiser sought reimbursement under PCN No. 068 for the cost of the 400V transformer.

(1363) Additionally, Nova Hut provides no documentation to support the amount of its alleged damages.

(1364) Therefore, this claim should be denied.

### 2.3.3    Discussion and decision

(1365) Section 3.6.7 of the Scope of Supply provides that the transformers must only be equipped with forced air cooling (fan cooling) "if required".

(1366) The record shows that the installation of a forced air cooling system was not required.

(1367) In a letter of 5 November 1999, Nova Hut stated its position about PCN No. 202 as follows (C210, p. 5):

> We agree the Scope of Supply specification of ONAN/ONAF cooling is conditional. We agree the requirement of ONAN/ONAF cooling for 690V Xfmrs is questionable. We insist the requirement of ONAN/ONAF cooling for 400V Xfmrs is justified. If respected it would not be necessary to install additional load center and to issue the corresponding change order # 068.

(1368) Nova Hut's witness Jiri Obsil has also testified that "[t]*he necessity to install forced ventilation on 400 V transformers obviously arose when Kaiser provided HVAC unit with nominal voltage of 400 V instead of 690 V as designed and when Nova Hut provided grinders with the same voltage problems*" (CWS5¶38, p. 10).

(1369) It thus appears that Nova Hut requested that Kaiser install additional cooling exclusively to remedy the fact that some items installed by Nova Hut required 400V instead of 690V power. This is certainly not a situation covered by the "if required" in the Scope of Supply. All the more so that Kaiser had supplied a 400V transformer at the request of Nova Hut to remedy the voltage issue.

293

(1370)   Therefore, the Arbitral Tribunal will reject Nova Hut's claim.

**2.4    PCN No. 205: 22 & 6 kV switchgear configuration discrepancy (USD 35,617.00)**

**2.4.1   Respondent's position**

(1371)   Pursuant to Sections 3.6.4 and 3.6.5 of the Scope of Supply, Kaiser had to supply, with respect to the 22kV switch gear line-ups, 18 fully equipped panels, and, with respect to the 6kV switch gear line-ups, 50 fully equipped panels.

(1372)   Kaiser only delivered 11 fully equipped panels for the 22kV switch gear line-ups and 45 fully equipped panels for the 6kV switch gear line-ups.

(1373)   During the PCN meeting held on 11 September 2000, Kaiser claimed to have supplied the required number of fully equipped panels for the 22kV switch gear line-ups, which Nova Hut disputed by letter dated 25 September 2000. On 29 September 2000, Kaiser rejected PCN No. 205.

(1374)   Based on the Nova Hut Zabreh Company switch gear quotation, the undelivered equipment is worth USD 35,617.00, an amount that Nova Hut is owed.

**2.4.2   Claimant's position**

(1375)   Nova Hut's claim ignores an agreement between the parties that Kaiser provide equipment for the project's electrical needs rather than provide only the equipment which was specified in the scope of supply.

(1376)   Kaiser provided all of the project's electrical requirements, which was more than was required in the scope of supply. For instance, Kaiser procured 22kV and 6kV switchgear from ABB that would not have been required under the Contract, but which Nova Hut needed.

(1377)  Moreover, Nova Hut has provided no documents to support its claim. It also fails to supply any documents to back up the amount of its alleged damages.

(1378)  Therefore, this claim should be rejected.

### 2.4.3    Discussion and decision

(1379)  Nova Hut's claim is based on an alleged discrepancy between the 22kV and the 6kV switchgears configuration specified in the Scope of Supply and the equipment actually supplied by Kaiser.

(1380)  As regards the 22kV panels, Franck Bury states that Kaiser supplied 18 panels as required (CWS8¶24, p. 11). However, Nova Hut's specific allegation is that out of these 18 22kV panels, only 11 were fully equipped (RWS3¶¶53-54, p. 13). As regards the 6kV panels, Franck Bury states that Kaiser delivered 56 sets (CWS8¶24, p. 11), whereas Nova Hut's allegation is that out of the 6kV panels delivered by Kaiser, only 45 were fully equipped (RWS3¶¶53-54, p. 13).

(1381)  Moreover, Jiri Obsil's testimony casts doubt on Kaiser's allegation that it supplied 56 6kV panels, i.e. more than the 50 it was required to supply. According to Nova Hut's witness, "*Mr. Bury's statement that Kaiser supplied 56 of 6kV panels etc. is wrong and confusing. Mr. Bury failed to distinguish between the Power Distribution Switchgear (PC 5), i.e. 22kV Switchgear (PS 05.03) and 6kV Switchgear (PS 05.04), which relate to Nova Hut claim, and corresponding auxiliary MV panels within the scope of Rolling Mill Process Distribution (PS 03.08), which are completely irrelevant and unrelated to the dispute*" (RWS5¶39, p. 10).

(1382)  Last, the purchase orders issued by Kaiser to its supplier Holec also evidences the fact that Kaiser did not supply the equipment it was required to supply (R68, R69, R70 and R73). According to Jiri Obsil, "*[o]ne can easily compare the Scope of Delivery under the above referenced purchase orders and change orders with*

*the specifications provided in the Scope of Supply. The difference corresponds to Kaiser's deficiency and Nova Hut's claim*" (RWS5¶41, p. 11).

(1383)    In light of the above, the Arbitral Tribunal finds that Kaiser did not supply the required equipment.

(1384)    It remains to be determined whether "[t]*he parties agreed that Kaiser would provide what was needed rather than what was called for in the scope of supply*" (Kaiser's Post-Hearing Brief of 28 October 2005, ¶331, p. 111).

(1385)    Franck Bury testified that such an agreement was entered into in his third witness statement submitted with Kaiser's Rejoinder of 28 June 2005 (CWS13¶2, p. 2). As pointed out by Kaiser in its Post-Hearing Brief of 28 October 2005, Nova Hut has not denied the existence of such an agreement and has provided no witnesses or documents to contradict this agreement (¶331, p. 111).

(1386)    The fact that Nova Hut did not dispute Kaiser's allegation that the parties entered into an agreement regarding the equipment to be supplied is a strong indication that such an agreement was indeed entered into. However, it does not bind the Arbitral Tribunal, which, in specific circumstances, may reach another conclusion.

(1387)    The Arbitral Tribunal finds that specific circumstances exist in the present case. First, contrary to what Franck Bury stated in his first witness statement, Kaiser did not supply the required sets of switchgear. Second, whereas the conclusion of an agreement is the thrust of Kaiser's defence for this claim, the witness only mentions such agreement in his third witness statement (CWS13¶2, p. 2). In his second witness statement, Franck Bury does not even mention the existence of an agreement and merely states that the required sets were supplied (CWS8¶24, p. 11). Third, the only exhibit cited by Kaiser in support of the allegation that an agreement was entered into does not make any reference to an agreement (C241, Minutes of a 29 April 1998 meeting with representatives of Kaiser, Nova Hut, Metalconsult, Holec/ETS and Elcom). Fourth, there is no reference either to an agreement in any of the letters exchanged by the parties to state their

respective positions regarding unresolved PCNs (see, e.g., Exhibits R35 (Nova Hut), R43 (Kaiser), R44 (Kaiser), R45 (Nova Hut), and R46 (Kaiser)).

(1388)   Therefore, the Arbitral Tribunal finds that Kaiser did not show that the parties agreed that Kaiser "*would provide what was needed rather than what was called for in the scope of supply*".

(1389)   Kaiser objects that Nova Hut provides no basis for its alleged damages.

(1390)   In his first witness statement, Jiri Obsil states that Nova Hut is due USD 35,617.00 "*based on the Nova Hut Zabreh Company switch gear quotation*" (RWS3¶56, p. 14). As pointed out by Kaiser, the quotation cited by Jiri Obsil has *not been produced by Nova Hut. In his second witness statement, Jiri Obsil* states that Nova Hut is due USD 6,090.00 (RWS5¶42, p. 11). This is obviously a mistake since USD 6,090.00 is the amount claimed by Nova Hut under PCN No. 202.

(1391)   It follows from the above that Nova Hut has not established the amount it was owed for failure by Kaiser to supply the equipment required by the Scope of Supply. Since Kaiser has disputed the amount of damages claimed by Nova Hut, the Arbitral Tribunal cannot but reject Nova Hut's claim.

## 2.5    PCN No. 207: VVVF drives for descale pumps (USD 359,259.00)

### 2.5.1    Respondent's position

(1392)   The Scope of Supply required Kaiser to provide a single speed motor for the *descale pumps.*

(1393)   Nova Hut directed Kaiser to modify the single speed motor called for in the Scope of Supply to make it a variable frequency drive.

(1394)    Kaiser made the requested change and Nova Hut approved PCN No. 039 for the delivery of a variable frequency drive for descale pumps and paid Kaiser USD 440,000.00 as per a protocol of 4 November 1998.

(1395)    Nova Hut paid the full amount of USD 440,000.00 under PCN No. 39 while the devices originally called for in the Scope of Supply were not delivered by Kaiser. Nova Hut is therefore due a credit for these undelivered items. The amount of USD 359,259.00 for which Nova Hut is due a credit is based on ABB quotation.

(1396)    Contrary to Kaiser's allegations, the ABB study is relevant to support the amount of Nova Hut's alleged damages.

### 2.5.2    Claimant's position

(1397)    Nova Hut asked Kaiser to modify the design of the descale pumps and supply a variable frequency drive. A variable frequency drive can operate at different speeds, thus using more or less electricity as needed. Kaiser estimated that the change would save Nova Hut about USD 330,000.00 in electricity per year.

(1398)    Kaiser's subcontractors modified the drive and issued PCN No. 039 in the amount of USD 440,000.00. Nova Hut accepted PCN No. 039 on 4 November 1998.

(1399)    Nova Hut apparently now claims that it is due a refund of the costs of installing the single-speed drive that was called for in the scope of supply as the original facility allowing for non-controlled drive was not delivered.

(1400)    Nova Hut's claim has no basis. The single-speed operation called in the scope of supply was provided and then was modified at Nova Hut's request. Nova Hut is not paying twice. It is paying for the motor it ordered and the modification it directed. Nova Hut did not object to PCN No. 039 covering the cost of the modification.

(1401)   Additionally, Nova Hut has no relevant evidence to support its claim for the alleged damage. First, the single speed motor was used as the base for the variable speed operation, and therefore Kaiser had no obligation to supply a second motor. Second, Nova Hut supports its alleged damages with an ABB study that purported to estimate the cost of the power supply motors if the variable frequency drive was not used. Nova Hut then compares the ABB estimate to the cost for the variable frequency drive modification provided by Kaiser and declares that the difference should be a refund. ABB's price quotation however is not equivalent to Kaiser's work. Additionally, the ABB estimate is inaccurate because it includes the cost for vacuum contactors and a starting transformer that were not required in the scope of supply.

### 2.5.3   Discussion and decision

(1402)   It is common ground between the parties that Nova Hut directed Kaiser to modify the single speed motor for the descale pumps provided in the Scope of Supply to make it a variable frequency drive. It is also undisputed that Kaiser made the requested change; that Nova Hut approved PCN No. 039 for the delivery of a variable frequency drive for descale pumps; and that Nova Hut paid Kaiser USD 440,000.00 in this respect.

(1403)   The thrust of Nova Hut's claim is, however, that Kaiser did not deliver the devices originally called for in the Scope of Supply and for which Nova Hut paid as part of the contract price. In other words, if Nova Hut is not reimbursed USD 359,259.00, Kaiser will have been paid twice (Jiri Obsil, Tr. 615:24-25 and 616:1-15):

> MR OBSIL: Let me clarify that. Initially it was proposed to get descaler pumps with non-regulated engines, and based on Nova Hut, Tippins and Kaiser negotiations it was agreed to purchase a regulated motor or engine which has some electricity savings implications. This PCN was implemented and paid for in due manner.
>
> The subject matter of 207 PCN is the fact that the original facility allowing for non-controlled drive was not delivered apparently. That is the principle behind PCN 207. Within the scope of supply and within the contractual purchase price, non-controlled drives were included. In addition to that, there was a payment for PCN for controlled drives and that was why Nova Hut issued PCN 207 as a payment which was, in fact, paid twice.

(1404)  In its Post-Hearing Brief of 28 October 2005, Kaiser contended that it provided the single-speed operation called for in the Scope of Supply, which was then modified at Nova Hut's request. PCN No. 039, it is alleged, covered the cost of the modification (¶336, p. 113).

(1405)  In its Reply Post-Hearing Brief of 14 November 2005, Kaiser does not claim anymore to have delivered the items called for in the Scope of Supply. However, it argues that PCN No. 039 covered the extra work requested by Nova Hut and was negotiated and paid for (¶90, p. 34).

(1406)  This noticeable change in Kaiser's argumentation is apparently the consequence of Jiri Obsil's testimony at the hearing that the original devices were not delivered (Tr. 616:7-8).

(1407)  In both its Post-Hearing Brief and Reply Post-Hearing Briefs, Kaiser alleges that the ABB price estimate relied upon by Nova Hut to quantify its claim is not a reliable basis because it includes items that were not called for in the Scope of Supply, and because ABB estimated the cost of attaching the single-speed motor in a way other than that specified in the Scope of Supply.

(1408)  Kaiser's last argument that the variable speed operation saved Nova Hut about USD 330,000.00 per year on electricity costs is completely irrelevant.

(1409)  Having reviewed the above submissions, the Arbitral Tribunal finds that it is very likely - without being fully certain - that Kaiser did not provide the single-speed motor called for in the Scope of Supply, the price of which was included in the contract price (Jiri Obsil says that the original device was *apparently* not delivered). Thus, one may not exclude that Kaiser, which was paid an extra USD 440,000.00 by Nova Hut to provide a variable frequency drive, was, to a certain extent, paid twice for the same thing.

(1410)  It remains that Nova Hut, which affirms that it does not seek to reopen PCN No. 039, willingly agreed to pay USD 440,000.00 to Kaiser for a variable speed

operation. If Nova Hut considered that part of the cost to provide such variable speed operation was included in the contract price, which provided for a single-speed drive, it should have said so timely and refused to approve PCN No. 039. In this respect, Nova Hut does not allege that Kaiser exerted pressure on it to obtain such approval or that it was otherwise deceived by Kaiser.

(1411)    Therefore, the Arbitral Tribunal shall reject Nova Hut's claim.


## 2.6    PCN No. 209: Ansaldo motors (USD 20,321.00)

### 2.6.1    Respondent's position

(1412)    Pursuant to Section 3.2.7.1 of the Scope of Supply, Kaiser was to supply bearings with a thrust capacity of 500kN and peak 2000kN for the mill motors bearings.

(1413)    Kaiser only supplied bearings having a 356kN continuous thrust capacity and peak 1500kN. Based on Ansaldo's bid of 7 July 1999, according to which the price of equipment in conformity with the Scope of Supply is USD 220,969.00, the difference of price between the equipment delivered and the equipment in conformity with the Scope of Supply is USD 20,321.00.[8] The quotation relied upon by Kaiser has not the same basis and, hence, may not be used for comparison purpose.

(1414)    At the PCN meeting of 11 September 2000, Nova Hut agreed to waive PCN No. 209 provided that Kaiser formally state that the supplied equipment would have no impact on the service life of the mill. Eventually, Nova Hut did not waive its claim for the difference in price.


### 2.6.2    Claimant's position

---

[8]    In his first witness statement (RWS3¶63), Jiri Obsil indicated that Nova Hut was due USD 33,145.00. At the hearing, he stated that the amount of damages should be USD 20,321.00. Nova Hut claims the same USD 20,321.00 amount in its Reply Post-Hearing Brief of 14 November 2005 (¶98, p. 34).

301

(1415)    Nova Hut claims USD 31,236.00 for the difference between the cost of Ansaldo motor bearings and the bearings required in the Scope of Supply.

(1416)    Nova Hut misrepresents the difference in the bearings, which was insignificant. Kaiser informed Nova Hut that there was no price difference in a letter in February 2000, which attached the price estimates for the two items. The letter and attached quotations show that the difference in price was about USD 208.00.

(1417)    Nova Hut has no support for the amount of its alleged damages. No explanation is provided for the estimate that Nova Hut is due 15% of the price specified by Ansaldo.

### 2.6.3    Discussion and decision

(1418)    Kaiser does not dispute that the specifications of the bearings it delivered did not comport with the contractual specifications. Nor does Kaiser dispute the fact that, in principle, Nova Hut may recoup the difference in price between the bearings supplied and those called for by the Scope of Supply (C212):

> We refer to the claim from Nova Hut for a credit of $220,969 based on a quotation from Ansaldo for the supply of 500/2000 kN thrust bearings.
> In order to resolve this matter ICF KN carried out a cost comparison of the 356/1500 kN bearing actually supplied versus the cost indicated in the Ansaldo quotation for the 500/2000 kN bearing.
> The results of this comparison are attached, and since this indicates the prices are in fact very similar, we request that Nova Hut review the position in line with the statements made by Nova Hut in November 1997, that the 356/1500 kN bearings supplied by Ansaldo are technically acceptable.

(1419)    It thus appears that the only disagreement between the parties is the actual difference in price between the equipment delivered and the one mandated by the Scope of Supply.

(1420)    In his first witness statement, Jiri Obsil states that the difference in price is USD 33,145.00, which he explains corresponds to 15% of the price quote by Ansaldo (RWS3¶62, p. 15). These figures are difficult to reconcile with Ansaldo's quotation of 7 July 1999 (R30) for a total amount of EUR 234,300.00. As a matter of fact, EUR 234,000.00 corresponds to USD 239'806.00 on 7 July 1999 (date of

the quotation) or USD 231'177.00 on 14 February 2000 (the date of the letter). 15% of either of these amounts is not equal to USD 33,145.00. It thus appears that Jiri Obsil is actually referring to the USD 220,969.00 amount referred to in Kaiser's letter of 14 February 2000 (C212).

(1421) In his second witness statement, Jiri Obsil states that the credit due to Nova Hut should be USD 20,321.00, i.e. 15% of EUR 142,200.00 (RWS5¶¶46-47, p. 14).

(1422) Kaiser objects that there is no difference between the price of the equipment installed and the price of the equipment quoted by Ansaldo. In support of its stance, Kaiser produces a letter from a supplier, Michell Bearings, quoting a price of GBP 23,002.00 for one thrust bearing. Kaiser points out that, applying the same exchange rate, GBP 23,002.00 is equal to EUR 37,447.00 whereas EUR 35,500.00, as quoted by Ansaldo, is equal to GBP 22,888.00.

(1423) As pointed out by Jiri Obsil, it is very unlikely that the bearings of lower thrust capacity supplied by Kaiser be more expensive than others of a higher thrust capacity (RWS5¶45, p. 13). The Arbitral Tribunal also notes that Kaiser did not submit the original quotation it received from its supplier or purchase orders it issued to such supplier, as it has done for other PCNs. Thus, Michell Bearing's quotation - which is dated 9 February 2000, whereas PCN No. 209 already existed in November 1999 - has seemingly been requested by Kaiser for the purpose of making a comparison. It is thus likely that this quotation does not correspond to the actual price paid by Kaiser for the bearings.

(1424) Notwithstanding the above, the Arbitral Tribunal must find against Nova Hut on this claim. The burden to establish the difference in price between the equipment supplied and the equipment called for in the Scope of Supply lies with Nova Hut. In this respect, Jiri Obsil's affirmation that a price difference of 15% of Ansaldo's quotation is reasonable, while certainly made in good faith, is not sufficient evidence. All the more so that Jiri Obsil changed his testimony in the course of the proceedings and that Nova Hut, while it was entitled to do so by the

applicable procedural rules, did not request the production of invoices issued by the bearings' supplier.

(1425) Based on the above, the Arbitral Tribunal shall dismiss Nova Hut's claim.

## 2.7    PCN No. 216: Internal piping water traps (USD 1,982.00)

### 2.7.1    Respondent's position

(1426) To conform to the applicable Czech standards, Kaiser was required to install 16 water traps in the internal piping.

(1427) However, the initially approved design drawings for the internal piping were modified by the removal of 16 water traps including insulation and tempering.

(1428) Nova Hut is due compensation for the 16 undelivered water traps, i.e. USD 1,982.00.

### 2.7.2    Claimant's position

(1429) Neither the regulation cited by Nova Hut nor the Scope of Supply require water traps. In addition, the Basic Design Drawings were modified during the development stages cancelling 16 water traps. Furthermore, Kaiser did not approve the Basic design Drawings, which did not become part of the Contract.

(1430) Additionally, Nova Hut provides no documents to support its alleged damages of USD 31,236.00. It initially claimed USD 31,236.00. Then Jiri Obsil stated that such a price impact was exaggerated. Nova Hut then sought to revise this claim to USD 1,982.00, which is the cost as estimated by Kaiser.

(1431) Therefore, Nova Hut's claim should be denied.

### 2.7.3    Discussion and decision

304

(1432)    Nova Hut has failed to establish that the standard CSN 386420 require the installation of water traps, even though Kaiser expressly disputed the allegation that this regulation mandated the installation of water traps.

(1433)    Moreover, Nova Hut has failed to prove the amount of damages it seeks. Having contended in his first witness statement that Nova Hut is owed USD 31,236.00 (RWS3¶63, p. 16), Jiri Obsil testifies as follows in his second witness statement (RWS5¶48):

> I agree that the original price impact was exaggerated and can accept Kaiser's estimate of 1 982 USD. The referenced drawings were prepared in compliance with BDD and can therefore be considered as part of Phase 1 Contract.

(1434)    No explanation whatsoever is given to this drastic change.

(1435)    On its side, Kaiser cites to "*a quotation from subcontractor MGT who quoted the price for 16 traps at $1,982 during the design phase*" (CWS8¶28, p. 14). This is no reliable evidence either: the CZK 53,500.00 figure referred to by Kaiser is for 4 (and not 16) "*Dewatering Tanks for Service drops*" (and not "water traps").

(1436)    Therefore, Nova Hut's claim must be dismissed.

## 2.8    PCN No. 220: Carbon dioxide fire extinguishing system (USD 52,799.00)

### 2.8.1    Respondent's position

(1437)    The Phase 1 Contract required Kaiser to provide an automatic carbon dioxide fire extinguishing system for the rolling mill operating pulpit, furnace pulpit and upcoiler control pulpit.

(1438)    Kaiser failed to supply the fire extinguishing system for pulpits K4, K5 and K6.

(1439)    Kaiser argues that it satisfied its obligations to Nova Hut by providing hand-held fire extinguishers that met the Czech fire code. This is a misrepresentation of

Nova Hut's claim, which is based on Section 6.2.2 of the Scope of Supply, and not on Section 6.3.

(1440)   Mr. Franck Bury's contention that Nova Hut did not want an automatic fire extinguisher system for reasons of safety is incorrect. The letter of 30 November 1999 cited by Kaiser does not support such contention.

(1441)   Mr. Franck Bury's allegations are, in any event, irrelevant. The price of the automatic fire extinguisher system was part of the Phase 1 purchase price. Accordingly, Nova Hut should not pay for an item that Kaiser did not deliver.

(1442)   The price of the undelivered equipment for three pulpits is USD 52,799.00, an amount that Nova Hut is due.

### 2.8.2    Claimant's position

(1443)   Kaiser satisfied its obligations to Nova Hut by providing hand-held fire extinguishers that met the Czech fire code at a cost of USD 2,195.00.

(1444)   Additionally, Nova Hut agreed that Kaiser should not supply the automatic carbon dioxide fire extinguishing system because of the intensive maintenance required of such a system.

(1445)   Last, Nova Hut's only support for its alleged damages is a quote from SHZ that expressly states that an exact price has to be determined later based on delivery and services. Also, Nova Hut's alleged damages do not take into consideration the USD 2,195.00 that Kaiser spent on fire extinguishers.

(1446)   Accordingly, this claim should be denied.

### 2.8.3    Discussion and decision

(1447)  Nova Hut contends that Kaiser failed to provide the automatic fire extinguishing system that the Scope of Supply required it to provide and seeks payment of an amount of USD 52,799.00, allegedly corresponding to the price of automatic extinguishing equipment for three pulpits.

(1448)  Kaiser does not dispute that it did not provide an automatic fire extinguishing system. However, it argues that it satisfied its obligations by providing handheld fire extinguishers meeting the Czech fire code. Kaiser also argues that Nova Hut agreed that Kaiser should not supply the automatic carbon dioxide fire extinguishing system.

(1449)  The Scope of Supply undeniably called for an automatic fire extinguishing system (R1, p. 196):

> 6.2.2  Carbon Dioxide (DPS 09.01.04)
>
> An automatic carbon dioxide fire extinguishing system will be provided for the rolling mill operating pulpit, furnace pulpit, and upcoiler control pulpit.

(1450)  Therefore, whether the handheld fire extinguishers provided by Kaiser met the Czech fire code is irrelevant.

(1451)  This being said, the Arbitral Tribunal finds that Kaiser has established that Nova Hut agreed that the automatic fire extinguishing system not be installed. At the hearing, Franck Bury testified as follows (Tr. 396:13-17):

> MR BURY: It was agreed to proceed in a certain way. We would have supplied the automatic fire extinguisher had they agreed to accept it, but they would not accept it. It was impossible to install something they would not accept and felt they were endangering their employees.

(1452)  If the record confirms that Nova Hut agreed that the automatic fire extinguishing system not be installed, it also shows that Kaiser had no objection in principle to Nova Hut being credited for the difference in price between the equipment called for by the Scope of Supply and the equipment actually installed. Thus, Kaiser wrote as follows to Nova Hut on 30 November 1999 (C211, emphasis added):

ICFKN had to supply in accordance with Exhibit "B" section 6.2.2 an automatic Carbon Dioxide Fire Extinguishing System for the rolling mill operating pulpit, furnace pulpit, and upcoiler pulpit. As Metalconsult advised during design, that an automatic system was not required by Czech standards, and that ICFKN could not probably find local suppliers for this system, ICFKN accepted the option to provide hand held fire extinguishers that meet Czech codes.

[...]

Based on the above criteria portable extinguishers supplied by ICFKN meet related Czech codes.

**NH accepted the portable extinguishers solution but now claims a credit for the automatic system.**

**NH are therefore requested to submit their support for the automatic Carbon Dioxide Fire Extinguishing System in order to allow ICFKN evaluate their claim.**

(1453)     In support of the amount of damages sought, Nova Hut has filed a quotation of 30 June 1999 for extinguishing equipment in which a supplier offers to install "stable extinguishing equipment" for a price of CZK 475,000.00 for one pulpit (R29). At the exchange rate prevailing on 30 June 1999, this amount corresponds to USD 13,406.30, i.e. USD 40,218.90 for three pulpits. Nova Hut does not explain how it calculates the USD 52,799.00 figure it relies upon.

(1454)     Kaiser has indicated that it supplied the handheld fire extinguishers at a cost of USD 2,195.00, which has not been disputed by Nova Hut.

(1455)     Therefore, the Arbitral Tribunal shall order that Kaiser pay Nova Hut USD 38,023.90.

## 2.9     PCN No. 221: Compressor station HVAC (USD 41,281.00)

### 2.9.1     Respondent's position

(1456)     Sections 4.2.2 and 4.2.3 of the Scope of Supply specify what HVAC ventilation system is to be delivered for the compressor station.

(1457)    Kaiser did not supply this equipment, thus forcing Nova Hut to have the adequate HVAC units and a separation wall installed at its own expenses. As a matter of fact, the building was inadequate for compressor operation and the equipment was necessary to ensure the reliable operation of the compressors.

(1458)    Nova Hut is due USD 41,281.00.

### 2.9.2    Claimant's position

(1459)    The Air Compressor Building was connected to the main building and therefore shared the central ventilation system installed by Kaiser.

(1460)    Nova Hut complained that the central ventilation system was inadequate, which is also wrong. Kaiser investigated the minor problems reported by Nova Hut and the results of Kaiser's report showed that Nova Hut's complaints were due to poor maintenance. In a letter to Nova Hut of 30 June 2000, Kaiser provided the results of its testing, along with recommendations on routine maintenance, and any problems were caused by Nova Hut's failure to maintain the system.

(1461)    In addition, Nova Hut provides no documents to support its alleged damages of USD 41,281.00. Jiri Obsil simply lists costs without supporting the amounts cited. Additionally, Jiri Obsil's estimate of costs includes reconstruction of the building in order to build a separate building for the compressors. Yet, Nova Hut decided not to build a separate compressor building to save money.

(1462)    Nova Hut's claim should be denied.

### 2.9.3    Discussion and decision

(1463)    Section 4.2 of the Scope of Supply provides the requirements of the heating, ventilating and air-conditioning systems *inter alia* for the Air Compressor Building (R1; "HVAC").

(1464)   Nova Hut claims that Kaiser failed to supply the HVAC equipment required for the Air Compressor Building and, accordingly, that it had to provide such equipment and to build a separation wall at its own expense.

(1465)   Kaiser replies that there was no need to install separate equipment as the Air Compressor Building was connected to the main building and shared the central ventilation system. Kaiser also denies the allegation that the latter was inadequate and claims that any defect was the result of poor maintenance by Nova Hut.

(1466)   Kaiser does not deny that it did not supply the required equipment. Moreover, in a letter of 30 March 1999, Kadrle Engineering confirmed that the installation of adequate ventilation was necessary to the proper functioning of the air compressors (R16):

> Recapitulation: For trouble-free operation of the SSR MH 150-2S compressors it is therefore necessary to separate compressor station room from the mill area (a separation wall), or possibly to enclose it (a ceiling) and introduce the following mode or air inlet and outlet:
>
> [...]
>
> This solution ensures trouble-free operation of the compressed air station also in extremely hot summer days. In case the sufficient inlet and outlet of cooling air for compressors is not ensured, they will become overheated in hot summer days and keep stopping their operation. Further it has to be stated that unless there is a controlled air conditioning system, there will be compressor operational temperature increase experienced also in other time periods (not only during extremely hot summer days), which will result to more rapid wear of individual compressor components. An increased temperature of sucked air would certainly also result in worse power efficiency of compressors during air compression. [...].

(1467)   It thus appears that an adequate ventilation system was necessary to the proper functioning of the air compressors, irrespective of whether the existing ventilation system was properly serviced or not.

(1468)   Admittedly, part of the problem was caused by the absence of separation between the Air Compressors Building and the main building. However, as noted above, the parties had agreed that no separate building would be built for the air

310

compressors, which would be located in the lean-to area adjacent to the upcoiler building.

(1469)    In any event, Kaiser does not dispute that Nova Hut paid for the HVAC equipment, the cost of which was accounted for in the contract price.

(1470)    It thus appears justified to grant the claim.

(1471)    Nova Hut claims payment of an amount of USD 41,281.00. Out of this amount, USD 13,323.00 was spent to erect a wall that, as pointed out above, Nova Hut agreed should not be installed. This amount shall be deducted. The Arbitral Tribunal also notes that USD 3,695.00 concern drawings for "intake/output of the cooling air for compressors" and for the "Compressor ventilation station". However, Kaiser has not objected to the inclusion of these amounts, which accordingly will not be deducted.

(1472)    Therefore, the Arbitral Tribunal will order that Kaiser pay Nova Hut USD 27,958.00.

## 2.10    PCN No. 224: Insulated bus-bars in 22 and 6 kV switchgear (USD 13,233)

### 2.10.1  Respondent's position

(1473)    Pursuant to Sections 3.6.4 and 3.6.5 of the Scope of Supply, Kaiser was to deliver completely insulated switchgear bus-bars.

(1474)    However, the bus-bars of the 22kV and 6kV panels supplied by Kaiser were not completely insulated, which caused extensive damages to corresponding equipment.

(1475)    The parties settled the matter at the PCN Meeting held on 11 September 2000, whereby Kaiser agreed to provide a 22kV spare circuit breaker free of charge in the stead of the undelivered equipment.

(1476)    However, Kaiser did not deliver spare circuit and Nova Hut is due USD 13,233.50 for the extensive defects caused to corresponding equipment.

## 2.10.2   Claimant's position

(1477)    Kaiser obtained the switchgear bus-bars from Holec, which confirmed that they were fully insulated, even more than required by the applicable industry standards.

(1478)    No documents are produced to support Nova Hut's contention that the bus-bars were not fully insulated.

(1479)    Nova Hut also does not provide any documents or support for its alleged damages of USD 15,000.00 due to extensive defects to corresponding equipment. Nova Hut does not state what equipment was allegedly defective, nor show the extra work required to repair these alleged defects. A report cited by Nova Hut concludes that the flaw was a cable termination problem and had nothing to do with the level of insulation in the breaker. There is no evidence that this failure was a symptom of insufficient insulation.

(1480)    Nova Hut provides no consistent basis for its request for damages. In its initial submittal, it alleges USD 15,000.00 in damages incurred due to extensive defects "to corresponding equipment". Nova Hut does not state which equipment was allegedly defective, nor does it provide documents showing the extra work required to repair these alleged defects.

(1481)    In its Rejoinder, Nova Hut changed its damages estimate to USD 13,233.50. It contended that there was an agreement to settle Nova Hut's bus-bar claim by providing a spare switchgear rather than repairing any alleged defect in the bus-bar. There was no agreement because Kaiser's subcontractor refused to admit that there was a problem with the bus-bar. While Nova Hut made the offer, Kaiser never accepted.

(1482)    Therefore, Nova Hut's claim should be denied.

## 2.10.3    Discussion and decision

(1483)    Nova Hut argues that the busbars in 22kV and 6kV switchgears delivered by Kaiser were not fully insulated, in contravention with Sections 3.6.4 and 3.6.5 of the Scope of Supply and claims "*compensation for the undelivered quality of MV switchgears*" (RWS3¶69, p. 17) and that the parties settled the matter by entering into an agreement whereby Kaiser agreed to deliver a 22kV spare circuit breaker free of charge (RWS3¶70, p. 17).

(1484)    Kaiser has produced a letter dated 1 March 2000 from Holec Middenspanning B.V., in which Holec confirms that the busbars it delivered were "*fully insulated*" and that the insulation method used is "*fully in accordance and complying with the testreport* [sic]" C213).

(1485)    It is irrelevant that the equipment delivered was of a fully-insulated type. As a matter of fact, the insulation may well have been damaged after its delivery, during installation or, later, during operation.

(1486)    In fact, an "Event Analysis Fault Report" issued by Holec on 18 June 1999 and setting forth Holec's findings as to the possible cause of a flash discharge having damaged a 22kV panel shows that the insulation of the busbars was indeed insufficient. Thus, in its report of 18 June 1999, Holec describes as follows the events at the origin of the breakdown (R74):

> [...]
>
> 6-    In reference to the final fault finding report:
>
> a)    Through a breakdown/deterioration of insulation (value) between the copper conductor of the damaged cable-core and the conductive layer and/or woven earthing shield a initially small current-flow was established between the previous named conductor and the conductive layer and/or vowen grounded earthing shield.
>
> b)    [...]

[...]

(1487)   Whether the defective insulation was the actual cause of the breakdown is less certain. Holec indicates that it will "*try to describe* [...] *the possible cause, in sequence of events that did lead to the flash discharge damage and sequential tripping of the above named medium voltage switchgear*" and concludes its report by suggesting "*a thorough investigation of the cable-end termination of the damaged cable*" (R74).

(1488)   It also appears that, after the breakdown, it was agreed by the parties that Kaiser would provide a 22kV spare circuit breaker free of charge. In relevant part, the minutes of a meeting held on 11 September 2000 read as follows (R44):

> PCN 224: 22kV and 6kV Switchgear Bus-bars: both party agreed on a settlement. ICFKN will provide a 22kV spare circuit breaker free of charge.

(1489)   Kaiser claims that there was no agreement because Kaiser's subcontractor refused to admit that there was a problem with the bus-bar and that, while Nova Hut made the offer, Kaiser never accepted it.

(1490)   Nowhere in the minutes – which were issued by Kaiser - is it specified that Kaiser did not accept Nova Hut's offer, or that its agreement was conditional upon its subcontractor acknowledging that the bus-bars were defective. Nor is there any evidence that Kaiser disputed the accuracy of the minutes cited to by Nova Hut.

(1491)   Kaiser asserts that Nova Hut provides no consistent basis for its request for damages and, in fact, provides no evidence that it suffered any damages at all.

(1492)   Nova Hut has produced evidence that the parties entered into an agreement, which Kaiser failed to perform. Kaiser does not dispute that it did not supply a 22kV spare circuit breaker.

(1493)   Nova Hut has also shown that, according to Jiri Obsil, the price of a 22kV circuit breaker is USD 13,233.50 "*according to Change order No. 0001 to Kaiser's*

314

*purchase order issued for HOLEC, dated 21st August 1998*" (RWS5¶¶57 and 59, p. 16).

(1494)    Therefore, the Arbitral Tribunal shall order Kaiser to pay Nova Hut USD 13,233.50.

## 2.11    PCN No. 229: Mill main building (USD 164,800.00)

### 2.11.1    Respondent's position

(1495)    The Phase 1 Contract required Kaiser to deliver to Nova Hut, on a turnkey basis, a fully constructed minimill. Accordingly, the construction of columns L12 to L18 of the Phase 1 minimill main building should have been included in Kaiser's scope of work and, in any event, was part of Kaiser's scope of work.

(1496)    However, to facilitate the utility piping installation, Nova Hut constructed the *foundations and installed columns L12 to L18 during Phase 0 of the work.*

(1497)    Therefore, Kaiser owes Nova Hut the cost of these works, i.e., USD 164,800.00.

### 2.11.2    Claimant's position

(1498)    The Phase 1 Contract states that construction of L12 to L18 columns is Nova Hut's responsibility. Nowhere does the Scope of Supply state that Kaiser will reimburse Nova Hut for this work.

(1499)    Kaiser would only be responsible for these works if the parties had agreed to a *turn-over contract contained in Section 9.1 of the Phase 1 Contract. This work* was not turned over to Kaiser and, thus remains Nova Hut's obligation.

(1500)    Additionally, Nova Hut has provided no documents to support the amount of alleged damages.

(1501)    Therefore, this claim should be denied.

### 2.11.3    Discussion and decision

(1502)    It is common ground between the parties that Nova Hut built columns L12 to L18 of the minimill main building during Phase 0 of the work.

(1503)    The issue is whether Kaiser remained financially responsible for the delivery of these columns and, accordingly, must compensate Nova Hut for the cost incurred to supply them.

(1504)    Sections 9.1, 10 and 11 of the Scope of Supply show that the supply of columns L12 to L18 was not within Kaiser's scope of supply. However, these provisions say nothing as to the financial responsibility for such work.

(1505)    Section 9.1 sets out Kaiser's recommendation that "*the columns L12 to L18 which were also designed, supplied and installed by Owner remain under contract to the Owner and not be part of any turn over package*" (R1, p. 206). There is however no reference to a final allocation of this item.

(1506)    The wording "*excluding partial columns L12-L18 by Owner*" in the Classification List (Section 10) or the Responsibilities Matrix (Section 11) might be interpreted in the sense that Kaiser wishes to ascribe it. However, it may also be understood to do nothing else than reflect reality, namely that columns L12 to L18 already existed and, hence, could not be part of Kaiser's scope of supply.

(1507)    In the silence of the Scope of Supply, the burden is on Nova Hut to evidence that there was an agreement between the parties that Kaiser would assume responsibility for the cost of columns L12 to L18.

(1508)    Nova Hut has failed to prove the existence of such an agreement. At the hearing, Jiri Obsil testified that Nova Hut *neglected* to address this matter (Tr. 613:16-25 and 614:1-14):

MS GREENE: Would it be correct to say that if there were a turn-over contract for that type of work that Kaiser would then assume responsibility for the cost of that work?

MR OBSIL: Of course, yes. Let me say that once again the entire steel structure of the entire rolling mill was part of Kaiser's scope of supply. This part was excluded because it had already been finalized by Nova Hut. I would not go into speculations as to who made the mistake of not dealing with this issue prior to that.

MS GREENE: Would you look at page P206 of the scope of supply.

MR OBSIL: I can see that this matter is not indicated here and that is why I said I would not go into speculation as to who was responsible for neglecting this matter.

MS GREENE. I want to be sure I understand your response. When you say this matter was neglected, what do you mean?

MR OBSIL: What I mean is that Nova Hut should have included these columns in 9.1 as a part that was intended to be included in the scope of turn-over contract. That is what I mean.

(1509)    Therefore, the Arbitral Tribunal shall dismiss Nova Hut's claim.


## 2.12    Summary

(1510)    The Arbitral Tribunal will award Nova Hut the principal amount of USD 79,215.40, breaking down as follows:

| PCN No. | Amount claimed (USD) | Amount awarded (USD) |
|---------|----------------------|----------------------|
| 043 | 0 | 0 |
| 202 | 6,090.00 | 0 |
| 205 | 35,617.00 | 0 |
| 207 | 359,259.00 | 0 |
| 209 | 20,321.00 | 0 |
| 216 | 1,982.00 | 0 |
| 220 | 52,799.00 | 38,023.90 |

317

| PCN No. | Amount claimed (USD) | Amount awarded (USD) |
|---------|---------------------|---------------------|
| 221 | 41,281.00 | 27,958.00 |
| 224 | 13,233.50 | 13,233.50 |
| 229 | 164,800.00 | 0 |
| Total | 695,382.50[9] | 79,215.40 |

## 2.13    Interest

### 2.13.1    Respondent's position

(1511)    Nova Hut did not expand on the issue of interest on unpaid PCNs. In its Post-Hearing Brief, Nova Hut simply requests payment "*of interest on the aforesaid sums*", which include the amount claimed by Nova Hut under PCNs.

### 2.13.2    Claimant's position

(1512)    Kaiser did not expressly state its position with respect to Nova Hut's request for interest.

### 2.13.3    Discussion

(1513)    The Arbitral Tribunal shall apply the same reasoning it has applied to Kaiser's claim for PCNs and award interest at the rate of 8% above LIBOR for one year US dollars deposits from 28 November 2000 until payment. It will also award compound interest on such interest, at the rate of 4% per annum until payment. Compound interest will accrue from 10 June 2005, i.e. the date of Nova Hut's Rejoinder on the Claim and Reply on the Counterclaim, in which Nova Hut for the first time expressly claimed payment of unpaid PCNs.

---

[9]    Nova Hut's claim is for USD 704,808.00. This amount includes, however, an amount of USD 9,426.00 in credit owed by Kaiser, which the Arbitral Tribunal already deducted from Kaiser's claim for unpaid PCNs.

| Daily production target: | 2000 tons | |
|---|---|---|
| Average t/hr of rolling time· | 159 0 | |

(425)    It is common ground between the parties that the Daily TSP report was agreed upon at a meeting on the morning following the day in question.

(426)    Nova Hut however alleges that the total weight of coils in the Daily TSP report is not the total weight of all the coils agreed by the parties to be acceptable. Thus, according to Nova Hut, Kaiser counted coils that were insufficiently descaled (coil #40502, C132, pp. 851 and 859); that had not been properly coiled (coil #20603, C132, pp. 114 and 122 for the constraint weight); or that had unacceptably wavy edges (coil #450129, C132, pp. 935 and 942).

(427)    Kaiser replicates that, to calculate the constraint adjusted weight, the parties relied on a list of coils that were acceptable and in accordance with the contract prepared by Nova Hut (see Claimant's Reply of 7 April 2005, ¶32, p. 12 and ¶69, p. 28; Claimant's Rejoinder of 28 June 2005, ¶52, p. 20; Claimant's Post-Hearing Brief of 28 October 2005, ¶5, p. 3). As to the threes notations from the TSP Daily report cited to by Nova Hut to show that unacceptable coils were counted, Kaiser states that these notations cannot prove anything. Also, all three coils cited to by Nova Hut are listed in Nova Hut's "good coils list".

(428)    In its Rejoinder of 10 June 2005 (¶33, p. 19), Nova Hut however explains that what Kaiser refers to as "Nova Hut's List of Acceptable Coils" only addresses the questions whether the coils were acceptable from the point of view of width, gauge variation and crown and does not contain any information about, for example, whether the coils were sufficiently descaled, whether they were properly coiled and whether the waviness of their edges was acceptable.

(429)    Kaiser denies this explanation, stating that "Nova Hut explain how Kaiser, or any party, would know that Nova Hut's list for acceptable coils did not address all standards Nova Hut considers relevant" (Claimant's Rejoinder of 28 June 2005, ¶52, p. 20). In any event, according to Kaiser, Nova Hut's list of acceptable coils

included only those coils that Nova Hut concluded met all standards for acceptability, including whether the coils had wavy edges, improper descaling, improper coiling, etc.

(430)    Therefore, the issue to be determined is whether what Kaiser has termed Nova Hut's "List of Acceptable Coils" was a proper basis to determine what coils produced during the 4WIPPT were of acceptable quality and would be counted for the purpose of determining the actual weight of steel produced.

(431)    The Arbitral Tribunal observes that no document on the record bears the name "List of Acceptable Coils". This name was "created by Kaiser" and appears for the first time in Kaiser's Reply of 7 April 2005, ¶32, p. 12: "*Nova Hut provided to Kaiser a list of coils which were acceptable [...]. The parties used this Nova Hut list of acceptable coils [...] for calculation of constraint adjusted weight*".

(432)    Also, as pointed out by Nova Hut, the "List of Acceptable Coils" does not appear to provide any information as to the coils' waviness, proper coiling or descaling. Thus, the "List of Acceptable Coils" is a Table that, for each listed coils, contains data as to its "TLOUSTKA", "SIRKA" and "KORUNA" (see C132, p. 64ff for Day 1):

| c.svitku | TLOUSTKA | | | SIRKA | | | KORUNA |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | jmenovita | tolerance | skutecnost | jmenovita | tolerance | skutecnost | |
| 420300 | 3,65 | -0 +0,40 | 3,85 | 1282 | -0 +30 | 1284 | 0,00 |
| 420301 | 3,65 | -0 +0,40 | 3,85 | 1282 | -0 +30 | 1282 | 0,00 |
| 420302 | 3,65 | -0 + 0,40 | 3,85 | 1282 | -0 + 30 | 1281 | 0,00 |

(433)    Yet, "TLOUSTKA" may be translated by "thickness" or "gauge", "SIRKA" by "width" and "KORUNA" by "crown".

(434)    Be it as it may, Premysl Kuncicky stated at the hearing that the "List of Acceptable Coils" included only those coils that the parties deemed to be acceptable (Tr. 503:6-25 and 504:1-2):

>  MR RAHN· I would like you to look at C-132, page 64. Are you familiar with this document?
>
>  MR KUNCICKY: Yes, I do know this document.
>
>  MR RAHN: Is this a document that was prepared by Nova Hut?
>
>  MR KUNCICKY: Yes, this document was prepared by Nova Hut.
>
>  MR RAHN: Was it prepared to list the coils that were acceptable for the Four-week Test?
>
>  MR KUNCICKY: I reckon this document was prepared only after the test. We took all the coils and we made a list of all coils qualified and not qualified, all the coils that were made in the course of the Four-week Test.
>
>  MR RAHN: Are those that are in dark, coils that are not qualified?
>
>  MR KUNCICKY: Probably so.
>
>  MR RAHN: Those not in dark would be those that are qualified, correct?
>
>  MR KUNCICKY: I assume so.

(435)    Kaiser's Nicholas Rickard had also testified that Nova Hut's list included only acceptable coils (CWS16¶5, pp. 2-3):

>  5. In paragraph 33 of its Rejoinder, Nova Hut alleges that Nova Hut's list of acceptable coils did not address descaling, proper coiling and waviness of edges. As explained in my earlier witness statements, I met with Nova Hut representatives each day of the testing period to discuss what coils would be included on the acceptable coil list. During these meetings, the parties reviewed the list of coils produced the previous day and discussed which should be included in Nova Hut's list of acceptable coils. I was present at meeting in which Nova Hut representatives identified coils that they alleged had wavy edges, improper descaling or improper coiling. After these discussions, the parties inspected the coils in question in the field to reach agreement about whether Nova Hut should include them in the acceptable coil list.

(436)    In his second witness statement, Joseph Pietryka confirmed that Kaiser relied on a document produced by Nova Hut in determining the coils that were acceptable (CWS10¶¶25-26, pp. 8-9):

25. In determining the coils that were acceptable and in accordance with the contract and test protocol for use in the four-week test calculations, Kaiser relied on a document produced by Nova Hut. This document listed the coils that were acceptable and in accordance with the contract and test protocol as determined through a procedure involving observers from both parties and a series of checks by Nova Hut. Each day, the parties examined the computer-generated production reports, which measured gauge, width, etc. Nova Hut and Kaiser observers in the mill viewed each coil and noted characteristics of that coil on a log. Chemical and metallurgical information was checked on samples delivered to the Nova Hut laboratory facilities. For any coils that were still suspect, Nova Hut and Kaiser observers performed visual checks in the finished coil yard and at the Nova Hut slitting line. Nova Hut then prepared a document for each day that listed the coils that were acceptable and in accordance with the contract and test protocol. [...]. Kaiser and Nova Hut used this Nova Hut list for the calculation of the daily constraint adjusted weight.

(437)    There are other indications that, at the time, Nova Hut considered that Kaiser had produced 42,209 tons of acceptable coils.

(438)    First, in a letter sent on 18 January 2001 in which it points to the reasons for Kaiser's failure to pass the 4WIPPT, Nova Hut does not mention the quality of the coils produced (R62):

[...]

The Four Week Integrated Test

As you know from previous correspondence, and in particular from NOVA HUT's letter of December 13, 2000, NOVA HUT is confident that Kaiser has not successfully passed the [4WIPPT] in accordance with the contract. The International Finance Corporation, to whose security interest in and restrictions over the contract Kaiser Netherlands and Kaiser International consented, shares this view. In this open letter, NOVA HUT once again wishes to explain why, even if we accept, *arguendo*, certain aspects of Kaiser Netherlands' position (aspects with which NOVA HUT and the International Finance Corporation strongly disagree), **Kaiser Netherlands has failed the production test**.

Under clause 9.2 of Appendix G to the contract, Kaiser Netherlands bears the burden of proving that it has passed the production test. This clause explicitly requires that if Kaiser "fails to prove" that the plant has passed the test, then Kaiser "shall be required" to repeat the test. Kaiser Netherlands bears this burden under the contract and as a matter of Austrian law. Kaiser Netherlands has not satisfied its burden of proving that the plant has attained the necessary rated maximum capacity.

The computations by which Kaiser Netherlands has calculated the constraint adjusted output of the plant during the test do not comport with the contract, and rely incorrectly on **several faulty assumptions and steps**. Several of these faults relate to **how Kaiser Netherlands has apportioned delays** to

NOVA HUT, and to **how Kaiser Nethernands has mischaracterized what constitutes a delay** (and thus the quantity of delays), both in disregard of the provisions of the Phase 1 contract. These miscalculations have caused **an incorrect determination of the constraint adjusted quantity of steel produced during the production test**.

[...]

(439)  Second, ten days before, on 9 January 2001, Jan Hascin had produced a Table comparing the total weight of steel coils produced during the 4WIPPT in accordance with the Czech National Standards and the weight in accordance with the Contract (C236). According to this Table, the weight of coils produced during the 4WIPPT that are in accordance with the Czech National Standards is of 42,209 tons.

(440)  The Arbitral Tribunal finds that Jan Hascin's explanations that his intention was merely to analyze figures that were made available to him (RWS6¶15, p. 5) are not very convincing.

(441)  According to the figures in Jan Hascin's Table, Kaiser only produced 6,170 tons of steel coils in accordance with the contractual specifications, which may explain why Nova Hut was dissatisfied with the results of the 4WIPPT and asserted that Kaiser included unacceptable coils in its calculation. However, on 18 October 2000 – i.e., pending the 4WIPPT - the parties executed Addendum #1 to the 4WIPPT Protocol (C131):

**Addendum #1**

**to the Nova Hut Minimill Phase 1, Four weeks Performance Test Procedure signed the 13 October by the Owner and the Supplier**

The following sentence will be added to the section 3.2 Calculation of the daily coil production:

- The coil production will be defined as acceptable if the coils are adhering to CSN, DIN, EU and ASTM Standards.

[Signatures]

(442)  Although this does not result from its reading, it is common ground between the parties that the impact of Addendum # 1 was to lower significantly the quality

standards applicable to determine whether the steel coils were acceptable. Thus, according to Premysl Kuncicky (RWS2¶33, p. 10):

> 33. [...]. The document was intended to replace the quality standards specified in the Phase 1 Contract with the minimum standards provided in Czech, German and EU regulations [...].

(443)    Based on the foregoing considerations, the Arbitral Tribunal finds that Kaiser's figure for actual weight only includes coils that were of acceptable quality, "acceptable" in the sense of being within the standards agreed in Addendum #1.

## 8.    Did Nova Hut acknowledge that Kaiser passed the 4WIPPT?

### 8.1    Preliminary comment

(444)    The Arbitral Tribunal has reached the conclusion that Kaiser did not pass the 4WIPPT.

(445)    However, Kaiser claims that Nova Hut agreed to the test calculations, procedures and results. Specifically, Kaiser argues:

-    that Nova Hut agreed to the very figures it now challenges immediately after the test and, before the arbitration, acknowledged that Kaiser had passed the 4WIPPT; and

-    that the documents proving that Kaiser passed the 4WIPPT were agreed upon by Nova Hut during the test itself.

### 8.2    Did Nova Hut agree to the figures it now challenges and acknowledge that Kaiser passed the 4WIPPT?

(446)    According to Kaiser, immediately after the test, Nova Hut agreed to the very figures it now challenges, namely that the production achieved was of 108.3% of the maximum rated capacity, that the constraint adjusted production totaled 84,027 tons, and that 178.02 t/h was the relevant hourly production rate to give credit to Kaiser for delays in the production.

(447)   In support of the above allegation, Kaiser claims that Nova Hut's Jan Hascin independently made his own calculations and shared his results with Joseph Pietryka, who, on his side, had performed the same calculations and achieved the same results. Jospeh Pietryka's document was then forwarded on to Premysl Kuncicky, who in turn (or another Nova Hut representative) delivered the calculations to Nova Hut's Strategy and Technology Director. In a letter to the IFC of 24 November 2000 acknowledged that Kaiser passed the test.

(448)   The Arbitral Tribunal has already dealt with Kaiser's allegation that Jan Hascin performed his own calculations and achieved the same results as those mentioned in Joseph Pietryka's summary document. The Tribunal reached the conclusion that Kaiser had not demonstrated that Jan Hascin performed his own calculations, let alone that he achieved similar results (261).

(449)   It is true that, in his letter to the IFC of 24 November 2000, Gerhard Pretsch states that the evaluation of the 4WIPPT was fulfilled and overreached at 108.5% (C233):

> The Minimill Performance test has been finished at 6 a.m. on November 13, 2000, and the final evaluation has been done on November 22, 2000. There followed from the evaluation that the Test has been fulfilled and overreached at the production volume up to 108.5%, whereby a theoretical claim for Kaiser NBV has risen for bonus amounting to USD 5.3 million, but NH has a claim of USD 4,8 million penalty for nonfulfilment [sic] of the quality tests.

(450)   Kaiser has heavily relied on this statement. In fact, it has gone as far as suggesting that Nova Hut voluntarily denied the passing of the 4WIPPT with a view to extract undue concessions from Kaiser (Claimant's Post-Hearing Brief of 28 October 2005, ¶17, p. 6 and ¶20, p. 7):

> 17. [...]. In other words, after conducting its own evaluation, Nova Hut knew in November 2000 that Kaiser passed the four-week test, but for its own purposes, intended to deny passage to keep working on the project and to extract further concessions.
>
> [...]
>
> 20. [...]. Instead, Nova Hut's plan is to hold-out and seek some additional concessions – concessions to which it is not entitled under the agreement.

(451)    At no point in these proceedings has Kaiser explained what further concessions Nova Hut wanted to extract.

(452)    Admittedly, Nova Hut keeps on writing in the above letter that, "[f]or the time being, [it] doesn't acknowledge the test, and shall attempt at the overall agreement, acceptable for NH, IFC, as well as KNBV".

(453)    Replaced in the context in which it was made, the above statement does not enable to conclude that Nova Hut acknowledged the passing of the 4WIPPT.

(454)    First, the immediately following sentence reads as follows (emphasis added):

> **The main problem is that the rolling mill has not proved the ability of reliable rolling of gauges under 2.5 mm, and it needs another 6 months for completion and modifications of some functions**. There is a real assumption that it shall succeed, but NH shall make the realization at the KNBV's cost, and at presence of the selected specialists of Tippins.

(455)    There is no dispute about the fact that, during the 4WIPPT, the minimill was to roll a broad spectrum of gauges, including gauges below 2.5mm.

(456)    Second, it is more than likely that the 108.5% mentioned by Gerhard Pretsch comes directly from Joseph Pietryka's summary document produced on 22 November 2000 (C132, p. 3). Gerhard Pretsch explicitly states that the 4WIPPT's "final evaluation has been done on November 22, 2000". 22 November was the day when Pietryka had made his calculation and handed over the forms and the diskettes to Nova Nut. In any event, the fact that Gerhard Pretsch refers to a performance ratio of 108.5% whereas Joseph Pietryka achieved a figure of 108.3% does not enable to conclude that Nova Hut had performed its own calculations, nor is there any evidence to the effect that Nova Hut had made its own evaluation on this very date.

(457)    Third, as already pointed out, Nova Hut's letter to the IFC was issued at a time when the results of the 4WIPPT had not yet been processed entirely.

(458)     Thus, on 15 November 2000, Nova Hut wrote as follows to Kaiser (R57, emphasis added):

> I was told by my engineers that Kaiser Netherlands B.V. seems to pretend that the signing of the protocols of the production rolled during the first days of the [4WIPPT] were to indicate that NOVA HUT accepts this production as being of acceptable quality as defined in the Phase 1 Contract.
>
> I may repeat in writing what I have already said many times orally and what follows clearly from the Contract itself. NOVA HUT has never accepted those coils as being of acceptable quality when signing the protocols as **NOVA HUT was not in a position to do so with virtually all quality tests still missing**. Consequently, the signatures of my experts only acknowledge that the coils were rolled. This is, however, only a pure reproduction of facts, not a binding declaration of law.

(459)     In a letter of 1 December 2000, Nova Hut reaffirmed that the testing of the coils produced was "ongoing" as 10,000 tons remained to be processed (R60). The two letters are quoted by the Arbitral Tribunal in order to show that on 24 November 2000, when Mr. Pretsch wrote to the IFC, the testing was still going on and an own evaluation by Nova Hut had not been done (Nova Hut's complaints about the quality of the produced coils was, as explained above, without merits).

(460)     Kaiser has also relied on Nova Hut's annual reports of 2002 and 2003, which, in relevant part, read as follows (C165, p. 39 and C167, p. 38) (emphasis added):

> In October and November 2000, the [4WIPPT] was made. According to the management of [Nova Hut], mill P1500 met expected performance **in terms of quantity of tons**, however **not in terms of expected range of products**. Furthermore, the **quality of products was not in line with the concluded contract**. The supplier of mill P1500, ICF Kaiser Netherlands B.V., considered, however, the acceptance test to be successful. As of the date of the financial statements, the Company and the supplier have not reached an agreement and due to this fact the final invoice was not issued by the supplier. [...].

(461)     In its Reply of 7 April 2005 (footnote no. 5, p. 11), Kaiser explains that Nova Hut's statement that "the quality of products was not in line with the concluded contract" relates to the HRCQTs that were performed during the 4WIPPT.

(462)     The above report refers explicitly to the 4WIPPT, not to the HRCQTs. This is evidenced beyond any doubt by the fact that the report then says that "[Kaiser]

*considered, however, the acceptance test to be successful*". Yet, Kaiser never claimed that it passed the HRCQTs. In other words, the reference to the "acceptance test" can only relate to the 4WIPPT.

(463)    Kaiser has not demonstrated that it relied on the above statements, which, in any event, were made several months after Nova Hut had clearly and unequivocally stated its position that Kaiser had failed the 4WIPPT (see Nova Hut's letter of 18 January 2001 (R62), quoted in part at ¶(437) above, in which Nova Hut "*formally requests that Kaiser Netherlands successfully complete another* [4WIPPT] *before April 30, 2001*").

(464)    Last, according to Kaiser itself, "*Kaiser was in almost constant communication with Nova Hut in January and February 2001 relating to negotiations over Final Acceptance*" (Claimant's Reply of 7 April 2005, ¶75, p. 31). There would have been no such negotiations if Nova Hut had, as Kaiser contends, acknowledged the passing of the 4WIPPT.

(465)    Therefore, the Arbitral Tribunal finds that Nova Hut did not acknowledge the passing of the 4WIPPT.

**8.3    What is the impact of the signing of some of the test documents?**

(466)    According to Kaiser, Nova Hut agreed upon the documents proving that it passed the 4WIPPT, either that Nova Hut representatives signed or initialed them or that they were produced by Nova Hut itself.

(467)    Specifically, Nova Hut's representatives signed or initialed:

-    the Daily Mill Delay Report, for each day of the test;

-    the Daily Caster Delay report, for each day of the test;

- the Daily and to Date Production Calculation, for the first nine days of the test (C221 to C229);

- Addendum 1 to the 4WIPPT Protocol (C135); and

- the 4WIPPT Protocol.

(468)   Moreover, Nova Hut provided to Kaiser a list of coils that were acceptable and in accordance with the Contract for each day of the test (for instance, C132, pp. 64 to 67 for the first day of the test).

(469)   The Arbitral Tribunal has already addressed the consequence, if any, of the execution by Nova Hut of Addendum #1 to the 4WIPPT Protocol (see ¶(441) ff), the Daily Mill Delay report (see ¶(329)), the Daily Caster Delay report (see ¶**Error! Reference source not found.**). The fact that Nova Hut provided Kaiser with a "List of Acceptable Coils" has also been already covered (see ¶¶(427) ff).

(470)   The consequence, if any, of the fact that representatives of Nova Hut signed the Daily and to Date Production Calculation for the first nine days of the test remains to be determined (C221 to C229).

(471)   The Arbitral Tribunal has already referred to the Daily and to Date Production Calculation (see ¶(262)). This document, entitled "Four weeks performance test", was produced by Joseph Pietryka each testing day and contains *inter alia* Kaiser's calculation of the daily constraint adjusted production, before and after compensation of delays (see C132, pp. 15 to 19 for Day 1).

(472)   Premysl Kuncicky signed the Daily and to Date Production Calculation for the first nine days of the test (C221 to C229). Kaiser alleges that Nova Hut thereby confirmed that it agreed with the figures recorded by Joseph Pietryka.

(473)   Kaiser's allegation is without merit.

(474)  As already mentioned (see ¶(264)), the Daily and to Date Production Calculation documents signed by Premysl Kuncicky (C221 to C229) differ from those relied upon by Kaiser (see for instance C132, pp. 15 to 19 for Day1). In particular, the 178.02 tons per hour figure relied upon by Kaiser does not appear on the versions signed by Premysl Kuncicky. This is due to the fact that the version on which 178.02 tons per hour appear, was made only at the end of the test.

(475)  Premysl Kuncicky has testified that he did not intend to agree to amendments to the contract and was no authorized to do so (RWS10¶7, p. 2):

> 7. I understand that Kaiser is trying to argue that because I signed Kaiser's daily calculation documents relating to the first nine days of the test, I thereby accepted various modifications to the Phase 1 Contract. That was certainly not my intention. Nor did I have authority to make such modifications.

(476)  Kaiser could not be mistaken with respect to Nova Hut's intention. In particular, it could not believe that, by signing the Daily Calculation Documents, Nova Hut was acknowledging Joseph Pietryka's figures for constraint adjusted weight before and after compensation of delays. As a matter of fact, as already mentioned, the constraint adjusted weight depended from the actual weight, which itself could only be finally assessed after completion of the relevant quality tests.

(477)  The record shows that Nova Hut never intended to endorse Kaiser's figures for constraint adjusted weight when it signed the Daily Calculation Documents and that it instructed its employees to stop signing when it realized that Kaiser was making this argument.

(478)  At the hearing, Nova Hut's witnesses could not explain why their managers instructed them to stop signing the Daily Calculation Documents (Tr. 465:6-18):

> THE PRESIDENT: It was probably a little later because you signed for nine days. Why were you told not to sign?
>
> MR HASCIN: Sometimes you have to accept the order without asking why. It was decided by the top managers and I was there in charge of verifying the coil quality. I was not there to ask questions of why not to sign anymore. That was not a proper question for me to ask.

*119*

THE PRESIDENT: Did you think something about it even if you did not ask questions?

MR HASCIN: I should not like to present that opinion of mine.

(479)    And (Tr. 513:4-20):

DR HOCK: [recte: in] The next paragraph of your witness statement you say, under paragraph 7, "Because I signed Kaiser's daily calculation documents relating to the first nine days of the test". What was the reason why you did not continue signing for the next days of the test?

MR KUNCICKY: That is a good question. This was my manager's decision. They decided that I was no longer responsible to sign. This was determined for me. I was ready to stop signing.

DR HOCK: Did they give any reason why you were no longer responsible for signing these sheets?

MR KUNCICKY: They never mentioned any reason and I did not feel the need to ask questions. This was not my responsibility to ask these questions.

(480)    However, in addition to the letter sent on 15 November 2000 by Gerhard Pretsch to Nicholas Rickard and quoted above at ¶(106) (R57), Nova Hut's intention is evidenced by the recitals of draft settlement agreement sent by Nova Hut to Kaiser on 1 December 2000 and by the SSAB Tunnplat report.

(481)    In relevant parts, the recitals of Nova Hut's draft settlement agreement provides as follows (R60, emphasis added):

B    Four Week Integrated Performance Production Tests

B.1    The first attempt to perform the [4WIPPT] was conducted from October 16, 2000 to November 13, 2000. On the one side, these 4WIPPT seem to have proved the ability of the rolling mill to roll a high quantity of coils of part of the product mix defined by the Phase 1 Contract; **however, on the other side, the 4WIPPT have also proved that at present, the rolling mill is not able to roll reliably the entire product mix, in particular coils with gauges of 1.5 to 2.5 mm. Production in this segment could not satisfy the quality parameters as determined by the Phase 1 Contract**.

B.2    [...]

B.3    In the course of the 4WIPPT, NH made the following experiences, observations and conclusions:

B.3.1 NH had **to stop confirmation of the protocols of daily productions**, because there were various indications of serious quality defects of the coils rolled, that could and can be reliably identified **only after processing the production** on the shearing lines, and later on, by claims raised by NH's customers.

(482)    In its report of 28 November 2000, SSAB explains as follows why the relationship between Nova Hut and Kaiser deteriorated in the course of the 4WIPPT (R58, p. 5):

> The relation between Nova Hut and ICF Kaiser was god [sic] until day of test: 12 when Nova Hut pointed out that negative crown would not be accepted in the performance test. The problem for ICF Kaiser was that there were approximately 300 coils with negative crown from the first 6 days and that would cause problem for them to reach the target for production rate. At this stage Nova Hut also informed that there were to [sic] big waves (250mm sometimes) at the slitting line where the coils were evaluated.

(483)    Based on the foregoing considerations, the Arbitral Tribunal finds that Nova Hut did not endorse Kaiser's disputed figures by signing documents produced by Kaiser referring to such figures.

## D.    CONCLUSION

(484)    Kaiser did not pass the 4WIPPT at its first attempt.

(485)    Pursuant to Section 9.2 of Appendix G to the Phase 1 Contract, it was required to repeat the 4WIPPT, which it could undertake up to three times:

> If the Supplier fails to prove in the first Four Week Integrated Production Performance Test that the Plant meets the specified Production Guarantees, then the Supplier shall be required to repeat the Four Week Integrated Production Performance Test subject to the conditions below. The Supplier may repeat the Four Week Integrated Production Performance Test a maximum of two times (for a maximum of three tests: the first test and two repeat tests).
>
> [...].

(486)    Kaiser did not attempt to pass the 4WIPPT a second or a third time within eighteen months following Preliminary Acceptance as required by the Contract (Section 14.6.1):

14.6.1  Prior to Final Acceptance, Supplier shall perform, and shall be obligated to successfully complete Performance Tests pursuant to the Contract Documents and as set forth in Appendix G.

.1  The Supplier shall be obligated to successfully complete the Performance Tests within eighteen (18) months after Preliminary Acceptance. If the Performance Tests have not been conducted or successfully completed eighteen months after Preliminary Acceptance, then the Supplier shall pay the Owner the liquidated damages or penalties set forth in Section 14.6.6 read with Appendix C for failing to accomplish the Performance Tests for delay.

(487)  Therefore, Kaiser did not achieve Final Acceptance.

122

VI.    **THE PARTIES' CLAIMS**

A.    CLAIMANT'S CLAIMS

1.    **Claimant's claim for payments due upon achievement of Final Acceptance (USD 33,754,720.62)**

1.1    **Claimant's position**

(488)    The Contract calls for five performance tests of two general types. One was the 4WIPPT. The 4WIPPT is the only test that Kaiser was required to pass to obtain Final Acceptance and final payment. The other tests fall under the general category of "quality" or "technology" tests. Kaiser was not required to pass these tests to obtain Final Acceptance, although there were monetary implications associated with passage of these tests.

(489)    Based on the calculations provided for in the contract, including information taken directly from the signed daily reports that summarize the agreed results of each day of the production test, Kaiser achieved a score of 108.3% against a standard of 100%, which was a higher score than Kaiser was required to achieve at the time of the test.

(490)    Kaiser is entitled to a bonus of USD 1 million for each percentage or part thereof above 103%. Accordingly, based upon the results of the 4WIPPT, Kaiser earned a production bonus of USD 5.3 million.

(491)    Under the Contract, to achieve Final Acceptance and be entitled to a Certificate of Final Acceptance, Kaiser had to provide Nova Hut with (1) a contract completion report, (2) final as-built drawings, (3) the final acceptance written schedule of deficiencies and (4) a date for Final Inspection (Section 14.7.1 of the Contract).

(492)    After passing the 4WIPPT, Kaiser took the steps necessary under the Phase 1 Contract to obtain a Certificate of Final Acceptance.

(493)  As a result of passing the 4WIPPT and submitting the documents noted above to Nova Hut, Kaiser has met the requirements for Final Acceptance as defined by Section 14.7 of the Phase 1 Contract, and is entitled to receive the following amounts from Nova Hut:

(a)  a net bonus in connection with the production performance test of USD 1.6 million (USD 5.3 million production bonus offset by USD 3.7 million penalties on some quality tests);

(b)  the contract retainage held by Nova Hut, in the amount of USD 10,673,814.00, plus USD 347,564.66 in bank interest;

(c)  the fee of USD 10 million due under the Contract; and

(d)  the amount of USD 11.1mio performance letter of credit and USD 33,341.96 in bank fees incurred in connection with Nova Hut's wrongful draw on the performance Letter of Credit.

(494)  Kaiser claims simple contractual interest at the rate of 8% above LIBOR for one year US dollars deposits from 2 March 2001 until payment is made on the principal amount of USD 22,654,720.62 (USD 1.6mio + USD 10,673,814.00 + USD 347,564.66 + USD 10mio + USD 33,341.96), plus compound interest on such contractual interest at the annual statutory rate from 2 January 2004 until payment (Kaiser's Post-Hearing Brief of 28 October 2005, ¶¶401 ff., pp. 134-136 and 405, p. 137). In connection with Nova Hut's wrongful draw on the letter of credit, Kaiser claims the principal amount of USD 11,133,341.96 *together with commercial interest to be determined by the Tribunal from February 16, 2001*" (*ibid.*, ¶406, p. 137). Kaiser does not seek payment of compound interest at the statutory rate

## 1.2    Respondent's position

(495)  Nova Hut claims that Kaiser did not pass the 4WIPPT and that it therefore owes no amounts to Kaiser on such account.

**1.3     Discussion and decision**

**1.3.1     Introduction**

(496)     Kaiser claims payment of the following amounts, which it claims are owed to it as a result of successfully passing the 4WIPPT; the submission of the relevant documents required by the Contract; and, in general, the completion of the steps necessary under the Phase 1 Contract to obtain a Certificate of Final Acceptance (Statement of Claim of 10 November 2004, ¶2.29, p. 13):

-     net bonus of USD 1.6mio in connection with the passing of the 4WIPPT;

-     the contract retainage in the amount of USD 10,673,814 held by Nova Hut, plus USD 347,564.66 in bank interest;

-     the USD 10mio fee due under the Contract; and

-     the release of the USD 11.1mio performance letter of credit, together with a USD 33,341.96 bank fee.

(497)     Kaiser claims payment of simple contractual interest at the rate of 8% above LIBOR for one year deposits from 2 March 2001 on all the above amounts until payment, together with compound interest at the annual statutory rate from 2 January 2004 on such interest until payment, except for the amounts of USD 11.1mio and USD 33,341.96 (letter of credit), for which Kaiser claims interest from 16 February 2001 but leaves it for the Tribunal to determine the applicable rate.

(498)     In its Statement of Defense of 24 January 2005 (¶26, p. 12), Respondent denied owing the above amounts or any sum to Kaiser for passing the 4WIPPT since Kaiser did not pass the 4WIPPT.

**1.3.2     The USD 1.6mio net bonus**

(499)    Kaiser alleges that it passed the 4WIPPT with a score of 108.3% against a standard of 100%. Based on the assumption that it is entitled to a production bonus of USD 1mio for each percent or part thereof above 103%, Kaiser contends to have earned a production bonus of USD 5.3mio in connection with the passing of the 4WIPPT. Since it admits that it owes USD 3.7mio in penalties in connection with the failure to pass the HRCQTs (see Section VI.B.1.2), Kaiser requests payment of a net amount of USD 1.6mio, plus interest.

(500)    Appendix C to the Phase 1 Contract, entitled "Schedule of Penalty Conditions, Calculations and Parameters", provides for certain bonuses and penalties.

(501)    Section 5.1 of Appendix C reads as follows:

> The Supplier shall be entitled to receive from the Owner a bonus of one million dollars ($1,000,000) or a proportionate amount thereof for each one percent (1%) or part thereof by which production in the Four Week Integrated Production Performance Test exceeds one hundred and three percent (103%) of Rated Maximum Capacity, up to a maximum bonus of ten million ($10,000,000). The bonus for production in excess of 103% shall be calculated in accordance with the following formula, where:
>
> B=the dollar amount of the bonus;
>
> P=production of prime quality coils in the Four Week Integrated Production Performance Test, expressed as a percentage of the Plant's rated Maximum Capacity of 80,000 tons for the four week period;
>
> B=$[(P-103)x1,000,000]

(502)    The Arbitral Tribunal has found above (see ¶(286)) that, using Kaiser's own figures, 71,829.86 tons of steel coils were produced during the 4WIPPT for a constraint capacity of 77,600 tons. Applying the above formula, the Arbitral Tribunal finds that Kaiser is not entitled to a production bonus.

### 1.3.3    The USD 10,673,814.00 Retention Reserve

(503)    Kaiser claims that the amounts retained by Nova Hut during performance of the Contract totaled USD 10,673,814.00 and that Nova Hut unduly withdrew such amount from the escrow account on which it was deposited. Accordingly, it claims payment of USD 10,673,814.00 plus accumulated interest.

(504)   Nova Hut has not disputed that the Retention Reserve amounted to USD 10,673,814.00. Nor has it challenged the allegation that it withdrew this amount from the account on which it was deposited.

(505)   To guarantee proper performance under the Contract, Kaiser was to provide Nova Hut *inter alia* with a Retention Reserve (Section 8.3.1.1 of the Phase 1 Contract).

(506)   Pursuant to Section 6.5.2 of the Contract, the Retention Reserve was to be advanced by Kaiser in the form of amounts retained by Nova Hut on each payment made to Kaiser:

> 6.5.2  For advancement of the retained reserve there will be retained from each payment to the Supplier an amount equal to 7.5% of such payment (the "Retention Reserve").

(507)   In accordance with Section 6.5.2.1 of the Contract, the Retention Reserve was to be kept in an escrow account.

(508)   Among the performance guarantees placed by Kaiser, the Retention Reserve was the first one that Nova Hut could call in case of breach of contract, in particular in case the plant failed to pass the performance tests:

> 8.3.4  In the event that the Supplier fails to produce the Plant on a turnkey basis in compliance with the requirements of this Contract (including without limitation such that it will meet the Performance Tests), then the order in which the Owner shall proceed against the Supplier's security for the completion of its responsibilities under this Contract shall be the order provided under Section 8.3.1, namely:
>
> .1    the Retention Reserve and/or Retention Letter of Credit, drawn in accordance with the Procedure for Draw on Retention, Appendix K;
>
> .2    the Performance Letter of Credit;
>
> [...]

(509)   Pursuant to Section 6.5.2.1, Nova Hut could unilaterally withdraw the Retention Reserve "*in the event of a breach of* [the Phase 1 Contract] *by the Supplier and*

127

*upon certification to CSOB of the fact of such breach*". In this case, Nova Hut was to issue to CSOB a certificate in the form set out at Appendix K to the Contract.

(510)     The full amount of the Retention Reserve, less any amount retained by Nova Hut, was to be paid to Kaiser "as part of the final payment upon Final Acceptance under Section 14.7" (Section 6.5.2.4).

(511)     As pointed out above, Kaiser did not pass the 4WIPPT and, as a result, did not achieve Final Acceptance (see Section V.D). Moreover, Nova Hut was entitled to keep the entire amount of the Retention Reserve (see Section VI.B.1.3 below).

(512)     Therefore, Kaiser's claim to the Retention Reserve plus accumulated interest, must be dismissed.

### 1.3.4    The USD 10mio fee due under the Contract

(513)     The contract price included a fee of USD 10mio, which, pursuant to Section 8.3.4 of the Contract, Nova Hut could retain in case Kaiser failed "*to produce the Plant on a turnkey basis in compliance with the requirements of* [the Contract] *(including without limitation such that it will meet the Performance Tests)*".

(514)     Pursuant to Section 6.5.4.3 of the Contract, the USD 10mio fee – less any amount retained by Nova Hut - was to be paid to Kaiser upon Final Acceptance as part of Final Payment (Section 6.5.4).

(515)     Kaiser did not achieve Final Acceptance (see Section V.D). Moreover, Nova Hut was entitled to retain the whole amount of the USD 10mio fee (see SectionVI.B.1.3 below).

(516)     Therefore, the Arbitral Tribunal will dismiss Kaiser's request that Nova Hut pay it USD 10mio plus interest.

### 1.3.5    The USD 11.1mio Performance Letter of Credit

(517)    Among the payments to which Kaiser claims to be entitled for Final Acceptance is the USD 11.1mio Performance Letter of Credit it issued in favor of Nova Hut. Kaiser also requests payment of USD 33,341.96 in banking fees which it claims to have incurred following Nova Hut's drawdown on the Letter of Credit (Statement of Claim of 10 November 2004, ¶2.30, p. 14).

(518)    Section 8.3.2 of the Contract required Kaiser to provide Nova Hut with a Performance Letter of Credit and a Bill of Exchange as security for the performance of its contractual obligations:

> 8.3.2 Supplier shall furnish the Owner within ten (10) Days of the Date of Effectiveness with a letter of credit in the form attached hereto as Appendix A (herein the "Performance Letter of Credit") in an amount of five million US dollars (US$5,000,000) together with a Bill of Exchange as described in Appendix F for five million US dollars (US$5,000,000) covering the Supplier's faithful performance of this Contract, in the form set out in the Attachment to Appendix F.
>
> .1    The initial Performance Letter of Credit shall be increased by eleven million one hundred thousand US dollars (US$11,100,000) to a total of sixteen million one hundred thousand US dollars (US$16,100,000) upon whichever is the earlier to occur of (i) the return to Supplier of the Phase 0 Performance Letter of Credit (the Supplier's obligation to increase the Performance Letter o Credit by $11,000,000 shall not be affected by any draw on the Phase 0 Performance Letter of Credit so returned to the Supplier) and (ii) June 30, 1998. Against receipt of this increase in the Performance Letter of Credit, the Owner shall return to the Supplier the five million US dollars (US$5,000,000) Phase 1 Bill of Exchange referred to above.
>
> [. .]

(519)    In the instant case, the record shows that the USD 5mio Performance Letter of Credit issued by Kaiser on 8 July 1997 was increased by USD 6.1mio on 15 September 1998 up to USD 11.1mio rather than being increased by USD 11.1mio up to USD 16.1mio pursuant to the above provision (C183).

(520)    Section 8.3.4 of the Contract authorized Nova Hut to draw down on the Letter of Credit in the event that Kaiser failed to pass the Performance Tests.

(521)    As stated above, Kaiser did not pass the 4WIPPT and the HRCQTs. Moreover, Nova Hut was entitled to keep the whole amount of the Performance Letter of Credit (see SectionVI.B.1.3 below).

(522)    Therefore, Nova Hut was entitled to draw down on the Performance Letter of Credit.

## 2.    Claimant's claim for Nova Hut's wrongful draw down on the Performance Letter of Credit (USD 11,133,341.96)

### 2.1    Preliminary comment

(523)    Kaiser asserts this claim in the alternative "*in the event the tribunal elects not to award the letter of credit funds as part of* [payments owed to Kaiser for Final Acceptance]" (Claimant's Statement of Claim of 10 November 2004, ¶3.19, p. 19).

(524)    The Arbitral Tribunal has dismissed Kaiser's request for payment of the USD 10mio Performance Letter of Credit as part of payments owed for Final Acceptance.

(525)    Therefore, the Tribunal shall now determine whether Nova Hut's draw on the Performance Letter of Credit was improper.

### 2.2    Claimant's position

(526)    Pursuant to Section 8.3.2.3 of the Contract, Nova Hut could draw down on the Performance Letter of Credit if it would expire before Final Acceptance and had not been extended to a date beyond the anticipated date for Final Acceptance.

(527)    Kaiser had achieved Final Acceptance in December 2000 and so advised Nova Hut. Therefore, Nova Hut was not entitled to demand payment under the Letter of Credit.

(528)   However, Nova Hut wrongfully refused to sign the Certificate of Final Acceptance and, on 21 February 2001, drew down on the Performance Letter of Credit.

(529)   By the time Nova Hut drew down on the Letter of Credit, Kaiser had arranged for an extension until 31 July 2001 of the letter of credit to satisfy the unjustified demands of Nova Hut. As required by the Letter of Credit, Kaiser gave notice to Nova Hut of its intention to extend the Letter of Credit 30 days before it was due to expire. Moreover, Kaiser was in constant communication with Nova Hut in January and February 2001 and, during these discussions, Kaiser representatives assured Nova Hut that it intended to extend the Letter of Credit. Nova Hut confirmed that it would not draw on it so long as Kaiser completed an extension before 7 March 2001.

(530)   Nova Hut had to give Kaiser notice that it would draw on the Letter of Credit. The letter sent by Nova Hut on 18 January 2001 did not constitute notice because after sending it, Nova Hut told Kaiser that it would not draw on the letter so long as it was extended until 31 July 2001.

(531)   Last, to draw down on the Performance Letter of Credit, Nova Hut falsely represented to the bank that Kaiser had not submitted notice to extend the Letter of Credit and that it had not achieved Final Acceptance.

(532)   Therefore, Nova Hut was not entitled to demand payment even if it had not achieved Final Acceptance.

## 2.3    Respondent's position

(533)   In accordance with the terms of the Performance Letter of Credit, Nova Hut was entitled to demand payment if the Performance Letter of Credit was to expire prior to Final Acceptance and if it had not received a notice of extension 30 days prior to the then applicable expiration date. Still according to the Letter of Credit, Nova Hut was to give Kaiser advice of its intent to demand payment at least 14 days prior to effectively drawing down.

(534)   At the relevant time, the Performance Letter of Credit was to expire on 7 March 2001. At this time, Kaiser had not achieved Final Acceptance.

(535)   On 18 January 2001, Nova Hut gave Kaiser advance notice that it would draw down on the Letter of Credit if it were not extended promptly. Contrary to Kaiser's unsupported allegation, Nova Hut never withdrew or amended, even orally, its formal notice.

(536)   On 7 February 2001, Nova Hut had not received a notice from Kaiser's bank that the Letter of Credit had been extended. The fact that Kaiser may have intended to extend the Letter of Credit and even reached an agreement with its bank and informed Nova Hut accordingly is irrelevant. So is the fact that IFC's representatives may have stated that it was not IFC's intention to have the Letter of Credit drawn.

(537)   Therefore, Nova Hut demanded payment and was entitled to do so.

(538)   To demand payment, Nova Hut submitted the form required by the Contract. This form did not say anything about the 4WIPPT and, accordingly, Nova Hut made no false representation to Kaiser's bank. In any event, Kaiser did not achieved Final Acceptance and hence, there would have been no false representation.

**2.4    Discussion and decision**

(539)   The issue to be determined is whether Nova Hut was entitled to draw down on the USD 11.1mio Performance Letter of Credit.

(540)   Section 8.3.2.3 of the Contract reads as follows:

> .3    If the Performance Letter of Credit by its terms will expire before Final Acceptance and has not been extended to a date beyond the anticipated date of Final Acceptance, the Owner may prior to the expiration of the Performance Letter of Credit draw down the full undrawn balance of the Performance Letter of Credit and hold the funds on the same terms as are set out in Section 6.5.2 with respect to the Retention Reserve.

AUTHENTICATED TELETRANSMISSION, COURIER OR HAND DELIVERY AT THE ABOVE DELIVERY AT THE ABOVE ADDRESS. ANY SUCH NOTICE SHALL BE EFFECTIVE WHEN RECEIVED BY YOU. <u>IN THE EVENT THAT A NOTICE OF EXTENSION HAS NOT BEEN RECEIVED BY YOU AT LEAST THIRTY (30) DAYS PRIOR TO THE THEN APPLICABLE EXPIRATION DATE</u> OR IN THE EVENT THAT NO REPLACEMENT STANDBY LETTER OF CREDIT IN THE REQUIRED AMOUNT IN ACCORDANCE WITH THE CONTRACT BETWEEN NOVA HUT, A.S. AND ICF KAISER NETHERLANDS, B.V. HAS BEEN PROVIDED TO YOU ON OR BEFORE THE THIRTIETH DAY PRECEDING THE FINAL EXPIRATION DATE HEREOF, <u>YOU MAY DRAW YOUR DRAFTS ON US AT SIGHT FOR AN AMOUNT NOT TO EXCEED THE BALANCE REMAINING IN THIS LETTER OF CREDIT WITHIN THE THEN APPLICABLE EXPIRATION DATE</u>, ACCOMPANIED BY YOUR DATED STATEMENT SIGNED BY ONE OF YOUR AUTHORIZED OFFICERS READING IN EITHER ONE OF THE FOLLOWING TWO FORMS: EITHER:

[...]

(545)   Last, the Letter of Credit expressly provided that Nova Hut did not need to present any other document than a statement signed by an officer of Nova Hut and certifying that no notice of extension had been received (C183, p 13, emphasis added):

<u>NO[4] OTHER DOCUMENTS WILL BE REQUIRED FROM YOU IN CONNECTION WITH SUCH DRAWING</u>.

(546)   The Arbitral Tribunal has found that Kaiser did not achieve Final Acceptance. There is no doubt that when Nova Hut drew down on the Letter of Credit, on 7 February 2001, there was no prospect that Kaiser could achieve Final Acceptance prior to the expiry of the Letter of Credit on 7 March 2001.

(547)   Was the Letter of Credit extended beyond the date of the anticipated date of Final Acceptance? As mentioned above, the notice of extension had to be received by Nova Hut at least 30 days prior to the expiry of the letter of credit, i.e., in the instant case, by 5 February 2001. Moreover, Nova Hut was to give 14-day advance notice of its intention to draw down on the letter of credit.

(548)   Nova Hut did not receive a notice of extension 30 days prior to the expiry of the Letter of Credit. Kaiser's reference in this respect to a letter sent by Nicholas

Rickard on 6 February 2001 (C156) is misplaced. First, Nova Hut was to receive a "notice of extension", not a "notice of Kaiser's intention to extend the Letter of Credit". Second, the Letter of Credit specifies that the notice must be sent by the bank (C183, p. 12):

> WE SHALL DULY SEND YOU A NOTICE OF EXTENSION IN THE FORM OF EXHIBIT /E/.

(549)    Exhibit /E/ provides as follows (C183, p. 18, emphasis added):

> EXHIBIT /E/
>
> FORM OF NOTICE OF EXTENSION
>
> GENTLEMEN:
>
> [...]. WE HEREBY NOTIFY YOU THAT, IN ACCORDANCE WITH THE TERMS OF THE LETTER OF CREDIT AND THE LETTER OF CREDIT AGREEMENT DATED AS OF / / / / / / / / / / /, 1997 BETWEEN CORESTATES BANK, N.A. AND IFCKN, THE EXPIRATION DATE OF THE LETTER OF CREDIT HAS BEEN EXTENDED TO / / (DATE)/ /.
>
> [...]
>
> **CORESTATES BANK, N.A.**
>
> S    **BY:**/ / / / / / / / / / /
>
> **NAME:**/ / / / / / / / / /
>
> **TITLE:**/ / / / / / / / / / /

(550)    By contrast, Nova Hut had given 14-day advance notice of its intention to draw down on the Letter of Credit. Thus, on 18 January 2001, Nova Hut requested that the L/C be extended until 31 July 2001, *"to allow the parties adequate time to determine whether or not Kaiser Netherlands has passed the second four week integrated production test"*. It specified that *"unless the Letter of Credit is extended promptly, [it] will initiate the process for drawing upon that letter"* (R62).

(551)    Kaiser does not dispute the fact that this was a valid advance notice. However, it argues that, after sending the letter, Nova Hut told Kaiser that it would not draw

---

4    The word "NO" is omitted in the Arbitral Tribunal's copy of Exhibit C183, p. 13. However, it appears in the terms of the Performance Letter of Credit set out in Appendix A to the Phase 1 Contract ("Form of Letter of Credit") (C18, p. 70).

on the letter so long as it was extended prior to 7 March 2001 (Claimant's Reply of 7 April 2005, ¶82, p. 33). Claimant's witness Nicholas Rickard has confirmed that he told Nova Hut that the Letter of Credit would be extended shortly, which under the circumstances, was reasonable (CWS11¶¶22 and 24, p. 8):

> 22. On January 18, 2001, I received a letter from Nova Hut threatening to draw on the letter of credit unless it was extended. Shortly after I received this letter, I told Mr. Pretsch that Kaiser would extend the letter of credit.
>
> 24 On several occasions after February 6, 2001, I told Mr. Pretsch, again, that Kaiser was in the process of extending the letter of credit and would do so before it expired.

(552)    However, Nicholas Rickard did not confirm that Nova Hut indicated that it would not draw on the Letter of Credit. This would have been surprising in light of the words used by Nova Hut's outside counsel in a letter of February 16, 2001 (C237, emphasis added):

> [ ..].
>
> We now understand that notwithstanding the valid presentment on February 12, 2001, First Union wrongfully dishonoured Nova Hut's draw request. Apparently, rather than honouring the draw after a valid presentment, First Union wrongfully accepted instructions from its customer, Kaiser Group International, the account party ("Kaiser") to delay payment. **At no time did Nova Hut authorize this delay. Further, on February 15, 2001, Rick Frimmer of our Philadelphia office had a number of conversations with you where he reiterated that Nova Hut expected the draw to be honoured immediately and that no extension would be accepted**. [...].

(553)    Kaiser also argues that the form submitted to the bank required that an authorized officer of Nova Hut confirm "*that Kaiser had not submitted notice to extend the letter of credit*" (Claimant's Reply of 7 April 2005, ¶83, p. 33). This is in contradiction with the plain language of the terms of the Letter of Credit – a fact that Kaiser feigns to ignore – that expressly specified that the notice of extension was to be received from the bank (C183, p. 12).

(554)    Kaiser's argument that Nova Hut is bound to have misrepresented the facts to First Union Bank since it was to certify that Kaiser had not passed the 4WIPPT must also fail. First, Kaiser did not pass the 4WIPPT. Therefore, any statement in this respect made by Nova Hut would have been a true representation of the

facts. Second, as pointed out above, the only document that Nova Hut was to submit to demand payment in case the Letter of Credit had not been extended was a statement signed by an officer of Nova Hut and certifying that no notice of extension had been received.

(555)    The Tribunal notes that First Union Bank paid the amount under the Letter of Credit (on 16 February 2001) only hours after Kaiser had conveyed that Nova Hut and CSOB (Nova Hut's bank) would be advised of the extension of the Letter of Credit by SWIFT on business opening on 16 February 2001 (C157). However, in accordance with the clear language of the contract, the extension had to be secured at least 30 days prior to the expiry of the Letter of Credit. In the present case, the Letter of Credit, which was bound to expire on 7 March 2001, should thus have been extended on 5 February 2001 at the latest. If Nova Hut had not demanded payment on 7 February 2001, it would have been foreclosed to do so and had no reason to believe that Kaiser would nevertheless extend the Letter of Credit on a voluntary basis.

(556)    In light of the above, the Tribunal finds that Nova Hut was entitled to draw down on the Letter of Credit and to deposit the amount thus paid to it on the escrow account serving to keep the Retention Reserve. Moreover, Nova Hut was entitled to keep the whole amount of the Performance Letter of Credit (see Section VI.B.1.3). The Tribunal will therefore dismiss Kaiser's claim.

## 3.    Claimant's claim for deferred project development costs (USD 510,000.00)

### 3.1    Claimant's position

### 3.1.1    Claimant's arguments

(557)    On 18 July 1994, Kaiser Engineers and Nova Hut entered into a Letter of Intent, whereby Kaiser Engineers agreed to provide Nova Hut certain advisory services, including a feasibility study required by IFC, in exchange for USD 1.5mio payable in ten monthly installments of USD 150,000.00 each.

(558)   On 14 August 1995, Nova Hut issued a purchase order, pursuant to which Kaiser Engineers agreed to provide certain *additional* interim engineering services for the Nova Hut minimill project in exchange for USD 4mio.

(559)   Kaiser performed the requested services under the Letter of Intent and the Purchase Order. In particular, a team of eight individuals spent two weeks at the site in Ostrava conducting an audit and another month in Pittsburgh writing a report on the findings. These findings were included in a larger report issued by the IFC in November 1996.

(560)   At the time that Kaiser Engineers was performing these services, Nova Hut was attempting to obtain financing through the IFC, which required various appraisal and evaluation services to be performed by third parties and a financial review. Nova Hut, which was having financial difficulties, requested that Kaiser Engineers assist it and Kaiser Engineers agreed that Nova Hut could temporarily defer payment of the following amounts until IFC financing was in place:

-   USD 200,000.00 for services under the Letter of Intent to pay the IFC appraisal fees;

-   USD 10,000.00 for services under the Letter of Intent to pay Price Waterhouse' financial review; and

-   USD 300,000.00 for interim engineering services under the Purchase Order to pay a second IFC appraisal fee.

(561)   Three letters by Kaiser confirm that repayment of the above amounts would be deferred until Nova Hut obtained financing. Nova Hut did not indicate that it might not repay these amounts at the time Kaiser Engineers agreed to defer their payment. Nor did Nova Hut object when Kaiser Engineers confirmed Nova Hut's obligation to repay these sums.

(562)    Nova Hut and Kaiser reaffirmed that the deferred payments were "advances" and thus that Nova Hut was to repay them in the Antecedents of the Phase 1 Contract. The language of the Antecedents section of the Phase 0 Contract is identical to the Antecedents section in the Phase 1 Contract. This section cannot have different meanings. If the amounts owed to Kaiser were not subsumed in the contract price for Phase 0, they cannot be subsumed into the contract price for Phase 1. Moreover, if the parties had intended Nova Hut's debt to be subsumed into the overall Phase 1 Contract price, then the letters whereby Kaiser agreed to defer payment would not have been cited in the Antecedents section.

(563)    On 25 July 1997, after Nova Hut had obtained IFC financing, Kaiser invoiced Nova Hut for USD 510,000.00. Thereafter, Kaiser demanded payment of such amount on 20 July 1999 and 29 February 2000.

(564)    Throughout the relationship, the parties referred indistinctly to Kaiser Engineers and Kaiser. The Antecedents section of the Phase 1 Contract does not distinguish between Kaiser Engineers and Kaiser but refers to agreements between "Owner" and "Supplier". Additionally, Kaiser sent monthly invoices to Nova Hut seeking payment for the work done by Kaiser Engineers. These invoices were paid by Nova Hut without complaint.

(565)    Kaiser is entitled to the amount of USD 510,000.00, plus simple contractual interest at the rate of 8% above LIBOR for one year US dollars deposits from 8 February 1998 until payment is made and compound interest on such interest at the annual statutory rate from 2 January 2004 until payment (Kaiser's Post-Hearing Brief of 28 October 2005, ¶¶401 ff., pp. 134-136 and 407, p. 137).

## 3.2    Respondent's position

(566)    Kaiser has not proven that the services for which it claims payment of USD 510,000.00 in deferred payments were in fact performed.

(567)    Besides, the parties to the Letter of Intent dated 18 July 1994 and the Purchase
Order dated 14 August 1995 are Nova Hut and Kaiser *Engineers*. Accordingly, if
the sums claimed are owed at all, they are owed to Kaiser Engineers, not to the
Claimant in this arbitration.

(568)    In accordance with Sections 1.1.1 and 6.1 of the Phase 1 Contract, the project
was to be performed for a Fixed Price on a turnkey basis. The Contract contains
an "entire agreement clause" (Section 12.8), the only exception to which is the
Phase 0 Contract. Therefore, if the sums claimed were owed to Kaiser, which
they are not, then they were superseded by the Phase 1 Contract. Otherwise, the
Phase 1 Contract would have stated when and how this amount was to be paid
or would have explicitly reserved the issue of the deferred payments, which it did
not.

## 3.3    Discussion and decision

### 3.3.1    Introduction

(569)    The record shows that Kaiser Engineers agreed to the following deductions from
amounts owed to it under a Letter of Intent and a Purchase Order:

-    USD 200,000.00 and USD 10,000.00 in connection with the Letter of Intent;

-    USD 300,000.00 in connection with the Purchase Order.

(570)    It is also manifest that the parties' initial intent was that these deductions would
be treated as advances to be repaid upon financial closing.

(571)    Thus, Kaiser Engineers sent the following letter to Kaiser on 28 March 1995 (C5,
emphasis added):

[...]

We confirm that we will uphold our obligation as specified in the Letter of Intent signed by our Respective Companies. Therefore, we propose the following:

1. **ICF Kaiser will agree to a deduction of $ 200,000 from the amounts owed to them in accordance with the terms of the Letter of Intent**. This amount of $ 200,000 will be used by Nova Hut to pay to IFC directly the Appraisal and Evaluation Fee.

[...]

3. Per our comments to the IFC Draft Letter, **it is expected and normal for all such expenses incurred for development of the financing, such as those to be incurred by IFC in items no.'s 1 and 2 to be recovered at the time of financial closing**. It is our understanding, therefore, that our payments in this regard will be reimbursed at financial closing.

[...]

(572)   Kaiser sent a similar letter on 8 August 1995 in connection with the USD 300,000.00 deduction to amounts due under the Purchase Order (C7, emphasis added):

[...]

In accordance with our continued obligation as your developer for the Mini-Mill Project, we confirm that we will uphold our obligations as specified in the Letter of Intent signed by our respective companies. Therefore, we propose the following:

1. **ICF Kaiser will agree to the deduction of $300,000 from the amounts owed to them** (or their affiliates, ICF Kaiser – Netherlands B.V.) to compensate Nova Hut for the appraisal fee charged by the IFC in accordance with the "Second Letter Agreement" dated July 7, 1995 negotiated between Nova Hut and the IFC.

[...]

3. **Should the project's financing close with the IFC for the Mini-Mill project, we will expect to recover the above costs at financial closing**.

[...]

(573)   An intent that a further USD 10,000.00 deduction from amounts owed to Kaiser Engineers under the Letter of Intent *would be reimbursed upon financial closing* does not result from the 7 April 1995 letter cited to by Kaiser in support of its allegation (C6):

[...]

The IFC has negotiated a price of US$10,000.00 for the initial financial review in accordance with the attached letter dated April 4, 1995. In accordance with the terms of our Agreement dated July 18, 1994, ICF Kaiser will agree to a deduction of US$10,000.00 from the amounts owed to us.

[...]

(574)    However, Nova Hut does not dispute that this USD 10,000.00 amount which Kaiser Engineers agree to deduct on 7 April 1995 must be treated under the same regime as the other two amounts. Thus, Nova Hut argues indifferently that the services for which Kaiser claims this USD 510,000.00 amount have not been rendered; that, if they were performed, the amount is owed to Kaiser Engineers, not to the Claimant; and, that, in the alternative, the amount was subsumed into the Phase 1 Contract.

(575)    The Arbitral Tribunal will address these three arguments in turn.

### 3.3.2    Nova Hut's defense that the related services were not rendered must fail

(576)    The record shows that the services rendered by Kaiser were billed to Nova Hut and that Nova Hut paid Kaiser USD 1,290,000.00 under the 18 July 1994 Letter of Intent out of a total price of USD 1.5mio and USD 3,700,000.00 out of a total price of USD 4mio under the 14 August 1995 Purchase Order (C98).

(577)    Moreover, the Antecedents section of the Phase 1 Contract expressly refers to the feasibility study to be performed under the Letter of Intent and the Building Permit Assistance to be provided under the Purchase Order.

(578)    Last, when Kaiser invoiced the deferred amounts, Nova Hut did not object that the related services were not rendered.

(579)    Therefore, there is no merit to Nova Hut's contention that Kaiser is not entitled to the deferred amounts as the related services were not rendered.

### 3.3.3 Nova Hut's defense that Kaiser lacks standing to claim the deferred amounts must fail

(580)    Nova Hut argues that the deferred amounts are owed, if at all, to Kaiser Engineers. In a letter of 19 August 2004, Nova Hut stated that this claim was without merit and submitted that the Arbitral Tribunal had no jurisdiction to entertain it. In its Post-Hearing Brief of 28 October 2005, answering a question raised by the Tribunal, Nova Hut withdrew this jurisdictional defense, whilst maintaining that "*Kaiser does not have standing to bring such claim*" (Respondent's Post-Hearing Brief of 28 October 2005, ¶112, pp. 43-44).

(581)    Nova Hut points out correctly that the Letter of Intent and the Purchase Order, from which Nova Hut's payment obligations derive, were entered into by Nova Hut and Kaiser *Engineers*.

(582)    It is however obvious that, with respect to the services provided by Kaiser Engineers prior to the conclusion of the Phase 0 and Phase 1 Contract, the parties agreed to treat Kaiser Engineers and Kaiser indistinctly.

(583)    The Antecedents section of the Phase 1 Contract (C18, p. 6) states that "[p]*rior to the date hereof **Owner engaged Supplier** to perform a feasibility study under an Agreement dated 18 July 1994; and to provide Building Permit Assistance under a Purchase Order dated 16 March 1995; and to provide Interim Engineering Services under a Purchase Order dated 14 August 1995*". Yet, it is undisputed that "Owner" and "Supplier" refer to "Nova Hut" and "Kaiser", respectively, while the agreements referred to in the Antecedents section were concluded by Nova Hut and Kaiser *Engineers*.

(584)    Following a similar pattern, Kaiser's letter of 8 August 1995 specifies that USD 300,000.00 are deducted "*from the amounts owed to* [ICF Kaiser] *or their affiliates, ICF Kaiser – Netherlands B.V.*" (C7).

*143*

(585)    Last, it is always Kaiser that invoiced the amounts owed under the Letter of Intent and the Purchase Order (C10 to C15). Nova Hut paid these amounts without complaining that Kaiser was not the proper party to these agreements.

(586)    On this basis, the Tribunal finds that the parties' agreement was that Kaiser could claim payment of amounts owed to Kaiser Engineers.

### 3.3.4    Nova Hut's defense that the deferred amounts were subsumed into the Phase 1 Contract must fail

(587)    Nova Hut mainly relies on the "entire agreement clause" set out in Section 12.8 of the Phase 1 Contract.

(588)    Many commercial contracts contain a provision stating that they constitute the entire agreement between the parties and that any other agreement not contained in the contracts have no force or effect. These provisions are commonly known as "entire agreement" or "four-corners" clauses.

(589)    While there is a presumption that the wording of a "four-corners" clause accurately and comprehensively reflects the parties' intention, these clauses, which are often standardized and commonly included in contracts, do not necessarily reflect the parties' true intention, especially when the contract contains language referring whether expressly or impliedly to other prior agreements.

(590)    In the present case, the Antecedents section of both the Phase 0 and Phase 1 Contract recall that certain services were performed prior to their conclusion (C18, p. 6):

> Prior to the date hereof Owner engaged Supplier to perform a feasibility study under an Agreement dated 18 July 1994; and to provide Building Permit Assistance under a Purchase Order dated 16 March 1995; and to provide Interim Engineering Services under a Purchase Order dated 14 August 1995. Supplier also agreed to fund interim development costs for financing in accordance with Supplier's letters dated 28 March 1995, 7 April 1995, and 8 August 1995 including an advance of IFC commitment costs

and the hiring of Price Waterhouse as an expression of Supplier's good faith performance of the obligations set forth between the Supplier and Owner in the Agreement dated 19 July 1994. [...].

(591)    Yet, if not to reserve Kaiser's right to payment of the deferred amounts, one fails to see any valid reason why – and Nova Hut did not give one – the parties would have mentioned the services provided by Kaiser Engineers prior to the Contracts and, beyond that, the very letters in which Kaiser Engineers made it clear that it expected to be compensated for the deferred payments upon financial closing.

(592)    In reality, Nova Hut is not mistaken about the effect of the reference made in the Antecedents section of the Contract to agreements executed beforehand. Thus, with respect to Kaiser's claim for amounts allegedly owed under a Memorandum of Understanding executed prior to the Contract, which raises the same issue, it makes the following statement (Respondent's Statement of Defense and Counterclaim of 24 January 2005, ¶87, p. 33):

> Kaiser's claim is based on a memorandum which was executed before the Phase 1 Contract and which is not even referred to in the Antecedents of the Phase 1 Contract. Accordingly, Kaiser's claim is barred by the entire agreement provision.

(593)    The parties' conduct subsequent to the conclusion of the Phase 1 Contract also shows that it was still their intention that the deferred amounts be paid by Nova Hut separately from the contract price. Thus, Kaiser invoiced Nova Hut for the USD 510,000.00 amount less than one month after Nova Hut had given it notice to proceed with the Phase 1 work (C21). There is no evidence that Nova Hut disputed this invoice when it received it. In particular, Nova Hut never asserted that Section 12.8 of the Contract barred Kaiser from claiming these amounts.

### 3.3.5    Conclusion

(594)    Kaiser claims payment "of $510,000 plus interest and late payment penalties which, as of June 30, 2004, amounted to $443,062.00" (Claimant's Statement of Claim of 10 November 2004, ¶4.18, p. 23; see also C176). It appears from the witness statement of Dale Fackler that the interest claimed correspond to a rate

equivalent to the LIBOR rate on one-year deposits plus 8% applied on the amount of USD 443,062.00 since 9 February 1998 (CWS3¶10, p. 3).

(595)    Section 6.3 of the Phase 1 Contract reads as follows (C18, p. 39):

> 6.3    INTEREST ON LATE PAYMENTS
>
> 6.3.1 In the event that any approved payment between the Owner and the Supplier is delayed of more than thirty (30) Days after the due date, then interest on the delayed payment will be paid at an annual rate of interest of LIBOR (for one year US dollar deposits) plus eight percent (8%) until the invoice is paid.

(596)    The parties' agreement was that the deferred payments would be repaid upon financial closing. Nova Hut secured financing from the IFC on 9 December 1997. Therefore, the deferred payments were due on 8 January 1998 and, consequently, late payment interest accrues since 8 February 1998.

(597)    The Arbitral Tribunal will thus order Nova Hut to pay Kaiser simple contractual interest on the amount of USD 510,000.00, at the rate of 8% above LIBOR, from 8 February 1998 until payment.

(598)    Moreover, under the system of Austrian law, compound interest may be claimed from the date the action is pending, if explicitly agreed upon or if due interest has been claimed (Article 1000(2) of the Austrian Civil Code):

> Der Gläubiger einer Geldforderung kann Zinsen von Zinsen verlangen, wenn die Parteien dies ausdrücklich vereinbart haben. Sonst kann er, sofern fällige Zinsen eingeklagt werden, Zinseszinsen vom Tag der Streitanhängigkeit an fordern. Wurde über die Höhe der Zinseszinsen keine Vereinbarung getroffen, so sind ebenfalls vier vom Hundert auf ein Jahr zu entrichten.
>
> Free translation
>
> The creditor of a monetary claim may request compound interest, provided the parties have expressly agreed thereon. Absent an agreement, the creditor may request compound interest from the date the action is pending and provided that due interest has been claimed. If the parties have not agreed on the rate of the compound interest, 4% per annum must be paid.

(599)   Based on the above, the Arbitral Tribunal will also award compound interest ("Zinseszinsen") to Kaiser from the date the Request for Arbitration was served to Nova Hut, i.e. 5 January 2004, until payment is made. Since there is no agreement of the parties regarding the applicable interest rate, compound interest will accrue at the (statutory) rate of 4% per annum.

(600)   Therefore, the Arbitral Tribunal will order Nova Hut to pay Kaiser USD 510,000.00, plus simple contractual interest at the rate of 8% above LIBOR for one-year US dollars deposits from 8 February 1998 until payment, plus compound interest on such interest, at the rate of 4% per annum, from 5 January 2004 until full an final payment.

## 4.   Claimant's claim for the warranty reserve and contingency fee (USD 5,250,000.00)

### 4.1   Claimant's position

(601)   On 8 November 1996, Kaiser and Nova Hut entered into a Memorandum of Understanding establishing the price for the Phase 1 Contract at USD 168.5mio.

(602)   In order to accommodate Nova Hut's requirements for funding from IFC, the parties agreed in April 1997, to reduce the final price for the Phase 1 minimill to USD 167mio.

(603)   The parties also agreed that the remaining USD 7mio would be paid as a contingency fund in the amount of USD 3.5mio upon Preliminary Acceptance, with the second USD 3.5mio paid in the form of a warranty reserve. It was agreed that the unused portion of the USD 3.5mio warranty reserve would be divided equally between Kaiser and Nova Hut at the end of the warranty period.

(604)   On 2 December 1997, Kaiser confirmed the parties' agreement in draft change orders submitted to Nova Hut. Kaiser again confirmed to Nova Hut the terms of the agreement after Nova Hut finally obtained financing from the IFC.

147

(605)    Nova Hut wrongfully refused to acknowledge the terms memorialized in Kaiser's change orders. It did so because it wanted to renegotiate the price of the Phase 1 Contract for the reason that the Thai Project had been cancelled.

(606)    Kaiser achieved Preliminary Acceptance on 29 October 1999, which triggered Nova Hut's obligation to pay Kaiser the USD 3.5mio contingency reserve. Additionally, the conclusion of the contractual warranty period on 7 December 2001 triggered Nova Hut's obligation to pay Kaiser an additional USD 1.75mio.

(607)    Therefore, Kaiser should be awarded USD 5.25mio, plus simple contractual interest at the rate of 8% above LIBOR for one year US dollars deposits from 30 December 1999 on the amount of USD 3.5mio (contingency amount) until payment is made and from 6 February 2002 on the amount of USD 1.75mio (warranty reserve), and compound interest on such interest at the annual statutory rate from 2 January 2004 until payment (Kaiser's Post-Hearing Brief of 28 October 2005, ¶¶401 ff., pp. 134-136 and 408, p. 137).

**4.2    Respondent's position**

(608)    The parties agreed that the Contract would supersede any prior agreement. Under Austrian law, the effect of an entire agreement clause is to render inadmissible extrinsic evidence to prove terms that differ from those in the contract.

(609)    The Phase 1 Contract superseded the Memorandum of Understanding, which is also evidenced by the fact that some of the latter's terms are outdated. Thus, Nova Hut purchased both grinding machines while the Memorandum of Understanding provided that Kaiser was to provide one piece.

(610)    The price stated in the Phase 1 Contract was all-inclusive and no contingencies were excluded from the fixed price. This was in accordance with the parties' agreements for the Phase 0 that provided for a fixed price into which the contingency reserve was integrated.

(611) The Phase 1 Contract provides that it may only be amended in writing. Neither Jaroslav Petros nor any other representative of Nova Hut have ever agreed to the modification of the Phase 1 Contract price in writing.

## 4.3    Discussion and decision

### 4.3.1    Introduction

(612) It is common ground between the parties that, on 8 November 1996, a Memorandum of Understanding was executed whereby the total price for the Phase 1 of the work was to be USD 168.5mio (C16):

**Memorandum of Understanding**

Between ICF Kaiser International, Inc. and ICF Kaiser Netherlands B.V. and NOVA HUT, a.s., done 8 November 1996.

The parties have agreed as follows:

1.  The total price of contract between NH, a.s. and ICF Kaiser Netherlands for Phase 1 of Minimill shall be 168.5000.000,– USD. The contract terms for Phase 1 will be similar to the contract terms for Phase 0.

2.  1 pc of grinding machine and Level III shall be excluded from the original Phase 1 scope of supply.

3.  [...]

4.  [...]

5.  The amount of 160.000.000,– USD shall be the fixed price. To this amount has been added 8.500.000,– USD for contingency and escalation.

[...]

(613) Kaiser states, without being contradicted, that the parties agreed in April 1997 to reduce the final price for the Phase 1 minimill to USD 167mio.

(614) It is also undisputed that, pursuant to Section 6.1.1 of the Phase 1 Contract, Kaiser undertook *"to carry out the Project and perform the Work as described herein in consideration of the Fixed Price of One Hundred and Sixty Million US dollars (US$160.000.000)"* (C18, p. 37).

(615)    The issue is whether Nova Hut owes Kaiser any amount in excess of the Phase 1 Contract "Fixed Price" of USD 160mio.

### 4.3.2    The Memorandum of Understanding was not superseded by the Phase 1 Contract

(616)    Contrary to Nova Hut's position, the Phase 1 Contract did not amend the Memorandum of Understanding.

(617)    The fact that Section 6.1.1 of the Contract provides that "[t]he Supplier undertakes to carry out the Project and perform the Work as described herein in consideration of the Fixed Price of One Hundred and Sixty Million US dollars (US$160.000.000)" is not determinative. Indeed, the Memorandum of Understanding - which distinguishes between the "Total Price" and the "Fixed Price" also specifies "the amount of 160.000.000,- USD shall be the fixed price".

(618)    The entire agreement clause contained in Section 12.8 of the Contract is also without effect on the validity of the Memorandum of Understanding. As a matter of fact, the parties' agreement was for a total price of USD 168.5mio, later reduced to USD 167mio. In other words, Section 6.1 of the Contract does not reflect the parties' actual and true intention.

(619)    In fact, it appears that the parties chose not to state the real contract price to facilitate the observation of financing from the IFC. This was unequivocally confirmed by Michael Gaffney (CWS4¶5, p. 2, emphasis added; see also C92, pp. 3-4):

> 5. While the negotiations between Kaiser and Nova Hut were ongoing, Nova Hut was negotiating with the International Finance Corporation for financing for the Phase 1 project. Although Nova Hut and Kaiser Netherlands agreed to a price of $168.5million, Nova Hut later requested that Kaiser Netherlands enter into a fixed price contract for $160 million, with the balance for contingencies to be paid out of alternate Nova Hut funding sources. Nova Hut told Kaiser Netherlands that by agreeing to this lower price, **Kaiser Netherlands would be assisting Nova Hut in conforming to the financial restrictions imposed by the International Finance Corporation, which would only agree to provide $160 million in financing.**

(620)    Pursuant to the Procedural Rules adopted by the Arbitral Tribunal, "[t]*he Arbitral Tribunal shall not consider the witness statement of a witness who fails to appear and does not provide a valid reason*" (Section 4.9). Michael Gaffney did not appear and, as a result, his testimony should not be taken into account. However, the Procedural Timetable provided for a date on which each party had to indicate to the other party and the Arbitral Tribunal which of the witnesses called by the other party it wished to cross-examine at the hearing. The Tribunal is of the view that, since Nova Hut did not call Michael Gaffney, the witness had a valid reason not to appear and, accordingly, shall take his testimony into account.

(621)    The parties' subsequent conduct tends to accredit Kaiser's version of the facts. In December 1997, Kaiser sent to Nova Hut draft Change Orders reflecting the parties' agreement for a USD 7mio contingency fund. In particular, Kaiser confirmed such agreement immediately after Nova Hut had secured financing from the IFC (C31, letter of 15 December 1997):

> I am writing to you to confirm the agreements made between you and I in the final negotiations for Phase 1 of the mini-mill. As you may remember, we ended our negotiating session with ICF's Kaiser's lowest price at $167 million USD, and Nova Hut wanting to agree to no more than $160million USD. You and I solved this impasse in a private meeting outside of the larger negotiating session. We agreed to the following:
>
> > 1. We would treat the warranty reserve as a separate issue; namely to mutually agree on how to spend the $3.5 million USD during the warranty period as defined in the Phase 1 contract, with any underrun [sic] split equally between ICF Kaiser and Nova Hut.
> >
> > 2. The remaining $3.5 million USD amount we agreed would be handled between Nova Hut and ICF Kaiser as another separate issue. We can call it "consulting fees" or "Technical Help" or by another name, but the full amount is to ICF Kaiser's account for use in Phase 1.
>
> [...]

(622)    At the time, Nova Hut did not point out that the Contract had superseded the Memorandum of Understanding. Rather, it stated that the contract price should be renegotiated following the cancellation of the Thai Project (C92, p. 3, Minutes of a meeting held on 18 June 1999, emphasis added):

> Mr. Pretsch advised that he was not in a position to speak on the subject of Exhibit B. Mr. Petros had received the change orders from ICF Kaiser but that his position was that due to the failure of the [Thai Project] that the agreements covered are invalid. [...].
>
> Mr. Medlock advised that the validity of previous agreements would be determined by the law and not by Nova Hut. The Memorandum of Understanding is a stand alone and enforceable agreement. [...].

(623)   It thus appears that Nova Hut refused to perform the Memorandum of Understanding in an attempt to do justice to itself by lowering the contract price following the cancellation of the Thai Project (CWS3 (Dale Fackler), ¶7, p. 2):

> 7. [...]. I attended this meeting with six Nova Hut representatives, including Gerhard Pretsch, who was Nova Hut's Director for Strategy and Technology and was responsible for the Phase 1 Project. At the meeting, Mr. Pretsch said that the General Director of Nova Hut, Jaroslav Petros, had received Kaiser Netherlands' change orders, but would not honor them because of the cancellation of a completely unrelated project in Thailand (...).

(624)   It remains that the parties' true agreement was for a contract price of USD 167mio. The fact that another unrelated term of the Memorandum of Understanding appears to have been amended does not suffice to question the validity of the Memorandum as a whole.

### 4.3.3    The Fixed Price is not all-inclusive

(625)   The Arbitral Tribunal has already dealt with Nova Hut's objection that Kaiser undertook to deliver the Phase 1 work on a turnkey basis in exchange for a fixed price of USD 160mio.

(626)   As stated above, the Fixed Price was USD 160mio. The total price agreed upon by the parties was, however, USD 167mio.

### 4.3.4    It is irrelevant that the parties did not agree in writing to change the contract price

(627)   Nova Hut argues that no valid agreement to change the price of the Phase 1 Contract was ever reached. It relies on Section 12.8.1 of the Contract, which

provides, in relevant part, that *"the Contract may be amended only by written instrument signed by both Owner and Supplier"*.

(628)   The above provision is of no relevance in the present case. As a matter of fact, the parties did not agree to amend the Phase 1 Contract. To the opposite, the Memorandum of Understanding was agreed prior to the conclusion of the Phase 1 Contract, which did not supersede it.

### 4.3.5    The quantum

(629)   The record shows that the parties' agreement was that the USD 7mio contingency fee would be paid as follows:

-   USD 3.5mio at Preliminary Acceptance (Contingency Fund); and

-   50% of the balance of the second USD 3.5mio amount (Warranty Reserve) at the end of the warranty period.

(630)   It is common ground between the parties that Kaiser achieved Preliminary Acceptance on 29 October 1999 (C107).

(631)   Therefore, the Arbitral Tribunal will order that Nova Hut pay Kaiser USD 3.5mio, plus simple contractual interest at the rate of 8% above LIBOR for one year US dollars deposits from 30 December 1999 until payment, plus compound interest on such interest, at the rate of 4% per annum, from 5 January 2004 until payment.

(632)   The second USD 3.5mio amount was a warranty reserve. The parties' agreement was that Kaiser was entitled to one half of any unused part of this amount at the end of the warranty period.

(633)   However, no warranty obligation is owed by Kaiser during the warranty period in the event of termination based on Section 13.1.3 of the Contract. In this case,

Kaiser's maximum liability is limited to the payment of the amounts referred to in Section 14.6.6 read in connection with Appendix C (emphasis added):

> 13.1.4    Supplier's maximum liability or penalties paid to Owner upon a termination under Section 13.1.2 or 13.1.3 for any and all claims, causes of action, complaints, costs, expenses, damages, penalties, etc. arising out of or in connection with the Contract or performance of the Work, whether based on contract, warranties, negligence (or other wrongful act) or strict liability shall be limited, in the case of termination under Section 13.1.2 to the maximum sum set out in Section 6 of Appendix C, and **in the case of termination under Section 13.1.3, to the payment of the amounts referred to in Section 14.6.6 read with Appendix C**, as applicable. Upon such termination, Supplier shall have **no further responsibility to owner under the Contract** except as set forth in 13.3.1, below except that Supplier shall be obligated to enforce any right of enforcement or recovery for Owner under Section 13.3.1.2 if so requested by Owner.
>
> 13.1.5    If the security provided by Supplier to Owner and described in Section 8.3 is inadequate to meet any liquidated damages or liability imposed in, or for which Supplier is liable under this Section 13.1 following a termination under Section 13.1.2 or 13.1.3, **then Supplier shall promptly pay the shortfall to Owner**.

(634)    Therefore, the USD 3.5mio warranty reserve must be added to the other securities granted by Kaiser. If the other securities are sufficient to cover the penalties owed by Kaiser to Nova Hut, then Kaiser will be entitled to receive USD 1.75mio. As will be seen below (see Section VI.B.1.3), the securities provided by Kaiser do not cover the penalties owed by Kaiser to Nova Hut. As a result, the warranty reserve will be added to such securities and Kaiser's claim in the amount of 1,75 mio USD will be dismissed.

## 5.    Claimant's claim for Nova Hut's delay in obtaining financing (USD 2,295,950.00)

### 5.1    Claimant's position

### 5.1.1    Claimant's arguments

(635)    Nova Hut, which was to borrow the funds necessary for the project through the IFC, expressly acknowledged that it could not proceed with Phase 1 unless the IFC Credit Agreements became effective and funding became available to it under such agreements (Section 2.4.1 of the Phase 1 Contract).



(636)    The Phase 1 Contract provided for a date of validity, which was the date on which the Contract was signed, and a Date of Effectiveness, which was defined as the date on which Nova Hut notified Kaiser that the credit agreements between Nova Hut and the IFC had become effective and funding had become available to Nova Hut. The Date of Effectiveness was the date on which Kaiser was to proceed with the work under the Contract.

(637)    Pursuant to Section 2.4.3 of the Phase 1 Contract, the Fixed Price, Schedule and other terms were to be adjusted by mutual agreement in case the Date of Effectiveness occurred after 30 June 1997.

(638)    Nova Hut did not obtain financing from the IFC and provide notice to Kaiser that the funding was in place and available to pay Kaiser for its work until 9 December 1997, over five months after the 30 June 1997 date. Therefore, 9 December 1997 became the Date of Effectiveness, and Kaiser is entitled to adjustment of the contract price and schedule in connection with this five-month delay.

(639)    On 27 June 1997, before actually receiving funding from the IFC, which Kaiser then ignored, Nova Hut sent Kaiser a notice for Kaiser to proceed with its work, subject to Kaiser's delivery of a letter of credit and a bill of exchange (C19). Kaiser submitted the requisite letter of credit and bill of exchange and, on 31 July 1997, Nova Hut directed Kaiser to proceed with Phase 1 work (C22).

(640)    Kaiser proceeded in good faith and mobilized its staff in Ostrava. However, Kaiser was unable to begin full work on the project until 9 December 1997, the Date of Effectiveness. In the interim, Nova Hut authorized Kaiser to perform limited work only to the extent it could fund the work from internal funds. The absence of full project financing made it impossible for Kaiser to complete and get paid for those work tasks originally scheduled for this stage of the project. Kaiser was forced to restrict and tailor subcontract work agreements and schedules to meet Nova Hut's limited funding. Because Nova Hut could not pay for the work, Kaiser could not utilize the full capacity of its existing staff, which Kaiser had assembled to perform a fully operational and unrestricted project work

effort. As Nova Hut at the same time insisted that IFC financing was imminent, Kaiser could not demobilize or reduce its existing staff level.

(641)    If Kaiser had known that Nova Hut had not obtained IFC financing in July 1997, it would have demobilized and sent its staff home. The necessity of maintaining staff when Kaiser could not proceed with the full work caused damages to Kaiser.

(642)    After Nova Hut finally obtained financing from the IFC, it refused to acknowledge that the Date of Effectiveness, in accordance with Section 2.4 of the Phase 1 Contract, was 9 December 1997. Moreover, Nova Hut refused to agree to an amendment of the fixed price, schedule and other terms as required by Section 2.4.3 of the Phase 1 Contract. Instead, Nova Hut wrongfully insisted that Kaiser meet the original contract deadlines and rejected Kaiser's requests for an extension of the deadlines.

(643)    Because Nova Hut refused to acknowledge a time extension, Kaiser was forced to accelerate its work to attempt to meet the deadlines. The delays caused by Nova Hut's failure to obtain timely financing and its subsequent wrongful refusal to extend the original project deadlines as required by the Phase 1 Contract resulted in an escalation of costs to Kaiser. Those included the cost of staff overtime and additional personnel required to attempt to meet the original project deadlines.

(644)    Nova Hut caused Kaiser to be delayed in its work from 31 July 1997 until 9 December 1997. During that time, Kaiser had to fully staff the project.

(645)    Nova Hut's breach of its contractual obligations caused damages to Kaiser of USD 2,295,950.00. Kaiser is entitled to contractual interest on this amount from 9 February 1998 until payment and compound interest from 2 January 2004. Moreover, Kaiser is entitled to a declaration that it is entitled to a time extension under its contract for not fewer than 163 days.

**5.1.2    Rebuttal of Respondent's arguments**

(646)  Nova Hut's assertion that it was not required to obtain project financing by a specified date is irrelevant to the determination of this claim. As a matter of fact, Kaiser does not assert that Kaiser was required to obtain project financing by any particular date. To the contrary, the date upon which Nova Hut received funding from the IFC is the Date of Effectiveness.

(647)  If the Date of Effectiveness, i.e. the date of funding, occurred after 30 June 1997, however, the fixed price, schedule and other terms had to be adjusted by mutual agreement (Section 2.4.3 of the Phase 1 Contract). Because Nova Hut admits that it did not receive financing until 9 December 1997, the fixed price, schedule and other terms must be adjusted to compensate for the delay in obtaining financing.

(648)  Nova Hut asserts that it could arbitrarily issue a notice to proceed at any time, effectively selecting any date as the Date of Effectiveness, regardless of when it received project financing, and, accordingly, that its issuance of a notice to proceed on 27 June 1997 triggered the Date of Effectiveness.

(649)  In this respect, Nova Hut's interpretation of section 2.4.3 of the Contract as providing that Nova Hut may give notice to proceed as early as it wishes, thereby setting the Date of Effectiveness whenever it likes, is contrary to the plain language of that provision and conflicts with central rules of interpretation under Austrian civil law. The plain meaning of Section 2.4.3 of the Contract is that the Date of Effectiveness could not occur until funding became available to Nova Hut.

(650)  Nova Hut's assertion that Kaiser itself recognized at the time that the notice to proceed was effective is disingenuous. In fact, when Nova Hut issued the notice to proceed, Kaiser had no reason to believe that Nova Hut did not have funding. Kaiser relied on Nova Hut's representations regarding the availability of funding.

(651)    Contrary to Nova Hut's suggestion, Kaiser never agreed that Nova Hut was within its contract rights to issue the notice to proceed before it obtained financing and that the notice to proceed was effective.

(652)    Nova Hut's contention that its delay in obtaining financing did not result in prejudice to Kaiser is false. When Nova Hut issued its notice to proceed on 27 June 1997, Kaiser relied upon Nova Hut's representation that Kaiser could proceed without concerns regarding Nova Hut's ability to pay for the work. The absence of project financing made it impossible for Nova Hut to pay Kaiser for those work tasks originally scheduled for this stage of the project. Kaiser was forced to restrict and tailor subcontract work agreements and schedules to meet Nova Hut's limited funding. Because Nova Hut could not pay for the work, Kaiser could not utilize the full capacity of its existing staff, which Kaiser had assembled to perform a fully operational and unrestricted project work effort. In addition, because Nova Hut represented that it would soon obtain financing, Kaiser did not demobilize or reduce its existing staff level.

(653)    Nova Hut's late issuance of the USD 10 million down payment did not alleviate Kaiser's concerns, nor did it enable Kaiser to maintain the project schedule. As noted in Kaiser's letter of 21 August 1997, up to that point, Kaiser had already expended or committed more than USD 13 million to the project. Kaiser's subcontractor, Tippins, was required at that time to commit USD 25 to 30 million in order to secure equipment for the project, which it would not do without, at a minimum, the down payment.

(654)    Kaiser repeatedly advised Nova Hut that the absence of financing would affect Kaiser's ability to maintain the original schedule in the Phase 1 Contract. Kaiser specifically explained to Nova Hut that neither Kaiser nor its subcontractors could continue to commit their own funds until project financing was in place.

(655)    Had Kaiser known early that Nova Hut would not obtain financing until 9 December 1997, it would have demobilized and sent its staff home. The necessity of maintaining staff when Kaiser could not proceed with the full work

caused damages to Kaiser of USD 2,295,950.00. Kaiser should be awarded this amount, plus contractual interest from 9 February 1998 and compound interest from 2 January 2004, and granted a declaration that it is entitled to a time extension of not fewer than 163 days (Kaiser's Post-Hearing Brief of 28 October 2005, ¶¶401 ff., pp. 134-136 and 409, p. 137).

(656)   Last, Nova Hut's allegation that the parties reached agreement on the consequences of its delay in obtaining financing and that Kaiser agreed not to pursue the matter further is inaccurate. The parties met and discussed the issue of Nova Hut's delay in obtaining project financing, but did not reach agreement on the disposition of the claim. The proposal regarding resolution of this claim was conditioned on Nova Hut's agreement to pay the costs incurred by Kaiser as a result of the Demonstration Day ceremony. Nova Hut has refused to pay Kaiser's demonstration Day costs and, accordingly, the parties have no agreement regarding the damages incurred by Kaiser as a result of Nova Hut's delay in obtaining financing.

## 5.2     Respondent's position

(657)   There was no requirement under the Phase 1 Contract for Nova Hut to obtain financing by a specified date. In particular, Section 2.4.3 of the Contract, which provides that the price, schedule and other terms will be amended if the Date of Effectiveness occurs after 30 June 1997, does not impose an obligation on Nova Hut to obtain financing by 30 June 1997. Hence, it cannot be liable to Kaiser for failure to do so. Nor is there any other basis for modifying the contract terms.

(658)   Nova Hut was entitled to give Kaiser notice to proceed before it had obtained financing.

(659)   Contrary to Claimant's suggestion, Respondent made no misrepresentation as to whether it had obtained financing from the IFC. In particular, there is no implicit misrepresentation because Nova Hut gave notice to proceed and Section 2.4.3 of the Phase 1 Contract provides that Nova Hut's notification that funding has been obtained will constitute Nova Hut's notice to proceed.

(660)    Kaiser was able to start working on the project almost immediately after the date of the Phase 1 Contract and it did so. Therefore, the effect of Nova Hut's delay in obtaining financing was certainly not to prevent Kaiser from carrying out any work during the entire period from 30 June until 9 December 1997.

(661)    The only particular that Kaiser gives in support of its allegation that it was forced to restrict and tailor subcontract work agreements and schedules to meet Nova Hut's limited funding is that Tippins was required to commit USD 25 to 30 million in order to secure equipment for the project and that Tippins would not commit those funds without the USD 10 million down payment. The down payment, which was due on 11 August 19997, was made with only one month delay on 15 September 1997. Yet Kaiser claims compensation for the entire period from 30 June to 9 December 1997.

(662)    In any event, Claimant was not entitled to an automatic adjustment of the fixed price, schedule and other terms because of Nova Hut's delay in obtaining financing.

(663)    On 23 June 1999, the parties reached agreement on the consequences of Nova Hut's delay in obtaining financing.

**5.3      Discussion and decision**

**5.3.1    Introduction**

(664)    Kaiser claims damages in an amount of USD 2,295,950.00 plus interest. It also seeks "*a declaration that it is entitled to a time extension under its contract of not fewer than 163 days*" (Claimant's Statement of Claim of 10 November 2004, ¶6.13, p. 30).

(665)    The above amount corresponds to additional *variable* costs[5] that fall in two categories:

-    costs of Kaiser's staff maintained between 31 July and 9 December 1997 without being able to proceed with full work as a result of Nova Hut's alleged delay in obtaining financing; and

-    additional costs incurred in an attempt to meet the deadlines following Nova Hut's failure to acknowledge and grant a time extension (acceleration).

(666)    Regarding the costs incurred to maintain staff between 31 July and 9 December 1997, Kaiser essentially argues that, on 27 June 1997, Nova Hut directed it to proceed with the Phase 1 work; that the notice was not received until 31 July 1997; that, at the time it directed Kaiser to proceed with the works, Nova Hut had not obtained financing and, hence, that its notice was improper; that Kaiser ignored that Nova Hut had not obtained financing; that, accordingly, Kaiser mobilized its staff in good faith; that, due to the limited funding available, Nova Hut authorized it to perform work only to the extent such work could be funded by Nova Hut from internal funds; that the absence of full project financing made it impossible for Kaiser to complete and get paid for those works originally scheduled and could not utilize the full capacity of its staff, which had been assembled to perform a fully operational and unrestricted project work effort; that Kaiser could not demobilize or reduce its staff as Nova Hut insisted that IFC funding was imminent; that Nova Hut gave notice to Kaiser that the funding was in place on 9 December 1997; and that, therefore, 9 December 1997 became the Date of Effectiveness.

(667)    Regarding the remaining damages, Kaiser claims that Nova Hut refused to acknowledge that 9 December 1997 was the Date of Effectiveness; that it refused to grant Kaiser a time extension and wrongfully insisted that Kaiser meet the original deadlines; and that this resulted in an escalation of costs to Kaiser,

---

[5]    As to the nature of the costs claimed by Kaiser, see the explanations of Dale Fackler, CWS3¶27, p. 8. Dale Fackler testifies that the amount claimed by Kaiser does not include fixed costs, which would not have been decreased by demobilizing.

which costs included staff overtime and additional personnel required to attempt to meet the original project deadlines.

(668)    Nova Hut replies:

-    that it was not required to obtain project financing by a specified date;

-    that, accordingly, and in any event, its failure to obtain project financing does not entitle Kaiser to claim damages or any modification of the contract term;

-    that Kaiser was not materially prejudiced; and

-    that the parties settled Kaiser's claim.

(669)    The Arbitral Tribunal shall now review in turn Nova Hut's arguments.

### 5.3.2    Whether Nova Hut was or not obliged to obtain financing by a specified date is irrelevant

(670)    Nova Hut alleges that, since it was not required to obtain financing by a specified date, it cannot be held liable to Kaiser for failure to do so.

(671)    It is correct that the Contract did not require that Nova Hut obtain financing by a certain date. In fact, the uncertainty regarding the point in time when financing would be secured was explicitly reflected in the Contract (Section 2.4.1, emphasis added):

> 2.4.1 The Owner will be borrowing the funds necessary to pay for Phase 1 from a consortium of lenders lead [sic] by and represented by the IFC, pursuant to certain loan and credit agreements (the "IFC Credit Agreements") to be executed between the IFC and the Owner. **The Owner anticipates that the IFC Credit Agreements will become effective during 1997, and that funding for Phase 1 under the IFC Credit Agreements will become available to the Owner immediately [sic] such agreement become effective.** [...].

(672)    Nevertheless, Nova Hut's argument that it was not bound to obtain financing by a specified date and, hence, that it cannot be held liable to Kaiser for failure to do so is irrelevant.

(673)    Kaiser's complaint is not that Nova Hut was late in obtaining financing, but that it instructed Kaiser to proceed with the work without having secured financing in the first place, in other words, that Nova Hut's notice to proceed was premature.

(674)    The true issue to be determined is therefore not whether financing was obtained timely, but whether the notice to proceed was given untimely.

### 5.3.3    Nova Hut was obliged to secure financing prior to issuing the notice to proceed

(675)    Nova Hut was under an obligation to secure financing and make such financing available to Kaiser prior to issuing a notice to proceed with the work. Such obligation may be inferred from several contract provisions.

(676)    First and foremost, Nova Hut did not have sufficient resources to finance the work with internal funds. This was expressly set out in Section 2.4.1 of the Contract (emphasis added):

> 2.4.1 **The Owner will be borrowing the funds necessary to pay for Phase 1 from a consortium of lenders** lead [sic] by and represented by the IFC, pursuant to certain loan and credit agreements (the "IFC Credit Agreements") to be executed between the IFC and the Owner. The Owner anticipates that the IFC Credit Agreements will become effective during 1997, and that funding for Phase 1 under the IFC Credit Agreements will become available to the Owner immediately [recte: after] such agreements become effective. **The Owner records that it cannot proceed with Phase 1 unless the IFC Credit Agreements become effective and funding becomes available to the Owner under the IFC Credit Agreements**.

(677)    Then, pursuant to Section 2.4.3 of the Phase 1 Contract, Nova Hut's notice to Kaiser that Kaiser proceed with the work was to take the form of a notice that funding was available (emphasis added):

> 2.4.3 The Owner will notify the Supplier when the IFC Credit Agreements become effective and funding becomes available to the Owner thereunder [sic], **which notification shall constitute the Owner's notice to the Supplier to proceed** under the Contract, and the date on which such notice is given shall constitute the Date of Effectiveness. [...].

(678)  The scheduling of the project and the payment mechanism adopted by the parties also demonstrate clearly that Nova Hut could not direct Kaiser to proceed with the work if it had not secured financing beforehand.

(679)  Thus, Kaiser was not free to schedule the work as it pleased. To the contrary, Section 5.1.1 of the Contract referred to a work schedule in Appendix D that Kaiser was "obligated to achieve". Section 5.3.1 of the Contract enumerated certain milestone dates that were "*recorded as being important to the accomplishment of Preliminary Acceptance by the date by which Preliminary Acceptance is required to be accomplished pursuant to Section 16.1*" (i.e., 30 June 1999).

(680)  Several provisions show that, to achieve Preliminary Acceptance within the imposed time limit, Kaiser was to start working immediately upon receipt of Nova Hut's notice. Section 5.1.1 provided that "[t]*he Work to be performed under the Contract and the Project shall commence upon the Date of Effectiveness*". Section 16.1.1 stipulated that "[t]*he Work to be performed shall be commenced on the Date of Effectiveness and, subject to authorized adjustments and to delays not caused by the Supplier, Preliminary Acceptance shall be achieved by the Supplier not later* [sic] *June 30, 1999, except as may be extended pursuant to Articles 5 or 9 or by mutual agreement*".

(681)  Also, the parties had recognized the importance that financing be available for Kaiser's ability to comply with the anticipated work schedule.

(682)  In this respect, section 6.5.3 of the Contract provided as follows (emphasis added):

6.5.3 Attached as Appendix F is the schedule of payments, setting out the anticipated construction schedule and matching the construction against such payments.

.1    The Owner and the Supplier record that it is their mutual intent that the Owner shall pay the Fixed Price to the Supplier **to a schedule that will keep Supplier on a cash-flow positive basis and that the payment schedule should be structured to correspond to the actual progress of the Works. To accomplish this, the Owner and the Supplier will follow the following procedures**.

(683)    Section 6.5.3 even provided for a coordination requirement between contracts concluded by Kaiser with subcontractors, on the one hand, and funding, on the other:

.2    The payment schedule will be reviewed and revised by Supplier and Owner at least monthly following the Date of Effectiveness, to take into account all executed Subcontracts in a manner consistent with the requirements of this Contract and to develop a materially greater level of detail. Thereafter, the Supplier and the Owner will periodically review, discuss and agree an updated payment schedule as the Project progresses.

(684)    In fact, Kaiser was prohibited from making payments to its subcontractors beyond the amounts that it could itself recoup from Nova Hut (Section 6.5.3, emphasis added):

.3    In jointly negotiating with Subcontractors, Supplier and Owner will cooperate during the negotiation of contracts with Subcontractors to structure the contracts with Subcontractors to require that payments be made to Subcontractors in the manner most consistent with the actual progress of the Works and obligations of the Supplier to Subcontractors in accordance with executed contracts. **Supplier will only make payments to Subcontractors in accordance with those terms or on such more favourable terms as Supplier might thereafter obtain**. [...].

(685)    In relevant parts, Appendix F reads as follows (C18, p. 187, emphasis added):

F.1    [...]

F.2    Both Parties recognize the importance of having a timely and accurate forecast of the expected schedule of payments during the term of this Contract. **This is particularly important for the Owner in order that financing requirements and sources of funds be balanced with cashflow requirements of the advances to be made to the Supplier**.

F.3   [...]

(686)   Last, Appendix F also shows that the parties anticipated that, between July 1997 and December 1997, Nova Hut would make advance payments to Kaiser towards the contract price totalling more than USD 34mio (C18, pp. 193-194).

(687)   In light of the above considerations, the Arbitral Tribunal finds that Nova Hut was obliged to secure financing prior to directing Kaiser to proceed with the Phase 1 work.

### 5.3.4   Nova Hut breached its obligation to secure financing prior to directing that Kaiser proceed with the Phase 1 work

(688)   Nova Hut does not dispute that, on 27 June 1997, it instructed Kaiser to proceed with the Phase 1 work (C19, emphasis added):

> Pursuant to the Contract between NOVA HUT, a.s. and ICF Kaiser Netherlands B.V. for the Design and Construction of the Phase 1 of the Flat Roll Products Mini Mill at NOVA HUT's facilities in Ostrava, Czech Republic (the Contract), **I am pleased to issue this Notice for ICF Kaiser Netherlands B.V. to proceed with its Work under the Contract**.
> This Notice shall be effective four (4) days after the delivery to NOVA HUT, a.s. of a Performance Guarantee Letter of Credit in the amount of USD 5.000.000,- and Bill of Exchange in the amount of USD 5.000.000,- in the form set forth in Appendices A and F to the Contract as required by Section 8.3.2 of the Contract.

(689)   Nor does Nova Hut dispute that, at the time the above notice was issued, it had not secured financing (Respondent's Statement of Defence and Counterclaim of 24 January 2005, ¶96, p. 36):

> 96. Nova Hut was unable to find such a source in time to pay the invoice on August 11, 1997. However, it was able to and did pay the $10 million on September 15, 1997. On December 9, 1997, Nova Hut obtained financing from the IFC.

(690)   It thus appears that Nova Hut breached its contractual obligation to secure financing prior to instructing Kaiser to start working under the Phase 1 Contract.

### 5.3.5   Nova Hut's breach of contract did prejudice Kaiser

(691)   Kaiser claims that it would not have mobilized or would have demobilized and sent home the staff necessary to perform the tasks originally scheduled for this stage of the project had it known that financing was not available. In other words, the damages claimed by Kaiser corresponds to the additional cost it incurred to maintain staff without being able to proceed with the full work (Claimant's Statement of Claim, ¶6.9, pp. 28-29). Kaiser also contends that the lack of financing caused it to be delayed in its work from 31 July 1997 until 9 December 1997.

(692)   Nova Hut asserts that "[t]*he effect of Nova Hut's delay in obtaining financing was certainly not to prevent Kaiser from carrying out any work during the entire period June 30, 1997 to December 9, 1997 [...]*" (Respondent's Statement of Defence and Counterclaim of 24 January 2005, ¶100, p. 37).

(693)   It is true that the construction of the plant was not completely immobilized between June and December 1997. Kaiser readily acknowledges that it performed some work over this period of time (C26):

> During the period of 27 June 1997 to 15 September 1997 ICF Kaiser developed bid specifications and solicited bids for engineering work packages, concrete testing, survey work, building foundations, cranes, structural steel supply/erection, scale pit subcontracts and lighting towers. During the 27 June to 15 September 1997 period, ICF Kaiser placed purchase orders for the foundation work, concrete testing and survey work. The foundation are now in a position to accept structural steel for the steel for the hall.

(694)   What appears however is that the lack of financing restricted Kaiser and prevented a regular progress of the work (C23):

> In accordance with the Notice to Proceed, ICF Kaiser has begun work on the project and has expended or committed more than $13,000,000. In order to maintain the Project's schedule Tippins must commit approximately $25 to 30 million dollars in equipment now. They will not do so without a down payment from ICF Kaiser, which is part of the obligation included in our down payment from Nova Hut a.s. to ICF Kaiser. [...].

(695)   On several occasions, Kaiser warned Nova Hut of the negative impact of the lack of financing on the progress of the Phase 1 work. On 14 October 1997, Kaiser

even requested that the project milestone dates be extended by seven weeks (C26):

> Due to the uncertainty of the availability of funding as advised by us and as confirmed in Nova Hut's letter dated 4 September 1997, both ICF Kaiser and Tippins were unable to incur additional financial exposure until Nova Hut could assure us that the cash flow for the Phase 1 project was in place. In fact, it was not until last week that the final agreements were reached for the cash flow for 1997.
>
> By this letter ICF Kaiser officially requests a seven (7) week extension to the project completion date and intermediate milestone dates.

(696)    Yet, Nova Hut has not disputed the fact that Kaiser had mobilized the necessary staff and other resources to perform the tasks originally scheduled for this stage of the project.

(697)    In this respect, Dale Fackler, a witness called by Kaiser, made the following unchallenged testimony (CWS3¶20, p. 6):

> 20. [...]. Had Kaiser Netherlands known that Nova Hut had not obtained IFC financing in July 1997, that it did not until December 9, 1997, and therefore Kaiser Netherlands could not proceed with its work as planned, Kaiser Netherlands would have demobilized after the Phase 0 project, sent its staff home and shut down its offices. Demobilization would have saved Kaiser Netherlands its overhead costs during the period between July to December 1997.

(698)    Based on the foregoing, the Arbitral Tribunal considers that Kaiser was prejudiced by the lack of financing.

### 5.3.6    Kaiser ignored that Nova Hut had not secured financing

(699)    Obviously, Kaiser may only be compensated for the damages it claims to have incurred if it acted under the belief that Nova Hut had secured financing and was entitled to believe so. As a matter of fact, if Kaiser knew that financing would not be available but nevertheless decided not to demobilize, it will be deemed to have taken the risk to incur extra costs. Moreover, Kaiser will only be entitled to the amount claimed if Nova Hut was not able to compensate for the lack of IFC financing by other resources available to it.

(700) Dale Fackler has confirmed that Kaiser assumed that financing would be immediately available (CWS3¶17, p. 5):

> 17. Kaiser Netherlands proceeded with work after receiving Nova Hut's Notice to Proceed on July 31, 1997. At that time, Kaiser Netherlands did not know that Nova Hut was having difficulty in obtaining funding from the IFC and that it had not received the funding, but acted in good faith under the belief that Nova Hut had reached agreement with the IFC.

(701) And further (CWS3¶20, p. 6):

> 20. Based upon Nova Hut's statement and representations concerning financing, Kaiser Netherlands did not demobilize, but kept its offices and employees in Ostrava so that it could continue work. [...].

(702) The fact that, on 8 July 1997, Kaiser complied with Section 8.3.2 of the Contract and provided Nova Hut with a USD 5mio Performance Letter of Credit (C183, p. 9; see Section VI.A.2 for further details) is another indication that Kaiser believed that financing had been secured. The same conclusion may be drawn from the fact that, on 25 July 1997, Kaiser invoiced the deferred project development costs to Nova Hut. As mentioned above, the payment of such costs was conditional upon Nova Hut obtaining financing from the IFC (see Section VI.A.3).

(703) Kaiser was entitled to assume that financing had indeed been obtained.

(704) As already noted, Section 2.4.3 of the Contract provided that the notice to proceed would be given in the form of a notice that funding was available. Upon receipt of the notice to proceed, Kaiser could therefore infer that Nova Hut had secured financing with the IFC.

(705) All the more so that, in accordance with Section 2.4.2 of the Contract, Nova Hut was under a duty to "*keep* [Kaiser] *informed of progress in finalizing the IFC Credit Agreements*". Yet, Respondent does not even allege that it advised Kaiser of any difficulties it was encountering in the process of securing financing.

(706)    It also appears that when Nova Hut did convey to Kaiser information about the steps taken to the IFC, it informed Kaiser that financing would be available shortly (C24, letter of 4 September 1997, emphasis added):

> Thank you for your letter concerning the financing of Phase 1 Minimill Project. We understand your concerns and your position, too.
>
> On the other hand we please you to understand our situation and our possibilities including our financial possibilities.
>
> [...]
>
> I hope you are also aware of very complicated negotiations with IFC. It seems to us that we are near to conclusion. **Yesterday the agreement between Commercial Bank and NH was signed which should result in releasing of money from IFC loan.**
>
> Based on expectation we have we think that financial package allowing us to continue the payment for both Phase 0 and Phase 1 **will be at disposal till the mid October latest.**
>
> [...]

(707)    It remains to be determined whether Nova Hut could and did compensate for the lack of third party financing over the summer and autumn of 1997.

(708)    The USD 10mio down payment effected by Nova Hut in September 1997 did not make up for the lack of third party financing. As expressly set out in Appendix F to the Phase 1 Contract, only USD 3mio out of such payment were intended to pay subcontractors (C18, p. 191):

> 1.    A down payment of $ 10 million to cover the costs of insurance, Letters of Credit, reimbursement for expenses in negotiating the project, allowances due NPD, portion of Kaiser's overhead and a portion of down payments due Supplier's Subcontractors as follows:
>
> | | |
> |---|---|
> | NPD Fee | $ 1,800,000 |
> | Performance L/C (partial) | 225,000 |
> | Phase 1 pre-contract costs | 400,000 |
> | Insurance (partial) | 270,000 |
> | Kaiser Overhead | 4,280,000 |
> | | |
> | Subtotal | $ 6,975,000 |
> | | |
> | Funds to be used for Down Payments to Kaiser's Subcontractors | $3,025,000 |

Total Down Payment          $10,000,000

(709)    Besides, the down payment that had to be made within 30 days of receipt of Kaiser's relevant invoice (Section 6.5.3.5(b)) - which Kaiser issued on 15 July 1997 (R2) – was only paid on 16 September 1997, i.e. with a two-month delay (see Respondent's Statement of Defence of 24 January 2005, ¶99, p. 37). At this juncture, pursuant to Appendix F to the Contract, Nova Hut should have made advance payments totalling more than USD 5.5mio.

(710)    In its 21 August 1997, Kaiser expressly stated that, in order to maintain the work schedule, its main subcontractor, Tippins, would have to commit between USD 25 to 30 million, which it would not do without a down payment from Kaiser (C23).

(711)    Therefore, the Arbitral Tribunal finds that the lack of financing actually prejudiced Kaiser.

## 5.3.7   The quantum

(712)    Kaiser claims USD 2,295,950.00, plus interest, in additional costs incurred as a result of Nova Hut's breach and a declaration that it is entitled to a time extension of not fewer than 163 days (31 July to 9 December 1997).

(713)    Regarding the time extension, Kaiser alleges that it has been delayed in its work from 31 July to 9 December 1997.

(714)    As mentioned above, the record shows that Kaiser was effectively hindered and that the work scheduled for this phase of the project did not progress as anticipated due to Nova Hut's fault.

(715)    However, it appears that the time extension claimed by Kaiser is excessive.

(716)    In a letter sent on 24 September 1997, Kaiser assessed the delay incurred by the project to be of two months (C25). Less than one month later, on 14 October 1997, Kaiser requested only a seven-week time extension of the project completion date (C26). The letter sent by Kaiser to Nova Hut, however, shows that part of the delay to be compensated by such time extension did not result from the absence of financing (emphasis added):

> By this letter ICF Kaiser officially request a seven (7) week extension to the project completion date and intermediate milestone dates.
>
> ICF Kaiser is committed to continue to attempt to complete the project on the original schedule, however structural steel supply is critical. **As you know Nova Hut has still not accepted or rejected our recommended supplier and your response has been outstanding for approximately one month**.

(717)    Eventually, on 27 November 1997, Kaiser issued Change Notice #18 requesting a time extension of seven weeks, out of which _five_ were deemed to be the consequence of the lack of funds and the late payment of the USD 10mio down payment (R7).

(718)    Therefore, the Arbitral Tribunal finds that the lack of financing delayed the construction schedule by five weeks.

(719)    Kaiser has argued that the economic damage it suffered as a result of Nova Hut's breach of contract amounted to USD 2,295,950.00 (C20). Dale Fackler explains how he calculated this amount as follows (CWS3¶27, p. 8):

> 27. Kaiser Netherlands is entitled to extra costs for the delays caused by Nova Hut from July 31, 1997, to December 9, 1997. Nova Hut's delays caused an increase in Kaiser Netherlands variable costs on the project. These costs include salaries for field personnel, employment fees and taxes, foreign taxes, and consultants. I have not included fixed costs – which are those that remain essentially unchanged based on the level of work, such as rent of office space – because Kaiser Netherlands would have incurred these costs and they would not have been decreased by demobilizing. Kaiser Netherlands is entitled to variable costs from July to December of 1997 of $ 2,295,950.

(720)    Nova Hut disputes Kaiser's calculation of the damage incurred as a result of the lack of financing (see Respondent's Post-Hearing Brief of 28 October 2005, ¶¶57 ff., pp. 25-26). According to Nova Hut, Kaiser improperly included costs incurred

in July and December 1997 and claims all the variable costs it incurred between July and December 1997 even though it performed work during that period.

(721)    The Arbitral Tribunal observes that Dale Fackler's calculation improperly takes into account variable costs incurred during the month of July 1997. Yet, according to Kaiser itself, "*Nova Hut caused Kaiser to be delayed in its work **from July 31, 1997, the date on which Nova Hut directed Kaiser to begin work**, until December 9, 1997, the date on which Nova Hut obtained financing and could pay Kaiser for its work*" (See Claimant's Statement of Claim, ¶6.12, p. 29, emphasis added).

(722)    The amount included in Kaiser's calculation for the month of July 1997, i.e. USD 308,908.00 must thus be deducted. Also, only 29% (9/31) of the USD 534,179.66 variable costs (USD 154,912.00) for the month of December 1997 shall be taken into account given that financing was obtained on 9 December 1997. Therefore, the Arbitral Tribunal shall base its calculation on an amount of USD 1,607,774.00.

(723)    Kaiser claims that it incurred the above variable costs over a period of 163 days. Yet, the Arbitral Tribunal has found above that the delay actually incurred by Kaiser between July and December 1997 was of five weeks. Therefore, the Arbitral Tribunal should award to Kaiser damages in the amount of USD 429,558.00 corresponding to the average variable costs over a five-week period, taking into account the fact that Kaiser incurred variable costs of USD 1,607,774.00 over 131 days (1 August to 9 December 1997).

### 5.3.8    Kaiser's claim for breach of contract was settled

(724)    On 3 June 1999, Kaiser wrote to Nova Hut insisting that the parties should resolve certain open contractual issues (R24). A memorandum setting out Kaiser's position on these issues was appended to Kaiser's letter. In relevant parts, the memorandum provided as follows:

> Phase 1 Contract Price, Schedule and other Contract terms Adjustment Caused By Project Financing Delays Resulting in Delay to the Date of Effectiveness
>
> [...]
>
> ICF Kaiser maintains that, because of the Nova Hut initial five (5) month delay in completing project financing arrangements whereby the Date of Effectiveness was delayed until 9 December 1997, the original Contract Schedule dates are no longer available and that an extension of time is due. With this extension of time, liquidated damages are not applicable based on the original Contract Schedule dates. In addition, ICF Kaiser seeks an adjustment of the Fixed Price as it is entitled to recover additional overhead costs for the extended five (5) month period for prolongation and escalation costs and as it was required to maintain personnel on the project while awaiting full project funding to be finalized. [...].
>
> This element of ICF Kaiser's claim does not include any consideration for additional claims for costs from affected subcontractors. Subcontractors claims for added costs associated with financing delays will be submitted when the full extent of these claims is known and ICF Kaiser reserves its right to do so.
>
> Failure by Nova Hut to mutually agree to the adjustment mentioned herein has caused Nova Hut to be in breach of its contractual obligations and ICF Kaiser seeks the appropriate remedy therefore. The IFC Kaiser position in this matter is detailed and substantiated in Exhibit C which follows.
>
> Due ICF Kaiser as a Result of Delays in Date of Effectiveness
>
> Cost....................US $2,292,000
>
> Time............. .. ...164 Days

(725)    Kaiser's claim for adjustment of the contract price and the work schedule was set out in greater details in Exhibit C to the memorandum.

(726)    Nova Hut argues that the parties met on 21 June 1999 and reached agreement on the consequences of Nova Hut's delay in obtaining financing.

/ 74

(727)    Exhibit R28 shows that, on 21 June 1999, representatives of the parties met to discuss various "*Open Contractual Issues*", in particular "*Exhibit "C" Extension of Time Claim*" (R28):

> ICF KAISER pointed out that Ph. 1 contract is very clear in that work could not proceed until IFC agreement and funding were in place. [...]. ICF Kaiser are of the opinion that they are entitled to 5 months extension, adjustment to fixed price, and to bonus fee for early finish.
>
> NH stated that both parties have a different opinion on the Date of Effectiveness. [...]. ICF KAISER never questioned the date at that time and for this reason NH insist on the Date of Effectiveness June 27, 1999.

(728)    Eventually, the parties agreed that the milestone date for Preliminary Acceptance would remain unchanged, but that the grace period for Kaiser to achieve it without being imposed liquidated damages would be extended until 16 September 1999 (R28, p. 5, emphasis added):

> Conclusions to Exhibit C:
>
> 1.    [. ]
>
> 2.    [. .]
>
> 3.    **The grace period for Preliminary Acceptance according to article 5.6.2 of the Contract will be extended in comparison to initial date of July 31, 1999 until September 16, 1999** when the Ph.0 warranty L/C expires. It was further agreed that Ph.1 Performance L/C will be increased by $8 mil September 17, 1999 at the latest, which means that total L/C will amount to $19.1 mil. Total warranty (L/C + Bill of Exchange) will be equal to the initial amount of $24.1 mil according to contract clause 8.3.2.2.
>
> 4.    **This does not affect the validity of Preliminary Acceptance date of June 30, 1999** according to Section 5.3.1.10 of the Contract.
>
> By this arrangement ICF KAISER will retract its claim presented in Exhibit C and agree not to further pursue the matter.

(729)    Contrary to Kaiser's allegations, the above agreement was final and unconditional. The language used by the parties in this respect is unequivocal. Thus, the parties agreed that, with this agreement, "*Exhibit "C"* [could] *be considered closed*". It was also stated that "[b]y *this arrangement ICF KAISER* [would] *retract its claim presented in Exhibit C and agree not to further pursue the matter*".

/ 75

(730)   Admittedly, at some point of the discussion, Kaiser stated that in light of Nova Hut's approach towards Exhibit E (additional costs for the Dedication Day ceremony), Exhibit C issues would have to be reopened. However, the parties then agreed that this issue would be discussed separately in working groups (R28, p. 6):

> It was decided that project directors of both parties (Mr. Winstanley and Mr. Halabrin) will form working groups and will meet at a later date to agree on real cost associated with Dedication Ceremony and conclude the matter.

(731)   Accordingly, Exhibit C was definitively closed:

> At the end of the discussion all issues were summarized. Exhibits "A" and "B" still stay open, Exhibit "C" was closed, Exhibit "D" will be a subject to working parties, and Exhibit "E" a subject to Project Directors.

(732)   On 29 February 2000, Kaiser sent a revised Exhibit C confirming the parties' agreement (R78):

> Current Status of Claim:
>
> -   Claim is valid and has been fully documented to Nova Hut
>
> -   Amount due of US$2,292,999 dropped by ICF Kaiser in exchange for the Nova Hut agreement to revised date for Preliminary Acceptance with no assessment of liquidated damages.
>
> -   Unresolved is the date for Final Acceptance.

(733)   It thus appears that, as pointed out by Nova Hut, Kaiser's claims resulting from the lack of financing during the early stages of the project was settled. The parties' agreement explicitly mentions the overhead costs claimed by Kaiser (see ¶(727), "*ICF Kaiser are of the opinion that they are entitled to 5 months extension, **adjustment to fixed price**, and to bonus fee for early finish*").

### 5.3.9   Conclusion

(734)   Therefore, the Arbitral Tribunal shall dismiss Kaiser's claims for additional costs incurred as a result of Nova Hut's failure timely to obtain financing and for a

declaration that is entitled to a time extension under the Contract of not fewer than 163 days.

**6.     Claimant's claim for a bonus payment for early achievement of Preliminary Acceptance (USD 2,800,000.00)**

**6.1     Claimant's position**

**6.1.1     Claimant's arguments**

(735)     The Contract provided that Kaiser was to demonstrate and achieve Preliminary Acceptance by 30 June 1999. Given that this date for Preliminary Acceptance was premised upon a start date of 30 June 1997, Kaiser had two years to achieve Preliminary Acceptance.

(736)     On 9 December 1997, Nova Hut obtained financing from the IFC. This became the Date of Effectiveness. The Contract provides that, in this case, the work schedule would be adjusted by mutual agreement. Accordingly, Kaiser is entitled to be in the same position it would have been in but for the delays caused by Nova Hut.

(737)     Kaiser is entitled to a further extension of 58 days based on delays caused by Nova Hut's insistence that Kaiser prepare for an out-of-scope Demonstration Day ceremony. The 58-day delay includes 21 days for Nova Hut's failure to supply electricity and 37 days in lost progress because of the Demonstration Day work.

(738)     The parties discussed several issues, including Kaiser's claim for costs associated with the Demonstration Day ceremony at a meeting held on 23 June 1999. Kaiser's acceptance of the terms proposed for the settlement of the preliminary acceptance and financing delay claims was contingent upon an agreement on the Demonstration Day claim. As there was no such agreement, Kaiser refused the proposed terms for Preliminary Acceptance.

177

(739)    Kaiser was entitled to a bonus of USD 40,000.00 for each day that it achieved Preliminary Acceptance earlier than 30 days before than the original required date.

(740)    Because of Nova Hut's cumulative delays, Kaiser was not required to obtain Preliminary Acceptance until 6 February 2000. It was therefore entitled to a bonus for each day that it achieved Preliminary Acceptance before 7 January 2000. Since Kaiser achieved Preliminary Acceptance on 29 October 1999, it is entitled to a bonus of USD 2,800,000.00 (70 days x USD 40,000.00), plus contractual late payment interest since 29 December 1999 and compound interest from 2 January 2004 (Kaiser's Post-Hearing Brief of 28 October 2005, ¶¶401 ff., pp. 134-136 and 410, p. 138).

(741)    Kaiser was only entitled to a bonus if it passed the performance tests relating to Final Acceptance. The 4WIPPT relates to Final Acceptance and, if the Tribunal finds that Kaiser did not pass the test, then Kaiser would not be entitled to a bonus. By contrast, Kaiser was not required to pass the quality tests and the quality tests have no bearing on whether Kaiser is entitled to a bonus for early achievement of early acceptance.

## 6.2    Respondent's position

(742)    Pursuant to Section 2.4.3 of the Contract, the Date of Effectiveness was the notice to proceed, which Nova Hut could issue as early as it wished. The notice to proceed was to be deemed to have been issued at the latest on the date when financing was available. Nova Hut was entitled to issue a notice to proceed on 27 June 1997. The Date of Effectiveness was the date of such notice. Kaiser recognized that the notice to proceed was effective.

(743)    The Phase 1 Contract does not provide for an automatic extension of the schedule in the event of a late Date of Effectiveness. Any extension must be negotiated and agreed upon by the parties. Therefore, even if the Date of Effectiveness had occurred on 9 December 1997, which it did not, Kaiser was not entitled to an automatic extension of the contractual schedule. In fact, following a

Project Change Notice issued by Kaiser on 27 November 1997 requesting a seven-week time extension, the parties discussed and agreed at meetings held on 23 June 1999 and 21 October 1999 that the milestone date for Preliminary Acceptance would remain 30 June 1999 but that Kaiser would be immune from penalties for delay until the end of October 1999.

(744)   Nova Hut was not responsible for the delays incurred as a result of the Demonstration Day ceremony. As a matter of fact, the work performed by Kaiser in relation with the Demonstration Day ceremony was within Kaiser's Phase 1 scope of work. Moreover, Nova Hut's request to schedule the ceremony on 22 June 1999 was based on the assumption that Hot Tests would take place on 15 June 1999 pursuant to Section 5.3.1 of the Contract. Accordingly, since the work to be performed by Kaiser for the Dedication Day ceremony was no more than a Preliminary Hot Test, no additional work would have been involved if Kaiser had complied with the work schedule. Furthermore, Kaiser agreed to the date proposed without stating that additional costs would be incurred. In any event, the Contract does not provide for an extension of the work schedule as a result of extra work, for which Kaiser claims 37 out of the 58 days of time extension requested.

(745)   The bonus claimed by Kaiser was only payable if it met all the performance tests of Appendix G to the Contract without the imposition of any penalties. Kaiser never passed the 4WIPPT and, by its own admission, is liable for penalties in connection with the HRCQTs. Therefore, Kaiser is not entitled to a bonus for early achievement of Preliminary Acceptance.

**6.3     Discussion and decision**

**6.3.1   The Date of Effectiveness occurred on 27 June 1997**

(746)   Kaiser argues that the Date of Effectiveness occurred on 9 December 1997 when Nova Hut obtained financing.

(747)   Section 2.4.3 of the Contract provides as follows:

/ 7 4

> 2.4.3 The Owner will notify the Supplier when the IFC Credit Agreements become effective and funding becomes available to the Owner thereunder [sic], which notification shall constitute the Owner's notice to the Supplier to proceed under the Contract, and the date on which such notice is given shall constitute the Date of Effectiveness. If the Date of Effectiveness occurs after June 30, 1997 the Fixed Price Schedule and other affected terms shall be adjusted by mutual agreement.

(748)   The Arbitral Tribunal has found above that Nova Hut breached the Contract by directing Kaiser to proceed with the Phase 1 work when it had not secured financing (see Section VI.A.5.3.4). It remains that Nova Hut issued a notice to proceed on 27 June 1997. While this notice should have been taken the form of a "notice that funding was available", the Date of Effectiveness occurred on that date.

(749)   Besides, Kaiser does not dispute that it started working upon issuance of the notice to proceed and acknowledged that fact contemporaneously. For instance, on 21 August 1997, Kaiser confirmed that it had begun to work on the project in accordance with the notice to proceed and had committed more than USD 13mio (C23). On 14 October 1997, Kaiser wrote as follows to Nova Hut (C26, emphasis added):

> In accordance with our letter to Nova Hut a.s. dated 21 August 1997, we advised that the project was being delayed due to lack of funds to continue the project. Nova Hut eventually paid ICF Kaiser Netherlands B.V. the down payment required by the contract on 15 September 1997. **This down payment should have been received 30 days from the Date of Effectiveness, i.e. 28 July 1997**. Until that payment was made, the project was except for engineering activities effectively delayed.

(750)   Therefore, the Arbitral Tribunal finds that the Date of Effectiveness occurred on 27 June 1997.

### 6.3.2    Kaiser had to achieve Preliminary Acceptance by 29 October 1999

(751)   Section 2.4.3 of the Contract provides that "[i]f the Date of Effectiveness occurs after June 30, 1997 the Fixed Price, Schedule and other affected terms shall be adjusted by mutual agreement".

(752)   As the Date of Effectiveness did not occur after 30 June 1997, Kaiser is not entitled to an extension of the work schedule under this provision.

(753)   However, Section 5.4 of the Contract provides as follows:

> 5.4    CERTAIN DELAYS
>
> If the Supplier is delayed in the Project by:
>
> [...]
>
> 5.4.4 Any other cause which Owner and the Supplier agree is justifiable, provided however, that neither Supplier nor Owner shall be obligated to agree to any such other cause; then
>
> > (i)   the Fixed Price at which the Supplier shall complete the Project shall be equitably adjusted by Change Order, and
> >
> > (ii)  the Schedule shall be extended by the delay in the Project caused thereby if, and only if, the Supplier can show the Project was in fact delayed, and only to the extent that the Schedule would not otherwise have been delayed by other causes.
>
> [..]

(754)   The Tribunal has found above that the lack of financing during the early stages of the project delayed the work by five weeks (see ¶(718)). Section 2.4.3 of the Contract - which provides that the work schedule shall be adjusted by mutual agreement if the Date of Effectiveness occurs after 30 June 1997 – read in connection with Section 5.3 ("IMPORTANT MILESTONES") – which specifies that Preliminary Acceptance is required to be accomplished by 30 June 1999 - makes it clear that Kaiser was entitled to two full years to reach Preliminary Acceptance.

(755)   Taking into account this five-week delay, Kaiser was theoretically to achieve Preliminary Acceptance by 4 August 1999.

(756)   However, Nova Hut alleges that the parties negotiated and agreed that the milestone date for Preliminary Acceptance would remain 30 June 1999 and that Kaiser would be immune from penalties for late achievement of Preliminary

Acceptance until the end of October 1999. Kaiser disputes the existence of such an agreement.

(757)    As mentioned above (see Section VI.A.5.3.8), Kaiser's claims for an extension of the work schedule and for additional costs incurred as a result of Nova Hut's failure to provide financing was settled. As part of such settlement, the parties agreed that the milestone date for Preliminary Acceptance would remain unchanged, but that the grace period for Kaiser to achieve it without being imposed liquidated damages would be extended until 16 September 1999.

(758)    The impact, if any, of the above agreement on Kaiser's claim for a bonus for early achievement of Preliminary Acceptance, must still be determined.

(759)    The record shows that the parties' decision to keep the milestone date for Preliminary Acceptance unchanged was simply the result of Nova Hut's displayed intention not to attract the IFC's attention on the delays incurred by the project (R28, p. 4, emphasis added):

> ICF KAISER suggested that Preliminary Acceptance milestone date should be shifted to 31 August '99 and grace period of 30 days should be left unchanged. ICF KAISER supported that request with the fact that they feel obliged they should get 5 months extension.
>
> **NH explained that with regard to the close scrutiny done by IFC through Hatch they do not want to change initially scheduled Preliminary Acceptance milestone. NH suggested to keep 30 June'99 as Preliminary Acceptance date but increase grace period until 16 September'99.**

(760)    In other words, the decision to keep the milestone date for Preliminary Acceptance unchanged was a "cosmetic" decision, and the true intention of the parties was that the work schedule would be extended. As a result of the parties' agreement, Kaiser was in fact to achieve "Preliminary Acceptance" by the date upon which Nova Hut would be entitled to impose liquidated damages, i.e. 16 September 1999, less the 30-day grace period of Section 5.6.2 of the Contract, i.e., 16 August 1999.

(761)     At a meeting held on 21 October 1999, Nova Hut proposed to further extend the grace period until the end of October 1999 (R34, emphasis added):

> [...]
>
> 5.     [.. ]. NH team asked for a break and subsequently came with the following suggestions:
>
> •     Immediately put all equipment in condition for further rolling (lit Reheat Furnace). Conditions of Contract for Preliminary Acceptance should be met by the end of October and roll two heats. If rolling is satisfactory NH will sign preliminary Acceptance protocol and will not imply Liquidated Damages (LD's). In case of not satisfactory results NH will as well sign Preliminary Acceptance but will require a certain amount of LD's which will be determined and officially approved via Change Order to Contract. LD's amount will be defined as a percentage of successfulness or in a similar way. **To be discussed and agreed 22 Oct'99**.

(762)     There is no evidence that a meeting was held on 22 October 1999. It appears however that Kaiser accepted Nova Hut's proposal that "the conditions for Preliminary Acceptance" be met by the end of October 1999 (R78, quoted above at ¶(732).

(763)     Therefore, the Arbitral Tribunal finds that, as a result of the delays incurred in the early stages of the project *due to the lack of financing*, Kaiser had to achieve Preliminary Acceptance by the end of October 1999. This conclusion is obviously subject to other time extensions owed to Kaiser for disruptions to the work schedule other than the lack of financing.

### 6.3.3     Kaiser is entitled to an additional 37-day time extension as a result of the Dedication Day ceremony

(764)     Kaiser further argues that it is entitled to an additional 37-day extension based on delays caused by Nova Hut's insistence that Kaiser prepare for an out-of-scope Demonstration Day ceremony (Claimant's Statement of Claim of 10 November 2004, ¶7.5, p. 30) and 21-day resulting from Nova Hut's failure to provide electrical power during preparation for the ceremony (¶¶8.3.5-8.3.6).

(765)    Section 5.4 of the Contract reads as follows:

5.4    CERTAIN DELAYS

If the Supplier is delayed in the Project by:

5.4.1  The failure of the Owner to provide the items specified in Section 1.2 of the Contract within the time periods and to the specifications required by Section 1.2;

5.4.2  Any pre-existing environmental conditions, or any non-environmental conditions which pre-exist at the Site and which are not disclosed in the Site Studies;

5.4.3  A delay authorized by a pending arbitration between Owner and Supplier where such pending arbitration relates to a material breach of this contract by the Owner which has the effect of delaying the Supplier's performance under this Contract; or

5.4.4  Any other cause which Owner and the Supplier agree is justifiable, provided however, that neither Supplier nor Owner shall be obligated to agree to any such cause; then

(i)    the Fixed Price at which the Supplier shall complete the Project shall be equitably adjusted by Change Order; and

(ii)   the Schedule shall be extended by the delay in the Project caused thereby if, and only if, the Supplier can show the Project was in fact delayed, and only to the extent that the Schedule would not otherwise have been delayed by other causes.

If such delay is in effect for more than 15 Days, Owner shall reimburse Supplier for all costs thereafter reasonably incurred by Supplier in connection therewith, provided that (i) Supplier shall be obligated to use reasonable efforts to work around the cause of such delay and shall keep Owner informed at all times of the cause and status of such delay and the steps Supplier is taking to work around the delay, and (ii) Supplier shall be obligated to provide proper verification of such costs and the necessity therefore if so requested by Owner.

(766)   The parties did not expand on the requirement in Section 5.4.4 above that the parties agree that "any other cause" be a "justifiable cause" for Kaiser to be entitled to a time extension. The explanation may well be that the parties considered, at the time, that the Dedication Day ceremony was a "justifiable cause". In fact, the record shows that the parties' dispute centered around the extent of the compensation to be granted to Kaiser as a result of the preparation for the ceremony rather than whether Kaiser was entitled to any such compensation (R28, emphasis added):

/84

NH expressed their concerns that their request to organize the Dedication Ceremony on June 22, 1999 based on the assumption that Contract Milestone – June 15, 1999 "Start of Hot Tests" prior to Preliminary Acceptance will be kept, which means that no additional costs could arise.

In NH's opinion, the costs were incurred mainly because of delays of Tippins/Stein Heurtey equipment deliveries, and later as a result of Stein Heurtey delayed commissioning, which is ICF Kaiser responsibility. **They said the whole issue had been reconciled and NH were willing to give $50,000 to cover all those extra costs**. NH reminded ICF Kaiser that they did not want to open at all the question of late mill operation which would result in production losses.

[...]

It was decided that project directors of both parties (Mr. Winstanley and Mr. Halabrin) will **form working groups and will meet at a later date to agree on real cost associated with Dedication Ceremony and conclude the matter**.

(767)    Pursuant to Section 5.4.4(ii) of the Contract, the schedule will be extended only if Kaiser can show that the project was in fact delayed and only to the extent the schedule would not otherwise have been delayed by other causes.

(768)    In its letter of 3 June 1999 (see ¶(724)), Kaiser had already claimed for a 37-day extension of the work schedule in relation with the Dedication Day ceremony (R24):

22 June 1999 Plant Dedication Preparation Costs (See Exhibit E for Detail)

[...]

ICF Kaiser's position, that it is entitled to extra cost for this extra work instructed by Nova Hut and is entitled to an extension of time and additional cost for the delay and disruption to its performance of the Contract as a result thereof, is detailed and substantiated in Exhibit E which follows.

Because the extra work associated with this effort is not yet complete, the actual cost associated therewith and with the effort of the added time required for normal contract performance will not be known until the work on the demonstration effort is complete. Current estimates of added costs and time for performance are as follows:

Estimated Costs Due ICF Kaiser and Subcontractors for Plant Demonstration Preparation..........US $800,000

Estimated Impact on Project Schedule for Plant Demonstration.... ........ .... ...............37 Days

(769)   In his witness statement, Franck Bury confirms that the preparation for the Demonstration Day ceremony caused 37 days of delays to the Phase 1 project (CWS2¶25, p. 6).

(770)   Nova Hut did not seriously dispute Kaiser's assessment of the delays caused by the preparation of the Dedication Day ceremony. In fact, it appears that the parties were and still are more concerned with the monetary implications of Kaiser's claim than by the possible impact on the work schedule.

(771)   Nevertheless, Nova Hut argues that Kaiser is not entitled to a time extension as a result of the Demonstration Day ceremony for the following reasons:

-   the plant demonstration was within Kaiser's scope of work;

-   Kaiser agreed to the date proposed by Nova Hut without stating that this would involve delays; and

-   Kaiser's subcontractors were experiencing difficulties causing significant delays.

(772)   Nova Hut alleges that the Demonstration Day ceremony was nothing more than a Preliminary Hot Test, which, according to the contractual schedule, should have taken place prior to the date reserved for the Ceremony. Accordingly, "*if Kaiser had complied with the contractual milestones, no additional work would have been involved in relation with the dedication ceremony*" (Respondent's Statement of Defense and Counterclaim of 24 January 2005, ¶148, p. 56). Jan Halabrin has confirmed that the scope of the demonstration did not exceed the one of the Preliminary Hot Test (RWS1¶22, p. 7).

(773)   It is irrelevant that the work that Kaiser had to perform in view of the plant demonstration was no more than a Preliminary Hot Test, which, according to the work schedule, should have taken place prior to the ceremony.

(774)    As correctly pointed out by Kaiser, Nova Hut's argument ignores the fact that the contract schedule set out in Section 5.3.1 of the Contract – according to which the first Preliminary Hot Test was to take place on 15 June 1999 – had been disrupted by Nova Hut's failure timely to provide financing. The Tribunal has found that the delay caused by such failure was of five weeks (see ¶(718)) and that, at a meeting held on 21 June 1999, i.e. one day before the Demonstration Day, the parties agreed that Nova Hut would not be entitled to impose liquidated damages for late Preliminary Acceptance until 16 September 1999. If the contractual schedule had been followed, Nova Hut would have been entitled to impose liquidated damages as of 30 July 1999 already (Section 5.6.2).

(775)    The record belies Nova Hut's allegation that Kaiser agreed to the date set by Nova Hut for the Dedication Day ceremony without stating that this would impact the work schedule. Nova Hut advised Kaiser that it had selected 22 June 1999 as the date for the plant demonstration at a meeting held on 17 February 1999 (R14). No other details were given to Kaiser except that Nova Hut committed to "*prepare the scenario with two alternatives*". Accordingly, at that time, Kaiser was not in a position to tell whether the ceremony would disrupt the work schedule.

(776)    By letter of 23 February 1999, i.e. less than one week thereafter, Kaiser requested Nova Hut's proposal in order to be able to begin the planning process. In this letter, Kaiser insisted that the ceremony was only 4 months away (C72). On 4 March 1999, Nova Hut sent Kaiser a tentative program for the ceremony (C75), specifying that "*Opening Ceremony means Preliminary Acceptance contemporary*". It thus appears that Nova Hut knew that the planned program for the demonstration would require that Kaiser be close to achieving Preliminary Acceptance at the time of the ceremony. In other words, given the delays caused by the lack of financing during the early stages of the project, Nova Hut knew that Kaiser would have to accelerate its work to be ready on 22 June 1999.

(777)    By letter of 15 March 1999, Kaiser advised Nova Hut that "*the current slippage to the schedule places great pressure on* [it] *to perform a meaningful plant demonstration on the 22nd of June 1999*" (C197). On 22 April 1999, Kaiser wrote

as follows to Nova Hut, attaching a "Dedication Day Implementation Schedule" to its letter (C83):

> We have reviewed the requirements to meet the Dedication Day with our major subcontractors, and attached for your information is the schedule set out to achieve this. [...].
>
> You will note that the plan is extremely aggressive, with little or no room for manoeuvre. Whether we can achieve this or not will rely on a smooth commissioning process and on the full support and cooperation of all parties involved.

(778)   Based on the above, the Arbitral Tribunal finds not only that Kaiser did not agree to the date of the ceremony, but also that it kept pointing to the disrupting effect of the ceremony on the work schedule.

(779)   The exhibits cited to by Nova Hut do not support the allegation that significant delays were caused by the difficulties experienced by Kaiser with its subcontractors. In fact, they would rather show that minor problems were encountered that did not exceed what a contractor can reasonably expect to experience and that had little or no impact on the work progress.

(780)   Thus, in a letter of 4 May 1999, Nova Hut reminds Stein Heurtey, one of Kaiser's subcontractor, that it committed to have the walking beam furnace tested and commissioned within the month of May (R18). In a letter sent two days after to Kaiser, Nova Hut states that "[t]here are problems with mobilization of Stein-Heurtey commissioning engineers who are immediately needed on site" (R19). However, in the very same letter, Nova Hut writes that delays have been partially eliminated:

> The Hot Strip Mill Project implemented jointly by our companies is approaching its final stage. In spite of the fact that there have been some significant recent delays in major deliveries by your main contractor TIPPINS, the progress on the site thanks to the self-sacrifice of installation companies and good managerial job of project management teams has partially eliminated those delays.

(781)   In a letter of 17 May 1999, ABB, one of Tippins' subcontractor, writes directly to Nova Hut to inform that "Tippins have cash flow problems which lead them to the facts not being able to fulfill their obligations to pay [ABB] final invoice" (R21).

However, ABB goes on to state that it has "*internally decided to continue with* [its] *already started end task for* [Nova Hut] *Minimill contract*".

(782)   The Tribunal finds that Kaiser is entitled to a 37-day extension. However, Kaiser has not demonstrated that 21 (additional) days were lost because of Nova Hut's alleged failure to supply electrical power between 7 and 29 April 1999.

(783)   Admittedly, Kaiser wrote to Nova Hut on 14 April 1999 to request that Nova Hut supply "*utilities and qualified operators, as necessary for the testing of Ph. 1 systems and equipment*" (C81) and two days later, on 16 April 1999, to advised that lack of power supply was "*seriously delaying* [it] *in the testing and commissioning of the plant*" (C82). In its 3 June 1999 letter, in which it summarized all the open contractual issues and claimed a 37-day time extension of the contract schedule in connection with delays incurred in preparing the Demonstration Day ceremony, Kaiser specified that the schedule impact for Nova Hut's delays in providing project power was "under evaluation" (R24, p. 4).

(784)   However, as late as on 29 February 2000, when it submitted its revised Exhibit E in respect of the costs and delays incurred in relation to the Dedication Day ceremony (R78), Kaiser did not press further its claim for an additional 21-day time extension. Therefore, the Arbitral Tribunal reaches the conclusion that Kaiser dropped this particular claim.

### 6.3.4    Kaiser achieved early Preliminary Acceptance

(785)   The Arbitral Tribunal has found above that Kaiser was to achieve Preliminary Acceptance by 29 October 1999. Moreover, Kaiser was entitled to a 37-day time extension as a result of delays incurred in connection with the preparation for the Dedication Day ceremony. In other words, Kaiser was not required to obtain Preliminary Acceptance until 5 December 1999.

(786)    Pursuant to Section 5.6.1, Kaiser was entitled to a success fee of USD 40,000.00 for each full day it achieved Preliminary Acceptance earlier than 30 days prior to the date on which it was required to achieve it.

(787)    It is common ground between the parties that Kaiser actually achieved Preliminary Acceptance on 29 October 1999, which was 37 days prior to the date on which it was required to achieve it.

(788)    Therefore, Kaiser is entitled to a bonus for seven days Preliminary Acceptance and the Tribunal should award this claim.

### 6.3.5    Kaiser's failure to meet all the performance tests bars it from claiming a bonus for early Preliminary Acceptance

(789)    The Arbitral Tribunal, however, observes that Kaiser, although it had achieved early preliminary Acceptance within the meaning of Section 5.6.2 of the Contract, is not entitled to a success fee due to its failure to pass all the performance tests.

(790)    Section 5.6.1 of the Contract provides as follows:

> 5.6.1    In the event that Supplier shall reach the Preliminary Acceptance Date earlier than May 31, 1999 (being thirty (30) days earlier than the date on which, under Section 16.1.1. the Supplier is required to accomplish Preliminary Acceptance), Owner shall pay to the Supplier a Success Fee of forty thousand US dollars (US$40,000) for each full Day Preliminary Acceptance is completed before May 31, 1999, up to a ceiling of four million US dollars (US$4,000,000).
>
> 5.6.2    Such success fee shall not be payable to Supplier unless and until, and the right of the Supplier to receive such success fee shall be conditional upon, the Phase 1 Plant completely meeting all of the Performance Tests set out in Appendix G with respect to Final Acceptance without the imposition of any penalties.

(791)    Kaiser admits that it failed to pass the HRCQTs (R59). However, Kaiser argues that the HRCQTs were not among the performance tests that it was required to pass to achieve Final Acceptance. Yet, Section 5.6.2 provides that the only performance tests that need to be passed without penalties being imposed are those "with respect to Final Acceptance".

(792)    Contrary to Kaiser's point of view, the 4WIPPT was not the only one that Kaiser was required to pass to achieve Final Acceptance:

    14.6    PERFORMANCE TESTS

    14.6.1    Prior to Final Acceptance, Supplier shall perform, and shall be obligated **to successfully complete, Performance Tests pursuant to the Contract Documents and as set forth in Appendix G**.

(793)    As results clearly from Section 1.2.2 of Appendix G to the Contract, the HRCQTs were among the Phase 1 performance tests addressed in 5.6.2 of the Contract (emphasis added):

    1.2.2    Sequence of Phase 1 Tests

    The tests shall be conducted after successful Preliminary Acceptance in the following sequence.

    1.    [...]

    2.    The tests to be conducted prior to or in conjunction with the Four Week Integrated Production Tests:

        2.1    [.. ]

        2.2    **The Hot Rolled Coil Tests referred to in Section 6**.

    3.    [...]

    **These various tests culminating in the [4WIPPT] will collectively be termed the Phase 1 Performance Tests**. The criteria for successful completion or failure of these Tests is described in Sections 4 through 9 of this Appendix and in the Phase 1 Contract.

(794)    In any event, Kaiser did not pass the 4WIPPT. In its Reply of 7 April 2005, Kaiser admits that "[i]*f the Tribunal finds that* [it] *did not pass the* [4WIPPT], [it] *would not be entitled to a bonus for early achievement of Preliminary Acceptance*".

(795)    Therefore, the Tribunal finds that Kaiser is not entitled to a bonus for early achievement of Preliminary Acceptance.

**7.        Claimant's claims for extra work (USD 2,793,815.00)**

**7.1        Preliminary comment**

(796)        Claimant advances three separate claims for extra work, namely:

- Proposed Change Notices (PCNs);

- extra work performed under agreed change orders; and

- the Demonstration Day ceremony.

**7.2        Unpaid PCNs (USD 393,320.00)**

**7.2.1    PCN No. 020: Ventilation system in the scale pit (USD 12,359.00)**

**a)        Claimant's position**

(797)        Pursuant to the Phase 1 Contract, Kaiser was to build an enclosed scale pit.

(798)        Kaiser warned Nova Hut that an enclosed scale pit might present ventilation problems and explained that any additional ventilation system was not within the scope of supply and, accordingly, would be considered extra work.

(799)        Despite Kaiser's warnings, Nova Hut insisted on an enclosed design.

(800)        The enclosed structure encountered high humidity problems, which Nova Hut directed Kaiser to remedy by installing additional ventilation equipment.

(801)        Nova Hut's claim that the enclosed scale pit was defective is incorrect.

(802)        Kaiser performed this extra work and is due USD 12,359.00.

**b)        Respondent's position**

(803)        The construction of a scale pit was within Kaiser's scope of supply.

(804)   However, Kaiser failed to build a scale pit of first rate quality, free from defects. In a letter dated 7 July 1999, Kaiser acknowledged that humidity in the scale pit was caused by insufficient ventilation.

(805)   Accordingly, on 14 April 1998, Nova Hut requested that Kaiser remedy its work by adding a ventilation system. Thus, the purpose of Nova Hut's request was to remedy a deficiency in the scale pit and Kaiser must bear the resulting costs.

(806)   Nova Hut asserts that Kaiser warned that an enclosed design might present ventilation problems, thereby suggesting that Nova Hut should bear the risk related to this item of work. This is in contradiction with the Section 1.3.1 of the Phase 1 Contract.

c)      **Discussion and decision**

(807)   It is common ground between the parties that the "mill water scale pit" built by Kaiser pursuant to Section 7.3.6 of the Scope of Supply (R1, p. 200) presented ventilation problems that resulted in a high humidity rate and that, upon Nova Hut's request, Kaiser provided a ventilation system.

(808)   The issue is whether Kaiser must bear the cost incurred to install this ventilation system notwithstanding.

(809)   Section 9.1.2 of the Contract reads as follows (emphasis added):

> 9.1.2 The base line from which Changes in Work shall occur shall be the Basic Design Documentation as adapted pursuant to Section 3.2.25, Scope of Supply, **proper functioning of the entire Phase 1 Plant** and all applicable laws, regulations, codes and standards valid in the Czech Republic at the Date of Validity. That means that, if e.g. a piece of equipment is described either in the Basic Design Documentation or in the Scope of Work **or is necessary for the proper functioning of the Phase 1 Plant or is required for such regulations, then it must be delivered and it shall not be considered as a change in the Work**.

(810)   It follows from the above provision that the mere fact that the Basic Design Documentation does not provide for a specific piece of equipment does not

already mean that the delivery of such equipment is to be considered extra work to be paid by Nova Hut. To the contrary, if a piece of equipment is necessary to ensure the proper functioning of the plant, then its supply is at Kaiser's expense.

(811)    The principle that the procedure for changes in the work does not apply to costs incurred to remedy deficiencies in Kaiser's work is set out in Section 9.2.5 of the Contract:

> 9.2.5 The procedure for Changes (whether minor changes or changes requiring Change Orders) shall not apply to correction of Supplier's Work which is defective or which fails to comply with the requirements of this Contract or correction of parts of the constructed Works affected by Supplier's Work which is defective or which fails to comply with the requirements of this Contract. Such corrections shall be corrected by the Supplier at its own cost as provided in Article 10 and without adjustment to the Schedule.

(812)    It follows from the above that Kaiser, which does not dispute that the excessive humidity in the scale pit was caused by a lack of ventilation, should in principle bear the costs of installing a ventilation system even though the latter was not included in the Basic Design Documentation.

(813)    The record shows, however, that the insufficient airing was due to the enclosed design of the scale pit, which Nova Hut had requested notwithstanding Kaiser's warning that this might result in ventilation problems (C96, letter of 7 July 1999 from Kaiser to Nova Hut):

> [...]
>
> The humidity in the scale pit is obviously caused by insufficient ventilation of the scale pit whose design was requested by NH in the very beginning of this project.
>
> Therefore we cannot be responsible for the current situation and a proposal to improve the ventilation would be backcharged to NH as a change order.
>
> [...].

(814)    In fact, Kaiser had recommended an open scale pit at the design stage already (C106, letter of 23 September 1999 from Kaiser to Nova Hut):

[...]

The final design of the Scale Pit was requested by NH engineers at early stage of the project. ICF KN was not in favour of this solution and had recommended an open scale pit design.

(815)    The Arbitral Tribunal finds that Nova Hut's insistence that Kaiser build a scale pit with an enclosed design notwithstanding Kaiser's warnings that this might result in ventilation problems bars it from relying on such ventilation problems to disclaim payment of the costs incurred by Kaiser to install a ventilation system.

(816)    Nova Hut does not dispute the amount of the damages claimed by Kaiser, namely USD 12,359.00.

(817)    Therefore, the Arbitral Tribunal will order Nova Hut to pay Kaiser USD 12,359.00.

### 7.2.2    PCN No. 027: Supply and installation of sedimentation tanks for the water treatment system (USD 12,147.00)

### a)    Claimant's position

(818)    In early 1998, Nova Hut directed Kaiser to install settlement tanks in the storm drainage system.

(819)    Kaiser supplied and installed sedimentation tanks but told Nova Hut that their installation was not included in the Phase 1 Contract.

(820)    Contrary to Nova Hut's stance, the Czech regulations do not prescribe the installation of sedimentation tanks. CSN No. 736760 requires rainwater downspouts – not sedimentation tanks. CSN No. 756101 does not require settlement tanks. In addition, regulation CSN No. 756101 para. 5.10.2 cited to by Nova Hut was enacted in October 2004, i.e., after construction was completed.

(821)    Therefore, Kaiser is entitled to USD 12,147.00 for extra costs incurred to supply and install sedimentation tanks.

/ 9.5

b)    **Respondent's position**

(822)    Article 4.2.9 of CSN 756101 issued in 1995 provides that conditions of connecting the drainage systems with external sewage systems are defined by Sewage Regulations in compliance with the Ministry of Forestry and Water Economy Directives CSR No. 8/1975 and 280/V/TPO/86 for Sewage Regulations development. In other words, regulation CSN No. 756101 para. 5.10.2 – which requires that any storm water system be equipped with drainage settlement tanks - already applied at the time the works were performed.

(823)    Therefore, the drainage settlement tanks were within Kaiser's scope of supply and Kaiser is not entitled to any compensation for supplying and installing those items.

c)    **Discussion and decision**

(824)    It is undisputed that the Scope of Supply does not require settlement tanks. Moreover, it appears from Kaiser's PCN No. 27 of 6 February 1998 (C36) that these tanks were not included either in the Basic Design Documentation.

(825)    However, pursuant to Section 9.1.2 of the Contract, "*all applicable laws, regulations, codes and standards valid in the Czech Republic*" are to be taken into account in addition to the Scope of Supply and Basic Design Documentation when determining whether there has been a change to Kaiser's scope of work.

(826)    Nova Hut argues that Section 5.10.2 of CSN No. 756101 required that Kaiser supply sedimentation tanks and that Section 5.6.2 of CSN No. 736760 required inspection/scavenge pieces.

(827)    Kaiser objects that CSN No. 756101 does not deal with sedimentation tanks and that, in any event, Section 5.10.2 was enacted after construction was completed. Kaiser further objects that CSN No. 736760 does not apply because it requires rainwater downspouts, not sedimentation tanks.

/ 96

(828)     Nova Hut has not disputed Kaiser's allegation that neither the Scope of Supply nor the Basic Design Documentation required sedimentation tanks. Accordingly, the Arbitral Tribunal deems this allegation to be proven.

(829)     To succeed on its defence, Nova Hut should have demonstrated that applicable Czech Standards required Kaiser to supply sedimentation tanks. Section 10.1.2 of the Contract - which provides that, when requiring Kaiser to correct work that does not comply with applicable requirements of Czech law, Nova Hut must identify by article or section number or other specific references the specific laws or regulations or part thereof with which the Work does not comply – confirms that the burden to establish the contents of applicable Czech Standards lies with Nova Hut. Yet, Nova Hut did not quote or produce copies of the Sections of the Czech Standards to which it cites, thereby making it impossible for the Arbitral Tribunal to determine whether applicable regulations required that Kaiser install sedimentation tanks.

(830)     Therefore, the Arbitral Tribunal finds that Kaiser is entitled to USD 12,147.00 for extra costs incurred to supply and install sedimentation tanks and will order that Nova Hut pay this amount to Kaiser.

### 7.2.3    PCN No. 036: Supply and installation of additional direct cooling booster pumps (USD 67,758.00)

### a)    Claimant's position

(831)     Nova Hut requested that Kaiser supply and install additional pumps for the cooling system to increase water pressure.

(832)     Nova Hut's assertion that the initial water pressure was insufficient and that modifications performed at Kaiser's expense were necessary is unsupported. The results of the test relied upon by Jiri Obsil in his witness statement were not conclusive because they were based on equipment installed for higher water pressure. Kaiser's expert subcontractor confirmed that the lower water pressure was adequate to operate the cooling system.

(833)   Nova Hut approved a change order for this work and should not be permitted to protest this extra work.

(834)   Kaiser is due USD 67,758.00 for the extra work.

**b)      Respondent's position**

(835)   Any item that proved to be necessary for the proper functioning of the minimill was within Kaiser's scope of work.

(836)   The use of the booster pumps during commissioning and hot start-up confirmed that the water pressure was not sufficient to operate the cooling system without them. Therefore, this item of work was within Kaiser's scope of work.

(837)   Kaiser argues that no change in the water pressure was required. In support of this argument, Kaiser relies on a letter it sent to Nova Hut on 18 October 1999 to advise that, based on Tippins' expert opinion, no change in the water pressure was required. This letter has no evidentiary value since Kaiser has not produced the Tippins' expert opinion. Kaiser's argument is also contradicted by a statement it made in the Tippins arbitration that "*the mill could not even operate at the lower pressure*". In addition, the Tippins Arbitral Tribunal rejected Tippins claim on the ground that Tippins failed to rebut Kaiser's allegations that the mill could not operate at the lower pressure.

(838)   Kaiser's reliance on two letters dated 18 May and 14 July 1998 in which Nova Hut conceded that this item of work would be solved as a change order is misplaced. First, at the time these letters were sent, the minimill was not yet in operation so that Nova Hut could not know that the cooling system supplied by Kaiser would not work properly. Nova Hut's approval was necessarily based on the assumption that the water pressure designed by Tippins would be sufficient. Second, Nova Hut advised Kaiser that the outcome of this PCN would depend on whether the use of the booster pumps would appear necessary for the proper functioning of the minimill.

(839)    Therefore, Nova Hut's request that Kaiser install additional pumps was necessary to bring the cooling system into compliance with the contractual requirements and Nova Hut was entitled to reject PCN No. 036 even though the additional pumps were not referred to in the Scope of Supply.

## c)    Discussion and decision

(840)    Nova Hut does not dispute that the Scope of Supply did not require additional cooling booster pumps. However, Nova Hut alleges that the installation of additional pumps was necessary to bring the cooling system into conformity with contractual requirements.

(841)    As already mentioned, pursuant to Section 9.2.1 of the Contract, an item of work that "*is necessary for the proper functioning of the Phase 1 Plant* [...] *must be delivered and it shall not be considered as a change in the Work*".

(842)    Nova Hut fails to show that the water pressure of the cooling system was insufficient.

(843)    Nova Hut refers to a statement apparently made by Kaiser in the course of the Tippins arbitration to the effect that "*the Mill could not even operate at the lower pressure*" (R86, ¶367, p. 70). The Tippins Arbitral Award shows that Tippins asserted a claim for extra costs incurred in connection with one Proposed Change Order No. 11 regarding the water system for the minimill. However, the Tippins Arbitral Award also shows that Tippins' claim was for engineering work, not for additional pumps. In fact, it clearly appears from the Tippins Arbitral Award that Kaiser also considered that additional pumps were out of Tippins' original scope of supply and that Tippins declined to install such pumps (R86, ¶365, p. 70):

> The additional pump station was considered to be out of the original scope of supply both by Nova Hut and Kaiser (Exh. K-1156, K-1157). However, the request to Tippins to supply further pump stations in order to handle higher pressure of water was declined by Tippins (Exh. K-1160).

(844)    The difference in value of Tippins' claim in the Tippins Arbitration (USD 7,000.00) and Kaiser's claim in the present arbitration USD 67,758.00 is a further indication that both claims are only remotely connected and, hence, that the findings in the Tippins Arbitral Award are of no help to Nova Hut.

(845)    Moreover, Tippins confirmed that the water pressure was sufficient without additional pumps (C209):

> [...]
>
> To date, Tippins have maintained their position that the additional pressure is not required and prefer to remain with the non boosted water cooling.

(846)    Nova Hut has argued that the necessity to install additional pumps could only be assessed during commissioning of the minimill (C210). However, Nova Hut has not produced any evidence that the commissioning of the minimill showed that the water pressure was insufficient and Jiri Obsil's statement that "*the booster pumps were actually used during commissioning and start-up, confirming that initial water pressure was sufficient*" is not convincing. Thus, Jiri Obsil does not even state that the water pressure was insufficient *without* the additional pumps.

(847)    In any event, Nova Hut had approved PCN No. 036 without making any reference to the fact that such equipment was required to remedy deficiencies in the cooling system or that the resulting extra costs would be paid only after commissioning, if the additional pumps revealed necessary (C45).

(848)    On 14 July 1998, Nova Hut confirmed that it would pay for the extra costs incurred to install the additional pumps (C54):

> [...]
>
> We remind of our requirement for the pressure on the rolls cooling nozzles to be 0.9 Mpa and the pressure on the other consumers of the contact cooling water to be 0.45 Mpa. Our statement that we will pay for the extra costs incurred, was sent to you via fax Ref. No. RTM/Sv/Ho/492 of 18th May, 1998.
>
> [...]



(849)    Therefore, the Arbitral Tribunal shall grant this claim and order that Nova Hut pay Kaiser USD 67,758.00.

### 7.2.4    PCN No. 040: Installation of basalt tiling in the laminar cooling flume (USD 10,028.00)

### a)    Claimant's position

(850)    The Phase 1 Contract required Kaiser to build a laminar cooling system with a scale flume tunnel. The Contract did not require basalt tiling inside the flume.

(851)    In early 1998, Nova Hut requested that the flume be lined with basalt tiling. Kaiser notified Nova Hut that the tiling was not included in the Contract and that this would be extra work. Notwithstanding Kaiser's warning, Nova Hut insisted upon the tiling.

(852)    Contrary to Nova Hut's claim, the lack of basalt tiling cannot be considered a design flaw. This was confirmed by Kaiser's subcontractors.

(853)    Therefore, basalt tiling was extra work for which Kaiser is entitled to be compensated. Nova Hut owes Kaiser USD 10,028.00.

### b)    Respondent's position

(854)    Basalt tiling in the scale flume tunnel was required under the Phase 1 Contract.

(855)    Thus, the absence of a scale flume lining was an error in the design that had to be remedied.

(856)    Kaiser has not produced any evidence in support of its allegation that its subcontractors confirmed that the basalt tiling was not necessary.

(857)    Therefore, Kaiser's claim should be denied.

c)      **Discussion and decision**

(858)    It is common ground between the parties that the Scope of Supply did not require basalt tiling in the scale flume tunnel.

(859)    Accordingly, the only issue to be determined by the Arbitral Tribunal is whether basalt tiling was within Kaiser's scope of work by virtue of Section 9.1.2 of the Contract, i.e., because it was necessary for the proper functioning of the minimill.

(860)    In its 21 May 1998 letter, in which it requested that the bottom of the scale flume tunnel be tiled with basalt shaped bricks (C47), Nova Hut merely stated that "[it] consider[ed] an absence of the scale flume bottom lining to be an error of the design", without providing any justification as to why the absence of tiling was considered a design flaw.

(861)    Furthermore, the minutes of a meeting held on 3 June 1998 with representatives of both Kaiser and Nova Hut tend to show that the matter was closed with the parties' agreement that Kaiser would issue a PCN (C50):

> 87      The Laminar Cooling Flume
>
> NH instructed ICFKN to proceed with tiles in the laminar cooling flume. ICFKN will proceed as directed and issue a change order. The item is now closed.

(862)    Nova Hut has not demonstrated that the absence of basalt tiling in the scale flume tunnel was a design flaw. Moreover, Nova Hut has not disputed the amount of damages sought by Kaiser.

(863)    Therefore, the Arbitral Tribunal will order that Nova Hut pay Kaiser USD 10,028.00.

**7.2.5    PCN No. 047: Increase of the size of the upcoiler lean-to (USD 164,284.00)**

a)      **Claimant's position**

202

(864)    During negotiations, Nova Hut had changed the scope of supply and took on responsibility for the building which was housing the compressors as a cost-cutting measure.

(865)    Ultimately, Nova Hut decided not to build a compressor building, to locate the compressors in an expansion to an existing upcoiler lean-to building, and it directed Kaiser to perform the necessary work.

(866)    Kaiser performed such work with the understanding that Nova Hut would pay for the out-of-scope costs. Moreover, Nova Hut approved the expansion of the air compressor building in a letter dated 13 March 1998. The letter approves a change in the compressors from two to three and the costs to expand the lean-to building were directly related to the number of compressors installed.

(867)    Nova Hut contends that Kaiser was responsible for the building housing the Phase 1 compressors. This is incorrect. There was an ambiguity in the Contract about which party was to pay for the building and which for the compressors. The parties agreed to split the responsibility and Kaiser was responsible for supplying the compressors.

(868)    Kaiser is due USD 164,284.00 for the extra work performed.

**b)    Respondent's position**

(869)    The expansion of the air compressor building was within Kaiser's scope of supply.

(870)    Kaiser argues that the parties agreed to split the responsibility for the compressors and the building due to an ambiguity in the Contract. There was no such ambiguity and, hence, there was no need for the parties to agree that Nova Hut would be responsible for providing the housing for the compressors.

(871)    The letter of 13 March 1998 sent by Nova Hut on which Kaiser relies relates only to the installation of three smaller air compressors instead of two bigger ones. It does not relate to the expansion of the air compressor building.

(872)    Section 11 of the Scope of Supply contains a table that represents the "matrix of responsibilities". The matrix required Kaiser to provide the "Adapted Compressed Air Station". This was not disputed by Mr. Franck Bury.

(873)    In any event, in a letter of 30 June 2000, Kaiser admitted that it was responsible to provide a separate building for the compressors.

(874)    It follows that Nova Hut never agreed to PCN No. 47 and that Kaiser is not entitled to payment of this PCN.

c)    **Discussion and decision**

(875)    With PCN No. 47, Kaiser claims payment of costs incurred to expand an existing upcoiler lean-to building to locate air compressors (C239). The issue is whether the work performed was within Kaiser's scope of supply.

(876)    Nova Hut rejected PCN No. 047 on 26 July 1999 with the following statement (C239):

> Compressor station building realized within Phase 0 project should has [sic] been designed for both Phase 0 & Phase 1 compressors. Finally the reduced building for phase 0 was provided, the balance of which was included into Ph. 1 project, see S.o.S. clause 4.1.2. [...].

(877)    On 30 June 2000, Kaiser wrote as follows to Nova Hut (C217):

> [...]
>
> As you are well aware, the air compressor building was the subject of considerable discussion between KN and NH during the Phase 1 contract negotiations. Originally KN was to provide a building to house the Phase 0 and Phase 1 air compressors. Due to the splitting of the project into two phases (0 and 1) NH elected to have smaller compressors installed into a smaller building just to meet the Phase 0 requirements. During Phase 1 negotiations, KN properly had an additional cost to furnish the additional air

compressors and separate building which NH elected to not have provided initially. At that time it was agreed that KN would provide a separate building to the extent of the difference between the smaller Phase 0 building and the planned Phase 1 building. This point is clearly supported by 4.1.2 of the Phase 1 scope of supply which states "(Balance of Phase 0 Building)".

[...]

(878)    The above shows that the parties' initial intention was that Kaiser supply a building to host both the Phase 0 and the Phase 1 compressors as part of the Phase 0 work. Then, for one reason or another, the parties decided that during Phase 0 Kaiser would only supply a building of a reduced size to meet the Phase 0 requirements and that the balance would be supplied at a later stage.

(879)    Section 4.1.2 of the Scope of Supply confirms that the construction of the balance of the air compressors building was included in Kaiser's Phase 1 scope (R1, p. 184):

These auxiliary buildings will be provided as part of Phase 1 and their preliminary size include:

[...]

Air Compressor Building – Mansonry block or prefabricated steel single (1) story building (SO 07.12) – (The balance of original Phase 0 building)

(880)    The "Responsibilities Matrix" contained in Section 11 of the Scope of Supply (R1, pp. 247 et seq., p. 268) confirms that Activity SO 07.12 ("Adapted Compressed Air Station") was Kaiser's responsibility.

(881)    It thus appears that, as part of its Phase 1 scope of supply, Kaiser was to build the balance of the air compressor building.

(882)    However, the parties again changed their minds and agreed that the balance of the air compressors building would not be erected and that the air compressors would be located in the lean-to area adjacent to the upcoiler building. Thus, in the letter quoted above (C217), Kaiser wrote that "[a]fter considerable discussion of the alternatives it was agreed between MC, NH, and KN that the air compressors for Phase 1 would be located in the lean-to area adjacent to the upcoiler

*hydraulic area and as such* [be] *addressed in the same manner as the mill building"*. Nova Hut's position on PCN No. 047 is that *"Final solution was to install ph. 1 compressors into enlarged lean-to building. Lean-to increase is considered a balance or original Ph. 0 building"* (C239).

(883)    Therefore, the issue is whether the increase of the size of the lean-to building was outside Kaiser's scope of supply, which required that Kaiser build the balance of the air compressors building, or whether, because the increased lean-to building replaced the air compressors building, it must be deemed to be included in Kaiser's scope of supply.

(884)    The Arbitral Tribunal finds that the work necessary to expand the lean-to building must be deemed to be included in Kaiser's scope of supply. The parties decided to increase the size of the lean-to instead of constructing the balance of the air compressors building. Yet, as acknowledged by Kaiser itself, the cost of supplying the balance of the air compressors building had been included in the Phase 1 price (C217):

> During Phase 1 negotiations, KN properly had an additional cost to furnish the additional air compressors and separate building which NH elected not to have provided initially.

(885)    Kaiser, which only produced evidence of the increased costs to expand the lean-to (C174), does not show that such costs exceeded those it would have incurred in supplying the balance of the air compressors building.

(886)    Therefore, the Arbitral Tribunal shall dismiss Kaiser's claim.

### 7.2.6    PCN No. 054: Installation of an additional roof over the emergency oil pits (USD 33,208.00)

### a)    Claimant's position

(887)    The Phase 1 Contract required that Kaiser build an emergency oil pit under the transformer pads to collect oil in the event of an oil spill or leak.

(888)   CSN No. 333240, para. 2, requires that transformers pads either have a roof or emergency oil pits large enough to catch leakage from the biggest transformer oil filing and monthly rainfall.

(889)   The emergency oil pit requested in the scope of supply was 0.5 cubic meter too small to conform with the Czech regulations without a roof, and Kaiser was required to either build such roof (at a cost of USD 36,208.00) or to enlarge the pit (at a cost of USD 3,000.00).

(890)   Nova Hut requested the roof, which was the more expensive solution. This decision was a preference and there was no basis to choose the roof over an expanded pit.

(891)   There is no support to Nova Hut's affirmation that the cost to enlarge the oil pit was 1.7 times more expensive than adding a roof.

(892)   Therefore, Nova Hut owes Kaiser USD 33,208.00, which is the difference between the two solutions.

**b)      Respondent's position**

(893)   Kaiser concedes that the applicable CSN standards require that the emergency oil pit be equipped with a roof over the transformer pads. Accordingly, the addition of a roof was within Kaiser's scope of supply.

(894)   Moreover, the solution retained by Nova Hut appeared to be 1.7 times cheaper than the roofless initial solution with a larger emergency pit.

(895)   Kaiser has not adduced any piece of evidence in support of its allegation that Nova Hut chose the most expensive solution.

**c)      Discussion and decision**

(896)    It is common ground between the parties that Kaiser was to build an oil pit under the transformer pads to collect oil in the event of a leak and that, pursuant to CSN No. 333240, the oil pit must either be large enough to be able to accept storm water on top of any oil leak or be covered by a roof.

(897)    The parties also agree that the oil pit supplied by Kaiser was too small to conform with the Czech regulations and, accordingly, that it had to be enlarged or to be equipped with a roof.

(898)    Kaiser claims that Nova Hut requested the roof, which was allegedly the more expensive solution, and seeks compensation for the difference in price between the two solutions.

(899)    Kaiser cites no support for its contention that the cost to install the roof was the more expensive solution. In particular, there is no evidence on record that the cost to enlarge the oil pit would have been USD 3,000.00. This has been disputed by Jiri Obsil who alleges that the roofless solution was actually 1.7 times more expensive than the implemented solution (RWS3¶24, p. 5).

(900)    Therefore, the Arbitral Tribunal shall dismiss Kaiser's claim.

### 7.2.7    PCN No. 055: Relocation of the collector rail for the shipping crane (USD 2,273.00)

### a)    Claimant's position

(901)    The Phase 1 Contract required that Kaiser install collector rails on the crane runaway of the minimill. The site for the collector rails was part of the design in the Phase 1 Contract and approved by both parties.

(902)    Nova Hut requested that Kaiser relocate the collector rails for the shipping crane on the opposite crane supports, without providing any justification for this change.

(903)   Jiri Obsil states only that moving the collector rail would ensure reasonable and trouble-free operation. He does not claim that the heat on the rail would cause damage or otherwise require action by Kaiser under the contract.

(904)   Thus, Nova Hut's request to move the collector rail was solely a preference.

(905)   While Nova Hut may make this decision, it cannot require Kaiser to pay for it. Kaiser is due USD 2,273.00 for this extra work.

**b)      Respondent's position**

(906)   The relocation of the collector rails was necessary to avoid that the collector rails be exposed to radiant heat and burnt.

(907)   Therefore, Nova Hut was justified in requiring this change and Kaiser's claim should be rejected.

**c)      Discussion and decision**

(908)   Pursuant to Section 9.1.2 of the Contract, the Basic Design Documentation, the Scope of Work and the proper functioning of the Phase 1 plant are the base line to assess whether a change in the work has occurred.

(909)   Nova Hut does not allege that the relocation of the collector rails was required to put this item of work in compliance with the Basic Design Documentation or the Scope of Work. Nova Hut's affirmation that the relocation of the collector rails was necessary to avoid that they be exposed to heat and burnt is wholly unsupported.

(910)   Therefore, the Arbitral Tribunal finds that Nova Hut's direction that Kaiser relocate the collectors rail was a change order and, accordingly, shall order that Nova Hut pay Kaiser USD 2,273.00.

209

### 7.2.8    PCN No. 060: Work associated with the award of the dry fire extinguishing system (USD 41,552.00)

### a)    Claimant's position

(911)    Nova Hut rejected NV-PRO as a subcontractor for the dry pipe fire extinguishing system and required Kaiser to hire Nova Hut's sister company, Nova Hut Division 3, at nearly double the cost.

(912)    Nova Hut has final approval of subcontractors only when there are at least three bidders acceptable to both parties. This was not the case here as the third subcontractor dropped out.

(913)    Nova Hut has the right under the Phase 1 Contract to direct which subcontractor is awarded the work. However, pursuant to Section 3.1.4 of the Contract, Kaiser may recoup the difference in price between the lowest bidder and the subcontractor requested by Nova Hut if the lowest bid was sufficiently similar in quality, schedule and technical specifications.

(914)    Contrary to Nova Hut's contentions, NV-PRO was technically acceptable and was able to show compliance with fire regulations. The report cited to by Nova Hut only states that NV-PRO's bid should be modified to conform with fire regulations. It does not state that NV-PRO was unacceptable. In this respect, Nova Hut itself directed Kaiser to have NV-PRO modify its bid. In fact, the first time that Nova Hut objected to NV-PRO as a bidder was after Nova Hut Division 3 submitted a competing bid.

(915)    NV-PRO was a valid bidder even if it was not included on the approved subcontractor list. As a matter of fact, the Contract does not require that subcontractors for the dry pipe extinguishing system be chosen from the approved list.

(916)    Therefore, Kaiser is entitled to USD 41,552.00 the difference in cost between Nova Hut Division 3's and NV-PRO's bids.

**b)      Respondent's position**

(917)     Kaiser claims payment for the difference in price resulting from Nova Hut's decision to select Nova Hut Division 3 rather than NV-PRO for the installation of the dry pipe fire extinguishing system.

(918)     Nova Hut selected Nova Hut Division 3 because NV-PRO's bid did not comply with contractual requirements and an expert report confirmed that NV-PRO would be unable to put its bid into conformity.

(919)     The letter whereby Nova Hut requested that NV-PRO revise its bid is dated 25 November 1998, whereas Kaiser sent the expert report to Nova Hut on 4 March 1999. Hence, the letter cited may not evidence that Nova Hut itself considered NV-PRO's bid to be acceptable provided it was revised.

(920)     In any event, even if Nova Hut had chosen a subcontractor that was not the lowest bidder, Kaiser would not be entitled to any compensation resulting from the higher price unless the difference in price was materially disproportionate to the benefits and advantages associated with the other factors set forth in the contract. Kaiser has not produced any evidence that the difference in price for which it claims payment is materially disproportionate.

(921)     Therefore, Kaiser's claim should be rejected.

**c)      Discussion and decision**

(922)     Section 3 of the Phase 1 Contract provides a comprehensive and detailed procedure of selection for the subcontractors. Essentially, the selection of a subcontractor takes place as follows:

-      Kaiser submits to Nova Hut a list of potential bidders (Section 3.1.2);

-      Nova Hut has the right to add bidders to the list, resulting in a combined list (Section 1.3.2.1);

- for first tier subcontractors and, with respect to certain subcontracts, for their lower tier subcontractors, Nova Hut has a veto right as to which subcontractor is included in the bid list, provided that there is at least three bidders for each tiers of subcontracts that are acceptable to both Kaiser and Nova Hut (Section 3.1.2.2);

- the following criteria are *inter alia* relevant for the inclusion in the list of bidders (Section 3.1.2.4): good maintenance and reliability characteristics and lifespan of the items to be supplied, use of same spare parts as used by other equipment used by Nova Hut; compatibility with and ability to communicate with the existing systems used by Nova Hut; low energy consumption levels; and the good reputation of the subcontractor and its products or services;

- after approval of the bidders' list, Kaiser has to request the submission of bids (Section 3.1.3) and assess them. In particular, Kaiser has to assess the bids "*for their technical, commercial and delivery compliance, for price, quality and performance (including specifically the factors set out in Section 3.1.2.4) and for their compliance with the other criteria set forth herein for the selection of bidders*" (Section 3.1.3.2);

- before awarding a subcontract, Kaiser then has to provide to Nova Hut its analysis and to recommend to Nova Hut the bidders who meet the various analysis factors, specifying how such bidders compare to those that have not be recommended (Section 3.1.3.3);

- Kaiser may recommend the award of a subcontract on the basis of the lowest price only if all of the other factors are approximately equal with respect to the other bidders. If these factors favour a more expensive bidder, then Kaiser is obliged to recommend that the subcontract be awarded to the more expensive bidder, "*unless the price difference is materially disproportionate to the benefits and advantages associated with the other factors, and the resulting higher price to the Supplier shall not*

> entitle the Supplier to any additional compensation from the Owner except
> and only to the extent of that difference that is materially disproportionate to
> the benefits and advantages associated with the other factors [...]" (Section
> 3.1.3.4);

- thereafter, Nova Hut has 10 days to accept or reject Kaiser's
  recommendation (Section 3.1.3.5);

- if Nova Hut elects to reject the recommended subcontractor, it has to
  specify in writing the reasons for such rejection (Section 3.1.4);

- Kaiser has then to make an alternate recommendation in order to conform
  with Nova Hut's objections or required modifications (Section 3.1.4). As part
  of this alternate recommendation, Kaiser has to inform Nova Hut of any
  potential schedule or other impacts and "to the extent that a higher price is
  materially disproportionate to the benefits and advantages associated with
  the other factors, that portion of the price difference that is materially
  disproportionate" (Section 3.1.4).

(923)   Kaiser first argues that Nova Hut was not entitled to reject NV-PRO given that, as
        a result, there remained only two bidders for the award of the dry fire
        extinguishing system subcontract.

(924)   Section 3.1.2.2 of the Contract reads as follows:

> 2.   The Owner is to have "veto" right as to who will be included in the bid
>      list both for first tier Subcontractors and, for items on the Owner's
>      focus list, for their lower tier Subcontractors at all relevant lower
>      levels, provided that there shall be at least a total of three (3) bidders
>      for each tier of subcontracts or itemized subcontract items who are
>      acceptable to both the Owner and the Supplier, unless otherwise
>      mutually agreed to.

(925)   On 11 February 1999, Kaiser requested that NV-PRO be added to the bidders
        list. At this time, only two other potential bidders were included in this list, namely

Nova Hut Division 3 and MGT Group. As a result, Nova Hut could not exercise its veto right and refused to add NV-PRO to the list of potential bidders.

(926)    However, Nova Hut's refusal to add NV-PRO to the list of potential bidders did not prejudice Kaiser. Thus, on 8 February 1999, Kaiser had invited NV-PRO to submit a quotation for the dry fire extinguishing system, which the latter did on 9 February 1999 (C193). Then, on 22 February 1999, Kaiser recommended that the dry fire extinguishing system subcontract be awarded to NV-PRO (C70).

(927)    Nova Hut's refusal to add NV-PRO to the list of bidders and its consecutive decision that Nova Hut Division 3 be awarded the dry fire extinguishing system subcontract notwithstanding its more expensive bids does not already mean that Kaiser may recoup the difference between the two bids.

(928)    Section 3.1.4 of the Contract provides as follows:

> 3.1.4 Should the Owner reject the Supplier's recommendation within the specified (10) working day approval period, the Owner shall specify in writing the reasons for his rejection. The Supplier shall make an alternate recommendation, if possible, within a further seven (7) working days in order to conform with the Owner's objections or required modifications. As part of this alternate recommendation and so that the Owner may be informed of all of the known impact associated with choosing the alternate recommendation, the Supplier shall inform the Owner of any potential schedule or other impacts which may occur and, if and only to the extent that a higher price is materially disproportionate to the benefits and advantages associated with the other factors, that portion of the price difference that is materially disproportionate to the benefits and advantages associated with the other factors.

(929)    It follows from the above provision that Kaiser may not recoup the entire price difference between NV-PRO's and Nova Hut Division 3's bids, but only that part of the difference that is materially disproportionate as compared to the advantages of Nova Hut Division 3's bid.

(930)    Kaiser has not shown that the difference in price between NV-PRO's and Nova Hut Division 3's bids was not justified, let alone that it was materially disproportionate. It is true that MGT's bid (CKZ 1,517,591.00; C193) was closer

to NV-PRO's than to Nova Hut Division 3's bid. However, MGT withdrew its bid on 11 February 1999 before it was assessed. The Arbitral Tribunal notes that NV-PRO's design for the dry fire extinguishing system had been heavily criticized in a report issued on 17 November 1998 by Karel Velicka of Nova Hut (C189). It also appears that Kaiser did not recommend NV-PRO on the ground that it was the less expensive of two equivalent bids, but because it was *"the lowest priced technically and commercially acceptable Bidder"* (C70). Thus, according to Kaiser itself, Nova Hut Division 3's bid was superior.

(931)    For the above reasons, Kaiser's claim will be rejected.

### 7.2.9    PCN No. 062: Change to the design of the laminar cooling pump and filtration system (USD 2,663.00)

**a)      Claimant's position**

(932)    In mid-1998, Nova Hut directed that Kaiser redesign the laminar cooling pump and filtration station.

(933)    Kaiser informed Nova Hut that the change was not included in the scope of supply and would constitute a change order.

(934)    Nova Hut contends that the laminar cooling pump and filtration system had to be redesigned to meet the operational requirements of the rolling mill, to *"respect all legal and reasonable owner's comments to ensure the operable and reasonable maintainable Phase 1 Plant equipment"*, and was based on *"Nova Hut's long-term experience in steel manufacturing"*. This is incorrect. The original arrangement of the equipment was in accordance with the drawings proposed by Tippins and Nova Hut fails to cite any design flaw or legal violation of the original design that required redesign.

(935)    Therefore, Nova Hut's decision to redesign this area was a preference that was not required and Kaiser is entitled to USD 2,663.00 for Nova Hut's unsupported change of design.

**b)     Respondent's position**

(936)     The additional work ordered by Nova Hut was necessary to bring the laminar cooling pump into compliance with the contractual requirements.

(937)     Accordingly, Nova Hut was justified in requiring Kaiser to perform this item of work at its own cost and expense.

**c)     Discussion and decision**

(938)     Nova Hut does not dispute that it requested changes to the final design of the laminar cooling pump and filtration system. However, it argues that these changes were necessary to bring this equipment into compliance with the contractual requirements.

(939)     The record shows that the changes required by Nova Hut were, to a large extent, necessary to remedy design flaws (C46, C55). It also appears that Kaiser was in agreement with all the changes requested by Nova Hut (C57).

(940)     Therefore, the Arbitral Tribunal shall dismiss Kaiser's claim.

**7.2.10     PCN No. 066: Additions and modifications to the pulpit platform (USD 9,227.00)**

**a)     Claimant's position**

(941)     Nova Hut requested that Kaiser add up walkways around the pulpit platforms for maintenance crews to clean up the pulpit windows.

(942)     This work was not within Kaiser's scope of supply. None of the cited Czech safety regulations required this addition.

(943)     Thus, Nova Hut's request was a preference intended to make it more convenient to clean up the pulpit windows.

(944)    Therefore, Kaiser is due USD 9,227.00 for the extra work.

**b)    Respondent's position**

(945)    Kaiser issued two change orders.

(946)    The item of work performed under the first one consisted in the addition of walkways around pulpits to bring the pulpit platform in compliance with the safety requirements set forth in the Czech regulations.

(947)    The item of work described in the second change order was not requested by Nova Hut and resulted from the lack of coordination between Kaiser and its subcontractor.

(948)    Therefore, Kaiser's claim should be dismissed.

**c)    Discussion and decision**

(949)    The issue to be determined is whether the addition of walkways around the pulpit platforms for maintenance of the pulpit windows was required by the applicable Czech standards and, hence, deemed within Kaiser's scope of supply (Section 9.1.2 of the Contract).

(950)    Nova Hut cites to Czech Regulation No. 48/82Sb. According to Kaiser, which is not contradicted on this point, Section 29 of Regulation No. 48/82Sb. provides that "[f]or a daylight illumination, a possibility of proper and safe maintenance of all illuminating openings (windows, skylights) must be ensured".

(951)    Kaiser asserts that it could satisfy this requirement "so long as the pulpit windows could be cleaned using standard maintenance methods" (Kaiser's Post-Hearing Brief of 28 October 2005, ¶309, p. 104). However, Kaiser does not explain what such "standard maintenance methods" are. Nor does it adduce any evidence in support of the affirmation that "the Czech engineering firm Metalconsult – which

217

*knows its own country's safety requirements – [...] confirmed that the walkways were not required*" (Ibid., ¶309, p. 104).

(952)    Therefore, it appears that the addition of walkways was required and Kaiser's claim shall be dismissed.

### 7.2.11    PCN No. 068: Work associated with an additional voltage supply in the roll shop area (USD 35,378.00)

#### a)    Claimant's position

(953)    Under the scope of supply, Kaiser was to provide 690V transformers, which it did.

(954)    The engineer recommended that Kaiser purchase a 400V transformer to supply the Nova Hut grinder. Nova Hut requested Kaiser to supply a 400V transformer. Kaiser informed Nova Hut that the modification would require a change order and the parties agreed to split the price.

(955)    Nova Hut contends that Kaiser did not have to perform any additional work because, rather than modify the voltage, Kaiser should have purchased additional cooling. Nova Hut however never requested that Kaiser provide additional cooling. Instead, Nova Hut has waited until after Kaiser performed the extra work and submitted this change order to protest this extra work.

(956)    Kaiser performed this extra work at Nova Hut's request and is due USD 35,378.00, which is half of the cost of the 400V transformer.

#### b)    Respondent's position

(957)    Kaiser did not have to perform any extra work as a result of Nova Hut's request that Kaiser install a 400-volt switchboard in the roll shop area. Thus, the required 400V power for the roll shop was not provided in addition to the 690V but in its stead. Moreover, if Kaiser had supplied an air forced cooling system as it was required to do, the need to install a 400V source would have been reduced.



## VII.    RECAPITULATION OF AMOUNTS CLAIMED AND AWARDED

### A.    AMOUNTS CLAIMED BY AND AWARDED TO CLAIMANT

| Claim | Principal Amount claimed (USD) | Principal Amount awarded (USD) | Contractual interest | From/to | Statutory interest | From/to |
|---|---|---|---|---|---|---|
| "Achievement of Final Acceptance" | 33,754,720.62 | 0 | - | - | - | - |
| "Wrongful draw on letter of credit" | 11,100,000[10] and 33,341.96 | 0 | - | - | - | - |
| "Deferred Project Development Costs" | 510,000 | 510,000 | Yes | 08.02.98/ payment | Yes | 05 01.04/ payment |
| "Warranty reserve and contingency amount" | 5,250,000 | 3,500,000 | Yes | 30.12.99/ payment | Yes | 05.01.04/ payment |
| "Delay in obtaining financing" | 2,295,950 | 0 | - | - | - | - |
| "Bonus for early achievement of Preliminary Acceptance" | 2,800,000 | 0 | - | - | - | - |

---

[10]    Kaiser claims payment of USD 11,100,000. under the claim for Final Acceptance or, *alternatively*, under the claim for the wrongful draw down on the letter of credit.

*319*

| Claim | Principal Amount claimed (USD) | Principal Amount awarded (USD) | Contractual interest | From/to | Statutory interest | From/to |
|---|---|---|---|---|---|---|
| "Extra Costs" | | | | | | |
| 1) PCNs | 1) 393,320 | 1) 128,982.16 | Yes | 28.11.00/ payment | Yes | 05.01.04/ payment |
| 2) Billings | 2) 166,033 | 2) 16,285 | No | - | Yes | 05.01.04 payment |
| 3) D-Day | 3)a) 1,793,106 | 3)a) 1,793,106 | No | - | No | - |
| | b) 744,468 | b) 604,968 | Yes | 29.04.00/ payment | Yes | 05.01.04/ payment |
| "Failure to provide materials" | 715,431 | 715,431 | Yes | 03.10.00/ payment | Yes | 05.01.04/ payment |
| "Cycloconverter" | 78,037 | 0 | - | - | - | - |
| "Office operating costs" | 428,737 | 0 | - | - | - | - |
| "Legal and consulting fees" | 1,879,610 | 0 | - | - | - | - |
| "Unjust enrichment" | Not quantified | 0 | - | - | - | - |
| Total | 50,842,754.58 | 7,268,772.16 | | | | |

**B.    AMOUNTS CLAIMED BY AND AWARDED TO RESPONDENT**

| Claim | Principal Amount claimed (USD) | Principal Amount awarded (USD) | Contractual interest | From/to | Statutory Interest | From/to |
|---|---|---|---|---|---|---|
| "Production penalty" (4WIPPT) | 46,000,000 | 46,000,000 | Yes | 01.07.01/ payment | Yes | 02.01.04/ payment |
| "Production penalty" (HRQQTs) | 3,700,000 | - | - | - | - | - |
| (Amounts retained) | (35,621,378.66) | - | - | - | - | - |
| **Sub-Total** | **14,078,621.34** | **10,378,621.34** | Yes | 01.07.01/ payment | Yes | 22.03.04/ payment |
| "PCNs" | 695,382.50 | 79,215.40 | Yes | 28.11.00/ payment | Yes | 10.06.05/ payment |
| **Total** | **14,774,003.84** | **10,457,836.74** | | | | |

**C.    SET-OFF**

(1514)    In its Procedural Order No. 5 of 23 September 2005, the Arbitral Tribunal *inter alia* asked that the parties indicate whether the Tribunal, in case it awarded amounts to both parties, should offset such amounts.

(1515)    Kaiser did not express its views on the issue. However, the Arbitral Tribunal notes that in its Statement of Claim of 10 November 2004, Kaiser claimed a net bonus in connection with the 4WIPPT of USD 1.6mio, i.e., a bonus of USD 5.3mio offset by USD 3.7mio in penalties claimed by Nova Hut (¶2.29a), p. 13).

(1516)    In its Post-Hearing Brief of 28 October 2005, Nova Hut submitted that if the Arbitral Tribunal awarded amounts to both parties, it should offset such amounts (¶116, p. 44). Moreover, Nova Hut made a set-off declaration "*in so far as may be necessary*" (¶117, p. 45). Nova Hut insisted on the importance of set-off in this case where the debtor was a shell company whose parent company filed a voluntary petition for relief under Chapter 11 of the US Bankruptcy Code.

(1517)    Section 1438 of the Austrian Civil Code reads as follows:

> When claims are correct and of the same nature and are so determined that property which is due to one party in his position as creditor can also be paid by him in his position as a debtor to the other party, a mutual set-off of the claims arises insofar as the claims are equal, and the reciprocal payment thereof is caused by operation of law.

(1518)    Therefore, the Arbitral Tribunal shall set off the amounts awarded to the parties.

322

## VIII.    OUTSTANDING PROCEDURAL ISSUES

(1519)    In its Statement of Claim of 10 November 2004, Kaiser asserted two claims based on Nova Hut's alleged failure to make payments it was required to make and wrongful refusal to acknowledge the achievement of Final Acceptance, namely:

-    a claim for extended overhead costs (Section 11, pp. 43-44); and

-    a claim for legal and consulting fees and costs (Section 12, pp. 44-45).

(1520)    In support of these claims, Kaiser adduced a witness statement (CWS3) and calculation sheets appended as exhibits E to N to such witness statements.

(1521)    In both its Statement of Defence of 24 January 2005 and Rejoinder of 10 June 2005, Nova Hut argued that Kaiser had not proven that it incurred the costs it was claiming as its damage summary was not supported by any evidence.

(1522)    On 2 September 2005, Kaiser filed with the Arbitral Tribunal corrected and supplemental exhibits. In particular, Kaiser requested leave to introduce Exhibit C247, which it stated was "*in support of Kaiser's claims for damages related to Extended Overhead and Legal and Consulting Fees*" and to reply to Nova Hut's contention "*that Kaiser failed to produce any evidence to support its damages*". According to Kaiser, Exhibit C247 was composed of monthly invoices from consultants and copies of monthly bills for such things as rent, office supplies and utilities to maintain the Ostrava office.

(1523)    In a letter of 5 September 2005 addressed to the Arbitral Tribunal, Nova Hut *inter alia* opposed the production, less than one week before the start of the evidentiary hearing, of revised versions of Exhibits E to N to CWS3 and of new

Exhibit C247, pointing out that the issue of the lack of substantiation of the Claimant's claim as early as in its Statement of Defence of 24 January 2005. Accordingly, the Claimant's attempt to introduce this exhibit at that time was untimely. Moreover, the argument followed, Nova Hut, which would not have enough time to prepare for the cross-examination of Kaiser's witnesses, would be prejudiced if the Arbitral Tribunal were to authorize the introduction of exhibit C247 into the record. Nova Hut requested the postponement of the hearing in case Kaiser were granted leave to file exhibits E to N to CWS3 and exhibit C247.

(1524)    On 7 September 2005, the Arbitral Tribunal decided not to accept the late production of Exhibit C247. The Tribunal's ruling was mainly prompted by the proximity of the evidentiary hearing and by the fact that Exhibit C247 could have been produced at an earlier stage, Nova Hut having pointed to the lack of substantiation of certain of Kaiser's claims as early as in its Statement of Defence of 24 January 2005 and having reiterated such objection in its Rejoinder of 10 June 2005.

(1525)    However, the Tribunal did not intend to rule out the possibility that Exhibit C247 be in fact needed for the proper resolution of the dispute and reserved its final decision on its admissibility until "*after the evidentiary hearing*".

(1526)    In a letter of 21 November 2005, Nova Hut objected to "*Kaiser's unacceptable attempt to rely on Exhibit C-247*" in its Reply Post-Hearing Brief of 14 November 2005 and requested that the Arbitral Tribunal "*again deny Kaiser's request to add Exhibit C-247 to the record and that it disregard those parts of Kaiser's Reply Post-Hearing Brief that refer to that exhibit*".

(1527)    In a letter of 24 November 2005, the Arbitral Tribunal stated that its decision not to accept the production of Exhibit C247 at this specific stage of the proceedings still stood and that a final decision on the admissibility of Exhibit C247 would be taken in the course of the Tribunal's deliberations. The Arbitral Tribunal specified that it would issue the necessary directions, taking into account the requirements of due process, should it decide to accept Exhibit C247.

(1528)     The Arbitral Tribunal has dismissed on their principle Kaiser's claims in support of which Exhibit C247 had been compiled and filed by Kaiser, namely the claim for USD 361,648.00 in extended overhead costs and for USD 992,890.08 in legal and consulting fees and costs.

(1529)     Therefore, the Arbitral Tribunal maintains its decision to disregard Exhibit C247 which had been filed in support of the quantum of these claims.

IX.    COSTS

A.    THE PARTIES' REASONABLE LEGAL AND OTHER COSTS

1.    Kaiser's costs

(1530)    In its Statement of Costs dated 11 November 2005, Kaiser claims fees and expenses of **USD 973,127.73**.

2.    Nova Hut's costs

(1531)    In its Statement of Costs dated 14 November 2005, Nova Hut claims fees of **USD 1,458,992.21** and expenses of **USD 10,111.74**, i.e., **USD 1,469,103.95**.

B.    THE ICC COSTS OF ARBITRATION

(1532)    The ICC costs of arbitration amount to USD 680,000.00. Towards this amount, each of the parties paid an advance of USD 340,000.00.

C.    THE PARTIES' RELIEF SOUGHT

1.    Kaiser's relief sought

(1533)    In its Post-Hearing Brief of 28 October 2005, Kaiser has made the following request for relief:

> 404. Nova Hut shall pay to Kaiser within thirty days of the issuance of the Tribunal's Final Award:
>
> [...]
>
> 419. Also, an amount to be determined after Kaiser's receipt of documentation from Nova Hut plus Value Added Tax, together with the costs of this arbitration and attorneys' fees.

(1534)    In its comments dated 21 November 2005 on Nova Hut's Statement of Costs, Kaiser requested that Nova Hut's claim for legal fees and disbursements be

*324*

denied. Essentially, Kaiser argued that Nova Hut did not provide the information necessary to determine the reasonableness of Nova Hut's fees and disbursements (such as, e.g., copies of invoices, identity of the lawyers and other persons charging time, billing rates, etc.). Kaiser also pointed out that Nova Hut's statement raised question in that Nova Hut's claim for its legal fees and disbursements was 150% more than Kaiser's.

## 2.    Nova Hut's relief sought

(1535)    In its Reply Post-Hearing Brief of 14 November 2005, Nova Hut has made the following request for relief:

> Based on the foregoing and on its previous written submissions, Nova Hut denies that Kaiser is entitled to any of the relief claimed and requests that it be granted an award:
>
> [...]
>
> (5)    assessing against Kaiser all of the costs of this arbitration proceeding, as provided in Article 20 of the ICC Rules, including legal fees and costs incurred by Nova Hut.

(1536)    In a letter of 21 November 2005, Nova Hut stated that it had no comments on Kaiser's Statement of Costs.

## D.    APPORTIONMENT BETWEEN THE PARTIES

(1537)    Under Article 31(3) of the ICC Rules, "*the final Award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties*". It is accepted that this rule gives the Arbitral Tribunal broad discretion in deciding on the costs of the arbitration, which are defined at Article 31(1). The only general requirement is that the Arbitral Tribunal give the reasons for the solution it adopts in accordance with Article 25(2) of the Rules.[11]

---

[11]    DERAINS/SCHWARTZ, *A Guide to the New ICC Rules of Arbitration*, The Hague 1998, pp. 340-344 and references.

(1538)    A common method is to award costs to the party having won the arbitration or, where there is no clear winner, to allocate costs taking into account the relative success of the claims and defences ("costs follow the event"). Another criteria adopted by arbitral tribunals under the ICC Rules is the general conduct of a party and the more or less serious nature of the case it has defended.[12]

## E.    DECISION

(1539)    In determining the appropriate award of costs, the Arbitral Tribunal has carefully considered the success of the parties on the various issues raised in this arbitration.

(1540)    On the one hand, Kaiser, which is entitled to a principal amount of USD **7,268,772.16** before set-off, did not prevail with respect to a significant amount of its aggregate claims (USD **50,842,704.58**). In particular, Kaiser did not succeed on its claim for breach of contract relating to acceptance of the project and breach of warranty, which was by far its main claim in terms of quantum. This claim had considerable impact on the amount of the advance on costs fixed by the ICC Court of Arbitration.

(1541)    On the other hand, Nova Hut has prevailed on most of its claims and is the net creditor once all claims are dealt with.

(1542)    Applying strictly the rule that a prevailing party is entitled to recover its reasonable fees and costs, the Arbitral Tribunal should find that Kaiser must bear the entirety of its own costs, the entirety of Nova Hut's costs and the arbitrators' fees and expenses as well as the ICC administrative expenses.

(1543)    However, the issue to be determined by the Arbitral Tribunal to decide Kaiser's claim for a production bonus and its counterpart, Nova Hut's counterclaim for a production penalty, was very complex. This is readily shown by the fact that a

---

[12]    DERAINS/SCHWARTZ, op. cit., pp. 341-342 and 344.

large part of the parties' written submissions and almost the entirety of the witness hearing were devoted to it.

(1544)   Besides, the outcome of this issue remained undecided until a very late stage in the proceedings. The Arbitral Tribunal needed to carefully consider all of the parties' written submissions, the large amount of documents produced by the parties and the various testimonies to make up its mind and reach a final conclusion in this respect.

(1545)   Yet, if one were to disregard this issue and the resulting claims and counterclaims, the outcome of this arbitration would be totally different. Nova Hut would only be awarded USD 79,215.40 for its claim for unpaid PCNs, whereas Kaiser, although it would not prevail on all of its remaining claims, would be the net creditor.

(1546)   The Arbitral Tribunal considers that the above considerations justify that it depart from a strict application of the "cost follow the event" principle. Therefore, having regard to the above factors, and exercising its discretion, the Arbitral Tribunal will order that Kaiser shall bear 70% of the costs of the arbitration, an apportionment that shall apply to both the arbitration costs and the parties' reasonable and other costs.

(1547)   The costs of this arbitration have been fixed by the ICC Court of Arbitration at USD 680,000.00. Kaiser shall bear 70% of that amount, i.e., USD 476,000.00. Nova Hut's part of 30% is equal to USD 204,000.00. Given that Nova Hut already advanced USD 340,000.00 towards the costs, Kaiser shall reimburse Nova Hut USD 136,000.00.

(1548)   The parties' reasonable legal and other costs total USD 2,442,231.68. 70% of that amount is equal to USD 1,709,562.18 and 30% is equal to 732,669.50.

(1549)    Admittedly, Nova Hut claims nearly 150% of Kaiser's costs. However, contrary to Kaiser's point of view, Nova Hut's statement of costs does not seem unreasonable.

(1550)    First, it is not unreasonable in light of the magnitude of the efforts and resources deployed by Respondent in this arbitration and considering the amount in dispute. Second, the difference between the parties' respective statements of costs may be explained by objective factors such as the fact that the native language of several of Nova Hut's witnesses, if not all, was not English, which certainly rendered counsel's work more difficult and costly. Last, Kaiser did not show that Nova Hut's statement of costs would include costs or disbursements that are not directly linked to Nova Hut's defence in this arbitration.

(1551)    Therefore, Kaiser shall reimburse to Nova Hut USD 736,434.45 (USD 1,469,103.95 less USD 732,669.50).

## X.     RELIEF

(1552)     Therefore, the Arbitral Tribunal hereby makes the following Award:

1.     Ordering Mittal Steel Ostrava, a.s., to pay Kaiser Netherlands B.V.:

-     USD 510,000.00, plus simple contractual interest at the rate of 8% above LIBOR for one-year US dollars deposits from 8 February 1998 until full and final payment, plus compound interest on such interest, at the rate of 4% per annum from 5 January 2004 until full an final payment;

-     USD 3,500,000.00, plus simple contractual interest at the rate of 8% above LIBOR for one year US dollars deposits from 30 December 1999 until full and final payment, plus compound interest on such interest, at the rate of 4% per annum from 5 January 2004 until full and final payment;

-     USD 128,982.16, plus simple contractual interest at the rate of 8% above LIBOR for one year US dollars deposits from 28 November 2000 until full and final payment, plus compound interest on such interest, at the rate of 4% per annum from 5 January 2004 until full and final payment;

-     USD 16,285.00, plus interest at the rate of 4% per annum from 5 January 2004 until full and final payment;

-     USD 1,793,106.00;

-     USD 604,968.00, plus simple contractual interest at the rate of 8% above LIBOR for one year US dollars deposits from 29 April 2000 until full and final payment, plus compound interest on such interest,

4.    Ordering that Kaiser Netherlands B.V. shall bear 70% of the costs of the arbitration and, accordingly, shall pay Mittal Steel Ostrava, a.s. USD 136,000.00.

5.    Ordering that Kaiser Netherlands B.V. shall bear 70% of the parties' reasonable legal and other costs and, accordingly, shall pay Mittal Steel Ostrava, a.s. USD 736,434.45.

6.    Denying all other claims of the parties.

Date:  *26 April 2006*

Place of arbitration: Vienna, Austria

............................................                                                ............................................
Dr. Johannes Hock                                                                   Dr. A. Baier

............................................
Prof. G. Kaufmann-Kohler

00649100/bls

*332*

# EXHIBIT B

8-K 1 a06-12093_18k.htm CURRENT REPORT OF MATERIAL EVENTS OR CORPORATE CHANGES

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT
### Pursuant To Section 13 or 15(d) of
### The Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): **May 16, 2006**

# KAISER GROUP HOLDINGS, INC.
(Successor issuer to Kaiser Group International, Inc.)
(Exact name of registrant as specified in its charter)

| **Delaware** | **File No. 1-12248** | **54-2014870** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| **9300 Lee Highway** | |
| **Fairfax, Virginia** | **22031-1207** |
| (Address of principal executive offices) | (Zip Code) |

**(703) 934-3413**
(Registrant's telephone number, including area code)

**N/A**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 8.01. Other Events.**

On May 16, 2006, Kaiser Group Holdings, Inc. (the "Company") was informed that the arbitration panel formed under the auspices of the International Chamber of Commerce has issued a ruling in the arbitration proceeding concerning the steel mini-mill that was constructed by the Company's subsidiary, Kaiser Netherlands B.V., for Nova Hut, a.s. (now Mittal Steel Ostrava, a.s.) in Ostrava, the Czech Republic. The decision by the arbitration panel is binding and non-appealable. After calculation of claim and counter-claim award amounts, the net balance award amount was approximately $3.2 million (excluding accrued interest calculations) in favor of the counter-claimant, Mittal Steel Ostrava, a.s. In addition, the panel determined that Kaiser Netherlands B.V. should bear 70% of the cost of the arbitration and the parties' legal and other costs associated therewith, resulting in an aggregate reimbursement amount of approximately $0.9 million due from Kaiser Netherlands B.V. to Mittal Steel Ostrava, a.s. The Company is evaluating the implications of this arbitration decision.

2

**Signatures**

Pursuant to the requirements of the Securities and Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Kaiser Group Holdings, Inc.
(Registrant)

/s/ Nicholas Burakow
Nicholas Burakow
Executive Vice President and Chief Financial Officer

Date:  May 17, 2006

3

# EXHIBIT B

8-K 1 a06-12093_18k.htm CURRENT REPORT OF MATERIAL EVENTS OR CORPORATE
CHANGES

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
#### Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT
### Pursuant To Section 13 or 15(d) of
### The Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): **May 16, 2006**

# KAISER GROUP HOLDINGS, INC.
#### (Successor issuer to Kaiser Group International, Inc.)
(Exact name of registrant as specified in its charter)

| **Delaware** | **File No. 1-12248** | **54-2014870** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**9300 Lee Highway**
**Fairfax, Virginia**
(Address of principal executive offices)

**22031-1207**
(Zip Code)

**(703) 934-3413**
(Registrant's telephone number, including area code)

**N/A**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 8.01. Other Events.**

On May 16, 2006, Kaiser Group Holdings, Inc. (the "Company") was informed that the arbitration panel formed under the auspices of the International Chamber of Commerce has issued a ruling in the arbitration proceeding concerning the steel mini-mill that was constructed by the Company's subsidiary, Kaiser Netherlands B.V., for Nova Hut, a.s. (now Mittal Steel Ostrava, a.s.) in Ostrava, the Czech Republic. The decision by the arbitration panel is binding and non-appealable. After calculation of claim and counter-claim award amounts, the net balance award amount was approximately $3.2 million (excluding accrued interest calculations) in favor of the counter-claimant, Mittal Steel Ostrava, a.s. In addition, the panel determined that Kaiser Netherlands B.V. should bear 70% of the cost of the arbitration and the parties' legal and other costs associated therewith, resulting in an aggregate reimbursement amount of approximately $0.9 million due from Kaiser Netherlands B.V. to Mittal Steel Ostrava, a.s. The Company is evaluating the implications of this arbitration decision.

2

**Signatures**

Pursuant to the requirements of the Securities and Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Kaiser Group Holdings, Inc.
(Registrant)

/s/ Nicholas Burakow
Nicholas Burakow
Executive Vice President and Chief Financial Officer

Date:  May 17, 2006

3

# EXHIBIT C

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| KAISER GROUP INTERNATIONAL, INC., *et al.*, | : | Case No. 00-2263 (MFW) |
| Debtors, | : | (Jointly Administered) |

------------------------------------------------X

| | | |
|---|---|---|
| KAISER GROUP INTERNATIONAL, INC., *et al.*, | : | Adv. P. No. 01-928 (MFW) |
| Plaintiffs, | : | |
| - against – | : | |
| NOVA HUT a.s. and INTERNATIONAL FINANCE CORPORATION, | : | |
| Defendants. | : | |

------------------------------------------------X

## DECLARATION OF JEAN-YVES GARAUD

JEAN-YVES GARAUD declares and says:

1.    I am a member of the law firm of Cleary, Gottlieb, Steen & Hamilton LLP

("Cleary Gottlieb"). I make this declaration in support of the Motion of Mittal Steel Ostrava,

A.S. (formerly Nova Hut, A.S.) Pursuant to Bankruptcy Rule 9011 for Sanctions Against Saul

Ewing LLP; in further support of the Motion of Mittal Steel Ostrava, A.S. for Summary

Judgment; and in response to the Debtors' Motion for an Order Pursuant to Federal Rule of

Bankruptcy Procedure 2004, or Alternatively a Bill of Equitable Discovery, Directing

Examination of, and Production of Documents by the International Finance Corporation, Nova

Hut, and Related Parties, filed in the above captioned case. Unless otherwise stated, this declaration is based on my personal knowledge.

2. The final award (the "Award") rendered in the arbitration between the Debtors and Mittal Steel Ostrava, A.S. ("Nova Hut") under the Rules of Conciliation and Arbitration of the International Chamber of Commerce ("ICC"), in Austria, is dated April 26, 2006. A true and correct copy of an excerpt of the final award bearing the April 26, 2006 date is attached hereto as Exhibit A.

3. Cleary Gottlieb first learned about the Award when it was notified about the Award by the ICC on May 16, 2006.

4. A Recent Assignments blurb posted on Cleary Gottlieb's external Web site describes the Award and bears the date April 26, 2006 at the top of the blurb. A true and correct copy of the blurb is attached hereto as Exhibit B. The April 26, 2006 date at the top of the blurb reflects the date of the Award. By an email dated June 30, 2006 sent to Paddy Mangunta, I approved the content of the blurb for posting on Cleary Gottlieb's external Web site. A copy of a chain of email correspondence that includes a true and correct copy of my written approval is attached hereto as Exhibit C.

5. I did not approve the posting of a Recent Assignments blurb regarding the Award on Cleary Gottlieb's external Web site at any time prior to June 30, 2006, and I am not aware of any version of a Recent Assignments blurb posted on Cleary Gottlieb's external Web site prior to June 30, 2006.

6. On information and belief, George E. Rahn, Jr., Esq. of Saul Ewing LLP, counsel to Kaiser Netherlands B.V., sent a letter dated October 12, 2006, to Anne-Marie Whitesell, Secretary General of the International Court of Arbitration of the International

2

Chamber of Commerce regarding the Cleary Gottlieb Recent Assignments blurb. A true and correct copy of the letter is attached hereto as Exhibit D.

7.    In response to the October 12, 2006 letter, I sent a letter to Secretary General Whitesell dated October 13, 2006 stating that the above described press release "was posted on Cleary Gottlieb's website by its marketing department on June 30, 2006 i.e. more than one month and half after the Award was notified to the parties" and further stating that "[t]he Cleary Gottlieb article bears the April 26, 2006 date simply because the Award was signed on this date." A true and correct copy of the letter is attached hereto as Exhibit E.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated:  London, England
        March 23, 2007

                                    Jean-Yves Garaud

3

# EXHIBIT A

# ICC

**International Chamber of Commerce**

*The world business organization*

**International Court of Arbitration  •  Cour internationale d'arbitrage**

# AWARD

**ICC International Court of Arbitration  •  Cour internationale d'arbitrage de la CCI**

38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28   Fax +33 1 49 53 29 33
Web site www.iccarbitration.org    E-mail arb@iccwbo.org

# INTERNATIONAL COURT OF ARBITRATION

## FINAL AWARD

## CASE 13101/EC

### KAISER NETHERLANDS B.V.
### (Netherlands)

### vs/

### MITTAL STEEL OSTRAVA, A.S.
### (FORMERLY ISPAT NOVA HUT, A.S.)
### (Czech Republic)

***** 

This document is an original of the Final Award rendered in conformity with the Rules of the
ICC International Court of Arbitration.

International Court of Arbitration

International Chamber of Commerce

ICC Arbitration No. 13101/EC

**Kaiser Netherlands B.V.,** c/o Citco Nederland B.V., Telestone 8, Teleport, Naritaweg 165, 1043 BW Amsterdam, The Netherlands

**Claimant**

**Counterrespondent**

Represented by **George E. RAHN, Jr, Esq.**, Saul Ewing LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania 19102-2186, USA and **Armin DALLMANN, Esq.**, Dallmann & Juranek, Gusshausstrasse 2, 1040 Vienna, Austria

v.

**Mittal Steel Ostrava, a.s. (formerly Ispat Nova Hut, a.s.)**, Vratimovska 689, 707 02 Ostrava-Kincice, Czech Republic

**Respondent**

**Counterclaimant**

Represented by **Jean-Yves GARAUD, Esq.**, Cleary, Gottlieb, Steen & Hamilton, 12, rue de Tilsitt, 75008 Paris, France

# AWARD

**26 April 2006**

# EXHIBIT B



NEWS DETAIL

**Mittal Steel Ostrava in ICC Arbitration Victory**
April 26, 2006

Cleary Gottlieb successfully represented Mittal Steel Ostrava, the Czech subsidiary of Mittal Steel Holdings N.V., in an International Chamber of Commerce arbitration commenced in 2004 by Kaiser Netherlands, a Dutch corporation.

The arbitration arose from a June 1997 contract for the design and construction by Kaiser Netherlands of a steel mill at the Mittal Steel facility in Ostrava. Mittal Steel Ostrava terminated the contract in early 2001 and the resolution of the opposing claims turned on whether Kaiser had delivered a facility that conformed to the contract requirements and passed a series of final performance tests.

Kaiser requested an award in the amount of more than $50 million in principal, arguing that it delivered a steel mill in compliance with the contract. Mittal Steel Ostrava denied Kaiser Netherlands' claim and requested an award for $46 million in liquidated damages for lost profits that Mittal suffered because the delivered steel mill did not conform to the contract's terms.

Even though Mittal Steel Ostrava had not strongly opposed Kaiser's claim that it successfully completed the performance tests, and even though the facility has achieved record production volumes in recent months, the Cleary Gottlieb team was able to convince the ICC Tribunal that Kaiser manipulated the figures in order to claim successful completion of the tests.

In its award, the ICC Arbitral Tribunal upheld Mittal Steel Ostrava's defense that the steel mill delivered by Kaiser Netherlands did not comply with the contractual requirements, dismissed Kaiser Netherlands' entire claim and granted Mittal Steel Ostrava's counterclaim. The unexpected outcome is an approximately $5 million net debt from Kaiser Netherlands to Mittal Steel Ostrava.

Practice Groups: Litigation and Arbitration

© Cleary Gottlieb Steen & Hamilton LLP, 2007. All rights reserved.
Under the rules of certain jurisdictions, this Web site may constitute Attorney Advertising.

# EXHIBIT C



**Jean-Yves
GARAUD/PAR/Cgsh**

30 June 2006  02:23 PM

To  Paddy Mangunta/NY/Cgsh@cgsh

cc

bcc

Subject  Fw: For your review

History:        ↳ This message has been forwarded.

This is fine.

Jean-Yves garaud
----- Forwarded by Jean-Yves GARAUD/PAR/Cgsh on 30/06/2006 20:21 -----



**Jean-Pierre
VIGNAUD/PAR/Cgsh**

28 June 2006  09:45

To  Jean-Yves GARAUD/PAR/Cgsh@CGSH

cc

Subject  Fw: For your review

peux-tu lui confirmer que c'est ok? thks.


Jean-Pierre Vignaud
Avocat au Barreau de Paris
Cleary Gottlieb Steen & Hamilton LLP
Tel:  33.1.40.74.68.00 - Fax:  33.1.45.63.66.37
E-mail:  jvignaud@cgsh.com
----- Forwarded by Jean-Pierre VIGNAUD/PAR/Cgsh on 28/06/2006 09:44 -----



**Paddy Mangunta/NY/Cgsh**

27 June 2006  20:29

To  Jean-Pierre VIGNAUD/PAR/Cgsh@CGSH

cc

Subject  For your review


Dear Mr. Vignaud,

I am sending the following item (below) to be approved for posting on the *external* web site.
Should any of the information below be removed before posting externally?

Please let me know how to proceed. Thank you very much.

Best regards,
Paddy

------------
**Mittal Steel Ostrava in ICC Arbitration Victory**
April 26, 2006 - Cleary Gottlieb successfully represented Mittal Steel Ostrava, the Czech

subsidiary of Mittal Steel Holdings N.V., in an International Chamber of Commerce arbitration commenced in 2004 by Kaiser Netherlands, a Dutch corporation.

The arbitration arose from a June 1997 contract for the design and construction by Kaiser Netherlands of a steel mill at the Mittal Steel facility in Ostrava.  Mittal Steel Ostrava terminated the contract in early 2001 and the resolution of the opposing claims turned on whether Kaiser had delivered a facility that conformed to the contract requirements and passed a series of final performance tests.

Kaiser requested an award in the amount of more than $50 million in principal, arguing that it delivered a steel mill in compliance with the contract.  Mittal Steel Ostrava denied Kaiser Netherlands' claim and requested an award for $46 million in liquidated damages for lost profits that Mittal suffered because the delivered steel mill did not conform to the contract's terms.

Even though Mittal Steel Ostrava had not strongly opposed Kaiser's claim that it successfully completed the performance tests, and even though the facility has achieved record production volumes in recent months, the Cleary Gottlieb team was able to convince the ICC Tribunal that Kaiser manipulated the figures in order to claim successful completion of the tests.

In its award, the ICC Arbitral Tribunal upheld Mittal Steel Ostrava's defense that the steel mill delivered by Kaiser Netherlands did not comply with the contractual requirements, dismissed Kaiser Netherlands' entire claim and granted Mittal Steel Ostrava's counterclaim.  The unexpected outcome is an approximately $5 million net debt from Kaiser Netherlands to Mittal Steel Ostrava.

-------------------------------------------------------
Paddy Mangunta
Web Site Content Coordinator
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Tel: 212 225 3629
Fax: 212 225 3999
www.clearygottlieb.com

# EXHIBIT D



COPY

George E. Rahn, Jr.

Phone: (215) 972-7165

Fax: (215) 972-1855

nrahn@saul.com

www.saul.com

# SAUL EWING

### Attorneys at Law
A Delaware LLP

October 12, 2006

Air Mail and
Facsimile 011 33 1 49 53 29 33

Anne-Marie Whitesell
Secretary General
International Court of Arbitration
International Chamber of Commerce
38 Cours Albert 1er
75008 Paris
France

      Re:   Kaiser Netherlands B.V. v. Ispat Nova Hut, a.s.
           (Case No. 13101/EC)

Dear Ms. Whitesell:

      We represent claimant Kaiser Netherlands B.V. ("Kaiser Netherlands") in the above-referenced matter. I am writing to request that the ICC conduct an investigation relating to the independence and conduct of the arbitrators assigned to this matter.

      The basis for this request is information that has recently been obtained by Kaiser Netherlands which suggests that one or more of the arbitrators may have had improper communications with respondent Ispat Nova Hut, a.s. ("Nova Hut") regarding the disposition of this matter. Specifically, Kaiser Netherlands has recently discovered information that suggests that the arbitration panel may have discussed and/or disclosed the Award in this case with Nova Hut or its attorneys before the Award became final.

      The parties were notified on May 16, 2006 by the ICC that an Award was issued in this case. However, Kaiser Netherlands recently discovered that the law firm that represented Nova Hut, Cleary Gottlieb Steen & Hamilton, posted an article about the Award on their website on April 26, 2006 -- 20 days before the Award was distributed to the parties by the ICC. This article is placed on the website in chronological date order between information dated before and after the April 26 article. I am enclosing a copy of a printout from the Cleary Gottlieb website.

Centre Square West ♦ 1500 Market Street, 38th Floor ♦ Philadelphia, PA 19102-2186
Phone: (215) 972-7777 ♦ Fax (215) 972-7725

BALTIMORE   CHESTERBROOK   HARRISBURG   NEWARK   PHILADELPHIA   PRINCETON   WASHINGTON   WILMINGTON
A DELAWARE LIMITED LIABILITY PARTNERSHIP

957723.1 10/12/06

October 12, 2006
Page 2


We understand that under the ICC Rules, before their distribution by the ICC, arbitration awards are to be maintained in the strictest confidence and are not to be disclosed by the arbitration panel or the ICC. Kaiser Netherlands is not aware of any reason that Cleary Gottlieb would have known about the substance of the Award before it was sent to the parties on May 16, 2006. The fact that Cleary Gottlieb apparently knew about the substance of the Award prior to this date suggests that there were improper communications between the arbitration panel and Nova Hut or its attorneys before the Award was distributed to the parties.

Based on this information, Kaiser Netherlands respectfully requests that the ICC conduct an investigation into the impartiality of the arbitration panel and the circumstances surrounding the distribution of the Award to Nova Hut and its attorneys. If you require any additional information, please do not hesitate to contact me.


Very truly yours,


George E. Rahn, Jr.


cc:     Dr. Armin Dallmann
        Jean-Yves Garaud, Esquire
        Mr. Eliseo Castineira

957722.1 10/12/06

**CLEARY GOTTLIEB**

ABOUT THE FIRM · OUR PRACTICE · OUR OFFICES · OUR LAWYERS · RECRUITING · NEWS & PUB

**NEWS & PUBLICATIONS**

> RECENT ASSIGNMENTS
> ALERT MEMORANDA
> PUBLICATIONS
> NEWS/PRESS RELEASES
> SEMINARS AND SPECIAL EVENTS
> FIRM BROCHURE
> SELECTED HONORS

## NEWS & PUBLICATIONS

### NEWS DETAIL

**Mittal Steel Ostrava in ICC Arbitration Victory**
April 26, 2006

Cleary Gottlieb successfully represented Mittal Steel Ostrava, the Czech subsidiary of Mitta Steel Holdings N.V., in an International Chamber of Commerce arbitration commenced in 2004 by Kaiser Netherlands, a Dutch corporation.

The arbitration arose from a June 1997 contract for the design and construction by Kaiser Netherlands of a steel mill at the Mittal Steel facility in Ostrava. Mittal Steel Ostrava terminated the contract in early 2001 and the resolution of the opposing claims turned on whether Kaiser had delivered a facility that conformed to the contract requirements and passed a series of final performance tests.

Kaiser requested an award in the amount of more than $50 million in principal, arguing th it delivered a steel mill in compliance with the contract. Mittal Steel Ostrava denied Kaiser Netherlands' claim and requested an award for $46 million in liquidated damages for lost profits that Mittal suffered because the delivered steel mill did not conform to the contract terms.

Even though Mittal Steel Ostrava had not strongly opposed Kaiser's claim that it successfully completed the performance tests, and even though the facility has achieved record production volumes in recent months, the Cleary Gottlieb team was able to convinc the ICC Tribunal that Kaiser manipulated the figures in order to claim successful completio of the tests.

In its award, the ICC Arbitral Tribunal upheld Mittal Steel Ostrava's defense that the steel mill delivered by Kaiser Netherlands did not comply with the contractual requirements, dismissed Kaiser Netherlands' entire claim and granted Mittal Steel Ostrava's counterclain The unexpected outcome is an approximately $5 million net debt from Kaiser Netherlands to Mittal Steel Ostrava.

Practice Groups: Litigation and Arbitration

# EXHIBIT E

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

NEW YORK

WASHINGTON, DC

BRUSSELS

LONDON

MOSCOW

FRANKFURT

COLOGNE

ROME

MILAN

HONG KONG

BEIJING

AVOCATS AU BARREAU DE PARIS

12, RUE DE TILSITT

75008 PARIS

01 40 74 68 00

FAX

01 45 63 66 37

WWW.CLEARYGOTTLIEB.COM

October 13, 2006

ROGER J. BENRUBI
SENIOR COUNSEL

JEAN-MICHEL TRON
MEMBRE DU CONSEIL DE L'ORDRE
JEAN-PIERRE VIGNAUD
GILLES ENTRAYGUES
ROBERT BORDEAUX-GROULT
FRANÇOIS JONEMANN
RUSSELL H. POLLACK
ARNAUD DE BROSSES
JEAN-MARIE AMBROSI
ANDREW A. BERNSTEIN
PIERRE-YVES CHABERT
PASCAL COUDIN
JEAN-YVES GARAUD
JOHN D. BRINITZER
FRANÇOIS BRUNET
FABRICE BAUMGARTNER
MARIE-LAURENCE TIBI
VALÉRIE LEMAITRE

CATHERINE PEULVÉ
SOPHIE DE BEER
CLAUDIA ANNACKER
SERGIO SORINAS-JIMENO
COUNSEL

Mrs. Anne-Marie Whitesell
Secretary General
Chambre de Commerce Internationale
38, Cours Albert 1er
75008 Paris

Re: Case No. 13101/EC - Kaiser Netherlands B.V. v. Nova Hut A.S.

Dear Mrs. Whitesell:

We represent Mittal Steel Ostrava (formely "Ispat Nova Hut") in the above-referenced matter. We are writing in response to Kaiser Netherlands Counsel's letter of October 12, 2006.

Kaiser Netherlands' Counsel claims that (i) Cleary Gottlieb apparently knew about the substance of the Award prior to May 16, 2006 and that (ii) there would have been improper communications between the arbitration panel and Nova Hut or its attorneys before the Award was distributed to the parties. These allegations are preposterous.

It goes without saying that neither Mittal Steel Ostrava nor Cleary Gottlieb had, or could have had, any information whatsoever in relation to the substance of the Award before it was notified by the ICC on May 16, 2006. The article mentioned by Kaiser Netherlands' Counsel in an attempt to substantiate its absurd claim was posted on Cleary Gottlieb's website by its marketing department on June 30, 2006 i.e. more than one month and half after the Award was notified to the parties. At this date, Kaiser Netherlands had already indicated the content of this Award in a public SEC report dated May 17, 2006 (see attached document). The Cleary Gottlieb article bears the April 26, 2006 date simply because the Award was signed on this date.

Kaiser Netherlands Counsel's could have easily raised this issue with our firm and avoided such a damaging statement to the ICC. Kaiser Netherlands Counsel's has not even attempted to approach us. Although it is hard to conceive, Kaiser Netherlands Counsel's appears to have had the deliberate intent to damage Cleary Gottlieb's reputation. It could also be a desperate attempt to hide its misrepresentation before the US Bankruptcy court where Kaiser Netherlands' Counsel had stated on July 5, 2006 that the matter was still "in arbitration" (see attached document).

In any event, Cleary Gottlieb reserve the right to initiate a legal action against Saul Ewing for any damages it may suffer as a result of its baseless and libellous statements.

Sincerely,

Jean-Yves Garaud

C.c.    George E. Rahn Jr., Esq.
        Armin Dallmann, Esq.
        Eliseo Castineira

SEC Info - Kaiser Group Holdings Inc - 8-K - For 5/16/06

*This is an EDGAR HTML document rendered as filed.  [ Alternative Formats ]*

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 8-K

---

### CURRENT REPORT
### Pursuant To Section 13 or 15(d) of
### The Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): May 16, 2006

# KAISER GROUP HOLDINGS, INC.

(Successor issuer to Kaiser Group International, Inc.)
(Exact name of registrant as specified in its charter)

| Delaware | File No. 1-12248 | 54-2014870 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| 9300 Lee Highway Fairfax, Virginia | 22031-1207 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

(703) 934-3413
(Registrant's telephone number, including area code)

N/A
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 8.01. Other Events.**

On May 16, 2006, Kaiser Group Holdings, Inc. (the *"Company"*) was informed that the arbitration panel formed under the auspices of the International Chamber of Commerce has issued a ruling in the arbitration proceeding concerning the steel mini-mill that was constructed by the Company's subsidiary, Kaiser Netherlands B.V., for Nova Hut, a.s. (now Mittal Steel Ostrava, a.s.) in Ostrava, the Czech Republic. The decision by the arbitration panel is binding and non-appealable. After calculation of claim and counter-claim award amounts, the net balance award amount was approximately $3.2 million (excluding accrued interest calculations) in favor of the counter-claimant, Mittal Steel Ostrava, a.s. In addition, the panel determined that Kaiser Netherlands B.V. should bear 70% of the cost of the arbitration and the parties' legal and other costs associated therewith, resulting in an aggregate reimbursement amount of approximately $0.9 million due from Kaiser Netherlands B.V. to Mittal Steel Ostrava, a.s. The Company is evaluating the implications of this arbitration decision.

2

SEC Info - Kaiser Group Holdings Inc - 8-K - For 5/16/06

**Signatures**

Pursuant to the requirements of the Securities and Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Kaiser Group Holdings, Inc.
(Registrant)

/s/ *Nicholas Burakow*
Nicholas Burakow
Executive Vice President and Chief Financial Officer

Date: May 17, 2006

3

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KAISER GROUP INTERNATIONAL, | ) | |
| INC., *et al.*, | ) | Case Nos. 00-2263 to 00-2301 (MFW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| KAISER GROUP INTERNATIONAL, | ) | |
| INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. No. 01-928 (MFW) |
| | ) | |
| NOVA HUT, a.s. and | ) | |
| INTERNATIONAL FINANCE | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## STATUS REPORT ON PREFERENCE ACTIONS

Kaiser Group International, Inc., *et al.*, by and through their undersigned counsel,

hereby submits the following status report in response to the Court's Notice and Order of

Request for Status Report.

_____

Mark Minuti (No. 2659)
Jeremy W. Ryan (No. 4057)
**SAUL EWING LLP**
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
(302) 421-6840

Attorneys for Kaiser Group International, Inc., *et al.*

Dated: July 5, 2006

DKT. NO. 273
DT. FILED 7-5-06

**EXHIBIT G**

**NOTICE OF SELECTION OF MEDIATOR FILED**

| Defendant Name | Adversary No. | Comments |
|---|---|---|
| NOVA HUT, a.s. | 01-928 | This matter is in arbitration. The Court has entered an order staying this adversary proceeding pending submission of the disputes to arbitration. |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| KAISER GROUP INTERNATIONAL, INC., *et al.*, | : | Case No. 00-2263 (MFW) |
| Debtors, | : | (Jointly Administered) |

-----------------------------------------------------X

| | | |
|---|---|---|
| KAISER GROUP INTERNATIONAL, INC., *et al.*, | : | Adv. P. No. 01-928 (MFW) |
| Plaintiffs, | : | |
| - against – | : | |
| NOVA HUT a.s. and INTERNATIONAL FINANCE CORPORATION, | : | |
| Defendants. | : | |

-----------------------------------------------------X

## DECLARATION OF EDWARD WEPPLER

EDWARD WEPPLER declares and says:

      1.     I have been employed as the Web Site Content Manager for the law firm of Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb") since January 1, 2005.  As part of my responsibilities as Web Site Content Manager, I maintain the content of Cleary Gottlieb's external Web site, including the Recent Assignments blurbs posted on the external Web site.  I also directly supervise Paddy Mangunta, the Web Site Content Coordinator employed by Cleary Gottlieb.  I make this declaration in support of the Motion of Mittal Steel Ostrava, A.S. (formerly Nova Hut, A.S.) Pursuant to Bankruptcy Rule 9011 for Sanctions Against Saul Ewing LLP; in

further support of the Motion of Mittal Steel Ostrava, A.S. for Summary Judgment; and in response to the Debtors' Motion for an Order Pursuant to Federal Rule of Bankruptcy Procedure 2004, or Alternatively a Bill of Equitable Discovery, Directing Examination of, and Production of Documents by the International Finance Corporation, Nova Hut, and Related Parties, filed in the above captioned case. Unless otherwise stated, this declaration is based on my personal knowledge.

2.      A standard procedure has been followed since at least August 2005 for posting a Recent Assignments blurb regarding a litigation or arbitration matter on Cleary Gottlieb's external Web site. After a blurb is drafted, a business development manager reviews the blurb and forwards it to a business development coordinator (including the Web Site Content Coordinator), for him or her to obtain partner approval to post the blurb on the external Web site. After a partner approves a blurb's content, the Web Site Content Coordinator posts the blurb on the external Web site, which is maintained on the Hubbard One FirmConnect Web system, Cleary Gottlieb's external Web site system.

3.      Attached hereto as Exhibit A is a true and correct copy of a Recent Assignments blurb dated April 26, 2006 (the "Kaiser Award Blurb"). The April 26, 2006 date at the top of the Kaiser Award Blurb is referred to as the display date. As a standard practice, the display date for litigation and arbitration matters refers to the date of a decision or order rendered by a tribunal, rather than the date a decision or order was received by Cleary Gottlieb or the date a blurb was written. Recent Assignments blurbs appear on Cleary Gottlieb's external Web site in reverse chronological order by display date.

4.      Attached hereto as Exhibit B is a true and correct copy of a printout of the record of the posting of the Kaiser Award Blurb obtained from the FirmConnect Web system.

2

The Display Date, April 26, 2006, is the date that appears at the top of the Kaiser Award Blurb. The Sort Date, 04/26/2006 00:00, is a reformatted version of the Display Date. The Recent Edits table at the end of the document lists all edits that have been made to the Kaiser Award Blurb, including the date the blurb was first posted on Cleary Gottlieb's external Web site. The notation "Fri 6/30/2006 06:58P" in the Date column is the creation date of the Kaiser Award Blurb in the FirmConnect Web system. The listing of only one row of information indicates that the blurb was not edited after it was initially posted.

5.     On March 23, 2007, I searched the FirmConnect Web database, and found no other version of the Kaiser Award Blurb saved as a Recent Assignments blurb in the database other than the one contained in the record attached as Exhibit B.

6.     On or about October 13, 2006, I requested that Hubbard One, Cleary Gottlieb's external Web site developer, provide me with the record of the Kaiser Award Blurb from its view of the database in order to confirm the creation date of the Kaiser Award Blurb. Attached hereto as Exhibit C is an email dated October 13, 2006, I received from Aimee Miller, the project manager for Cleary Gottlieb's external Web site, attaching a screenshot of Hubbard One's view of the Kaiser Award Blurb record from the database. The screenshot confirms the creation date of the Kaiser Award Blurb is June 30, 2006, and the sort date is April 26, 2006.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  New York, New York
        March 23, 2007

_____
Edward Weppler

3

# EXHIBIT A



**NEWS DETAIL**

**Mittal Steel Ostrava in ICC Arbitration Victory**
April 26, 2006

Cleary Gottlieb successfully represented Mittal Steel Ostrava, the Czech subsidiary of Mittal Steel Holdings N.V., in an International Chamber of Commerce arbitration commenced in 2004 by Kaiser Netherlands, a Dutch corporation.

The arbitration arose from a June 1997 contract for the design and construction by Kaiser Netherlands of a steel mill at the Mittal Steel facility in Ostrava. Mittal Steel Ostrava terminated the contract in early 2001 and the resolution of the opposing claims turned on whether Kaiser had delivered a facility that conformed to the contract requirements and passed a series of final performance tests.

Kaiser requested an award in the amount of more than $50 million in principal, arguing that it delivered a steel mill in compliance with the contract. Mittal Steel Ostrava denied Kaiser Netherlands' claim and requested an award for $46 million in liquidated damages for lost profits that Mittal suffered because the delivered steel mill did not conform to the contract's terms.

Even though Mittal Steel Ostrava had not strongly opposed Kaiser's claim that it successfully completed the performance tests, and even though the facility has achieved record production volumes in recent months, the Cleary Gottlieb team was able to convince the ICC Tribunal that Kaiser manipulated the figures in order to claim successful completion of the tests.

In its award, the ICC Arbitral Tribunal upheld Mittal Steel Ostrava's defense that the steel mill delivered by Kaiser Netherlands did not comply with the contractual requirements, dismissed Kaiser Netherlands' entire claim and granted Mittal Steel Ostrava's counterclaim. The unexpected outcome is an approximately $5 million net debt from Kaiser Netherlands to Mittal Steel Ostrava.

Practice Groups: Litigation and Arbitration

© Cleary Gottlieb Steen & Hamilton LLP, 2007. All rights reserved.
Under the rules of certain jurisdictions, this Web site may constitute Attorney Advertising.

# EXHIBIT B

## Edit News

**News Title**

Mittal Steel Ostrava in ICC Arbitration Victory

**SubTitle**

**Sort Date** (mm/dd/yyyy hh:mm)

04/26/2006 00:00

**Display Date**

April 26, 2006

**Expiration Date** (mm/dd/yyyy hh:mm)

**Authors**

Add

**Other Author**

**News Type**

Newsworthy

[ Edit ]

**Abstract**

[ Edit ]

**Body Text**

Cleary Gottlieb successfully represented Mittal Steel
Ostrava, the Czech subsidiary of Mittal Steel Holdings
N.V., in an International Chamber of Commerce
arbitration commenced in 2004 by Kaiser Netherlands,
a Dutch corporation.

The arbitration arose from a June 1997 contract for
the design and construction by Kaiser Netherlands of
a steel mill at the Mittal Steel facility in Ostrava. Mittal
Steel Ostrava terminated the contract in early 2001
and the resolution of the opposing claims turned on
whether Kaiser had delivered a facility that conformed
to the contract requirements and passed a series of
final performance tests.

Kaiser requested an award in the amount of more than

| Edit |
| --- |

**Image**

| Upload | Remove | View |
| --- | --- | --- |

**File Upload**

| Upload | Remove | View |
| --- | --- | --- |

**Source**

**URL Link**

**Offices**

| Edit |
| --- |

**Practice Groups**

Litigation and Arbitration

| Edit |
| --- |

**Practice Areas**

| Edit |
| --- |

**Related Industries**

| Edit |
| --- |

**Related Clients**

| Edit |
| --- |

**Does this record contain client names?**
◉ Yes ○ No

**Globalization**
<u>Add</u>

**Comments**

**Move To Stage**



Edit Stage    Approved

Save   Cancel

**Recent Edits**

| Date (GMT) | Stage | User | Comments |
|---|---|---|---|
| Fri 6/30/2006 06:58P | Approved | pmangunta | |

# EXHIBIT C



aimee.miller@thomson.com        To   eweppler@cgsh.com
13 October 2006  12:02 PM       cc

                                bcc

                            Subject  FW: Cleary News itema create date

History:                  📨 This message has been replied to and forwarded.

Hi EJ,

Here's a screenshot of the data stored in the database.  Let me know if this is suffice.

Aimee


Aimee Miller
Project Manager
www.hubbardone.com
Aimee.Miller@Thomson.com

Hubbard One, a Thomson Elite Business.


**From:** Tran, Dinh (Elite US)
**Sent:** Friday, October 13, 2006 10:09 AM
**To:** Miller, Aimee (Elite US); Tran, Dinh (Elite US)
**Subject:** Cleary News itema create date

Hey Aimee,

This is just a screenshot of the query that I ran on the db to get the information you requested.  Let me know if you have any questions or need anything else.

Thanks,

Dinh  cleary_ostrava.bmp



# EXHIBIT D

```
                  UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF DELAWARE
                                      .
IN RE:                                .      Chapter  11
                                      .
Kaiser Group International,           .
Inc., et al.,                         .
                                      .      Bankruptcy #00-2263 (MFW)
             Debtor(s).               .      thru      #00-2301 (MFW)
.............................................................
                                      .
Kaiser Group International,           .
Inc., et al.,                         .
                                      .
       Plaintiff(s)                   .
                                      .
            vs.                       .
                                      .
Nova Hut, A.S., et al.,               .
                                      .
       Defendant(s).                  .      Adversary #01-928 (MFW)
.............................................................


                        Wilmington, DE
                        April 25, 2007
                          3:00 p.m.

                  TRANSCRIPT OF MOTIONS HEARING
              BEFORE THE HONORABLE MARY F. WALRATH
                  UNITED STATES BANKRUPTCY JUDGE


   APPEARANCES:

   For The Debtor(s):            Mark Minuti, Esq.
                                 Saul Ewing, LLP
                                 222 Delaware Ave.
                                 Wilmington, DE 19899

                                 George E. Rahn, Jr. Esq.
                                 Saul Ewing, LLP
                                 Central Square West
                                 1500 Market St.-38th Fl.
                                 Philadelphia, PA 19102
```

2

```
                              Jonathan M. Landers, Esq.
                              Gibson Dunn & Crutcher, LLP
                              333 South Grand Ave.
                              Los Angeles, CA 90017

For Nova Hut, AS:             Victoria W. Counihan, Esq.
                              Greenberg Traurig, LLP
                              The Nemours Bldg.
                              1007 North Orange Street-Ste. 1200
                              Wilmington, DE 19801

                              Annapoorni R. Sankaran, Esq.
                              Greenberg Traurig, LLP
                              One International Place-20th Fl.
                              Boston, MA 02110

For The International:        Robert J. Stearn, Jr., Esq.
Finance Corporation           Richards Layton & Finger,
                              One Rodney Square
                              Wilmington, DE 19899

                              Warren Zirkle, Esq.
                              McGuire Woods, LLP
                              1750 Tysons Blvd.-Ste. 1800
                              McLean, VA 22102

Audio Operator:               Brandon McCarthy

Transcribing Firm:            Writer's Cramp, Inc.
                              6 Norton Rd.
                              Monmouth Jct., NJ 08852
                              732-329-0191
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

3

1           THE CLERK:  All rise.  You may be seated.

2           THE COURT:  Good afternoon.

3           MR. MINUTI:  Good afternoon, Your Honor, Mark Minuti

4   from Saul Ewing.  I'm here today for the Kaiser Group Debtors.

5   Your Honor, this is a proceeding in connection with both the

6   main case and the adversary proceeding against Nova Hut and the

7   IFC.  As Your Honor is no doubt aware, there has been a flurry

8   of activity in these cases of late, but the only thing going

9   forward today is the Debtors' Discovery Motion.  Before we get

10  to that, I think there are introductions to be made on both

11  sides as to not interrupt the argument.  On our side, Your

12  Honor, just to reintroduce Your Honor, we have Ned Rahn, my

13  partner.  He will be making the argument today on behalf of the

14  Debtors.  Also at counsel table is Jonathan Landers of the

15  Gibson Dunn firm, and Your Honor will recall Dr. Berecov from

16  the company is with us here today as well.  And so let me turn

17  the podium over to Nova Hut and IFC.

18          THE COURT:  Thank you.

19          MS. COUNIHAN:  Good afternoon, Your Honor, Victoria

20  Counihan from Greenberg Traurig.  We represent the Defendant

21  Nova Hut, which is now know as Metal Steel Astrava, and I have

22  with me today Anna Sankaran from Greenberg Traurig.  And I

23  believe Your Honor has already signed an order approving her

24  pro hac vice admission, and she'll be making our argument

25  today.

4

```
 1          THE COURT:   All right, thank you.  Welcome.

 2          MR. STEARN:  Good afternoon, Your Honor, may it please

 3  the Court, Bob Stearn from Richards, Layton & Finger on behalf

 4  of the IFC.  With me today is Warren Zirkle from the firm of

 5  McGuire Woods in Virginia.  Mr. Zirkle will be making argument

 6  today.  The Court previously has granted our motion to have him

 7  admitted pro hac vice.

 8          THE COURT:  All right.

 9          MR. STEARN:  Thank you, Your Honor.

10          MR. MINUTI:  Again, Your Honor, for the record, Mark

11  Minuti.  As I said at the outset, Your Honor may be aware that

12  there are Cross Motions for Summary Judgment that have been

13  filed in this case, and just last week, Nova Hut filed a Rule

14  11 Motion against my firm.  Those matters are no on today.  The

15  only thing that's on for today, again, is the Debtors'

16  Discovery Motion, and for that I'm going to turn the podium

17  over to my partner, Ned Rahn.

18          THE COURT:  Thank you.

19          MR. MINUTI:  Thank you, Your Honor.

20          MR. RAHN:  Thank you, Your Honor, as Mr. Minuti said,

21  I'm here today in connection with Debtors' Motion --

22      (Proceedings interrupted)

23          THE COURT:  Sorry about that, you may proceed.

24          MR. RAHN:  Thank you, Your Honor.  Our Motion for

25  Discovery is pursuant to Bankruptcy Rule 2004, or
```

5

1 alternatively, we're seeking an equitable discovery in

2 connection with the request we are making.  In the motion

3 papers that have been filed in opposition -- in connection with

4 the opposition to our motion, there are many allegations

5 concerning our Motion for Discovery; allegations such as the

6 motion contains bold-faced falsities, blatant falsities, that

7 it's outrageous, that's it's flagrant, that the allegations are

8 recklessly false, completely unfounded, disingenuous, bold-

9 faced speculation, untruths, perversions of true facts,

10 misleading.  And I'm sure I missed a few.  All in connection

11 with a request that the Debtors be permitted to take discovery

12 in connection with claims that have -- are set forth in an

13 adversary proceeding.

14      Your Honor, despite these protestations, if -- a review of

15 the papers will show that the Defendants do not contest any of

16 the factual statements that we make.  They do not contest the

17 factual allegations concerning the press release, they do not

18 contest the date on the press release, they do not contest the

19 timing of the press release, they do not contest any of the

20 allegations that we have made in our papers concerning the

21 conduct of the IFC and its interferences and conduct in

22 connection with the contract.

23      In fact, I would like the Defendants to show the Court

24 what factual allegations are in our motion that are inaccurate.

25 They may contest the inferences that we suggest.  They may

6

1    contest that we shouldn't be suspicious about the statements

2    that we make in our papers --

3         THE COURT:  Well, excuse me, but I believe there were

4    affidavits submitted to dispute your factual allegation that

5    the posting to the website occurred on April 26th.

6         MR. RAHN:  That's correct, but they don't -- we never

7    said that it was posted at any particular date.  What we said

8    was that the date on the press release is April 26th, that the

9    award was communicated to the parties on May 16th, and that

10   this raised a suspicion.  We never --

11        THE COURT:  Well, it was stated that the date on the

12   {quote} "press release" is not the date of the press release

13   but simply the date of the award.

14        MR. RAHN:  That's what they say.

15        THE COURT:  So that disputes one of your facts, which

16   is that the --

17        MR. RAHN:  They dispute it, but they -- but that

18   doesn't mean that what we said in our papers is in any way

19   inaccurate.  They have a different interpretation.  They say

20   that the facts will show something different.  The only way to

21   tell, we've been advised, when a posting was made on a website

22   is to go to the server and examine the server and what's on

23   that server.  We understand that they have an affidavit from

24   somebody.  We haven't taken that person's deposition.  We

25   haven't taken the depositions of anybody.  We haven't examined

7

1  their server.  And in or adversary system, I don't think that

2  we're required to accept at face value an affidavit without

3  having the opportunity for discovery.  It may turn out that

4  they're correct.

5       THE COURT:  Well, explain to me why discovery is

6  available in the Bankruptcy Court.  This issue --

7       (Proceedings interrupted)

8       THE COURT:  I think we're done.  Sorry about that.

9  Again, it's no refection on anybody's argument.

10       MR. RAHN:  It gave me an opportunity to think maybe.

11       THE COURT:  Now, what was my question?

12       MR. RAHN:  The questions was what authority under the

13  Bankruptcy Rules, I think, something -- are we seeking the

14  discovery.

15       THE COURT:  And given the status of the adversaries.

16       MR. RAHN:  Right, right.  Your Honor, I think the

17  status of the adversaries is important to an understanding of

18  what our position is and why we feel we need discovery and

19  should be entitled to it.  Both the claims against the IFC and

20  Nova Hut have been stayed by orders of the District Court and

21  Your Honor, which means that of course we can't employ the

22  Federal Rules of Civil Procedure in order to obtain discovery.

23  We also then would be relegated to a proceeding for discovery

24  under the international rules, the International Chamber of

25  Commerce rules because the stay said that we should have -- we

8

1   had to pursue arbitration in accordance with the contract

2   between Kaiser Netherlands, a subsidiary, and Nova Hut, and

3   that contract provides for ICC arbitration.  As we've said in

4   our papers, there is no provision under the ICC rules for

5   discovery.  The rules do not provide for discovery as a right.

6   So therefore, we are left in a position where we have to

7   proceed with the arbitrations and proceed with the claims that

8   we've filed in this Court under the rules of the ICC.

9        Now, I guess I should take a moment to address what's

10  available under the ICC, but under those circumstances, we're

11  aware of the line of cases that says that if there's an

12  adversary proceeding pending, then the Debtor or a party can't

13  avail or should not be able to avail himself -- themselves of

14  other discovery rules, say a Rule 2004.  However, I don't

15  believe that that's a per se rule or a blanket rule that covers

16  all situations, and I don't believe the cases say that.

17       In this situation where we are limited, very limited, may

18  not get any discovery at all in the ICC proceeding, where we

19  are not able to pursue the Federal Rules of Civil Procedure and

20  the discovery available under those rules, we believe that the

21  Court should exercise its power to grant an examination under

22  Rule 2004 because otherwise the kinds of information we need

23  and want to investigate in order to pursue our arbitrations,

24  and, frankly, to determine if we even have a basis for the

25  arbitrations is not available otherwise.  Now --

9

1        THE COURT:  But there is some limited discovery

2   available under the ICC rules.

3        MR. RAHN:  The rules do not grant anybody any right to

4   discovery.

5        THE COURT:  Well, you have the right to ask.

6        MR. RAHN:  You have the right to ask --

7        THE COURT:  Well --

8        MR. RAHN:  -- that's correct.

9        THE COURT:  All right.

10       MR. RAHN:  And you may get discovery, you may not get

11   discovery.  But the kinds of discovery that you're going to get

12   -- in my experience, the kinds of discovery you're going to get

13   is very limited as explained in the papers that we submitted

14   relating to the Nova Hut/Kaiser Netherlands arbitration.  Very

15   limited and it's only documents.  There are no depositions and

16   there may be specific categories of documents.  So to get

17   discovery under the ICC rules, you have to first convince the

18   arbitrators that in fact you ought to be able to present a

19   request for arbitration.  Then you have to make specific

20   requests, demonstrate specific claims in the arbitration about

21   which the documents that you can identify might be relevant or

22   are relevant, not -- are relevant, and then it's in the

23   discretion of the arbitrators.

24       Now, I will say -- and we were accused of misleading the

25   Court as to this fact in connection with the amount of

1  discovery available in an ICC proceeding.  We didn't ever say

2  you can't get it, we said it's extremely limited.  And in the

3  one arbitration that was cited, the Nova Hut/Kaiser Netherlands

4  arbitration, the arbitrators provided that we could in fact

5  request certain discovery.  We tailored our discovery requests

6  to the requirements and asked for six different categories of

7  documents.  For whatever reason, Nova Hut, in that case, chose

8  not to oppose those limited requests; perhaps because we

9  limited them and tailored them in a specific way.  I don't hear

10  from the IFC or Nova Hut that in fact they would not oppose a

11  discovery in the ICC arbitration.  I suspect that they will

12  oppose it vigorously.

13      So first of all, we'd have to get in place a process to

14  allow discovery.  Second, we'd have to then get the discovery

15  granted by the arbitrators, probably -- and again, I don't know

16  for sure -- but over objections to the discovery.

17      THE COURT:  Well --

18      MR. RAHN:  And let me --

19      THE COURT:  Go ahead.

20      MR. RAHN:  And let me tell you -- give you an example

21  of what -- precisely an example of the way that we were --

22  parties are hamstrung as far as what we're used to in the

23  United States in discovery under the continental system.  We

24  obtained a document from Nova Hut in response to the discovery,

25  which was a letter from the manager of Nova Hut to the IFC

1  stating that Nova Hut -- I'm sorry, stating that Kaiser
2  Netherlands had passed the underlying production performance
3  test; not only passed it, but had exceeded the test
4  requirements and was due a bonus with some offsets.  However,
5  we were not able to take that individual's deposition, and Nova
6  Hut didn't present that person at the arbitration.  Instead,
7  they argued what this person must have meant in writing this
8  letter and brought in, you know, as lawyers do -- I mean,
9  that's what we do as lawyers -- argued well, he didn't really
10 mean it, or he meant this, or under the circumstances it must
11 have meant that.  And unfortunately, arbitrators disregarded
12 that letter, which we considered to be a crucial piece of
13 evidence in their final award.  Had we been able to take the
14 deposition of the individual, we would know what in fact he did
15 mean, what information in fact he had in front of him, and we
16 would be able to go the IFC because he was in that letter
17 requesting guidance from the -- he was reporting to the IFC on
18 the report -- on the results of a test.  And presumably, the
19 IFC responded in some way as to the course of action Nova Hut
20 should take with respect to this letter because he was asking
21 for some guidance.  So that's just an example of the way in
22 which discovery is limited.
23      And if Your Honor wants a good description, we attached as
24 an exhibit to our papers Procedural Order #2 that was entered
25 in that case, which says the procedure is intended to be

12

1    specific and limited.  There is no provision for full discovery

2    or document disclosure as in the Anglo American legal systems.

3    It then goes on to say some other things about discovery.  ICC

4    rules afford considerable discretion to the arbitrators when

5    ruling upon production of documents, but unlike in common law

6    court proceedings, a party has no right to the discovery of

7    documents in an ICC arbitration proceeding, but such discovery

8    is not excluded either.  It is left to the arbitral tribunal to

9    decide on a case-by-case basis how much, if any, discovery

10    should be allowed.

11        So we find ourselves here today in a position where we're

12    asking the Court to exercise its discretion, permit us to take

13    discovery in aid of the arbitrations --

14            THE COURT:  Did you have any cases where Courts have

15    allowed 2004 discovery in connection with a pending

16    arbitration?

17            MR. RAHN:  No.

18            THE COURT:  Yes, I'm not aware of any either.

19            MR. RAHN:  And we researched it specifically.  We did

20    not find any case, although we did find cases in which a Court

21    allowed 2004 discovery in different contexts when there were

22    pending adversary proceedings.  But we didn't find that

23    specific situation.  I think it's a matter of, frankly, of the

24    Court's discretion and perhaps first impression; at least with

25    reported cases.

13

1        THE COURT:  Okay.  Now, specifically with respect to
2    Nova Hut, what discovery are you seeking?  The arbitration is
3    over.
4        MR. RAHN:  Well, we're seeking, of course, discovery
5    in connection with the website posting.  We're not saying that
6    the press release was actually posted on April 26th, we just
7    think that it raises a question and we're entitled to take
8    discovery because Nova Hut is now -- for several reasons.  Nova
9    Hut has now filed a Motion to Lift the Stay.  First of all,
10   they've filed a Motion to Lift the Stay in this case.  We don't
11   oppose that motion; we didn't want the stay in the first place.
12   But of course that's up to Your Honor.  So they've filed the
13   Motion to Lift the Stay and at the same time for summary
14   judgment on the basis of res judicata and collateral estoppel.
15   One of the issues in res judicata and collateral estoppel
16   application is whether a party had a fair and full opportunity
17   to present their case in the underlying arbitration, and if
18   there was some kind of impropriety, that would lead to a lack
19   of full opportunity to submit your case.  So that's number one.
20       Number two, we think we're entitled to discovery against
21   Nova Hut, even aside from that, with respect to the claims
22   against the IFC.  They're a party to the contract and an
23   involvement with IFC, so there's no reason we shouldn't be able
24   to take discovery against Nova Hut with the IFC.  And we've
25   submitted, in opposition to the Motion for Summary Judgment,

14

1    that we are not subject to -- we are not -- the Debtors, who

2    are not parties to the arbitration, are not bound by the

3    results of the Kaiser Netherlands arbitration.

4            THE COURT:  Okay.

5            MR. RAHN:  Okay?  Any other -- I guess I got off to --

6            THE COURT:  No, no, I have no other questions.  Did

7    you cover everything you wanted to, though?

8            MR. RAHN:  Well, I think I covered -- it is important

9    to understand, obviously, the procedural context in which we

10   find ourselves.  And I would remind the Court that the IFC

11   filed a Motion to Dismiss the claims on the basis of sovereign

12   immunity.  The Court of Appeals for the 3rd Circuit reversed

13   and said that we were entitled to proceed against the IFC on

14   the merits of the claims.  Those claims have now been stayed by

15   Your Honor pending arbitration, and we understand that.  We may

16   not agree with it, but we understand that.  And we were

17   prepared to go to arbitration, but we've never had any

18   opportunity to take discovery from the IFC in connection with

19   our claims against them.

20       As far as the -- I think I've talked already about the

21   defenses that have seemed to be raised to our discovery.

22   Number one seems to be that the press release -- the

23   allegations -- or our suspicions, not our allegations, our

24   suspicions are contrary to what Nova Hut says are the facts.

25   And in this adversary system I think we should be permitted to

1  test that, particularly since Nova Hut has now put on the

2  record their version, their version of the facts.  And as I

3  said, we just want discovery.

4       We wonder -- frankly, Nova Hut said it's all -- it's

5  explainable, it's simple, it's easily understood.  If that's

6  the case, they apparently already have their position together.

7  They can produce the discovery.  We think we're entitled to an

8  examination so that -- of their server, as I sad, so that we

9  can confirm, if possible, when in fact it was posted on the

10  website.

11      The other defenses seem to be that because there was an

12  arbitration ordered here, because there is arbitration, then

13  per se we're not entitled to discovery.  But the cases cited by

14  Nova Hut and the IFC on that point are frankly distinguishable

15  because in this case, as Your Honor knows, we were required --

16  the Debtors are required to arbitrate, not because they signed

17  an arbitration -- contract with an arbitration clause.  In

18  fact, it's not disputed that there no contract between Debtors

19  and Nova Hut that contains an arbitration clause, there is no

20  contract between IFC and Debtors that contains an arbitration

21  clause, it's the judicial doctrine of equitable estoppel which

22  has been applied.  So we did not agree, as Nova Hut alleges, to

23  submit ourselves to arbitration.  And I think that cuts against

24  the argument that somehow we have waived our right or consented

25  to the -- to ICC -- the limitations of ICC arbitration.

1    And one other allegation is that somehow we have violated

2    the stay orders by filing our motion -- just simply by filing

3    our Motion for Discovery.  We have not taken any steps to take

4    discovery.  We've come to the Court and said we think we need

5    the discovery.  We want to look at the relationship between

6    Nova Hut and the IFC; IFC's involvement in all of this.  We

7    want to look at the background of this situation and find out

8    what really went on.  And those documents are not available to

9    us.  The kinds of discovery we are seeking is not discovery,

10   not information that we can obtain otherwise.  This is

11   information that is solely in the hands of IFC, Nova Hut or

12   other parties.  So for that basis -- for that reason, it's

13   imperative, we believe, that we have this discovery.

14       And, Your Honor, if you'd look at the -- what's the

15   balance here, what's the prejudice to the other side, what's

16   the prejudice to the Debtors if we don't get the discovery, we

17   may be severely hampered in discovering what it is that really

18   went on in this matter if we don't get the discovery.  On the

19   other hand, we have not seen or heard any allegation that what

20   we're seeking would be even burdensome, let alone overly

21   burdensome, to the IFC or Nova Hut, which in this case, in this

22   Court, have not yet been subject to discovery at all.

23       So unless my colleagues have anything, I will sit down.

24           THE COURT:  All right, thank you.

25           MS. SANKARAN:  Good afternoon, Your Honor, Anna

1  Sankaran from Greenberg Traurig for the Defendant, Nova Hut.

2  The Plaintiffs in this case filed a reply brief that I'm sure

3  Your Honor said and introduces itself with the rhetorical

4  question, "What do the Defendants have to hide here?  Why are

5  they so worried about discovery?"  They're treating this as if

6  it were any adversary proceeding that's coming before Your

7  Honor, and they just want discovery so they can move forward

8  with their case.  But that's not the situation we have here.

9       Let's look at how we got here.  This case was stayed

10  because the identical dispute was pending between Kaiser

11  Netherlands and Nova Hut, and it was going to be arbitrated in

12  Austria.  And so the case was stayed as to Nova Hut and as to

13  the IFC so that those questions could be resolved without

14  duplication of litigation, without wasting judicial resources,

15  or the Debtors estate wouldn't have to be unnecessarily

16  depleted in the defense of the case.  And that's what was

17  decided.  It was clear among all the parties that that was what

18  was going to happen.

19       The District Court issued its decision, and in fact,

20  knowing full well that its claims -- that the Plaintiffs in

21  this case, that their claims were going to be implicated in the

22  Austrian proceeding with Kaiser Netherlands, they amended their

23  request for arbitration after this Court -- or after the

24  District Court issued the stay and added claims that were not

25  originally pending before the ICC arbitral tribunal but that

18

1    were pending here.  So they did acknowledge that and they know

2    that.  And even Your Honor recognized that during oral argument

3    on IFC's renewed motion.  And Your Honor recognized well,

4    aren't all of these claims going to be decided in Austria.  And

5    even Plaintiff's counsel admitted during that hearing that yes,

6    all of the issues that we have here are going to be decided in

7    that case.  I mean, that's the crux of what brings us here

8    today.

9        It's not that the Defendants are saying we don't ever want

10   to give them any information.  The reason we're here today is

11   that this dispute has been presented to an arbitral tribunal

12   and has been decided.  And in fact, Your Honor, they issued

13   this 333 page decision.  I mean, this no small feat, as I'm

14   sure Your Honor can appreciate what goes into writing a

15   decision of that length and that depth with respect to every

16   single issue.  It's the same letter of intent, same memorandum

17   of understanding.  Every single claim or theory that was

18   advanced in the amended complaint in this case was decided in

19   this final award.  So that's what brings us here today.

20       So let's look at the law.  As Your Honor had originally

21   asked, well, what authority do we have to move forward with

22   discovery here?  Well, as you know, the case has been stayed,

23   and under the Federal Arbitration Act, no discovery can proceed

24   while that stay is pending.  Furthermore, there's a time and a

25   place to challenge whether this award was granted under proper

19

1   circumstances or not, and that's not in this Court.  In fact,
2   this award is being sought to be confirmed by Nova Hut right
3   now in a proceeding in the Netherlands, and it is in that
4   proceeding and under the applicable rules and in the applicable
5   timeframe that Kaiser Netherlands and the Debtors can raise any
6   objection that they have with respect to the propriety of this
7   award, if there is anything.  And we submit there's really
8   nothing top question here.  As we move forward, I can explain
9   that to you in more detail.
10      Let's look at the actual rules as well, Your Honor.  Rule
11  2004, as Your Honor noted, is not applicable when an adversary
12  proceeding is pending.  It's Rules 26 through 37, 38 that will
13  govern what discovery takes place and what methods of discovery
14  and the grounds for discovery.  Furthermore, post-confirmation,
15  the availability of 2004 Examination is extremely limited.
16  It's usually only limited to whatever discretion the Court has
17  retained for itself or jurisdiction the Court has retained for
18  itself in a plan and/or usually limited to seeking to determine
19  whether plan terms have been complied with or sale terms have
20  been complied with.  That's not the case here.  And 2004 really
21  is not an appropriate vehicle.  And finally there is
22  significant case law, and we cite it in both the IFC's brief
23  and in Nova Hut's brief, with respect to the fact that
24  Bankruptcy Rule 2004 cannot be used to aid in an arbitration.
25      Furthermore, there was discovery that was taken before the

1  ICC proceedings.  Those documents that were requested were

2  produced.  And, in fact, as Plaintiff's counsel noted, Nova Hut

3  did not object.  So there's not some basis to contend that Nova

4  Hut's acting nefariously in how it's proceeding through

5  discovery.  They didn't object.  They produced the documents

6  that were requested.  No objection was made in that proceeding

7  to any of the terms of discovery.

8      The Plaintiffs argue that they shouldn't be held to all of

9  these provisions of the case law, that 2004 doesn't apply in

10  adversary proceedings, et cetera, because they didn't sign the

11  agreement that required them to arbitrate.  But, Your Honor, I

12  submit three points.  One is that the District Court found, by

13  ordering the stay and ordering the arbitration, that the

14  Plaintiffs did enjoy the fruits of the contract between Kaiser

15  Netherlands and Nova Hut.

16      Furthermore, the Plaintiffs -- or Kaiser Netherlands

17  amended their request for arbitration before the ICC Arbitral

18  Tribunal to reflect claims that were originally brought here,

19  but not brought there after the stay was in place.  So there

20  clearly is some coordination.  And when it is the time for Your

21  Honor to consider the Summary Judgment Motion that is before

22  you, you will have the opportunity to assess that.

23      And finally, they claim in their reply, the Plaintiffs do,

24  that they're not trying to use the arbitration final award in

25  an affirmative way, but that's not the case.  If you do look at

1  their Summary Judgement, they are seeking summary judgment on

2  some of the findings under the final award.

3      In the procedural posture we have right here, I see -- I'm

4  sorry, Nova Hut has submitted a Motion for Summary Judgment,

5  and once a Motion for Summary Judgment has been submitted, the

6  only way to obtain discovery before the decision is rendered is

7  to satisfy the requirements of 56(f).  And as Your Honor is

8  well aware, there are requirements.  One must submit an

9  affidavit specifically identifying what evidence is needed and

10 how that will affect whether there is a question of fact and

11 whether either party would be entitled to judgment as a matter

12 of law.  And it is the fact that courts can award summary

13 judgment with no discovery taking place.  And, in fact, that's

14 not the case here.  It just didn't happen in this proceeding.

15 There's a whole other proceeding with a very, very detailed

16 award.

17     And finally, in order to challenge an arbitration or an

18 arbitration award, the standard is very high.  It's just not a

19 matter of saying, "Well, there might have been some bad acts.

20 It might have -- there might have been something going on

21 behind the scenes."  There's a significant standard that must

22 be met.  There has to be clear and convincing evidence of the

23 actual fraud that may have taken place, and that fraud has to

24 be linked directly to an adverse finding.  And we don't have

25 any of that presented to this Court.  And, in fact, in their

22

1  reply and just before Your Honor a few minutes ago, counsel for
2  Plaintiff said it might be the case that Nova Hut and IFC are
3  right, that they were innocent actors.  That's not sufficient
4  to satisfy Rule 56(f).
5      The sole reason that they are looking for discovery with
6  respect to the Summary Judgement Motion is that they want to
7  determine whether there was a full and fair opportunity to
8  litigate.  This is not the time or place to do that, as Your
9  Honor is well aware.  There are proceedings when awards are
10 confirmed, et cetera, and before the ICC where that can be
11 done.
12     With respect to the specific allegations here, there is
13 the press release that Your Honor inquired about earlier.  And
14 I think Your Honor has read the papers and has seen the
15 affidavit that the date on the posting on the website is the
16 date of the award, but they're attached to Mr. Wepler's
17 affidavit.  You will see not only the internal Cleary Gottlieb
18 records showing that it wasn't posted until June 30th, but also
19 the web administrator's url posting that says it wasn't
20 approved until June 30th.  Those are both exhibits to the
21 affidavit.  So any questions that the Plaintiffs have are
22 answered by the submissions here.  It's just not sufficient to
23 say, "Well, it raises a question."  I mean, that -- based on
24 that argument, any disgruntled litigant from an arbitration can
25 come back and say, "Well, maybe things weren't so fair."

1    The delay in the final award allegations are also not

2  sufficient to show that there was any type of taint towards the

3  proceedings.  And as Your Honor is aware, I'm sure, it took a

4  lot of time to finish that award, and any minor delays probably

5  related to the depth of the analysis that went into that

6  document.

7    With respect to the performance test issues, Plaintiffs

8  keep arguing there is this letter, but the IFC -- sorry, the

9  ICC Tribunal decided to ignore it.  But that's a decision that

10  was made by the ICC Tribunal.  We can't re-litigate that now.

11  The whole point is to save the estate and this Court's time by

12  determining whether all the issues were answered and then

13  deciding whether it should be applied to the Plaintiffs in this

14  case.

15    And then finally, there are some issues about interference

16  or the relationship between Nova Hut and the IFC.  And I'm sure

17  my co-counsel here for the IFC will explain further, but

18  there's really no legitimacy behind the allegations there.

19  They said, "Well, there may be shares.  There may have been --

20  there may be an issue of them going into bankruptcy."  But

21  there's no evidence to support that.  All of these allegations

22  are simply allegations with no support, no affidavits other

23  than it might be the case.  And that's not sufficient under

24  Rule 56(f), which is the only thing that we have to measure

25  whether discovery is appropriate here.

24

1     Finally, with respect to the Equitable Bill of Discovery,

2  it is an antiquated theory to look at to obtain discovery and

3  is not usually used in these types of proceedings.  In fact,

4  there isn't one bankruptcy case allowing an Equitable Bill of

5  Discovery.  We have plenty of rules that could allow discovery

6  in different forms here, whether it be 2004 if it applied,

7  56(f), Rules 26 through 37, if they applied.  And they don't

8  here.  And we've gone through the analysis and explained why

9  they don't.  There's no reason to override those provisions by

10  allowing an Equitable Bill of Discovery here.  And in fact, the

11  case law says that they -- that the Equitable Bill of Discovery

12  should not be used when there is clear procedures governing

13  discovery, and they just simply aren't entitled to it.

14     So based on all of this, Your Honor, we do think that

15  discovery at this point is inappropriate.  And they're looking

16  for far-ranging discovery.  What you have before you is a well

17  reasoned decision, and the Defendants in the case are asking

18  for summary judgment with respect to that decision so that we

19  can, hopefully, end this matter, appear before you a few more

20  times to have it all resolved, and move on from there.

21         THE COURT:  Thank you.

22         MS. SANKARAN:  Thank you, Your Honor.

23         MR. ZIRKLE:  Good afternoon, Your Honor.  I am Warren

24  Zirkle from McGuire Woods on behalf of the IFC.  Your Honor,

25  the last time that we were here before you on this matter was

1  in May of 2005, the hearing in which Your Honor ruled that you

2  were staying the proceedings against the IFC pending

3  arbitration.  That's been, obviously, almost 2 years ago.  At

4  that hearing, discovery was on the docket, as the Court may

5  recall and as we point out in our papers.  There was also on

6  the docket that day -- on the agenda that day was a motion by

7  the Plaintiffs to take discovery.  There was some exchange at

8  the beginning of the hearing about the fact that we would take

9  up the IFC's renewed Motion for a Stay Pending Arbitration,

10  first because if that stay were granted it would moot the

11  request for discovery.  In fact, after the hearing, that was

12  repeated at Page 59 of the transcript, there was a statement

13  made by Plaintiff's counsel that therefore that your ruling on

14  the Stay Motion does moot the request for discovery.

15      Now, what's happened in the 2 years since then?  Well,

16  first of all, just to be clear, one thing that hasn't happened,

17  there's been no discovery, no -- excuse me, no arbitration

18  initiated against the IFC.  What in fact happened, as you know,

19  is that they chose to let the Kaiser Netherlands subsidiary

20  arbitration go forward, as counsel have all agreed, covering

21  all the claims proceeding here.  This happened in the context,

22  also, of a dialog with Your Honor in our hearing in May about

23  what the scope of that proceeding would be, but more

24  importantly, what the effect of rulings on key issues in that

25  arbitration would be on these proceedings.  And it was

26

1  acknowledged, for example, that the ruling on the 4-week test
2  would be determinative of many of the issues in this case.  In
3  Your Honor's order there, you duly noted -- and I have a copy
4  for the Court's convenience.  It's Exhibit C to our papers, but
5  if it would be --
6          THE COURT:  No, I have it.  Thanks.
7          MR. ZIRKLE:  Okay.  The Court there noted, of course,
8  that the bulk of the issues, and this is paragraph 5, and the
9  predicate facts that need to be determined in deciding the
10 claims of the Third Amended Complaint against the IFC will be
11 determined in that arbitration.
12      Now, having that decision, the 2 years go by, we're now
13 here because obviously, candidly and bluntly, they are unhappy
14 with what happened in the arbitration and they've come back a
15 second time.  But that doesn't give them a basis for opening
16 discovery in this case.  And to respond to that, let me break
17 down the issues about the discovery here and the IFC's --
18          (Proceedings interrupted)
19          THE COURT:  It's only fair that you should be
20 interrupted as well.
21      (Laughter)
22          MR. ZIRKLE:  I understand.  So as I was about to say -
23 - so even though we were not party to that arbitration, we find
24 this motion filed against us seeking discovery from the IFC in
25 pursuit of the thinnest of allegations about the potential for

27

1  a tainted proceeding in that arbitration and the direct charge

2  that the IFC somehow participated in fixing that arbitration.

3      Now, counsel can say, "Well, but there's been no dispute

4  about our facts."  Well, that's only because they limit their

5  facts to the very narrowest thing, the date of the press

6  release and the fact, apparently, that there was a delay.

7  Okay, maybe we're talking about inferences.  The fact of the

8  matter is all of the inferences they argued have -- were, first

9  of all, we continue to say recklessly false in even suggesting

10 them in view of what they already knew.  Continuing to pursue

11 them is, likewise, the same in the face of affidavits that have

12 responded to each of those points.

13     Now -- but let's take them, just for a moment, one-by-one.

14 They start with a delay in the decision, which as counsel for

15 Nova Hut addressed, obviously, the decision alone suggest it

16 would take some time to do.  But what is outrageous is to go

17 from that to say, "There was a delay, therefore the IFC must

18 have been involved."  That's what you have before you as a

19 basis for discovery against the IFC.  They now suggest, "Oh,

20 well, the IFC had a motive.  Well, no, they've said the IFC has

21 said no they didn't -- the loan was not still outstanding, but

22 the argument is we have a right to still test those denials."

23 What that overlooks, of course, is who has the burden of saying

24 there's some basis for discovery in the first instance.

25     Let's continue with their allegations and see if there's

28

1  anything there.  They argue because the date on the arbitration

2  -- I mean on the press release, therefore somebody at Cleary

3  must have had access to the award in advance.  Now to call that

4  an inference that somehow -- you know, they'll -- okay, that's

5  disputed, but that's somehow still enough to get us to

6  discovery is what is really outrageous about this.  We have

7  refuted the motive from the IFC's point of view.  Nova Hut and

8  Cleary have clearly indicated that there's no basis for the

9  website information.

10      But let's put this in context.  For that to have happened,

11  there would have to have been a conspiracy to fix this

12  arbitration that would have involved multiple parties,

13  including the International Chamber of Commerce, which had

14  custody of the award during this period of delay.  Cleary would

15  have to have been involved.  And I'm sorry, Your Honor, but the

16  absurdity of that argument, that Cleary somehow was involved in

17  fixing the arbitration but nonetheless went public on its

18  website by posting an article indicating that they had notice

19  of the award in advance of its publication, on its face, even

20  if there had been no affidavits, is absurd.

21      Now, let's go to Plaintiff's point that, "Well, okay,

22  we've made the allegations.  There have been denials, but we're

23  still entitled in discovery to test those denials."  What's

24  wrong with that is that even if they were still entitled to

25  challenge the award, which they're not, this is not the

29

1  ordinary adversary proceeding where I come in, I make my
2  allegations, they have to be accepted as true for purposes of a
3  motion to dismiss, and then I get discovery.  What they're now
4  trying to do is turn over a duly constituted award by a panel
5  that is deserving of dignity, deserving of a presumption of
6  correctness unless somebody comes forward with clear,
7  convincing evidence that says that's not true.
8        Now, certainly in this country, in our system, no one
9  would be able with a straight face to make the argument that
10 because there was a longer delay than expected before the Court
11 issued an opinion, particularly a 300 page opinion, that
12 somehow that means that somebody, including a third party
13 lender, must have tampered with the award.  Saying it out loud
14 is, you know, enough by itself to dispose of it.
15       But more importantly, under the Federal Arbitration Act,
16 it's very clear that if they had a challenge to this award, it
17 had to be brought within 3 months of the notice of the award.
18 It doesn't say, "But you get another crack if somebody comes in
19 and tries to enforce the award against you."  Again, that's in
20 keeping with the dignity that is given to and the comity, if
21 you will, that is given to awards of arbitration panels as a
22 matter of federal policy.  If you're gonna challenge them, if
23 you've got something to challenge it, there's a way to do it,
24 but you got to do it right away and you got to have good
25 evidence to do it.  It's not enough to come in and say -- and

1  this is what these allegations amount to -- "We believe that

2  the IFC in this case may have been involved."  Now, at the

3  February hearing, of course, we had on -- the telephonic

4  hearing that we had on the extension request in this case, as

5  Your Honor noted there, there is a long delay by Kaiser in

6  bringing any of this to light, well past the 90 days which

7  would have run in August of 2006.

8       Now, how about the claims against the -- or for discovery

9  from the IFC on the claims against them for this future

10  arbitration?  First of all, whether we call this motion a

11  violation of the stay or whether we call it an effort to

12  circumvent the stay, the fact is it clearly is trying to get

13  around the stay.  The stay of proceedings pending arbitration

14  means, is generally understood to mean, that all proceedings in

15  the court are stayed because the parties have either consented

16  by -- explicitly or implicitly consented to have the matter

17  into arbitration.  This is a case of that implicit consent.  As

18  Your Honor ruled in May of 2005, they don't get the benefit of

19  the underlying contract in part.  If they want the benefit as a

20  basis of their claims against the IFC, then they have to take

21  the rest of it as well, and that was the basis of Your Honor's

22  decision at that time.

23      They can't then come and say, and this is, again, a

24  remarkable argument, "Because the adversary proceeding is

25  stayed, that means normal Federal Rules of Evidence discovery

1   is not available to us, therefore we're entitled to 2004

2   discovery."  It's a stay of proceedings because the entire

3   matter, obviously, has been sent to arbitration.  And having

4   lost on that issue in 2005, particularly when it was already on

5   the agenda and decided not to bring it -- not to bring

6   discovery forward, Plaintiffs now can't avoid that ruling by

7   trying to get discovery by these other mechanisms.

8        Now, the second argument about why they should get

9   discovery is that, again back to this implicit or explicit

10  point, because they didn't sign any arbitration agreement

11  themselves, they argue that therefore they are entitled to

12  still get discovery because they did not voluntarily choose the

13  limited discovery available in arbitration.  That, again, is an

14  issue disposed of by Your Honor's order in 2005.  Again, we had

15  a situation where, as you recall, you adopted the District

16  Court's analysis on the <u>Nova Hut</u> decision.  Again, explicitly

17  there the District Judge noted that they could not take the

18  benefit of the contract without getting it all.  Specifically,

19  the District Court held that a non-signatory should be

20  prevented from embracing a contract and then turning its back

21  on those portions of the contract which it finds distasteful.

22  This Court adopted and followed that.  The Plaintiff's motion,

23  then, now is simply a backdoor way to get around that without

24  even coming forward straight up and asking for a modification

25  of the order.

1      So, Your Honor, I don't -- we don't believe this is truly

2  an issue about the scope of 2004, Rule 2004 discovery, or what

3  the scope of equitable discovery is or whether equitable

4  discovery still exists.  This matter can and should be resolved

5  on the basis of Your Honor's ruling in its -- as reflected in

6  your order of January 29, 2005 -- June, excuse me.  And having

7  dealt with the issue at that point, there's nothing new here.

8  There's no reason to reopen that matter.  And you've not been

9  asked, actually, to reopen it.  You've been asked to aid them

10  in circumventing it.  We urge the Court to deny that effort and

11  to leave the parties, again, to litigate this matter in

12  arbitration if Kaiser so chooses to proceed with it.

13      Unless you have further questions, Your Honor?

14          THE COURT:  No, thank you.

15          MR. ZIRKLE:  Thank you.

16          THE COURT:  Any reply?

17          MR. RAHN:  Yes, Your Honor.  Your Honor, a few points.

18  The -- first of all, my adversary from Nova Hut, and I think

19  also IFC, is making the contention that the District Court

20  ruled that the matter -- that the Nova Hut -- the Debtors

21  versus Nova Hut adversary proceedings should be stayed because

22  of or pending an arbitration between Kaiser Netherlands and

23  Nova Hut.  The Court made no such determination.  The Court

24  looked at the situation and simply decided that the Doctrine of

25  Equitable Estoppel applied so that the dispute between Debtors

1  and Nova Hut should go to arbitration.  It did not say -- it

2  did not say anything about the arbitration between Nova Hut and

3  Kaiser Netherlands resolving anything.  So they're trying to

4  mix up the results of the rulings.  The Court took it on its

5  face and said this -- these adversary proceedings should be

6  stayed pending submission of these disputes to arbitration.

7  And that's what we want -- we are analyzing here.  And that's

8  what we're asking the Court to give us discovery on.

9          THE COURT:  Well, if in 2005, or when the District

10  Court decided this issue, the Debtor had raised the 2004

11  Motion, do you think that either Judge Farnan or myself would

12  have come to different conclusions?

13          MR. RAHN:  Oh --

14          THE COURT:  Do you think we would have granted a 2004

15  Motion at that time?

16          MR. RAHN:  Well certainly the Court -- neither Court

17  was asked to address that issue.  I can't speculate what you

18  would have done, but Judge Farnan never said that we couldn't

19  go -- ask for discovery under 2004 or an Equitable Bill of

20  Discovery in aide of the arbitration.  That simply wasn't a

21  matter that was addressed.

22          THE COURT:  Well, except that you did raise, as one

23  reason not to stay the proceeding but to let it proceed, was

24  that arbitration provided less ability to conduct discovery.

25          MR. RAHN:  Yes.

1          THE COURT:  And the Court -- both Courts rejected

2     that.

3          MR. RAHN:  If we -- I mean, I haven't gone back and

4     read those briefs, frankly.  If that's one reason that we

5     argued, sure, that would be a reason not to want to go to

6     arbitration.  That doesn't mean that the Court should deny us

7     our chance to present our cases in an arbitration and to

8     investigate those chances.  We've been seeking -- there's no

9     question, we've been seeking discovery in these cases for

10    years.  There's no question about that.  We believe it's

11    critical to the Debtor's ability to proceed with their claims.

12    And we have done it on several occasions, and we still believe

13    we're entitled to some discovery in order to investigate our

14    claims, whether it's under 2004, whether it's 56(f), whether

15    it's an Equitable Bill of Discovery.  To shut the Debtors out

16    from any kind of inquiry into the documents that these parties

17    possess only themselves, that we can only get from themselves,

18    we believe is a denial of our ability to prosecute our claims.

19    That's what we're saying.  And we're saying under one of these

20    theories, some way, we should be able to get discovery.  And we

21    see no harm in granting that discovery to the process, to the

22    Defendants or to any party in this proceeding.

23          THE COURT:  Really?  You don't think this interferes

24    with the arbitration provisions?

25          MR. RAHN:  No.  How would that interfere with the

35

1  arbitration provision?

2          THE COURT:  Well, because --

3          MR. RAHN:  Did the arbitrator --

4          THE COURT:  The ICC has the right to set their

5  procedures, and what gives some other Court the right to

6  interfere with that?  I mean, that's the way I view this.

7          MR. RAHN:  Okay, well --

8          THE COURT:  Me granting discovery of claims you may

9  have before them?

10          MR. RAHN:  I don't believe that's an interference with

11  their rights to handle the case.  It's merely -- it may

12  supplement.  It -- this is a case before this Court.  You

13  haven't washed your hands of it.

14          THE COURT:  Well, it's been --

15          MR. RAHN:  You've stayed it, that's true.

16          THE COURT:  It's been stayed.

17          MR. RAHN:  Yeah, it's been stayed.  There's no

18  question about it and we're not arguing about that.  We're not

19  -- it's Nova Hut that's arguing about it being stayed, not us.

20  For them to come in and say, "We want to lift the stay" --

21          THE COURT:  Well, that's not before me today.

22          MR. RAHN:  Okay, but that's a -- it is a little bit

23  ironic that they want to lift it just a little bit, just a

24  little bit.  And I'll bet if you -- when Your Honor denies

25  their motion, they'll want to shut it down again.  So -- and

1  that's the situation we're in here today.  The IFC --

2          THE COURT:  Well, why did you wait 2 years to seek

3  discovery under Rule 2004?

4          MR. RAHN:  Well, frankly, because we wanted to see

5  what the result of the arbitration was.  We have limited

6  resources.  We can't -- we have to preserve the estate's

7  resources, and if -- we wanted to see what the result was.  We

8  did seek discovery back when we were opposing the Motion for a

9  Stay.  So it's not as though -- it's not as though we haven't

10 sought, repeatedly in this Court, discovery.  It's not as

11 though you can say we've sat on our hands.  Yes, we didn't come

12 back while the arbitration was going on and seek 2004

13 discovery.  And it wasn't until the Fall of 2006 that we

14 discovered this website posting, which, by the way, is not part

15 of the adversary proceeding.  A claim -- our claim concerning

16 the impropriety, or a potential investigation of the

17 impropriety, is not part of the adversary proceeding.  So that

18 ought to go ahead under any circumstance.

19          THE COURT:  But it is implicated by the arbitration.

20          MR. RAHN:  Yes.

21          THE COURT:  I mean, it's --

22          MR. RAHN:  But we're not --

23          THE COURT:  It's a matter --

24          MR. RAHN:  But --

25          THE COURT:  -- for the arbitrators to decide, is it

1   not?

2           MR. RAHN:  We haven't -- we have tried.  We tried to

3   get the ICC to look -- to investigate the matter and we were

4   rejected.  And also, the IFC -- the IFC's argument, Your Honor,

5   is that if you take any one of these matters on its own, then

6   perhaps that doesn't rise to a sufficient level to give anybody

7   cause to -- pause to think that there should be discovery.  But

8   that's not what our motion is.  Our motion is that the totality

9   of circumstances gives us the right and the suspicion that

10  something went awry.  It wasn't just that the posting of the

11  website or the dating of the website, which we cannot determine

12  without discovery when that was actually posted, it's also the

13  content of that document.  The document said that they didn't

14  even try very hard and didn't contest that we passed the

15  performance test very hard.  And it also said that the mill has

16  reached record production levels in Cleary Gottlieb's website.

17  It's not what we put in the website.  So they said in spite of

18  the fact that they didn't contest that Kaiser passed the

19  performance test very hard, and despite the fact that there

20  were record production levels at this plant, they still won.

21  Now, how did that happen?  That's what -- that's from their

22  lawyers.

23          And also, when you have this history that we've recited in

24  Dr. Berecov's affidavit of statements that the IFC was going to

25  control whether we passed the test or not, the IFC was going to

1   control all aspects of this project, which the IFC has not

2   contested in any affidavit --

3         THE COURT:  Because no arbitration has been filed

4   against them.  That issue is not going to be decided by me.

5   Didn't I already decide that?

6         MR. RAHN:  Well, they haven't moved to lift that stay,

7   nor have we, you're right.

8         THE COURT:  All right.

9         MR. RAHN:  But we still believe we should be entitled

10  to an examination of the facts surrounding this -- the website

11  posting and discovery from the IFC.  Thank you, Your Honor.

12        THE COURT:  Thank you.  Well, let me do this.  I think

13  I must deny the Motion for Discovery.  I think that in some

14  respects the arguments are similar to the arguments that were

15  made in connection with the Motions to Stay the Adversary

16  Proceedings.  And for the reasons I and the District Court

17  decided those motions, I'm going to also decline to extend the

18  right of the Debtor to conduct discovery under either Rule 2004

19  or an Equitable Bill of Discovery.  I think that as stated in

20  my prior decision, the parties generically agreed to

21  arbitration and that any claims under the contract should go to

22  arbitration.  I think the parties are bound by the rules of the

23  arbitral proceeding, and therefore, the ICC rules will apply.

24  I am not aware, as I asked the Debtor and the Debtor concedes,

25  they are not aware of any cases that have held a Debtor's

39

1  entitled to discovery under Rule 2004 or any other basis while

2  another proceeding is pending, whether it be an adversary or,

3  specifically, an arbitration.  And I have not found any case

4  dealing with an arbitration.  Instead of seeing this as a novel

5  issue, I think the reason we don't see decisions is that it's

6  implicit in staying a matter and allowing it to proceed to

7  arbitration that all discovery will be conducted in accordance

8  with the arbitration rules that are applicable to that

9  arbitration.  So I'll just deny the motions.  I don't think

10  anything more need be said.

11      Do the -- well, there is one point.  To the extent that

12  the integrity of the arbitration award is being contested, I

13  think I made it clear that it's not before me.  I think it

14  needs to proceed before the appropriate parties, and I don't

15  think it's proper for me to interfere with the arbitration

16  proceeding or any appeal, using that term generically, of the

17  arbitration proceeding by permitting discovery under bankruptcy

18  rules.  So again, I'll deny the motion.  Okay?  We'll stand

19  adjourned then, I think.

20      MR. MINUTI:  Your Honor, we'll prepare a short order

21  and circulate it to the parties and then submit it to Chambers.

22      THE COURT:  All right.

23      MR. MINUTI:  That completes our agenda.  Thank you,

24  Your Honor.

25      THE COURT:  All right.  Thank you.

40

```
 1          ALL:  Thank you, Your Honor.

 2      (Court adjourned)

 3

 4                  CERTIFICATION
 5  I certify that the foregoing is a correct transcript from the
 6  electronic sound recording of the proceedings in the above-
 7  entitled matter.
 8

 9   Lewis Parham                    5/3/07
10  _____    _____
11  Signature of Transcriber           Date
```

Westlaw.

Not Reported in F.Supp.                                                                                  Page 1
Not Reported in F.Supp., 1988 WL 120689 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**



Motor Carriers Labor Advisory Council v. Trucking
Management, Inc.
E.D.Pa.,1988.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
MOTOR CARRIERS LABOR ADVISORY
COUNCIL, et al.
v.
TRUCKING MANAGEMENT, INC., et al.
**CIV. A. No. 86-4562.**

Nov. 3, 1988.

Robert J. Bray, Jr., Philadelphia, Pa., for plaintiffs.
Francis M. Milone, Morgan Lewis & Bockius,
Philadelphia, Pa., Steven R. Wall, Robert A. Dufek,
Francis L. Casey, III, Washington, D.C., for Trucking
Mgt., Inc.
James A. Matthews, Jr., Michael J. Ossip, Morgan
Lewis & Bockius, Philadelphia, Pa., for Central Pa.
Motor Carriers Conf., Inc.
J. Kittredge Fegley, Reading, Pa., Jack G. Mancuso,
Michael L. Mixell, for Central Pa. Teamsters Pension
Fund, Central Pa. Teamsters Health & Welfare Fund,
James Burns, Wm. Baum, John Kleinfelter, Vincent
Dagen.

*MEMORANDUM AND ORDER*
HUYETT, District Judge.
**\*1** Plaintiffs have moved to file a third amended
complaint, or, in the alternative, for an amendment to
my order of January 27, 1988 limiting discovery. If
granted, the proposed amendment to the order will
permit plaintiffs to seek an interlocutory appeal under
28 U.S.C. § 1292(b) (1986) of the order limiting
discovery.

The original complaint in this complex suit, filed July
31, 1986, involved alleged violations of the Sherman
Antitrust Act, the Employee Retirement and Income
Security Act, and the Taft-Hartley Labor
Management Relations Act. That complaint was
accompanied by a motion for a temporary restraining
order seeking, *inter alia*, preliminary injunctive relief
requiring that certain plaintiffs not be compelled to
execute certain documents related to the Central
Pennsylvania Teamsters Pension and Health and
Welfare Funds ("Funds"). After the defendants and
the plaintiffs were able to reach agreement on the

execution of the documents, the motion was
withdrawn on August 12, 1986.

On August 13, 1986, plaintiffs filed an amended
complaint stating fourteen (14) counts against the
defendants based on various theories of recovery.
The plaintiffs sought declaratory, equitable, and
monetary relief. On May 28, 1987, after limited
discovery, I granted in part defendants' motions for
judgment on the pleadings. In that order, I allowed
plaintiffs leave to amend their complaint to state
claims for the individual employee plaintiffs for
breach of fiduciary duty under ERISA and the federal
common law of ERISA. Plaintiffs subsequently
filed a second amended complaint on June 12, 1987.
Thereafter, the parties began discovery proceedings
in earnest.

During discovery, it became evident that plaintiffs'
counsel was attempting to broaden his claims under
counts XI and XII. Count XI purportedly states a
claim for relief under section of the Sherman
Antitrust Act, 15 U.S.C. § 1, for conspiracy "to fix,
control, raise, and stabilize the fringe benefit costs of
[trucking] carriers doing business in ... the trucking
industry [.]" Second Amended Complaint at 46.
Count XII purportedly states a claim for relief under
section 2 of the Sherman Act, 15 U.S.C. § 2, for
monopoly or attempted monopoly in "the trucking
marketplace in the Pennsylvania region [.]" Second
Amended Complaint at 47.

At a pretrial conference on September 23, 1987, the
issue of the scope of the antitrust allegations arose.
Counsel for the parties disagreed over the scope of
the allegations. Counsel for defendants claimed the
complaint stated only claims relating to the Central
Pennsylvania region, while counsel for the plaintiffs
argued the complaint alleged nationwide antitrust
claims. To clarify the ambiguity, I requested that the
parties submit written statements describing what
they believed to be the scope of the antitrust
allegations. By order dated December 22, 1987, I
found that the position statements did not present the
matter in a manner appropriate for review. Thus, on
January 7, 1987, defendants filed a motion for an
order limiting discovery on the antitrust claims to the
Pennsylvania region.

**\*2** After considering defendants' motion and
plaintiffs' response, and the allegations of the second

Not Reported in F.Supp.
Not Reported in F.Supp., 1988 WL 120689 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

amended complaint, I issued an order on January 27, 1988, limiting discovery to the Pennsylvania region. On April 15, 1988, plaintiffs filed the instant motion seeking leave to file a third amended complaint, or, in the alternative, to seek an interlocutory appeal of my order of January 27, 1988 limiting discovery to the Pennsylvania region.

Plaintiffs' proposed third amended complaint names six additional defendants. These new defendants are the three so-called nationwide network carriers and their parent companies. Further, plaintiffs' proposed complaint alleges antitrust violations in both the Pennsylvania region and the entire nation by all defendants, including the six new defendants.

After approximately one year of intensive discovery in this case, discovery was scheduled to close on April 30, 1988. Plaintiffs filed this motion to amend only two weeks before discovery was scheduled to close. Since discovery began in this case, I am informed that over forty (40) depositions have been taken, in addition to a plethora of document discovery and interrogatories.

The Federal Rules of Civil Procedure require that, at this stage of the litigation, "a party may amend the party's pleading only by leave of court ... and leave shall be freely given when justice so requires." F.R.Civ.P. 15(a). In *Foman v. Davis*, 371 U.S. 178, 182 (1962), the Supreme Court stated

In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, etc.-the leave should be "freely given." Of course the grant or denial of an opportunity to amend is within the discretion of the District Court.

Plaintiffs argue that, under *Foman,* they are not guilty of bad faith, or acting for the purpose of delay. In support of these arguments, plaintiffs state:

Defendants themselves have been aware that plaintiffs' allegations have raised questions concerning conspiracy by the defendants on a national level. On March 21, 1986, MCLAC filed a similar complaint in the United States District Court for the Northern District of New York. This [New York] Complaint ... sets forth similar nationwide conspiracy allegations as the instant Complaint.

Memorandum of Law in Support of Plaintiffs' Motion for Leave to Amend the Complaint or in the Alternative to Amend the Interlocutory Order, at 14.

A copy of the New York complaint was filed in this case on January 14, 1988 as an exhibit to plaintiffs' response to defendants' motion to limit discovery. Plaintiffs in the New York suit are Motor Carriers Labor Advisory Council, Eastern Labor Advisory Association, Chemical Leaman Tank Lines, Inc., all plaintiffs in this action, and Pennsylvania Truck Lines, Inc., who ELAA represents in this case. Among the defendants is Trucking Management, Inc., a defendant in this litigation. Importantly, the three nationwide network carriers are not named as defendants. Counts IX and X of the New York complaint allege violations of sections 1 and 2 of the Sherman Act in "the trucking marketplace in the Upper New York State region[.]" Memorandum of Law in Opposition to Defendants [sic] Motion for an Order Limiting Discovery, Exhibit A, at 34.

**\*3** While the New York action alleges similar, if not exactly the same type, antitrust violations, that complaint can not be construed to allege "nationwide conspiracy allegations." I conclude that plaintiffs' argument that defendants should have known plaintiffs were attempting to allege a nationwide antitrust claim is without merit.

Among the factors discussed by the *Foman* court is whether undue delay may be occasioned by the proposed amendment. In this already complex case, plaintiffs are attempting to broaden the scope of their allegations from Pennsylvania to the entire nation some twenty months after the initial complaint was filed. Discovery was scheduled to conclude on April 30, 1988. Plaintiff states that if the proposed amendment is allowed, any further discovery should be concluded within ninety (90) days. I find the suggestion that discovery in a *nationwide* antitrust conspiracy case can be completed in that time frame is unrealistic.

The second amended complaint sets forth allegations about a conspiracy to set fringe benefit levels by the defendants. The proposed third amended complaint claims the present defendants were "merely a part of the national activities of TMI and its affiliated associations around the country whereby similarly situated Taft-Hartley funds around the country are party to such actions." Proposed Third Amended Complaint at 53, ¶ 152. The notion of turning this action into one involving still unidentified pension and welfare funds of unidentified Teamster locals

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 3
Not Reported in F.Supp., 1988 WL 120689 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

throughout the country, and completing the necessary additional discovery within ninety days is beyond credulity. [FN1] Clearly, to allow plaintiffs to broaden their allegations to include the nationwide conspiracy would inflict a protracted delay in the adjudication of the claims already stated against the defendants in this case.

Plaintiffs argue that they should be granted leave to file the proposed complaint because *outside the course of discovery in this action* they uncovered evidence of "widespread predatory pricing and discounting and other monopolistic practices on a nationwide basis" by the nationwide network carriers. The central piece of evidence supporting this claim is a report prepared by Dr. James A. Clifton [FN2] for use in another lawsuit filed in federal district court in South Carolina by Lifschultz Fast Freight, Inc. against the three nationwide network carriers. Dr. Clifton's report, dated April 30, 1987, is entitled "Predatory Pricing in the Eastern Central Region of The Motor Carrier Industry Since 1980." This report does not support plaintiffs' argument that they recently uncovered evidence of a *nationwide* conspiracy. This report simply addresses practices in the "Eastern Central Region." The report describes the Eastern Central region as the area stretching north from Texas and New Mexico to North Dakota, and east therefrom to Maine, but excluding the southeastern quadrant of the United States.

**\*4** The most problematic aspect of the proposed amended complaint lies with the nature of the antitrust claim. To this point, plaintiffs' antitrust claims have been based on the practices of the named defendants concerning collective bargaining practices and employee benefit contributions. The report of Dr. Clifton which supposedly provides evidence of a nationwide conspiracy to fix and control fringe benefit costs relates, as its title suggests, almost entirely to evidence of below cost pricing and monopolization by the nationwide network carriers. The fringe benefit costs at issue in this litigation are, at best, only one component of the nationwide carriers' cost structure.

I find that the "evidence" plaintiffs claim in support of their motion for leave to file a third amended complaint is neither "newly discovered" [FN3] nor does it appear to support the inference of a nationwide conspiracy. Thus, the underlying facts and circumstances do not support allowing plaintiffs another opportunity to amend their complaint. *See Foman, 371 U.S. at 182.* Moreover, the delay which

would certainly result from broadening this action to a nationwide antitrust suit would be "undue." The defendants to this litigation already have spent a tremendous amount of resources in terms of time and money, to defend plaintiffs' charges of a regional conspiracy. To allow plaintiffs to broaden the scope of their claims and re-open discovery at this juncture would undoubtedly result in unfair prejudice to the defendants.

Plaintiffs ask that, in the alternative, I amend [FN4] my January 27, 1988 order which limited discovery to the Pennsylvania region to include a statement which would allow for an interlocutory appeal of that order under 28 U.S.C. § 1292(b) and that this action be stayed while plaintiffs seek appellate review. Plaintiff argues that my order has "caused serious harm" by "hinder [ing] plaintiffs' ability to prove *the intent behind the regional manifestation* of the conspiracy alleged." Plaintiffs' Memorandum of Law in Support, at 20. They argue further that evidence of the defendants' activities outside the Pennsylvania region is relevant to the intent of defendants to cause harm to plaintiffs and that there is a substantial ground for differences of opinion on the scope of the complaint's conspiracy allegations.

Under § 1292(b), I must find that the issue plaintiffs seek to appeal is (1) a controlling question of law, (2) about which there is a substantial ground for a difference of opinion, and (3) that an immediate appeal may materially advance the ultimate disposition of the litigation. 28 U.S.C. § 1292(b); *In re Cement Antitrust Litigation (MDL no. 296), 673 F.2d 1020, 1026 (9th Cir.1982).* Further, § 1292(b) is to be used "only in exceptional situations in which allowing an interlocutory appeal would avoid protracted and expensive litigation." *Id.;* see *Coopers & Lybrand v. Livesay, 437 U.S. 463, 475 (1978)* (discussing the legislative history of § 1292(b)); *Milbert v. Bison Laboratories, 260 F.2d 431, 433-35 (3d Cir.1958).*

**\*5** The subject matter of an interlocutory order need not constitute a reversible error to fall within § 1292(b). *Cement Antitrust Litigation, 673 F.2d at 1026.* However, orders which are collateral to the basic issues of the case cannot be presented as "controlling questions of law." *United States v. Woodbury, 263 F.2d 784, 787-88 (9th Cir.1959).* The issues in this lawsuit concern alleged violations of antitrust and employee benefits law by these defendants in the Pennsylvania area. They do not concern predatory pricing by the nationwide network carriers throughout the country. Given the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

substantial amount of discovery which has occurred in this case *within the scope* of my January 27 order, I cannot conclude that additional discovery is necessary to reach a binding decision on the antitrust matters raised by plaintiffs' second amended complaint. The order restricting discovery was not dispositive of any issue in this case. *Cf. Trans World Airlines, Inc. v. American Coupon Exchange, Inc., 682 F.Supp. 1476, 1489 (C.D.Cal.1988)* (certifying for interlocutory appeal an order which is dispositive of liability issues in antitrust case).

Plaintiffs also claim that there is a substantial ground for difference of opinion as to whether I should have limited discovery to the Pennsylvania region in an antitrust case. In support of this contention plaintiffs cite three cases. I do not believe the cases cited demonstrate a "substantial ground for difference of opinion." "Substantial grounds for difference of opinion may be demonstrated by adducing conflicting and contradictory opinions of courts which have interpreted and ruled upon the particular question of law." *Dorward v. Consolidated Rail Corp., 505 F.Supp. 58, 59 (E.D.Pa.1980).* Also, the scope of a discovery order is not an issue of first impression or an issue on which courts disagree as a matter of law. *See Board of Education of Township High School District no. 214, Cook County v. Climatemp, Inc., 91 F.R.D. 245, 251 (N.D.Ill.1981).*

An immediate appeal of this issue, and a stay of this action, at a time when motions for partial summary judgment on plaintiffs' antitrust claims are pending will not advance the ultimate resolution of this dispute. Rather, I find that if plaintiffs' alternative motion was granted, disposition of the antitrust claims against the defendants would be substantially delayed.

An appropriate order follows.

### ORDER

Upon consideration of the motion of all plaintiffs for Leave to Amend the Complaint and, in the alternative, to Amend Interlocutory Order, the responses of all defendants, the supporting memoranda, exhibits, and the comments of counsel at oral argument on defendants' motions for partial summary judgment on September 23, 1988, and for the reasons stated in the attached memorandum,

Plaintiffs' motion for leave to file a third amended complaint is DENIED. Plaintiffs' alternative motion

to amend my order of January 27, 1988, and to stay this case while plaintiffs seek appellate review of that order is also DENIED.

**\*6** IT IS SO ORDERED.

> FN1. Plaintiffs apparently assume that the new defendants will not desire to file any motions addressing the sufficiency of the complaint or take any discovery themselves.

> FN2. Dr. Clifton also prepared a report at the direction of plaintiffs' counsel in this litigation, dated April 14, 1988, entitled "Economic Evidence of Predation and Monopolization by Yellow Freight, Roadway Express, and Consolidated Freightways in Civil Action No. 86-4562, MCLAC et al. v. TMI et al."

> FN3. I note that the "newly" discovered evidence was attached to plaintiffs' summary of damages dated February 5, 1988, over two months before the instant motion was filed.

> FN4. Defendants claim that plaintiffs' motion is not properly brought under F.R.Civ.P. 60. Rule 60 provides for motions for relief from orders in cases of mistake, newly discovered evidence, fraud, void or satisfied judgments and for "any other reason justifying relief from the operation of the judgment." F.R.Civ.P. 60(b). While plaintiffs have not stated any of the specifically enumerated grounds for relief contained in the rule, I construe their motion as a motion for relief within the "any other reason" category.

E.D.Pa.,1988.
Motor Carriers Labor Advisory Council v. Trucking Management, Inc.
Not Reported in F.Supp., 1988 WL 120689 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.


**Westlaw.**

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 545288 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Burns v. Lavender Hill Herb Farm, Inc.
E.D.Pa.,2005.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
Thomas J. BURNS, Plaintiff
v.
LAVENDER HILL HERB FARM, INC.,
Pennsylvania Certified Organic, Marjorie S. Lamb,
Kathryn Elizabeth Lamb, Helen Nicholson, and
Leslie Zuck, Defendants
**No. Civ.A. 01-7019.**

March 2, 2005.

for Plaintiff Thomas J. Burns, Holmes, PA, pro se.
John P. Penders, Marshall, Dennehey, Warner,
Coleman and Goggin, Jose L. Ongay, Norman W.
Briggs, Frey, Petraska & Deeb, Carl J. Minster, III,
Minster & Facciolo, LLC, Philadelphia, PA, for
Defendants.

*MEMORANDUM OPINION AND ORDER*
RUFE, J.
**\*1** By Order dated February 2, 2005 (the "Order"),
this Court quashed Plaintiff's subpoena on Honorable
Jay H. Conner and entered a protective order staying
any further discovery by Plaintiff against Judge
Conner in this matter. In the accompanying
Memorandum Opinion (the "Opinion"), the Court
held that the doctrine of issue preclusion estopped
Plaintiff from relitigating his allegations of Judge
Conner's financial interest in Lavender Hill Herb
Farm, Inc. ("Lavender Hill"), the alleged basis for
seeking discovery against Judge Conner, because that
issue has been litigated before and decided by the
Delaware state courts.[FN1] The Court also invited the
parties to submit legal authority addressing the issue
of what preclusive effect, *if any*, a certain stipulation
between Plaintiff and his ex-wife Marjorie Lamb
dated November 22, 2000 (the "Stipulation"), may
have on Plaintiff's standing in this action.[FN2] Plaintiff
now moves for a certification of interlocutory appeal
pursuant to 28 U.S.C. § 1292(b).

    FN1. The Court also held that Plaintiff's
    subpoena and the request for production
    directed to Judge Conner were invalid
    because they were not served properly.

FN2. Opinion at 10. The parties are referred
to the complete text of the Opinion for a full
definition and a detailed discussion of the
Stipulation.

Section 1292(b) sets forth the requirements the Court
must consider when deciding whether to allow an
appeal of an interlocutory order such as the Order:
When a district judge, in making in a civil action an
order not otherwise appealable under this section,
shall be of the opinion that such order involves a
controlling question of law as to which there is a
substantial ground for difference of opinion and that
an immediate appeal from the order may materially
advance the ultimate termination of the litigation, he
shall so state in writing in such order.[FN3]

    FN3. 28 U.S.C. § 1292(b); *see also Katz v.
    Carte Blanche Corp., 496 F.2d 747, 754 (3d
    Cir.1974).*

The decision to grant a section 1292(b) certificate is
within the sound discretion of the Court. One of the
main purposes of section 1292(b) is to prevent
wasteful litigation.[FN4] With this principle in mind, the
Court applies these factors to the Order.

    FN4. For a discussion of the legislative
    history of § 1292(b), *see Katz,* 496 F.2d at
    754-55 ("And on the practical level, saving
    of time of the district court and of expense
    to the litigants was deemed by the sponsors
    to be a highly relevant factor."); *see also
    Milbert v. Bison Labs., Inc.,* 260 F.2d 431,
    433 (3d Cir.1958) ("It is quite apparent from
    the legislative history ... that Congress
    intended that section 1292(b) should be
    sparingly applied. It is to be used only in
    exceptional cases where an intermediate
    appeal may avoid protracted and expensive
    litigation and is not intended to open the
    floodgates to a vast number of appeals from
    interlocutory orders in ordinary litigation.")

Plaintiff represents that the Order made two rulings.
First, that "certain 'identical' issues had been 'fully
litigated' by the Delaware Courts," and second, that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 545288 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

"the Delaware Supreme Court 'appeared' to consider and rule that plaintiff [sic] signature on a Stipulation and Order dated 11/22/00 was valid." Plaintiff's overarching argument is that the Order incorrectly applied the doctrine of issue preclusion to Plaintiff's claims because no claim or issue presently before this Court was ever litigated in the Delaware Supreme Court. [FN5] Plaintiff represents that the only issue ever decided by the Delaware Supreme Court was whether Judge Conner violated the Delaware Code of Judicial Conduct.

> FN5. Plaintiff's main concern appears to be the Court's statement that Plaintiff's challenges to the validity of his signature on the Stipulation "appear to have been denied by the Delaware Supreme Court as lacking any factual basis."

Plaintiff's Motion must be denied on two separate grounds. First, the Motion is premature. The Order was a protective one, staying discovery by Plaintiff against Judge Conner in this matter. As discussed in the Opinion, Plaintiff alleged that Judge Conner had a financial interest in Lavender Hill, a Defendant in this matter. The Court, after a thorough review of the child support contempt of court proceedings between Plaintiff and his ex-wife Marjorie Lamb in the Delaware state courts (the "Delaware proceedings"), found that this specific issue had been fully litigated by the parties and was decided by the Delaware courts, including the Delaware Supreme Court.

**\*2** The Court did not rule on the preclusive effect of any other issues, but did invite parties to submit legal authority regarding the possible preclusive effect of the Stipulation on Plaintiff's standing in this action. In fact, the Court has not made any specific rulings on that issue, and Plaintiff's Motion is premature as far as it concerns any preclusive effect of the Stipulation- or any issue other than that of Judge Conner's interest in Lavender Hill.

Second, the Motion fails to satisfy requirements of section 1292(b). Plaintiff's argument that the Order's rulings involve a controlling question of law because the Court indicated that "the issue might affect plaintiff's standing to maintain this action" and that "several of Plaintiff's claims have been resolved" under the doctrine of *res judicat* appears to refer to the issue of Plaintiff's standing. As stated above, the Order denied Plaintiff discovery against Judge Conner. That discovery issue does not "truly implicate[ ] the policies favoring interlocutory

appeal" and is not a controlling question of law here. [FN6] Plaintiff does not articulate any harm resulting from a possibly erroneous protective order, and Plaintiff's argument that an immediate appeal would avoid possibly wasted trial time is meritless.

> FN6. *See Katz,* 496 F.2d at 755.

Plaintiff's argument that a substantial ground for difference of opinion exists with regard to the Court's rulings on issue preclusion is nothing but Plaintiff's personal disagreement with the Court's application of the issue preclusion doctrine to the facts of record. The history and record of the Delaware proceedings, as set forth in more detail in the February 2, 2005 Opinion, directly contradict Plaintiff's bare allegations that no issues "identical" to those presently before the Court were "fully litigated" in Delaware state courts. Plaintiff's disagreement with the Court's logic, without citation to contrary authority, does not create a legally sufficient difference of opinion.

The third requirement of section 1292(b) presents yet another ground to deny Plaintiff's Motion. An immediate appeal, instead of advancing the ultimate termination of this litigation, would only result in further delays. Plaintiff represents that "[r]egardless of the outcome of the trial," at its conclusion he "intends to appeal" the Order "precluding certain issue [sic] from being litigated," and that a successful appeal would necessitate a remand for a second trial, which would be "highly duplicative" of the first trial. [FN7] First, common sense provides that if the Court were to preclude certain issues from being litigated, such issues would not be presented at the first trial at all. Second, Plaintiff's efficiency argument, aside from being premised on the erroneous assumption that the Court has ruled against him on the issue of standing, depends on a number of future occurrences: that the Court will not dispose of the parties' claims on summary judgment motions; that Plaintiff will lose at trial and then successfully appeal; and that on remand the case will proceed to a second trial. Accordingly, granting the Motion would not advance the ultimate termination of this action but instead create piecemeal litigation that section 1292(b) desires to avoid.

> FN7. Pl's Memorandum in support of the Motion.

**\*3** The Court also notes Plaintiff's allegations that "so

far in this litigation the District Court has not required any Defendant to produce any documentation or provide the name of any witnesses that support any defense" while requiring the Plaintiff "to produce tens of thousands of documents at great expense." Plaintiff alleges he was "forced to serve discovery on one of defendants business partners Jay H. Conner" "as a direct result of none of the defendants making any meaningful response to discover[y]" [sic]. These allegations do not warrant a substantive discussion since they are directly contradicted by the record in this litigation, including Plaintiff's own pleadings.

The Court therefore declines to amend its February 2, 2005 Order to certify it for immediate appeal. An appropriate Order follows.

*ORDER*

AND NOW, this 2nd day of March, 2005, upon consideration of Plaintiff's Motion to Certify Memorandum and Opinion Order Entered February 2, 2005 for Immediate Appeal and for Stay Pending Appeal [Doc. # 173], and upon review of the record, it is hereby ORDERED that the Motion is DENIED.

It is so ORDERED.

E.D.Pa.,2005.
Burns v. Lavender Hill Herb Farm, Inc.
Not Reported in F.Supp.2d, 2005 WL 545288 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                     Page 1
Not Reported in F.Supp., 1996 WL 363806 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

In re Edison Bros. Stores, Inc.
D.Del.,1996.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
In re EDISON BROTHERS STORES, INC., et al.,
Debtors.
Jonathan VICTOR, Richard Polak, and Martin Katz,
Appellants,
v.
EDISON BROTHERS STORES, INC., et al.,
Appellees.
**No. CIV.A. 96-177-SLR.**

June 27, 1996.

Laura Davis Jones, and Joel A. Waite, of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware; and Harvey R. Miller, and Richard P. Krasnow, of Weil, Gotshal & Manges LLP, New York, New York, and D.J. Baker, of Weil, Gotshal & Manges LLP, Houston, Texas, for appellees/debtors.
Jeffrey C. Wisler, of Williams, Hershman & Wisler, of Wilmington, Delaware, and Peter D. Wolfson, Carole Neville, John A. Bicks, and Pamela Cohen, of Pryor, Cashman, Sherman & Flynn, New York, New York, for appellants.
Thomas L. Ambro, and Deborah E. Spivack, of Richards, Layton & Finger, Wilmington, Delaware, and David S. Kurtz, Timothy R. Pohl, and Sean D. Malloy, of Jones, Day, Reavis & Pogue, Chicago, Illinois, for the Official Committee of Unsecured Creditors of Edison Brothers Stores, Inc.
E. Gordon Robinson, and Susan R. Sherrill, of U.S. Securities and Exchange Commission, Atlanta Georgia, and Ellen W. Slights, Assistant United States Attorney, Wilmington, Delaware, for U.S. Securities and Exchange Commission.

*MEMORANDUM OPINION*
SUE L. ROBINSON, District Judge

I. INTRODUCTION AND BACKGROUND

**\*1** Pending before the court is a motion filed by appellee, the Official Committee of Unsecured Creditors (hereinafter the "Creditors' Committee"), for an order dismissing the appeal of Joseph Harrosh, Jonathan Victor, Richard Polak and Martin Katz (hereinafter the "appellants"), all of whom are non-

insider public shareholders of Edison Brothers Stores, Inc. and 65 subsidiaries (hereinafter the "debtors") which filed chapter 11 petitions in this district's bankruptcy court in November 1995.[FN1] By letters dated November 9 and November 22, 1995, appellants wrote to the United States Trustee requesting that an official equity committee be appointed pursuant to 11 U.S.C. § 1102(a).[FN2] On December 7, 1995, the United States Trustee declined appellants' request.

> FN1. As of the Petition Date, approximately 22,000,000 shares of the debtors' common stock were outstanding. Those shares are widely held by more than 4,000 record holders, and a substantially larger number of beneficial holders.

> FN2. Section 1102(a) of the Bankruptcy Code provides in relevant part that:
> (1) As soon as practicable after the order for relief under chapter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the United States trustee deems appropriate.
> (2) On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States trustee shall appoint any such committee.
> (Emphasis added)

On January 12, 1996, appellants filed a motion with the bankruptcy court requesting the appointment of an official committee of equity security holders. The California Public Employees Retirement System (holding approximately 150,000 shares of the debtors' common stock) and the Securities and Exchange Commission ("SEC") supported the motion. The debtors, the United States Trustee and the Creditors' Committee opposed the motion.

Hearings on the motion were held by the bankruptcy court on February 29 and March 20, 1996. Appellants asserted to the court that (1) the debtors

Not Reported in F.Supp.                                                                Page 2
Not Reported in F.Supp., 1996 WL 363806 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

were not insolvent, (2) the debtors' public shares were widely held, (3) the debtors' chapter 11 cases were complex, and (4) insiders of the debtors could not adequately represent the interest of public shareholders in the chapter 11 cases for conflict of interest reasons.   The opponents to the motion argued that the debtors' current and former management could and would provide adequate representation for the debtors' public shareholders, as a result of their ownership of approximately 35% of the debtors' outstanding common shares.   The bankruptcy court declined to appoint an equity committee, stating during the course of the hearing the following, *inter alia:*

* "I'm going to deny without prejudice obviously, because as this case progresses I think there may be an appropriate time for a committee of equity holders...."

* "[I]f somebody wants to come on with evidence to suggest that [the interests of related shareholders are not aligned with those of non-insider shareholders,] I'd be glad to entertain it...."

* [I]f the petitioning shareholders reach a point where they think that additional facts need to be brought to my attention which would warrant a change of my position, then I would urge them to do so...."

* "I think that based upon a different posture six months from now [the request to appoint an equity committee] may be an appropriate application...."

(D.I. 16, # 15 at 101, 103, 114, 114-115, respectively)

Appellants thereafter filed a timely appeal to this court.   In response to the appeal, the Creditors' Committee filed the pending motion to dismiss the appeal for want of subject matter jurisdiction.

## II. DISCUSSION

**\*2** As with many bankruptcy cases, it is a difficult task in the case at bar to divine legal principles when dealing with an equitable process revolving around a discretionary matter.   Clearly the establishment of an official equity committee pursuant to 11 U.S.C. § 1102(a) is a discretionary matter, the resolution of which is fact-driven and, therefore, not amenable to any bright line tests.   And while the bankruptcy court in this case has expressed its willingness to revisit its order if facts warrant, the court has conclusively determined that, on the present record, the appointment of an equity committee is not necessary to assure adequate representation of non-insider equity security holders.

To establish that review of the bankruptcy court's decision is appropriate at the present time, appellants must show that the decision is either a final order, an interlocutory order appealable under 28 U.S.C. § 158(a)(3), or a collateral order.

### A. Final Orders

This court has jurisdiction to hear appeals "from final judgments, orders, and decrees" of the bankruptcy court.   28 U.S.C. § 158(a)(1).   Finality is viewed flexibly in the bankruptcy context.   *See, e.g., In re Trans World Airlines, Inc.,* 182 B.R. 102, 105 (D.Del.1995) ("In bankruptcy cases, the courts accord finality a somewhat 'flexible pragmatic definition' ") (*citing In re Columbia Gas System, Inc.,* 146 B.R. 106, 110 (D.Del.1992), *aff'd,* 50 F.3d 233 (3d Cir.1995)); *In re Columbia Gas System, Inc.,* 182 B.R. 397 (D.Del.1995); *In re Buckhead America Corp.,* 180 B.R. 83, 84 (D.Del.1995).   The Third Circuit has explained the rationale for viewing finality under a less rigorous standard in the bankruptcy area as follows:

Bankruptcy cases frequently involve protracted proceedings with many parties participating.   To avoid the waste of time and resources that might result from reviewing discrete portions of the action only after a plan of reorganization is approved, courts have permitted appellate review of orders that in other contexts might be considered interlocutory.

*In re Amatex Corp.,* 755 F.2d 1034, 1039 (3d Cir.1985).   In the Third Circuit, courts typically look to a number of factors to determine if an order is a final order:  1) the impact of the bankruptcy court's order upon the assets of the bankruptcy estate;  2) the necessity for further fact-finding on remand to the bankruptcy court;  3) the preclusive effect of the district court's decision on the merits of subsequent litigation;   and 4) the furtherance of judicial economy.   *Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp.,* 920 F.2d 1127, 1131 (3d Cir.1990).

Appellants do not offer specific arguments that the factors identified in *Allegheny* weigh in favor of finding finality under the circumstances at bar. Instead, appellants essentially argue the merits of the dispute, i.e., finality should be found (and the order reversed) so that "the debtors' thousands of public shareholders [will not be excluded] from effective participation in the reorganization process including the restructuring of the debtors' business operations, the formulation of the business plan, and the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3
Not Reported in F.Supp., 1996 WL 363806 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

negotiation of a plan of reorganization."  (D.I. 15 at 8) With none of the factors even arguably applying, however, and with the only case law directly on point holding contrary to appellants' position,[FN3] the court concludes that the order in dispute is not final for purposes of an appeal of right pursuant to 28 U.S.C. § 158(a)(1).

> FN3. The United States Court of Appeals for the Second Circuit held in *In re Johns-Manville Corp.,* 824 F.2d 176, 179-180 (2d Cir.1987) that "[o]rders denying shareholder requests for official committee status" are not final for purposes of appeal because they "do not resolve particular disputes within the overall bankruptcy case;  they simply affect the committee structure within which various disputes in the reorganization proceeding will be considered."

### B. Interlocutory Orders

**\*3** Section 158(a)(3) of Title 28 of the United States Code gives this court jurisdiction to hear appeals, with leave of court, from interlocutory orders and decrees.  In deciding whether an interlocutory order is appealable in the bankruptcy context, courts have typically borrowed the standard found in 28 U.S.C. § 1292(b), which governs whether an appeal of an interlocutory order of a district court to a court of appeals is warranted.  *In re Delaware and Hudson Ry. Co.,* 96 B.R. 469, 472-73 (D.Del.), *aff'd,* 884 F.2d 1383 (3d Cir.1989).  Although the concept of finality is accorded some measure of flexibility in the context of § 158(a)(1) appeals, apparently the same standard does not apply in the context of § 158(a)(3) interlocutory appeals.  Thus, an appellant must establish that "exceptional circumstances justify a departure from the basic policy of postponing review until after the entry of final judgment."  *Id.* at 473. Also, under § 1292(b), an interlocutory appeal will be granted only when the order at issue (1) involves a controlling question of law as to which there is (2) substantial ground for difference of opinion and (3) when an immediate appeal from the order may materially advance the ultimate termination of the litigation.  *Id.*

The court declines to characterize the dispute at bar as presenting "exceptional circumstances" warranting leave to appeal under § 158(a)(3).  Although one might arguably characterize the issue of when it is appropriate to establish an official equity committee as a "controlling question of law," nevertheless the

court is not convinced that an immediate appeal in this case will materially advance the ultimate termination of the litigation (as opposed to materially advancing the rights of appellants, as they argue).

### C. Collateral Orders

The final basis for appellate jurisdiction is the collateral order doctrine.  In general, the collateral order doctrine applies to the class of prejudgment orders which "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated."  *Richardson-Merrell, Inc. v. Koller,* 472 U.S. 424, 430 (1985) (*quoting Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546 (1949)).  For the collateral order doctrine to apply, an order must satisfy three conditions:  1) it must "conclusively determine the disputed question;"[FN4] 2) it must "resolve an important issue completely separate from the merits of the action;"  and 3) it must "be effectively unreviewable on appeal from a final judgment."  *Richardson-Merrell,* 472 U.S. at 431.

> FN4. Both in their opening and reply briefs, the Creditors' Committee focuses solely on this first condition that must be satisfied if the collateral order doctrine is to apply. The court nevertheless has reviewed the other two conditions.

As noted above, the bankruptcy court has conclusively determined that, under the facts of record, it is not necessary to appoint an official equity committee to assure adequate representation in the reorganization process to non-insider equity shareholders.[FN5]  The issue of whether non-insider public shareholders are adequately represented in the reorganization process is an important issue (as attested to by the interest in these proceedings by the Securities and Exchange Commission) completely separate from the merits of the reorganization. Finally, all parties to this dispute have acknowledged that, at some point in the proceedings, the opportunity to effectively participate in the reorganization will be lost, thereby mooting the question of official committee status.  To decline review of this kind of order in the reorganization context will most certainly engage the court and the parties in a guessing game of when such an issue has

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 4
Not Reported in F.Supp., 1996 WL 363806 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

been developed enough for review without being
mooted by the passage of time.

> FN5. The use of the "without prejudice"
> language is not persuasive in this context,
> since a change of facts is generally grounds
> for revisiting a matter.

### III. CONCLUSION

**\*4** Although the court is cognizant of the long-
standing Congressional policy against piecemeal
appeals which underlies the final judgment rule, the
court is satisfied that the issue of whether an equity
committee should be appointed under the facts of
record has been determined in such a fashion that
appellate review is warranted under the collateral
order doctrine without waiting for any further factual
development. Therefore, the motion to dismiss filed
by the Creditors' Committee is denied.

An order shall issue.

D.Del.,1996.
In re Edison Bros. Stores, Inc.
Not Reported in F.Supp., 1996 WL 363806 (D.Del.)

**END OF DOCUMENT**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Matter of Tahkenitch Tree Farm Partnership
E.D.La.,1994.
Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.
In the Matter of TAHKENITCH TREE FARM PARTNERSHIP.
TAHKENITCH TREE FARM and Pacific Capital Partners of Oregon, Inc.
v.
MURPHY SALES COMPANY.
**Civ. A. No. 94-460.**

July 12, 1994.

*ORDER AND REASONS*

CLEMENT, District Judge.

***1** Murphy Sales Company ("Murphy") has appealed the Bankruptcy Court's denial of its motion to transfer venue. As the Court has determined that the Bankruptcy Court's order is not final, the appeal is DISMISSED.

This Court has jurisdiction "to hear appeals from final judgments, orders, and decrees ... of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." 28 U.S.C. § 158(a). It is this appellate jurisdiction that Murphy seeks to invoke. The Bankruptcy Court's order denying Murphy's motion to transfer venue is interlocutory rather than final.

An interlocutory order or decree is one which does not finally determine a cause of action but only decides some intervening matter pertaining to the cause, and which requires further steps to be taken in order to enable the court to adjudicate the cause on the merits.

1 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 3.03, at 3-184. Given the foregoing definition, it is apparent that the order appealed from is a classic example of an interlocutory order. Even applying the expanded definition of finality that it is applicable in bankruptcy matters, *see A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1009 (4th Cir.), *cert. denied* 79 U.S. 876 (1986), there can be no question that this order does not qualify. In *Robins*, the district court had ordered that all of the Dalkon Shield litigation be transferred to federal district court in Richmond, Virginia, the district in which the bankruptcy was pending. This case is a simple adversary proceeding between the debtor and Murphy, wholly unlike the situation presented to the Fourth Circuit.

Furthermore, the propriety of the Bankruptcy Court's order may be adequately reviewed on final judgment. As such, it does not come within the *Cohen* exception to the final-judgment rule. *In re: King Memorial Hospital, Inc.*, 767 F.2d 1508, 1510 (5th Cir.1985) ("*Cohen* 's collateral order exception only permits appeals from orders which ... cannot be reviewed along with the eventual final judgment because by then effective review will be precluded and the rights conferred will be lost....") (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949)). As an interlocutory order, there is no right to appeal pursuant to 28 U.S.C. § 158(a).[FN1] Accordingly,

IT IS ORDERED that the appeal is DISMISSED.

FN1. 28 U.S.C. § 158(a) allows appeals of interlocutory orders only with leave of court. Treating Murphy's notice of appeal as a request for leave of court to appeal, the Court would reach the same result. As the Court has determined that the order denying Murphy's motion may be fully reviewed upon final judgment, no purpose, other than upsetting the orderly adjudication of this adversary proceeding before the Bankruptcy Court, would be served by allowing an immediate appeal.

E.D.La.,1994.
Matter of Tahkenitch Tree Farm Partnership
Not Reported in F.Supp., 1994 WL 374215 (E.D.La.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2000 WL 1902188 (S.D.Ind.)
**(Cite as: Not Reported in F.Supp.2d)**

C

Mitsubishi Intern. Corp. v. Prepetition Senior
Lenders
S.D.Ind.,2000.
Only the Westlaw citation is currently available.
United States District Court, S.D. Indiana,
Indianapolis Division.
MITSUBISHI INTERNATIONAL CORP., Plaintiff,
v.
PREPETITION SENIOR LENDERS and Qualitech
Steel Iron Carbide, Defendants.
**No. IP 00-1468-C H/G.**

Dec. 19, 2000.


ENTRY ON MOTION FOR LEAVE TO APPEAL
HAMILTON.
**\*1** Mitsubishi International Corporation seeks leave
to appeal an interlocutory discovery order by the
Bankruptcy Court. The order in question ordered
Mitsubishi to produce documents and to pay the
opponents' costs, including fees, caused by
Mitsubishi's failure to respond to the document
requests.

The parties have submitted extensive briefs
addressing the merits of the Bankruptcy Court's
order, but this case drops out at this point at the more
basic level. There is no doubt that the Bankruptcy
Court's order of August 14, 2000, was an
interlocutory order. See *Reise v. Board of Regents,*
*957 F.2d 293, 295 (7th Cir.1992)* (discovery orders
are not final decisions and can, if erroneous, be
corrected on appeal after a final decision). The
district court therefore must grant leave for an appeal
before such an appeal can proceed. See 28 U.S.C. §
158(a)(3).

Other district courts have looked to 28 U.S.C. §
1292(b) and cases construing it for guidance as to
how they should exercise their discretion in such
cases under § 158(a)(3). See, *e.g., Gouveia v.*
*Internal Revenue Service,* 228 B.R. 412, 413
(N.D.Ind.1998); *In re Gracey,* 80 B.R. 675, 677-78
(E.D.Pa.1987), *aff'd mem.,* 849 F.2d 601 (3d
Cir.1988). This court does likewise, recognizing that
the standard under § 158(a)(3) may be more flexible
than under § 1292(b). See generally *Fruehauf Corp.*
*v. Jartran, Inc.,* 886 F.2d 859, 866 (7th Cir.1989)
(exercising jurisdiction over interlocutory appeal

from bankruptcy court; "we decline to read anything
into subsection (a) other than what it clearly says-that
interlocutory appeals may proceed with leave of the
district court").

Mitsubishi has not shown that the case turns on a
controlling question of law as to which there is
substantial ground for difference of opinion. Whether
to award costs as part of a discovery order is a
discretionary decision best made by the judicial
officer responsible for managing the case in question.
Mitsubishi has not identified a controlling question of
law here. See *Ahrenholz v. Board of Trustees of*
*University of Illinois,* 219 F.3d 674, 677 (7th
Cir.2000) (denying leave for interlocutory appeal of
denial of summary judgment because it did not
present "controlling question of law"; appropriate
question would be "a pure question of law, something
the court of appeals could decide quickly and cleanly
without having to study the record"). Mitsubishi's
proposed controlling questions of law are intensely
fact-specific, requiring close attention to the record in
this case.

Mitsubishi argues that it never had an opportunity to
be heard on the issue of costs, and it seeks to find a
general question of law in terms of its right to be
heard. In fact, the order in question in this case does
not specify an amount of costs, but contemplates an
additional opportunity for Mitsubishi to be heard on
the question of the amount. See August 14, 2000,
Order, Concl. of Law 18. In addition, Rule 37(a)(4)
and Rule 26(c) in effect presume that an award of
costs is appropriate when a motion for protective
order is denied. See Fed.R.Civ.P. 37, Advisory
Committee Notes for 1970 amendment to Rule
37(a)(4) ("The proposed change provides in effect
that expenses should ordinarily be awarded unless a
court finds that the losing party acted justifiably in
carrying his point to court."). To the extent the
Bankruptcy Court might have erred procedurally, and
this court does not mean to suggest that it did, there
remained (and still remains) ample opportunity for
the Bankruptcy Court to cure any perceived problem.
That opportunity weighs heavily against allowing an
interlocutory appeal of the discovery order.


**\*2** Mitsubishi also has failed to show how an
immediate appeal of this routine discovery order is
likely to advance the ultimate resolution of the case.
On the contrary, allowing leave to appeal such

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1902188 (S.D.Ind.)

**(Cite as: Not Reported in F.Supp.2d)**

Page 2

interlocutory discovery orders would be an invitation to numerous and disruptive delays while interlocutory appeals were considered. Cf. *Gouveia v. Internal Revenue Service,* 228 B.R. at 414 (interlocutory appeal would cause only delay and add expense).

Accordingly, the motion for leave to appeal is hereby denied, and this appeal is dismissed.

So ordered.

S.D.Ind.,2000.

Mitsubishi Intern. Corp. v. Prepetition Senior Lenders

Not Reported in F.Supp.2d, 2000 WL 1902188 (S.D.Ind.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.