# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------x
In re:                                          :        Chapter 11
                                                :
KAISER GROUP INTERNATIONAL,                     :        Case No. 00-2263 (MFW)
INC., et al.,                                   :        Adv. P. No. 01-928 (MFW)
                                                :
                              Debtors.          :        (Jointly Administered)
-----------------------------------------------------x
                                                :
KAISER GROUP INTERNATIONAL,                     :
INC., et al.,                                   :
                              Plaintiffs,       :
                                                :        C.A. No. 07-124 (JJF)
        - against -                             :
                                                :
ARCELORMITTAL STEEL OSTRAVA,                    :
a.s. and INTERNATIONAL FINANCE                  :
CORPORATION,                                    :
                                                :
                              Defendants.       :
-----------------------------------------------------x
                                                :
KAISER GROUP INTERNATIONAL,                     :
INC., et al.,                                   :
                              Plaintiffs,       :
                                                :        C.A. No. 07-125 (JJF)
        - against -                             :
                                                :
ARCELORMITTAL STEEL OSTRAVA,                    :
a.s. and INTERNATIONAL FINANCE                  :
CORPORATION,                                    :
                                                :
                              Defendants.       :
-----------------------------------------------------x
```

## MEMORANDUM OF LAW IN OPPOSITION TO DEBTORS' MOTION TO SUPPLEMENT THE RECORD OR, ALTERNATIVELY, TO REMAND THE CASE TO THE BANKRUPTCY COURT FOR RECONSIDERATION BASED ON NEWLY DISCOVERED EVIDENCE PURSUANT TO RULE 60(B)(2), AND IN SUPPORT OF CROSS-MOTION FOR DAMAGES AND COSTS

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ..................................................................................................1

RELEVANT FACTUAL BACKGROUND................................................................3

ARGUMENT ......................................................................................................6

I.     THE DEBTORS' REQUEST TO AMEND THE APPELLATE RECORD TO
       ADD "NEWLY DISCOVERED EVIDENCE" IS CONTRARY TO SETTLED
       LAW AND SHOULD BE DENIED.................................................................6

II.    THE DEBTORS HAVE FAILED TO ESTABLISH A BASIS FOR REMAND..............7

       A.     The Debtors Chose To Raise Reconsideration In This Court Rather Than
              In The Bankruptcy Court ..............................................................8

       B.     The Relief the Debtors Seek Is Unavailable Because Rule 60(b) Is
              Inapplicable To Interlocutory Orders.........................................9

       C.     The Debtors Have Nevertheless Failed To Meet Their Heavy Evidentiary
              Burden Under Rule 60(b)(2) .........................................................9

III.   THE COURT SHOULD GRANT NOVA HUT DAMAGES AND COSTS
       BECAUSE THE DEBTORS' MOTION IS FRIVOLOUS ON ITS FACE....................13

IV.    CONCLUSION.........................................................................................14

i

# TABLE OF AUTHORITIES

**PAGE**

**Federal Cases**

*Bohus v. Beloff*, 950 F.2d 919 (3d Cir. 1991) ....................................................................... passim

*Dean v. Brandywine Studios Inc.*,
    Civ. A. No. 99-679-KAJ, 2003 WL 299362 (D. Del. Feb. 10, 2003) .................................10, 12

*Goldstein v. MCI Worldcom*, 340 F.3d 238 (5th Cir. 2003) .............................................................8

*In re Application of Ariel Adan*, 437 F.3d 381 (3d Cir. 2006)..................................................6, 7, 13

*In re Elonex Phase II Power Mgmt. Litig.*, 279 F. Supp. 2d 521 (D. Del. 2003) ....................8, 13

*In re Halvajian (Halvajian v. Bank of New York)*, 216 B.R. 502 (D.N.J. 1998) ...........................6

*In re Kaiser Group Int'l (Kaiser Group Int'l v. Nova Hut a.s.)*, 307 B.R. 449 (D. Del. 2004).......4

*In re Martin-Trigona*, 795 F.2d 9 (2d Cir 1986)...........................................................................13

*LaSalle Nat. Bank v. First Connecticut Holding Group, LLC*, 287 F.3d 279 (3d Cir. 2002).........7

*Penn West Associates, Inc. v. Cohen*, 371 F.3d 118 (3d Cir. 2004) .................................................9

*Perricone v. Corr. Lieutenant Clarke*,
    Civ. A. No. 96-6248, 1999 WL 1067865 (E.D. Pa. Nov. 8, 1999) ...........................................11

*Plisco v. Union Railway Co.*, 379 F.2d 15 (3d Cir. 1967)...................................................9, 10, 12

*Torres v. Chater*, 125 F.3d 166 (3d Cir. 1997) .................................................................................9

*U.S. v. Mitchell*, 365 F.3d 215 (3d Cir. 2004)...................................................................................7

*United States ex rel. Mulvaney v. Rush*, 487 F.2d 684 (3d Cir. 1973)..............................................6

*Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc.*,
    Civ. A. No. 06-4003, 2008 WL 282742 (E.D. Pa. Jan. 31, 2008) ............................................11

*Venen v. Sweet*, 758 F.2d 117 (3d Cir. 1985) ...................................................................................8

*Zig Zag Spring Co. v. Comfort Spring Corp.*, 200 F.2d 901 (3d Cir. 1953)...................................8

**Federal Statutes**

28 U.S.C. § 1927.........................................................................................................................16, 17

**Federal Rules**

Fed. R. Evid. 201(b)............................................................................................................................7

Defendant ArcelorMittal Steel Ostrava, a.s. (formerly Nova Hut, a.s.) ("Nova Hut") respectfully submits this memorandum of law in Opposition to Debtors' Motion to Supplement the Record or, Alternatively, to Remand the Case to the Bankruptcy Court for Reconsideration Based on Newly Discovered Evidence Pursuant to Rule 60(b)(2), and in support of its separate motion for damages and costs pursuant to Rule 8020 of the Federal Rules of Bankruptcy Procedure and 28 U.S.C. § 1927.

## INTRODUCTION

The Debtors' Motion to Supplement the Record or, Alternatively, to Remand the Case to the Bankruptcy Court for Reconsideration Based on Newly Discovered Evidence Pursuant to Rule 60(b)(2) is one of a long line of unfounded motions filed in this Court, and in the Bankruptcy Court. Like their failed motion for discovery in the Bankruptcy Court from which they filed their improper interlocutory appeal, the Debtors' present motion to supplement or remand directly contradicts settled law in this Circuit, and is founded upon conjecture, not evidence. The Debtors' motion to supplement or remand should, therefore, be denied, and their interlocutory appeal should be dismissed.

The Debtors' motions, however, are not only baseless. The Debtors continue to file repeated motions to tarnish the reputations of third parties with rumor best left for second-rate gossip magazines. In the discovery motion that is the subject of their interlocutory appeal, the Debtors accused Nova Hut's law firm, Cleary Gottlieb Steen & Hamilton LLP ("Cleary, Gottlieb"), of improper influence of the arbitration panel that rejected the Debtors' claims. The "smoking gun" evidence upon which the Debtors purported to rest this tissue-thin allegation was that Cleary Gottlieb posted a notice of the arbitration decision on its public website. As

explained in Nova Hut's response to the Debtors' motion for interlocutory appeal, the assertion that its law firm engaged in improper activity is patently false.

In the same motion, the Debtors also accused the arbitration panel sanctioned by the International Chamber of Commerce (the "ICC") of corruption. Rather than accept the proven fact that the Debtors' subsidiary, Kaiser Netherlands, N.V. ("Kaiser Netherlands"), failed to design and construct a rolled-steel mill consistent with the terms of its agreement, the Debtors wrote off the arbitrators' 333-page reasoned decision as the product of arbitrator fraud. As explained in Nova Hut's response to the Debtors' motion for interlocutory appeal, there is no evidentiary basis for this falsehood either.

Having failed to conjure evidence to support their prior "arguments" that the lawyers and the arbitrators were part of a worldwide arbitration conspiracy, the Debtors now accuse the World Bank of "corruption" relating to the arbitrators' decision. The World Bank is an entity whose purpose is to facilitate economic development and to reduce worldwide poverty. The Debtors point to Paul Wolfowitz's promotion of a companion, "allegations" concerning a health care project in India, anticipated and unnamed "reports" involving a "project in Kazakhstan", and an ongoing business relationship between Defendant-Appellee International Finance Corporation ("IFC") -- one of Nova Hut's lenders -- and other ArcelorMittal-related companies, as the so-called "evidence" that the arbitration award was the product of fraud rather than fact. None of these allegations -- even assuming discovery would prove their validity -- have anything to do with the arbitration award. Indeed, the Debtors offer nothing more than conjecture to support their irrelevant allegations, choosing to forego documentary evidence and any declaration that would require a witness to swear to facts under penalty of perjury.

The time has come to put this case to rest. No measure of rumor or salacious gossip, much less a deep sea discovery expedition, can change the fact that the arbitration panel, sanctioned by the ICC governing body, received thousands of pages of evidence and days of testimony, and thereafter concluded that the Debtors were wrong, and awarded a judgment to Nova Hut based on breach of contract. The Debtors should no longer be permitted to drag Nova Hut, and a never-ending string of third parties, through the mud; the Debtors should no longer be permitted cause Nova Hut further unwarranted expense; and the Debtors should no longer waste the limited judicial resources of this Court and the Bankruptcy Court with motions that are unfounded in both fact and law. Stated simply, the Court should put an end to the Debtors' procedural games by denying their motion to supplement or remand, by dismissing their interlocutory appeal as improper, and by awarding Nova Hut its reasonable costs and fees.

## RELEVANT FACTUAL BACKGROUND

The following facts are those relevant to resolving the Debtors' motion to supplement or remand. Nova Hut respectfully refers the Court to its opposition to the Debtors' motion for interlocutory appeal for a more complete procedural and factual background of this action. (Adv. P. No. 01-928, D. I. 343)

This action relates to the Debtors' failure, through a wholly-owned subsidiary (Kaiser Netherlands), to design and construct a steel mill at Nova Hut's manufacturing facility in Ostrava, Czech Republic. Kaiser Netherlands was obligated to prove the steel mill performed to contract-mandated quality and quantity standards within a certain time period. Although the steel mill failed the tests, the Debtors believed they were entitled to final payment and other consideration. Under the agreement that governed the construction of the steel mill, the Debtors were incorrect.

The Debtors sought to litigate their dispute with Nova Hut in the Bankruptcy Court. The Debtors also sued one of Nova Hut's lenders, the IFC, for tortious interference with contract and with prospective business relations relating to the same agreement with Nova Hut that governed the construction of the steel mill.

On March 18, 2004, this Court ordered further proceedings stayed, and compelled the Debtors to arbitrate their claims against Nova Hut. *In re Kaiser Group Int'l (Kaiser Group Int'l v. Nova Hut a.s.)*, 307 B.R. 449 (D. Del. 2004).

For two years, the Debtors' wholly-owned subsidiary, Kaiser Netherlands, represented by the Debtors' managers and lawyers, conducted discovery and engaged in proceedings under the Rules of Arbitration of the International Chamber of Commerce, in Austria, under Austrian law. On April 26, 2006, the arbitration panel issued a 333-page Final Award that resolved all potential factual issues relating to the claims asserted against Nova Hut in this action.

Based upon the facts resolved by the arbitrators in their reasoned Final Award and the direct privity among the Debtors and Kaiser Netherlands, on December 13, 2006, Nova Hut moved for summary judgment against the Debtors' claims in this case under the doctrines of *res judicata* and collateral estoppel. In response, the Debtors cross-moved for discovery, pursuant to Fed. R. Bankr. P. 2004, Fed. R. Civ. P. 56(f), and the antiquated doctrine of equitable bill of discovery, that is the subject of the present appeal.

On April 25, 2007, the Bankruptcy Court considered the Debtors' discovery motion, and ruled that because the Debtors' claims were to be arbitrated, "discovery will be conducted in accordance with the arbitration rules that are applicable to that arbitration." (Exh.

"A" hereto [Hearing Tr.] at 39.)  On May 31, 2007, the Bankruptcy Court entered an order denying the Debtors' motion for discovery in accordance with the prior hearing.

On June 8, 2007, the Debtors filed a notice of appeal and motion in this Court for leave to appeal the interlocutory discovery order.  The complete record of the discovery motion was transmitted the Clerk of this Court on June 20, 2007.

The present motion to supplement the appellate record or to remand follows.  By their present motion, the Debtors seek to add so-called "newly discovered evidence" to the appellate record.  Other than making conclusory allegations, the Debtors do not bother to identify or verify the alleged "newly discovered evidence", much less the facts the alleged "evidence" proves, whether the alleged "evidence" is material, or whether the alleged "evidence" would likely have changed the outcome of the discovery order.  The Debtors also incorrectly point to state law that is nevertheless off the point to resolve this federal procedural question.  In short, the Debtors have failed at every level to furnish a basis in fact or in law for this Court to permit the appellate record to be supplemented, or for the extraordinary relief they request under Rule 60(b)(2) of the Federal Rules of Civil Procedure.

For these reasons and for the reasons set forth below, the Debtors' motion should be denied, and their request for interlocutory appeal dismissed.  In addition, the Court should award Nova Hut its damages and costs associated with the Debtors' motion.

## ARGUMENT

I.  **THE DEBTORS' REQUEST TO AMEND THE APPELLATE RECORD TO ADD "NEWLY DISCOVERED EVIDENCE" IS CONTRARY TO SETTLED LAW AND SHOULD BE DENIED**

Under Rule 8006 of the Federal Rules of Bankruptcy Procedure, the record on an appeal from the Bankruptcy Court is limited to the "items so designated by the parties, the notice of appeal, the judgment, order, or decree appealed from, and any opinion, findings of fact, and conclusions of law of the court." *See In re Halvajian (Halvajian v. Bank Of New York)*, 216 B.R. 502, 509 (D.N.J. 1998) (district court "is limited to review of the evidence before the Bankruptcy Court and which was made a part of the record at the time the [underlying] decision was rendered"). The Debtors designated the record in this interlocutory appeal on June 18, 2007. The Debtors now seek to amend the record to add unidentified "newly discovered evidence." (Motion at 2 and ¶ 11.) The Debtors' motion should be denied.

In *In re Application of Ariel Adan*, 437 F.3d 381, 388 n.3 (3d Cir. 2006), the Third Circuit confirmed that submitting "newly discovered evidence" on appeal is reserved for the most "extraordinary circumstances." The *only circumstances* under which "newly discovered evidence may be considered are facts" that "render the case moot or alter the appropriateness of injunctive relief, a change in pertinent law, or facts of which a court may take judicial notice." *Id.*[1] Nothing in the Debtors' motion even attempts to meet the Third Circuit's standard to amend the appellate record, and with good reason.

Here, the yet-to-be-identified "evidence" consisting of "allegations" and "new reports" that are "expected to surface" purportedly concern whether the IFC "may have acted improperly

---

[1] Courts may also amend the record "to correct inadvertent omissions, not to introduce new evidence." *Adan*, 437 F.3d at 388 n.3; *see United States ex rel. Mulvaney v. Rush*, 487 F.2d 684, 687 n.5 (3d Cir. 1973) ("The purpose of the rule is to permit correction or modification of the record transmitted to the Court of Appeals so that it adequately reflects what happened in the District Court."). Nothing in the Debtors' motion suggests that the current record omits evidence submitted to the Bankruptcy Court.

in this matter." (Motion ¶¶ 3, 4, 13.) The Debtors do not seek to supplement the record to render their own appeal "moot", to alter the appropriateness of "injunctive relief", or to alert the Court to "a change in pertinent law." *Adan*, 437 F.3d at 388 n.3. Moreover, judicial notice is inapplicable to unidentified "allegations" and anticipated "new reports." Even assuming that allegations and anticipated reports constitute facts, such "facts" are, by definition, "subject to reasonable dispute." Fed. R. Evid. 201(b); *see U.S. v. Mitchell*, 365 F.3d 215, 252 n.30 (3d Cir. 2004) ("Matters like 'February 7, 1977 was a Monday' [a fact] are suitable for judicial notice, while propositions like 'daily exercise reduces the likelihood of heart disease' [a scientific conclusion] are not."). The Debtors have not even argued that the so-called "allegations" and anticipated "new reports" contain facts "generally known" in this District, or are "capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned" as is required before judicial notice is warranted. Fed. R. Evid. 201(b); *LaSalle Nat. Bank v. First Connecticut Holding Group, LLC*, 287 F.3d 279, 290 (3d Cir. 2002). In short, because the unidentified "evidence" the Debtor seeks to add to the record does not fall within any of the "categories" under which the Third Circuit permits a supplemented record, this Court "cannot consider" the evidence as a matter of law. *Adan*, 437 F.3d at 388 n.3.

## II.    THE DEBTORS HAVE FAILED TO ESTABLISH A BASIS FOR REMAND

The Debtors request, in the alternative, that the Court remand this case back to the Bankruptcy Court to enable them to submit the unidentified "evidence" in that forum as part of a motion under Rule 60(b)(2) of the Federal Rules of Civil Procedure. The Debtors have failed to meet their heavy burden to justify remand.

## A.    The Debtors Chose To Raise Reconsideration In This Court Rather Than In The Bankruptcy Court

The Debtors were accorded a clear choice under the law concerning the forum in which to file their motion under Rule 60(b)(2) of the Federal Rules of Civil Procedure.  In the first instance, the Debtors could have filed their Rule 60(b)(2) motion in the Bankruptcy Court.  As the trial level court, the Bankruptcy Court was empowered to "entertain and to deny" the motion based upon the evidence submitted.  *Venen v. Sweet*, 758 F.2d 117, 123 (3d Cir. 1985); *accord In re Elonex Phase II Power Mgmt. Litig.*, 279 F. Supp. 2d 521, 523 (D. Del. 2003) ("Under Third Circuit precedent, the court has jurisdiction to entertain and deny [the movant's] motion notwithstanding [the movant's] notice of appeal.").  If the Bankruptcy Court was inclined to grant the motion, it would certify to this Court -- as the appellate court -- "its inclination or its intention" to grant the motion, and this Court could then "entertain a motion to remand the case." *Id.*  The Debtors chose to dispense with this procedure.

Instead, the Debtors moved in the first instance in this Court for a remand.  Having chosen their present procedural route, the Debtors were required to meet the elements of Rule 60(b)(2) with admissible evidence, and prove that it is "probable" the alleged "newly discovered evidence" would "produce a different trial result." *Zig Zag Spring Co. v. Comfort Spring Corp.*, 200 F.2d 901, 908 (3d Cir. 1953); *accord Bohus v. Beloff*, 950 F.2d 919, 930 (3d Cir. 1991) (Rule 60(b)(2) requires new evidence "would probably have changed the outcome of the trial"); *Goldstein v. MCI Worldcom*, 340 F.3d 238, 257 (5th Cir. 2003) (it is "self-evident that the newly-discovered evidence be both admissible and credible").  The Debtors have failed in their burden in every respect, and therefore a remand is unwarranted.

**B.    The Relief the Debtors Seek Is Unavailable Because
Rule 60(b) Is Inapplicable To Interlocutory Orders**

On its face, Rule 60(b) provides for potential "relief from a *final* judgment, order, or

proceeding."   Fed. R. Civ. P. 60(b) (emphasis added).   Based upon its clear language, the Third

Circuit has repeatedly confirmed that Rule 60(b) applies to "applies only to 'final' judgments and

orders." *Penn West Associates, Inc. v. Cohen*, 371 F.3d 118, 124 (3d Cir. 2004), *citing Torres v.

Chater*, 125 F.3d 166, 168 (3d Cir. 1997).   By their motion for permission to appeal, the Debtors

readily conceded that the discovery order was interlocutory.   [Adv. P. No. 01-928, D. I. 340]

Accordingly, under the express provisions of Rule 60(b), and the repeated decisional law of the

Third Circuit, the Debtors' requested relief is a non-starter, and should be denied.

**C.    The Debtors Have Nevertheless Failed To Meet Their
Heavy Evidentiary Burden Under Rule 60(b)(2)**

The Third Circuit has declared that the "movant under Rule 60(b) 'bears a heavy burden'

. . . which requires 'more than a showing of the potential significance of the new evidence.'"

*Bohus*, 950 F.2d at 930, *quoting Plisco v. Union Railway Co.*, 379 F.2d 15, 16-17 (3d Cir. 1967).

Here, the Debtors are required to identify "newly discovered evidence" that is admissible, and

then prove that the evidence "is (1) material and not merely cumulative, (2) could not have been

discovered prior to trial through the exercise of reasonable diligence, *and* (3) would probably

have changed the outcome of the trial."   *Id*.   Recognizing the potential for repeated and

piecemeal litigation, the Third Circuit has made it clear that "[w]e view Rule 60(b) motions as

'extraordinary relief which should be granted only where extraordinary justifying circumstances

are present.'"  *Id.*, *quoting Plisco*, 379 F.2d at 16.

The Debtors have not even identified the so-called "newly discovered evidence" and

demonstrated its admissibility, much less submitted proof or attempted to argue that the elements

of Rule 60(b)(2) can be satisfied.   Even providing the Debtors every benefit of the doubt -- to

which they are not entitled under the heavy evidentiary burden declared by the Third Circuit --

the only "new" facts they potentially identify are (1) Paul Wolfowitz was "forced to resign just

last year because of allegations of impropriety" (Motion ¶ 2), (2) "significant allegations"

relating to a health care project in India (*id.*), (3) anticipated and unnamed "reports of

corruption" involving "suspect conditions" involving a "project in Kazakhstan" (*id.* ¶ 3), (4) the

IFC "seems to have favored Mittal steel in business transactions" (*id.* ¶ 15), and (5) the IFC

played an "extraordinary role . . . in the affairs of Nova Hut" (*id.* ¶ 28).   Other than alleging these

so-called facts in their motion, the Debtors fail to submit any underlying "evidence" in

admissible form to support these so-called facts.   Accordingly, the Debtors' motion is devoid of

substance as they have failed to submit even a scintilla of proof that there is, in fact, "newly

discovered evidence" from which the Bankruptcy Court can make further factual findings.   For

this separate reason, the motion to remand should be denied.   *See, e.g., Dean v. Brandywine*

*Studios Inc.*, Civ. A. No. 99-679-KAJ, 2003 WL 299362 at *3 (D. Del. Feb. 10, 2003) (rejecting

"bare assertion[s]" as a basis for Rule 60(b)(2) relief because the motion was "devoid of

substance").

Nor have the Debtors even attempted to explain how the unidentified "newly discovered

evidence" is "material".   *Bohus*, 950 F.2d at 930.   None of the so-called "reports" or

"allegations" that the Debtors identified as "example[s]" (Motion ¶ 2) have anything to do with

the issues in this appeal.   Whether someone was hired for a position within the World Bank,

whether there have been "allegations" relating to a health care project in India, whether there are

anticipated "reports" involving a project in Kazakhstan, whether the IFC "seems to have"

favored Mittal in other business transactions (*id.* ¶ 15), and whether the IFC played an

"extraordinary role" in Nova Hut's affairs are facts relating to those matters.   The issues in this

appeal concern whether the Debtors are entitled to discovery outside of arbitration, and more broadly, whether there was some untoward influence upon an arbitration panel, applying Austrian law to contract claims, relating to a steel mill project in the Czech Republic. None of the potential "new" facts comes close to being related to discovery in arbitration or the legitimacy of the arbitration panel. The Debtors' motion should, therefore, be denied because the "allegations" and anticipated "new reports" – even assuming they were identified and were proven admissible in evidence – are not material. *See, e.g., Perricone v. Corr. Lieutenant Clarke*, Civ. A. No. 96-6248, 1999 WL 1067865 at *1 (E.D. Pa. Nov. 8, 1999) (denying relief under Rule 60(b)(2) where the movant "failed to show that [the new evidence was] material").

The Debtors also have failed to prove that the so-called "newly discovered evidence" could not have been discovered "prior to trial through the exercise of reasonable diligence." *Bohus*, 950 F.2d at 930. Many of the proposed "facts" to which the Debtors point relate to matters widely reported in the press. For example, *The New York Times*, among hundreds of other publications, reported the resignation of Mr. Wolfowitz when it happened back in May, 2007 after a long public debate. Steven R. Weisman, *Wolfowitz Resigns, Ending Long Fight at World Bank*, N.Y. TIMES, May 18, 2007 at A1 (Exh. "B" hereto). Another "example" is that the ArcelorMittal-related entity purchase of a steel mill in Kazakhstan, and its loan from the IFC, was disclosed in a world wide press release back in 1998. http://www.ebrd.com/new/pressrel/1998/18apr14.htm (Exh. "C" hereto). To suggest, without proof, that the yet to be identified "evidence" could not be discovered is simply false. *Urban Outfitters, Inc. v. BCBG Max Azria Group, Inc.*, Civ. A. No. 06-4003, 2008 WL 282742 at * 10 (E.D. Pa. Jan. 31, 2008).

Perhaps most dispositive of the Debtors' motion is their failure in their "heavy burden" to establish that the purported "evidence" would have changed the outcome in the Bankruptcy Court. *Bohus*, 950 F.2d at 930. It bears repeating that before relief under Rule 60(b)(2) may even be considered, the Debtors were required do more than show "'the potential significance of the new evidence.'" *Id.*, quoting *Plisco*, 379 F.2d at 16-17. Here, the Debtors have not even identified the "new evidence". And assuming the "allegations" and anticipated "new reports" constitute admissible "new evidence" -- which they do not -- the most the Debtors are able to muster, despite an investigation by "a major and reputable international investigation firm", is that the new evidence may support their "*belief* that the IFC *may have acted* improperly in this matter" and it "*may change* the result in the Bankruptcy Court." (Motion ¶¶ 4, 9, 10) (emphasis added). Thus, the Debtors argue nothing more than the "potential significance" of potential new evidence -- an argument falling well-short of their "heavy burden" to prove that actual and admissible new evidence would have changed the outcome in the Bankruptcy Court. Under these circumstances, "extraordinary relief" under Rule 60(b)(2) is also inappropriate as a matter of law. *See, e.g., Bohus*, 950 F.2d at 930 ("abuse of discretion" for district court to grant relief where the "record was devoid of the 'extraordinary justifying circumstances'" and the new evidence "would not have changed the outcome"); *Dean*, 2003 WL 299362 at *3 (denying relief because "it is questionable that defendants could have shown, even if they had gone through the trouble of providing argument and authorities, that the evidence was material . . . and that it would 'would probably have changed the outcome of the trial'").

*    *    *    *

In short, the Debtors motion to supplement the appellate record or to remand should be denied. The purpose of the Debtors' motion is to inject seemingly irrelevant unidentified "new

evidence" into the appellate record without even attempting to meet the requirements to supplement, or their "heavy burden" under Rule 60(b)(2) for an appropriate remand.

## III.    THE COURT SHOULD GRANT NOVA HUT DAMAGES AND COSTS BECAUSE THE DEBTORS' MOTION IS FRIVOLOUS ON ITS FACE

Because this Court sits as an appellate court in this matter, it is empowered to grant Nova Hut damages and costs.  Pursuant to Rule 8020, a "district court" sitting as an appellate court a bankruptcy appeal may "award just damages and single or double costs to the appellee" for a frivolous appeal.  Likewise, 28 U.S.C. § 1927 empowers the court to grant the "excess costs, expenses, and attorneys fees reasonably incurred, as a result of conduct that multiplies the proceedings."  The appellate damages and costs provisions apply in connection with frivolous motions.  *See, e.g., In re Martin-Trigona*, 795 F.2d 9 (2d Cir. 1986).  And they also apply to "facially meritless" motions pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.  *In re Elonex*, 279 F. Supp. 2d at 523.

As explained above, the only bases approved by the Third Circuit to amend an appellate record are the "extraordinary circumstances" that "render the case moot or alter the appropriateness of injunctive relief, a change in pertinent law, or facts of which a court may take judicial notice," or "to correct inadvertent omissions."  *Adan*, 437 F.3d at 388 n.3.  In their motion to supplement, the Debtors offer none of these reasons for requesting that the Court permit an amendment to the record, and do not even identify the so-called "newly-discovered evidence" that they request be added to the record.  Nova Hut and this Court are therefore left to guess the nature of the evidence, which nonetheless would not be permissible supplement as a matter of settled law.  The Debtors' motion in this regard, accordingly, is "facially meritless" both as a matter of fact and law.

The Debtors' request to remand for consideration pursuant to Rule 60(b)(2) is also "facially meritless." As explained above, the Debtors chose this appellate Court as the forum in which to vet their motion for reconsideration. The settled law in this Circuit required the Debtors to meet a "heavy burden" to prove, with evidence, the elements of Rule 60(b)(2). The Debtors failed to submit the so-called "newly discovered evidence", and made it clear that they were relying upon inadmissible "allegations" and anticipated "new reports" as the basis for their motion. They then relied upon the unproven allegations and speculation of new reports to accuse the World Bank and the IFC of corruption, even though the allegations and anticipated reports -- even if proven true -- have nothing to do with this appeal.

Stated simply, the Debtors' entire motion is frivolous, as is their interlocutory appeal from a discovery order. Through this opposition, Nova Hut was required to incur costs and fees to respond to the Debtors' frivolous motion. The Court should, therefore, award Nova Hut damages and costs pursuant to Fed. R. Bank. P. 8020 and 28 U.S.C. § 1927.

## IV.    CONCLUSION

WHEREFORE, Nova Hut requests that the Court: (i) enter an order denying the Debtors' Motion in its entirety; (ii) enter an order in the form attached hereto granting Nova Hut its damages and costs; and (iii) grant such other and further relief as just and proper.

Dated: March 17, 2008                    GREENBERG TRAURIG, LLP


                                         Victoria Watson Counihan (No. 3488)
                                         Dennis A. Meloro (No. 4435)
                                         The Nemours Building
                                         1007 North Orange Street, Suite 1200
                                         Wilmington, Delaware 19801
                                         (302) 661-7000
                                         counihanv@gtlaw.com
                                         melorod@gtlaw.com

— and —

Adam D. Cole
GREENBERG TRAURIG, LLP
885 Third Avenue
New York, New York 10022
(212) 848-1000

*Attorneys for ArcelorMittal Steel Ostrava, a.s.*
*(formerly Nova Hut, a.s.)*

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Chapter  11 |
| | . | |
| Kaiser Group International, | . | |
| Inc., et al., | . | |
| | . | Bankruptcy #00-2263 (MFW) |
| Debtor(s). | . | thru       #00-2301 (MFW) |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

| | | |
|---|---|---|
| Kaiser Group International, | . | |
| Inc., et al., | . | |
| | . | |
| Plaintiff(s) | . | |
| | . | |
| vs. | . | |
| | . | |
| Nova Hut, A.S., et al., | . | |
| | . | |
| Defendant(s). | . | Adversary #01-928 (MFW) |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Wilmington, DE
April 25, 2007
3:00 p.m.

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For The Debtor(s):

Mark Minuti, Esq.
Saul Ewing, LLP
222 Delaware Ave.
Wilmington, DE 19899

George E. Rahn, Jr. Esq.
Saul Ewing, LLP
Central Square West
1500 Market St.-38th Fl.
Philadelphia, PA 19102

2

```
                                 Jonathan M. Landers, Esq.
                                 Gibson Dunn & Crutcher, LLP
                                 333 South Grand Ave.
                                 Los Angeles, CA 90017

For Nova Hut, AS:                Victoria W. Counihan, Esq.
                                 Greenberg Traurig, LLP
                                 The Nemours Bldg.
                                 1007 North Orange Street-Ste. 1200
                                 Wilmington, DE 19801

                                 Annapoorni R. Sankaran, Esq.
                                 Greenberg Traurig, LLP
                                 One International Place-20th Fl.
                                 Boston, MA 02110

For The International:           Robert J. Stearn, Jr., Esq.
Finance Corporation              Richards Layton & Finger,
                                 One Rodney Square
                                 Wilmington, DE 19899

                                 Warren Zirkle, Esq.
                                 McGuire Woods, LLP
                                 1750 Tysons Blvd.-Ste. 1800
                                 McLean, VA 22102

Audio Operator:                  Brandon McCarthy

Transcribing Firm:               Writer's Cramp, Inc.
                                 6 Norton Rd.
                                 Monmouth Jct., NJ 08852
                                 732-329-0191
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

35

1  arbitration provision?

2          THE COURT:  Well, because --

3          MR. RAHN:  Did the arbitrator --

4          THE COURT:  The ICC has the right to set their

5  procedures, and what gives some other Court the right to

6  interfere with that?  I mean, that's the way I view this.

7          MR. RAHN:  Okay, well --

8          THE COURT:  Me granting discovery of claims you may

9  have before them?

10         MR. RAHN:  I don't believe that's an interference with

11 their rights to handle the case.  It's merely -- it may

12 supplement.  It -- this is a case before this Court.  You

13 haven't washed your hands of it.

14         THE COURT:  Well, it's been --

15         MR. RAHN:  You've stayed it, that's true.

16         THE COURT:  It's been stayed.

17         MR. RAHN:  Yeah, it's been stayed.  There's no

18 question about it and we're not arguing about that.  We're not

19 -- it's Nova Hut that's arguing about it being stayed, not us.

20 For them to come in and say, "We want to lift the stay" --

21         THE COURT:  Well, that's not before me today.

22         MR. RAHN:  Okay, but that's a -- it is a little bit

23 ironic that they want to lift it just a little bit, just a

24 little bit.  And I'll bet if you -- when Your Honor denies

25 their motion, they'll want to shut it down again.  So -- and

36

1  that's the situation we're in here today.  The IFC --

2          THE COURT:  Well, why did you wait 2 years to seek

3  discovery under Rule 2004?

4          MR. RAHN:  Well, frankly, because we wanted to see

5  what the result of the arbitration was.  We have limited

6  resources.  We can't -- we have to preserve the estate's

7  resources, and if -- we wanted to see what the result was.  We

8  did seek discovery back when we were opposing the Motion for a

9  Stay.  So it's not as though -- it's not as though we haven't

10 sought, repeatedly in this Court, discovery.  It's not as

11 though you can say we've sat on our hands.  Yes, we didn't come

12 back while the arbitration was going on and seek 2004

13 discovery.  And it wasn't until the Fall of 2006 that we

14 discovered this website posting, which, by the way, is not part

15 of the adversary proceeding.  A claim -- our claim concerning

16 the impropriety, or a potential investigation of the

17 impropriety, is not part of the adversary proceeding.  So that

18 ought to go ahead under any circumstance.

19         THE COURT:  But it is implicated by the arbitration.

20         MR. RAHN:  Yes.

21         THE COURT:  I mean, it's --

22         MR. RAHN:  But we're not --

23         THE COURT:  It's a matter --

24         MR. RAHN:  But --

25         THE COURT:  -- for the arbitrators to decide, is it

37

1 not?

2        MR. RAHN:  We haven't -- we have tried.  We tried to

3 get the ICC to look -- to investigate the matter and we were

4 rejected.  And also, the IFC -- the IFC's argument, Your Honor,

5 is that if you take any one of these matters on its own, then

6 perhaps that doesn't rise to a sufficient level to give anybody

7 cause to -- pause to think that there should be discovery.  But

8 that's not what our motion is.  Our motion is that the totality

9 of circumstances gives us the right and the suspicion that

10 something went awry.  It wasn't just that the posting of the

11 website or the dating of the website, which we cannot determine

12 without discovery when that was actually posted, it's also the

13 content of that document.  The document said that they didn't

14 even try very hard and didn't contest that we passed the

15 performance test very hard.  And it also said that the mill has

16 reached record production levels in Cleary Gottlieb's website.

17 It's not what we put in the website.  So they said in spite of

18 the fact that they didn't contest that Kaiser passed the

19 performance test very hard, and despite the fact that there

20 were record production levels at this plant, they still won.

21 Now, how did that happen?  That's what -- that's from their

22 lawyers.

23        And also, when you have this history that we've recited in

24 Dr. Berecov's affidavit of statements that the IFC was going to

25 control whether we passed the test or not, the IFC was going to

38

1    control all aspects of this project, which the IFC has not

2    contested in any affidavit --

3            THE COURT:  Because no arbitration has been filed

4    against them.  That issue is not going to be decided by me.

5    Didn't I already decide that?

6            MR. RAHN:  Well, they haven't moved to lift that stay,

7    nor have we, you're right.

8            THE COURT:  All right.

9            MR. RAHN:  But we still believe we should be entitled

10   to an examination of the facts surrounding this -- the website

11   posting and discovery from the IFC.  Thank you, Your Honor.

12           THE COURT:  Thank you.  Well, let me do this.  I think

13   I must deny the Motion for Discovery.  I think that in some

14   respects the arguments are similar to the arguments that were

15   made in connection with the Motions to Stay the Adversary

16   Proceedings.  And for the reasons I and the District Court

17   decided those motions, I'm going to also decline to extend the

18   right of the Debtor to conduct discovery under either Rule 2004

19   or an Equitable Bill of Discovery.  I think that as stated in

20   my prior decision, the parties generically agreed to

21   arbitration and that any claims under the contract should go to

22   arbitration.  I think the parties are bound by the rules of the

23   arbitral proceeding, and therefore, the ICC rules will apply.

24   I am not aware, as I asked the Debtor and the Debtor concedes,

25   they are not aware of any cases that have held a Debtor's

39

1   entitled to discovery under Rule 2004 or any other basis while
2   another proceeding is pending, whether it be an adversary or,
3   specifically, an arbitration.  And I have not found any case
4   dealing with an arbitration.  Instead of seeing this as a novel
5   issue, I think the reason we don't see decisions is that it's
6   implicit in staying a matter and allowing it to proceed to
7   arbitration that all discovery will be conducted in accordance
8   with the arbitration rules that are applicable to that
9   arbitration.  So I'll just deny the motions.  I don't think
10  anything more need be said.
11      Do the -- well, there is one point.  To the extent that
12  the integrity of the arbitration award is being contested, I
13  think I made it clear that it's not before me.  I think it
14  needs to proceed before the appropriate parties, and I don't
15  think it's proper for me to interfere with the arbitration
16  proceeding or any appeal, using that term generically, of the
17  arbitration proceeding by permitting discovery under bankruptcy
18  rules.  So again, I'll deny the motion.  Okay?  We'll stand
19  adjourned then, I think.
20      MR. MINUTI:  Your Honor, we'll prepare a short order
21  and circulate it to the parties and then submit it to Chambers.
22      THE COURT:  All right.
23      MR. MINUTI:  That completes our agenda.  Thank you,
24  Your Honor.
25      THE COURT:  All right.  Thank you.

40

1                  ALL:  Thank you, Your Honor.

2             (Court adjourned)

3

4                        CERTIFICATION
5   I certify that the foregoing is a correct transcript from the
6   electronic sound recording of the proceedings in the above-
7   entitled matter.
8

9   *Lewis Parham*                          5/3/07

10  _____             _____
11  Signature of Transcriber                 Date

# EXHIBIT B

**The New York Times**
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY


May 18, 2007

# Wolfowitz Resigns, Ending Long Fight at World Bank

By STEVEN R. WEISMAN

Correction Appended

WASHINGTON, May 17 — Paul D. Wolfowitz, ending a furor over favoritism that blew up into a global fight over American leadership, announced his resignation as president of the World Bank Thursday evening after the bank's board accepted his claim that his mistakes at the bank were made in good faith.

The decision came four days after a special investigative committee of the bank concluded that he had violated his contract by breaking ethical and governing rules in arranging the generous pay and promotion package for Shaha Ali Riza, his companion, in 2005.

The resignation, effective June 30, brought a dramatic conclusion to two days of negotiations between Mr. Wolfowitz and the bank board after weeks of turmoil.

"He assured us that he acted ethically and in good faith in what he believed were the best interests of the institution, and we accept that," said the board's directors in a statement issued Thursday night. "We also accept that others involved acted ethically and in good faith."

In the carefully negotiated statement, the bank board praised Mr. Wolfowitz for his two years of service, particularly for his work in arranging debt relief and pressing for more assistance to poor countries, especially in Africa. They also cited Mr. Wolfowitz's work in combating corruption, his signature issue.

Mr. Wolfowitz said he was grateful for the directors' decision and, referring to the bank's mission of helping the world's poor, added: "Now it is necessary to find a way to move forward. To do that I have concluded that it is in the best interests of those whom this institution serves for that mission to be carried forward under new leadership."

Mr. Wolfowitz's negotiated departure averted what threatened to become a bitter rupture between the United States and its economic partners at an institution established after World War II. The World Bank channels $22 billion in loans and grants a year to poor countries.

Case 1:07-mc-00124-UF    Document 9-2    Filed 03/17/2008    Page 2 of 4

But he left behind a place that must heal its divisions and overhaul a flawed, cumbersome structure that had allowed the controversy over Mr. Wolfowitz to spread out of control.

People close to the negotiations said that Mr. Wolfowitz had agreed not to make major personnel or policy decisions between now and June 30. Some bank officials said he might go on an administrative leave and cede day-to-day functions to an acting leader, but that might not be decided until Friday.

President Bush earlier in the day praised Mr. Wolfowitz at a news conference but signaled that the end was near by saying he regretted "that it's come to this." A White House spokesman, Tony Fratto, said, "We would have preferred that he stay at the bank, but the president reluctantly accepts his decision."

More important for the bank's future, Mr. Fratto said, President Bush will soon announce a candidate to succeed Mr. Wolfowitz, quashing speculation that the United States would end the custom, in effect since the 1940s, of the American president picking the bank president.

Many European officials previously indicated that they would go along with the United States' picking a successor if Mr. Wolfowitz would resign voluntarily, as he now has.

Treasury Secretary Henry M. Paulson Jr. said Thursday that he would "consult my colleagues around the world" before recommending a choice to Mr. Bush, in what seemed to be an effort to assure allies that the United States would not repeat what happened in 2005 when Mr. Bush surprised them by selecting Mr. Wolfowitz, then a deputy secretary of defense and an architect of the Iraq war.

Leaders of Germany and France objected but decided not to make a fight over the choice and risk reopening wounds from their opposition to the war two years earlier. Some also argued that Mr. Wolfowitz, as a conservative seeking to write a new chapter in a career that had been focused on national security, might bring new support to aiding the world's poor.

Soon after Mr. Wolfowitz took office, however, he engaged in fights in various quarters at the bank over issues including his campaign against corruption, in which he suspended aid to several countries without consulting board members, and his reliance on a small group of aides.

Mr. Wolfowitz's resignation, while ending the turmoil that erupted in early April over the disclosure of his role in arranging Ms. Riza's pay and promotion package, will not by itself repair the divisions at the bank over his leadership, bank officials said Thursday evening.

Case 1:07-mc-00124-JF  Document 9-3    Filed 03/17/2008    Page 3 of 4

By all accounts, the terms of Mr. Wolfowitz's exoneration left a bitter taste with most of the 24 board members, who represent major donor countries, as well as clusters of smaller donor and recipient countries. Most had wanted to adopt the findings of the special board committee that determined he had acted unethically on the matter of Ms. Riza.

But the closest the board came to criticizing Mr. Wolfowitz was saying in that "a number of mistakes were made by a number of individuals in handling the matter under consideration and that the bank's systems did not prove robust to the strain under which they were placed."

Also angered was the bank's staff association, which had called for Mr. Wolfowitz's resignation in early April. The bank's internal blogs were filled with denunciations of the action on Thursday evening.

Late in the evening, the association issued a statement saying, "Welcome though it is, the president's resignation is not acceptable under the present arrangement," and that it "completely undermines the principles of good governance and the principles that the staff fight to uphold."

The association represents most of the 7,000 full-time employees at the bank in Washington. Their unhappiness could be a crucial factor in the bank board's ability to heal the wounds left by the fight over Mr. Wolfowitz. It appeared likely that after Mr. Wolfowitz's departure there would be a departure of several top aides, including Robin Cleveland, who officials said was involved in the negotiations over the statements accompanying his departure.

During the day, as word spread throughout the institution that Mr. Wolfowitz was close to a deal, some officials said that one of the obstacles was his compensation package. But there was no information Thursday night on whether he would receive any sort of severance package or pension, or be reimbursed for legal fees from his long battle.

Mr. Wolfowitz's after-tax salary was $391,440 beginning July 1, 2005. His contract calls for him to be paid a year's salary if he is terminated, but it was unclear whether his resignation would be considered a termination as defined by the contract.

Mr. Wolfowitz's fight for vindication was led by his lawyer, Robert S. Bennett, and negotiated at the bank by the British director, Thomas Scholar, a close associate of Gordon Brown, the chancellor of the Exchequer who is to become prime minister this summer.

Correction: May 22, 2007

A front-page article on Friday about the resignation of Paul D. Wolfowitz as president of the World Bank referred incorrectly to the pay package for the job. It was the previous World Bank president — not Mr. Wolfowitz — who was paid a salary of $302,470 and expenses of $141,290 in 2004. (Mr. Wolfowitz, who did not arrive at the bank until 2005, was paid an after-tax salary of $391,440 beginning July 1, 2005. )

Copyright 2007 The New York Times Company

Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map

# EXHIBIT C

 HOME

About the EBRD
**News & events**
 Press releases
 Feature stories
 Speeches & articles
 Video & photos
 Calendar of events
 Annual meeting
Publications
Countries & topics
Projects
Apply for financing
Environment
Capital markets
Working together

[ Search ]

Home > News & events > 1998 press releases > EBRD and IFC launch "landmark" syndicat...

# press release

14 April 1998

### EBRD and IFC launch "landmark" syndicated loan for giant steel company, Ispat Karmet, in Kazakhstan

The European Bank for Reconstruction and Development (EBRD) and the International Finance Corporation (IFC) today launched their largest syndicated loan to date in the Commonwealth of Independent States (CIS), a US$ 250 million loan for Ispat Karmet in Kazakhstan.

The loan is the leading element of a US$ 450 million financing package provided jointly by the EBRD and the IFC to Ispat Karmet, one of the world's largest single-site integrated steel plants with two captive power plants and 15 coal mines. As well as being the largest commercial enterprise in Kazakhstan, the company is a member of the fastest-growing steel conglomerate in the world, the LNM Group, which recently announced its intention to acquire one of the largest US steel companies, Inland Steel.

The Ispat Karmet financing package is the first for a major private industrial company in Kazakhstan and the largest financing ever provided for a privatised enterprise in the country. In addition to the EBRD and IFC loans, US$ 350 million of the investment package totalling over US$ 800 million is being funded by Ispat Karmet from internally generated cash flow.

Led by the EBRD and the IFC, two major multilateral financial institutions with extensive experience in Central Asia, the syndicated loan is fully underwritten. Joining the EBRD and the IFC in this transaction are five major commercial co-arrangers: ABN AMRO, Bayerische Landesbank, Credit Suisse First Boston, ING Barings and the Royal Bank of Canada Europe Limited. Their endorsement demonstrates the renewed interest in co-financing opportunities in the emerging markets of Central Asia.

The IFC fosters economic growth in the developing world by financing private sector investments, mobilising capital in the international financial markets, and providing technical assistance and advice to governments and businesses.

**Press contact:**
Axel Reiserer, Tel: +44 20 7338 7753; E-mail: reiserea@ebrd.com

Subscribe to press release email alerts

Related links

Kazakhstan homepage

Ispat-Karmet Steel Works (Mittal Steel Termitau "MST") [Project Summary Document]

Ispat-Karmet Steel Works (Mittal Steel Termitau "MST") [Environmental Impact Assessment]

Terms and conditions Sitemap Feedback